Dale C. Christensen, Jr. (DC4441)
Bruce G. Paulsen (BP9563)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004

Attorneys for Plaintiff Life Receivables Trust

JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL, 60611
John H. Mathias, Jr.
Robert T. Markowski
James T. Malysiak
 Of Counsel



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIFE RECEIVABLES TRUST,<br><br>     Plaintiff,<br><br>   - v. -<br><br>GOSHAWK SYNDICATE 102 at LLOYD'S,<br><br>     Defendant. | Civil Action No.  O 8  C V  3675 (LAK)<br><br><br>**COMPLAINT** |

   Plaintiff Life Receivables Trust, by its attorneys, Seward & Kissel LLP, for its

Complaint against Defendant Goshawk Syndicate 102 at Lloyd's ("Syndicate 102") alleges as

follows:

## NATURE OF ACTION

   1.  Life Receivables Trust ("LRT"), a Delaware statutory special purpose

business trust, hereby seeks (a) to enjoin an arbitration wrongfully commenced by the members

of Syndicate 102 on its behalf;[*] (b) to enforce the absolute, unconditional contractual obligations of Syndicate 102 to make payments long overdue to LRT for the benefit of its lender and investors; (c) to recover damages based upon Syndicate 102's payment defaults; and (d) declaratory relief to prevent further damages to its lender and investors resulting from Syndicate 102's misconduct.  Now in run-off, and having had its old management replaced for cause by a specialist agency appointed by Lloyd's, Syndicate 102 is reneging upon and disowning the cornerstone covenants unambiguously set forth in four contracts ("the CCI contracts") used to obtain the initial lender financing from which it was paid many millions of dollars in premiums.  These contractual payments were made, for example, upon Syndicate 102's express representation and acknowledgement:

> [That it] understood and agreed that the Lender is relying upon the **absolute and unconditional nature of the obligations** of the Underwriters [Syndicate 102] in entering into the Lending Transactions and providing financing thereunder.

Ex. 1, Tabs A, B, C and D at 17 (emphasis added).

2.     In pursuit of an aggressive run off strategy that seeks to avoid, if not eliminate its obligations, Syndicate 102 is now willfully frustrating the essential purpose of the CCI contracts, that is, to protect LRT's lender and investors by providing an absolute guaranty that (a) Syndicate 102 will pay amounts when due to LRT no unconditionally; and (b) if Syndicate 102 claims any basis to dispute its obligation to pay, its sole recourse is to seek indemnification from LRT's "Servicer" and "Originator," Life Settlement Corporation d/b/a Peachtree Life Settlements ("Peachtree").

---

[*]     The injunctive relief sought here also seeks to stay a pending arbitration commenced by LRT over two years ago and now scheduled for hearing in September 2008.

3.      LRT seeks a declaratory judgment pursuant to 28 U.S.C § 2201, *et seq*., that the Syndicate 102's obligation to pay LRT's claims is "absolute, unconditional and irrevocable" and not subject to any "defense of any kind."  *See* Ex. 1, Tabs A, B, C and D at 16.

4.      LRT also seeks preliminary and permanent injunctive relief barring as to LRT (a) an omnibus American Arbitration Association International Centre for Dispute Resolution ("ICDR") arbitration recently initiated by Syndicate 102's members against LRT and Peachtree contending that the CCI contracts should all be rescinded due to alleged fraud by entities other than LRT, the lender and investors (the "Rescission Arbitration"); and (b) an additional pending arbitration (Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's, ICDR No. 50-195-T-00372-05) (the "Wang Arbitration").  A copy of the Statement of Claim in the Rescission Arbitration, with exhibits, is attached hereto as Exhibit 1; a copy of the Statement of Claim in the Wang Arbitration, without exhibits, is attached hereto as Exhibit 2.

5.      Importantly, pursuant to the express terms of the CCI contracts,  the grant of adjudicative authority to the arbitrators is provisional rather than unconditional:

> 3.  The Arbitration Tribunal may in its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute; ***provided that*** the parties shall each retain the right to appeal errors of law to a court of law having jurisdiction of the matters addressed herein and, each party executing this Insurance hereby consents and agrees that the state or federal courts located in New York shall have exclusive jurisdiction to hear and determine any such matters.

Ex. 1, Tabs A, B, C and D at 23 (emphasis added).

6.      Significantly, on March 25, 2008, the United States Supreme Court by a majority opinion in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 2008 U.S. LEXIS 2911, 76 U.S.L.W. 4168 (Mar. 25, 2008), issued a ruling which has the effect of nullifying the provisional grant of adjudicative authority to an "Arbitration Tribunal" contained in the CCI contracts.

7.      LRT thus seeks preliminary and permanent injunctive relief enjoining, as to LRT, the Rescission Arbitration, commenced shortly after the rendition of *Hall Street Associates* on the grounds that (a) there is no agreement to arbitrate; (b) LRT did not agree to arbitrate any and all claims brought <u>against</u> it, as the parties agreed that Syndicate 102's obligation to pay LRT is absolute and incontestable; (c) Syndicate 102 agreed that its sole recourse is to bring indemnity claims against Peachtree as the Servicer and Originator of LRT; and (d) in any event, Syndicate 102 has failed to satisfy the following condition precedent to arbitration expressly set forth in the CCI contracts:

> [U]nder no circumstances [other than for reasons not applicable here] shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim as set forth in the section entitled Claim Procedures.

Ex. 1, Tabs A, B, C and D at 6.  The Wang Arbitration, in light of *Hall Street Associates*, should be stayed.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction of this action under 28 U.S.C. § 1332(a) on the ground that LRT is of diverse citizenship from Syndicate 102 and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in this district under 28 U.S.C. § 1391(a) because Syndicate 102 expressly agreed in the CCI contracts to submit to the personal jurisdiction and venue of the United States District Court for the Southern District of New York for any legal action arising out of or relating to the CCI contracts.  The parties to the CCI contracts agreed that legal actions relating to the CCI contracts may be brought in this court.

**THE PARTIES**

10.     LRT is a Delaware business trust.

11.     Upon information and belief, Syndicate 102 underwrote the CCI contracts under which LRT is the Assured.

12.     Upon information and belief, Goshawk Dedicated Ltd. and Kite Dedicated Ltd., are English limited liability corporations with their principal places of business in London, England, and are the sole members of Syndicate 102 for the 2000 and 2001-2003 years of account, respectively, during which the CCI contracts issued to LRT were underwritten.

**FACTUAL ALLEGATIONS**

**Background**

**A.     LRT's Investment Portfolio of Life Insurance Policies**

13.     LRT is a Delaware statutory trust formed under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 *et seq*.

14.     LRT owns a portfolio of life insurance policies originally purchased by Peachtree, a "life settlement provider," for LRT's account.  Peachtree has no financial interest in the LRT portfolio.  As the owner and beneficiary of the policies, LRT funds payment of the premiums and receives the insurance proceeds when the policies mature.

15.     LRT's beneficiaries and investors are the Lender defined in the CCI contracts (now Allied Irish Banks, plc) and non-lender investors who have an interest in any return realized by LRT's portfolio of life insurance policies after the Lender is fully paid.  The CCI contracts provide that the Lender is an additional Loss Payee and expressly state that:

> [T]he Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.

Ex. 1, Tabs A, B, C and D at 17.

**B.    Life Settlement Transactions**

16.    A "life settlement" transaction involves the purchase of a life insurance policy by a life settlement provider for more than the cash surrender value specified in the policy, but less than the face value of the life insurance policy.  The purchaser maintains the life insurance policy in force by paying the premiums and becomes entitled to the policy's proceeds on its maturity.

17.    Life settlement transactions benefit the life insureds by giving them the opportunity to receive more cash for their life insurance policies while they are alive than they would otherwise receive as the cash surrender value .

18.    A life settlement provider may purchase insurance policies for its account or to sell to investors.  The purchased policies may be structured into an asset-backed financing vehicle -- a bankruptcy remote special purpose vehicle -- in order to create a diversified portfolio, to reduce risk and to provide an income stream to investors.

19.    The potential yield on a life insurance policy investment depends on the specified life expectancy of the seller and other factors, such as the price paid for the policy, the amount of insurance proceeds, and the projected premium payments over the course of the seller's specified life expectancy.

20.    A Contingency Cost Insurance contract, also referred to as CCI contract, is used as a financial guarantee against the risk that the seller will live longer than expected.

**C.    The CCI Contracts**

21.    Beginning in 2000, Syndicate 102 issued the CCI contracts to provide a financial guarantee against the actuarial or longevity risk that a seller of a life insurance policy (referred to in the CCI contracts as a "Senior") might live two years beyond the specified life expectancy.  These polices are Contingency Insurance Policy No. CR010054, effective February

5, 2001 ("CCI Contract 054"); Contingency Insurance Policy No. CR010122, effective August 15, 2001("CCI Contract 122"); Contingency Insurance Policy No. CR020127, effective May 22, 2002 ("CCI Contract 127"); and Contingency Insurance Policy CR030057, effective March 17, 2003 ("CCI Contract 057"). Copies of CCI Contract 054, CCI Contract 122, CCI Contract 127 and CCI Contract 057 are attached as Exs. A, B, C and D, respectively, to the Statement of Claim, Ex. 1 hereto, and are cited by their letter designation hereafter.

22.      Syndicate 102 charged and collected some $8 million under these CCI contracts to hedge LRT's risk that a Senior might live two or more years beyond the specified life expectancy.

23.      Pursuant to each of the CCI contracts, Syndicate 102 agreed to pay LRT the Net Death Benefit ("NDB") of a life insurance policy on the agreed date (generally at the end of the Senior's estimated life expectancy plus two years) if the Senior was still living at that date, and Syndicate 102 would in turn acquire the underlying life insurance policy, including the right to the NDB, and have the obligation to pay premiums going forward. Upon the death of the Senior, Syndicate 102 itself would receive from the life insurance company the NDB that Syndicate 102 had paid LRT. Ex. 1, Tabs A, B, C and D at 7.

24.      The CCI contracts that LRT purchased from Syndicate 102 operate essentially as a financial guarantee or "put" of the NDB of the subject life insurance policies, ensuring that LRT will receive payment on those policies by a date certain, i.e., generally at the end of the Senior's specified life expectancy plus two years, even if the policies have not matured.

25.      The purpose of the CCI contracts issued to LRT is to guarantee an investment return to investors in LRT's portfolio of life insurance policies, based on receipt of the NDB from Syndicate 102 and the assumption by Syndicate 102 of the premium payments for

each life insurance policy in LRT's portfolio no later than the end of the Seniors' specified life expectancy plus two years, i.e., the Deferred Period.

26.     The terms and conditions of the CCI contracts are essentially identical.

27.     In accordance with the "Interest" section of the CCI contracts, Syndicate 102 agreed "[t]o indemnify the Assured in respect of the Net Death Benefit at the time of purchase by the Assured of each Qualified Life Insurance Policy . . . where the Senior is not deceased at the end of the Deferred Period." Ex. 1, Tabs A, B, C and D at 3.

28.     The CCI contracts are governed by the "internal laws of the State of New York." Ex. 1, Tabs A, B, C and D at 12.

29.     Under the CCI contracts, any life insurance policy proposed to be acquired by LRT is "deemed to be accepted for coverage under this Insurance" on execution and delivery by the Servicer (Peachtree) and the Back-Up Servicer (BNY Asset Solutions LLC) of a "Coverage Certification" in the form attached to the CCI contracts. *See* Ex. 1, Tabs A, B, C and D at 4.

30.     The CCI contracts provide that "[e]ach life insurance policy as to which a Coverage Certification shall have been delivered shall constitute a Qualified Life Insurance Policy hereunder without the need for any additional action of any party." *See* Ex. 1, Tabs A, B, C and D at 11.

31.     All payments due Syndicate 102 under the CCI contracts have been made.

**A.     Syndicate 102's "Unconditional" Obligation to Pay LRT's Claims**

32.     The "Recourse" section of the CCI contracts provides for Syndicate 102's "absolute, unconditional and irrevocable" obligation to pay LRT's claims. In relevant part, paragraph 2 of the Recourse section provides:

2.    *Obligations Unconditional*.    Subject only to the section entitled Contingency Insurance Premium below, [Syndicate 102] agree[s] that . . . **their obligation to pay the full and complete Net Death Benefit to the Assured [LRT] by payment into the Collection Account or to the Loss Payee** . . . (A) **is absolute, unconditional and irrevocable** . . . (C) **shall not be subject to any right of rescission, set-off, diminution or counterclaim or defense of any kind**, including without limitation (i) fraud or misrepresentation by any person or entity . . . (ii) any failure by . . . the Assured, the Servicer, the Back-Up Servicer or the Originator or any other person or entity . . . to comply with any covenant or agreement contained in this Insurance or the Servicing Agreement or in any other agreement or instrument or any applicable legal requirement, (iii) any breach of or inaccuracy in any representation, warranty, certification or statement made by the Assured, the Servicer, the Originator, the Back-Up Servicer . . . in this Insurance or the Servicing Agreement or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (iv) any negligence or misconduct by the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity . . . (vi) any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of [Syndicate 102] hereunder; **it being understood and agreed that the Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.**

*See* Ex 1., Tabs A, B, C and D at 16-17 (emphasis added).

**B.    Syndicate 102's "Sole and Exclusive Remedy"**

33.    Under the CCI contracts, Peachtree, as Servicer, makes certain representations and warranties as to each life insurance policy accepted by Syndicate 102 for contingency coverage, and is responsible for ensuring and certifying in a Coverage Certification that each such life insurance policy complies with the terms and conditions set forth in Appendix A-1 to the CCI contracts.  *See* Ex. 1, Tabs A, B, C and D at 4.

34.    Peachtree, as Servicer and Originator, is required under certain circumstances to indemnify Syndicate 102 against losses "in respect to any Qualified Life

Insurance Policy" as to which Syndicate 102 makes payment to LRT, if those losses result from LSC's breach of its representations, warranties or other obligations under the CCI contracts.

Paragraph 3 of the "Recourse" section provides in relevant part:

> 3.    *Servicer Indemnities.* . . **the Servicer and the Originator agree to indemnify [Syndicate 102] against losses in respect of any Qualified Life Insurance Policy as to which [Syndicate 102] make[s] payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein** that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy . . . .

*See* Ex. 1, Tabs A, B, C and D at 17 (emphasis added).

35.    Paragraph 5 of the Recourse section provides that Paragraph 3 of the Recourse section, cited above, is Syndicate 102's "**sole and exclusive remedy**" for "losses arising out of, in relation to or in connection with any and all" breaches of warranty, misrepresentation, or fraud in any document delivered in connection with the CCI contracts. *See* Ex. 1, Tabs A, B, C and D at 18 (emphasis added).

36.    Based on the foregoing contractual provisions, Syndicate 102 has no recourse against LRT, the Assured, for any losses caused by the wrongful conduct of Peachtree or any other person or entity in any way relating to the CCI contracts. In addition, Syndicate 102's obligation to pay LRT's claims for the NDB is "absolute, unconditional and irrevocable" and not subject to any "defense of any kind." *See* Ex. 1, Tabs A, B, C and D at 16.

**C.    There is No Agreement to Arbitrate**

37.    The arbitration provision of the CCI contracts provides, in relevant part:

> 1. All disputes and differences arising under or in connection with this Insurance shall be referred to arbitration under the American Arbitration Association Rules. The Arbitration Tribunal shall consist of three arbitrators, one to be appointed by the Claimant, one to be appointed by the Respondent and the third to be appointed by the two appointed arbitrators. The third member of

the Tribunal shall be appointed as soon as practicable (and no later than (i) three Business Days, in the case of a Claim Dispute, and (ii) 28 days, in all other cases) after the appointment of the two party-appointed arbitrators. The Tribunal shall be constituted upon the appointment of the third arbitrator.

\* \* \*

3.    The Arbitration Tribunal may in its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute; **provided that the parties shall each retain the right to appeal errors of law to a court of law having jurisdiction of the matters addressed herein** and, each party executing this Insurance hereby consents and agrees that the state or federal courts located in New York shall have exclusive jurisdiction to hear and determine any such matters. The Arbitration Tribunal shall have the widest discretion permitted under the law governing the arbitral procedure when making such orders or directions.

Ex. 1, Tabs A, B, C and D at 23 (emphasis added).

38.    The Supreme Court's recent decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 2008 U.S. LEXIS 2911, 76 U.S.L.W. 4168 (Mar. 25, 2008) nullifies the parties' right to appeal errors of law by the arbitrators to a court. The parties' provisional grant of power to the Arbitration Tribunal to enter the orders necessary "for the final determination of the matters in dispute" is expressly limited by the parties' retention of the right to obtain review by a court of errors of law. Consequently, in light of *Hall Street Associates*, the arbitration provision is ineffectual and a nullity.

**D.    Even if Syndicate 102 Had a Right to Arbitrate, It Is Required To Pay LRT as a Condition Precedent to Commencing Arbitration**

39.    As a condition precedent to bringing an arbitration, Syndicate 102 **must** pay LRT's claim. As the CCI contracts provide:

**[U]nder no circumstances** (other than for reasons set forth in clause (a) or (b) of the immediately preceding sentence) shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to

> arbitration **prior to payment of such Claim** as set forth in the
> section entitled Claim Procedures.

Ex. 1, Tabs A, B, C and D at 6 (emphasis added).  The "other reasons" referred to in the CCI

contracts are that, according to the issuing life insurance company, (a) the subject life insurance

policy is no longer in force or (b) the Assured (that is, LRT) is not the "owner of and beneficiary

under" the policy.  *Id.*  Those reasons do not apply to the Mecca, Walter or Goldreyer policies.

   40.  The parties have agreed to the right to litigate in, and to the broad

jurisdiction of, the federal and state courts located in New York City over any legal dispute

arising from these transactions:

> THIS CONTRACT SHALL BE GOVERNED BY, THE
> INTERNAL LAWS OF THE STATE OF NEW YORK, U.S.A.
> WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS
> PRINCIPLES THEREOF.  EACH PARTY . . . HEREBY
> IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR
> PROCEEDING ARISING OUT OF OR RELATING TO THIS
> INSURANCE OR ANY RELATED TRANSACTIONS MAY BE
> BROUGHT IN THE COURTS OF THE STATE OF NEW YORK
> LOCATED IN NEW YORK CITY OR OF THE UNITED
> STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF
> NEW YORK AND HERBY IRREVOCABLY SUBMITS TO
> THE PERSONAL JURISDICTION AND VENUE OF SUCH
> COURTS FOR THE PURPOSES THEREOF. . . .

Ex. 1, Tabs A, B, C and D at 12.

**The Life Insurance Policies at Issue**

**A.  LRT's Acquisition of the Walter Policy for its Investment Portfolio**

   41.  Hartford Life Insurance Companies issued Policy No. VL9310486, insuring

a Mr. Walter with a face value of $5,000,000 (the "Walter Policy"; the policy holders' first

names have been omitted for confidentiality purposes).

   42.  On October 31, 2000, the owner of the Walter Policy, entered into a certain

Purchase Agreement and Absolute Assignment of Life Insurance Policy, agreeing to sell the

Walter Policy to Peachtree (the "Walter Purchase Agreement").

43.     Prior to its sale of the Walter Policy to LRT, Peachtree requested American Viatical Services ("AVS"), a life evaluator designated and approved by Syndicate 102, to evaluate Walter's life expectancy in accordance with the "Qualified Consulting Physician" section of CCI Contract 054.  AVS set Walter's life expectancy at 48 months as of November 29, 2000.

44.     On January 17, 2001, Peachtree entered into a certain Assignment of Purchase Agreement, transferring to LRT "all of its rights, title and interest in and to" the Walter Purchase Agreement.

**B.      Syndicate 102's CCI Contract for the Walter Policy**

45.     The Walter Policy was declared to CCI Contract 054 for coverage.

46.     Both Peachtree, as Servicer, and BNY Asset Solutions LLC, as Back-Up Servicer, executed and caused to be delivered Coverage Certifications for the Walter Policy on or about February 2 and 7, respectively, 2001.

47.     In accordance with the "Interest" section of CCI Contract 054, Syndicate 102 agreed to indemnify LRT against the NDB of the Walter Policy if Walter was not deceased by November 29, 2006, the end of his specified 48-month life expectancy plus the Deferred Period of 24 months.  *See* Ex. 1, Tab A at 3.

48.     Based on 4% of the $5 million NDB of the Walter Policy, the Contingency Insurance Premium for the Walter Policy charged and collected by Syndicate 102 was $200,000.

**C.      Submission of LRT's Claim on the Walter Policy**

49.     The Deferred Period for the Walter Policy expired on November 29, 2006. Because Mr. Walter was not deceased at the end of the Deferred Period, LRT became entitled to submit a claim to Syndicate 102 under CCI Contract 054 for the $5,000,000 NDB of the Walter Policy (the "Walter Claim").

50.    By letter dated September 29, 2006, in accordance with the "Claim Adjustment Period" section of CCI Contract 054 (*see* Ex. 1, Tab A at 6), Peachtree, acting as Servicer and on behalf LRT, forwarded "Proposed Claim Documents" (as defined in CCI Contract 054) for the Walter Claim to Cavell Managing Agency Limited ("Cavell"), Syndicate 102's run off manager.

51.    Because the Walter Policy is in force and LRT is its owner and beneficiary, Syndicate 102 could not, and did not, exercise its right under the "Claim Adjustment Period" section of CCI Contract 054 (*see* Ex. 1, Tab A at 6) to dispute its obligation to pay the Walter Claim after it received the Proposed Claim Documents.

52.    By letter dated November 30, 2006, in accordance with the "Claim Procedures" section of CCI Contract 054 (*see* Ex. 1, Tab A at 6), Peachtree, acting as Servicer and on behalf of LRT, forwarded a "Claim Certification" (as defined in CCI Contract 054) for the Walter Claim to Cavell to substantiate the amount of loss claimed.

53.    In accordance with the "Claim Procedures" section of CCI Contract 054 (*see* Ex. 1, Tab A at 8), Syndicate 102 was required to pay LRT the NDB of the Walter Policy by December 21, 2006, the 15th Business Day after receipt of a Claim Certification for the Walter Claim.

**D.    Syndicate 102's Wrongful Refusal to Pay the Walter Claim**

54.    Notwithstanding Syndicate 102's "absolute, unconditional and irrevocable" obligation to pay LRT's claims under CCI Contract 054, Cavell, acting on behalf of Syndicate 102, wrongfully refused to pay the Walter Claim by letter dated January 2, 2007 to Peachtree.

55.    In refusing to pay for the Walter Claim, Syndicate 102 alleged that (a) the life expectancy set by AVS for Walter was false; (b) Peachtree, as Servicer, made misrepresentations as to the Walter Policy being a Qualified Life Insurance Policy under CCI

14

Contract 054; and (c) Peachtree failed to disclose AVS's alleged fraud or negligence in the setting of life expectancies.

56.     None of the reasons for Syndicate 102's refusal to pay the Walter Claim relieves Syndicate 102 of its "absolute, unconditional and irrevocable" obligation to pay LRT the NDB for the Walter Policy.  Moreover, Syndicate 102's obligation to pay the Walter Claim is not subject to any "defense of any kind."

57.     Mr. Walter died on or about December 12, 2007, about one year after the expiration of the Deferred Period on November 29, 2006, the date that triggered Syndicate 102's obligation to pay LRT the NDB under the Walter Policy.  Thus while Syndicate 102's practice of non-payment of LRT's claim submitted may have succeeded in obviating here the obligation to pay the NDB (although that NDB has not yet been received), LRT still has incurred damages, including, for example, premium payments to keep the Walter Policy in force after the expiration of the Deferred Period.  Syndicate 102 is now imposing still additional costs in requiring LRT to pursue its rights to payment of the Walter Claim.

**The Mecca Claim under CCI Contract 122**

**A.     LRT's Acquisition of the Mecca Policy for its Investment Portfolio**

58.     New York Life Insurance and Annuity Corporation issued Policy No. 62772790, insuring Mr. Mecca with a face value of $2,500,000 (the "Mecca Policy").

59.     On February 14, 2001, a court-appointed receiver and owner of the Mecca Policy entered into a certain Purchase Agreement and Absolute Assignment of Life Insurance Policy, agreeing to sell the Mecca Policy to Peachtree (the "Mecca Purchase Agreement").

60.     Prior to its sale of the Mecca Policy to LRT, Peachtree requested AVS, a life evaluator designated and approved by Syndicate 102, to evaluate Mecca's life expectancy in

accordance with the "Qualified Consulting Physician" section of CCI Contract 122. AVS set Mecca's life expectancy at 36 months as of September 10, 2001.

61.    On September 28, 2001, Peachtree executed a certain Assignment of Purchase Agreement, transferring to Life Receivables I, LLC for the benefit of LRT "all of its right, title and interest in" the Mecca Purchase Agreement.

**B.    The CCI Contract for the Mecca Policy**

62.    The Mecca Policy was declared for coverage under CCI Contract 122.

63.    Both Peachtree, as Servicer, and BNY Asset Solutions LLC, as Back-Up Servicer, executed and caused to be delivered Coverage Certifications for the Mecca Policy within the meaning of CCI Contract 122 on or about October 11 and 12, respectively, 2001.

64.    In accordance with the "Interest" section of CCI Contract 122, Syndicate 102 agreed to indemnify LRT against the NDB of the Mecca Policy if Mecca was not deceased by September 10, 2006, the end of his specified 36-month life expectancy plus the Deferred Period of 24 months. *See* Ex. 1, Tab B at 3.

65.    Based on 4% of the $2,500,000 NDB of the Mecca Policy, the Contingency Insurance Premium for the Mecca Policy charged and collected by Syndicate 102 was $100,000.

**C.    Submission of the Claim on the Mecca Policy**

66.    The Deferred Period for the Mecca Policy expired on September 10, 2006. Because Mr. Mecca was not deceased at the end of the Deferred Period, LRT became entitled to submit a claim to Syndicate 102 under CCI Contract 122 for the NDB of the Mecca Policy (the "Mecca Claim").

67.    By letter dated July 6, 2006, in accordance with the "Claim Adjustment Period" section of CCI Contract 122 (*see* Ex. 1, Tab B at 6), Peachtree, acting as Servicer and on behalf of LRT, forwarded "Proposed Claim Documents" (as defined in CCI Contract 122) for the

Mecca Claim to Cavell. Because the Mecca Policy is in force and LRT is its owner and beneficiary, Syndicate 102 could not, and did not, exercise its right under the "Claim Adjustment Period" section of CCI Contract 122 (*see* Ex. 1, Tab B at 6) to dispute its obligation to pay the Mecca Claim after it received the Proposed Claim Documents.

68.    By letter dated September 11, 2006, in accordance with the "Claim Procedures" section of CCI Contract 122 (*see* Ex. 1, Tab B at 6), Peachtree, acting as Servicer and on behalf of LRT, forwarded a "Claim Certification" (as defined in CCI Contract 122) for the Mecca Claim to Cavell to substantiate the amount of loss claimed.

69.    In accordance with the "Claim Procedures" section of CCI Contract 122 (*see* Ex. 1, Tab B at 8), Syndicate 102 was required to pay LRT the NDB of the Mecca Policy by October 2, 2006, the 15th Business Day after receipt of a Claim Certification for the Mecca Claim.

**D.    Syndicate 102's Wrongful Refusal to Pay for the Mecca Claim**

70.    Notwithstanding Syndicate 102's "absolute, unconditional and irrevocable" obligation to pay LRT's claims under CCI Contract 122, Cavell, acting on behalf of Syndicate 102, wrongfully refused to pay the Mecca Claim by letter dated December 15, 2006 to Peachtree.

71.    In refusing to pay the Mecca Claim, Syndicate 102 alleged that (a) the Mecca Policy is not a Qualified Life Insurance Policy under CCI Contract 122, (b) Peachtree, as Servicer, made misrepresentations as to the Mecca Policy being a Qualified Life Insurance Policy and (c) Peachtree failed to disclose AVS's alleged fraud or negligence in the setting of life expectancies.

72.    None of the reasons for Syndicate 102's denial of coverage for the Mecca Claim relieves Syndicate 102 of its "absolute, unconditional and irrevocable" obligation to pay

LRT the NDB for the Mecca Policy.  Moreover, Syndicate 102's obligation to pay the Mecca claim is not subject to any "defense of any kind."

**The Goldreyer Policy**

**A.    LRT's Acquisition of the Goldreyer Policy for its Investment Portfolio**

73.    On January 28, 1998, United of Omaha Life Insurance Company issued Policy BU1026235, a survivorship life policy on the lives of Mr. & Mrs. Goldreyer, with a face value of $2,552,375 (the "Goldreyer Policy").  The issuer of a survivorship life policy undertakes to pay the policy's NDB on the death of the second to die.

74.    On February 25, 2001, the Goldreyer 1998 Irrevocable Trust 2/5/98 entered into a certain Purchase Agreement and Absolute Assignment of Life Insurance Policy, agreeing to sell the Goldreyer Policy to Peachtree (the "Goldreyer Purchase Agreement").

75.    Prior to its sale of the Goldreyer Policy to LRT, Peachtree requested AVS, a life evaluator designated and approved by Syndicate 102, to evaluate the Goldreyers' life expectancy in accordance with the "Qualified Consulting Physician" section of CCI Contract 054.  AVS set the Goldreyers' life expectancy at 60 months as of February 9, 2001.

76.    Thereafter, Peachtree assigned for the benefit of LRT all of its right, title and interest in the Goldreyer Policy.

**B.    The CCI Contract for the Goldreyer Policy**

77.    The Goldreyer Policy was declared for coverage under CCI Contract 054.

78.    Both Peachtree, as Servicer, and BNY Asset Solutions LLC, as Back-Up Servicer, executed and cause to be delivered Coverage Certifications for the Goldreyer Policy within the meaning of CCI Contract 122.

79.    In accordance with the "Interest" section of CCI Contract 054, Syndicate 102 agreed to indemnify LRT against the NDB of the Goldreyer Policy if the Goldreyers were

not deceased by February 9, 2009, the end of their specified 60-month life expectancy plus the Deferred Period of 36 months. *See* Ex. 1, Tab B at 3.

80.    Based on 4% of the $2,552,375 NDB of the Goldreyer Policy, the Contingency Insurance Premium for the Goldreyer Policy charged and collected by Syndicate 102 was $102,095.00.

## C.    The Status Of The Goldreyer Potential Claim

81.    No claim has yet been made under CCI Contract 054 for the Goldreyer Policy.

82.    Notwithstanding Syndicate 102's "absolute, unconditional and irrevocable" obligation to pay LRT's claims under CCI Contract 054 when made, Syndicate 102 in the Rescission Arbitration seeks discharge from its absolute obligation to pay LRT with respect to the Goldreyer Policy.

83.    In the Rescission Arbitration, Syndicate 102 seeks to rescind its absolute obligation to pay LRT's claims on the Walter and Mecca Policies, and seeks to rescind its obligation to pay LRT's future claims, including the potential claim on the Goldreyer Policy, notwithstanding (a) the complete absence of any legitimate basis for its disclaimers of coverage, (b) the "absolute, irrevocable and unconditional" nature of its obligation to pay LRT's claims, (c) its express agreement not to make its obligation to pay LRT's claims subject to any "defense of any kind," and (d) its express agreement to limit its recourse for any losses solely against Peachtree.

## The Wang Claim and Ensuing Arbitration

84.    Nearly three years ago, on September 14, 2005, LRT commenced an arbitration against Syndicate 102 before the ICDR, captioned Life Receivables Trust against Goshawk Syndicate 102 at Lloyd's, ICDR No. 50 195 T 00372 05 (the "Wang Arbitration").

19

85.    Under CCI Contract 054, Syndicate 102 was obligated to pay LRT

$5,012,975 in NDBs under two life insurance policies covering Mr. Wang at the expiration of the

Deferred Period.  On July 20, 2005, LRT submitted its claims on the Wang Policies to Syndicate

102.  Despite Syndicate 102's absolute and unconditional obligation to pay these claims, it

denied them and failed to pay LRT the NDBs for the two Wang Policies.  The Wang Arbitration

is still pending before the ICDR.  In fact, Syndicate 102 has succeeded in prolonging the Wang

Arbitration for over 2 ½ years by many means, including extraordinary discovery relating to

issues that have nothing to do with its obligations to pay LRT's claims on the Wang Policies,

thereby imposing substantial additional expense and burden on LRT.

86.    Mr. Wang died in 2006, and the life insurer paid LRT the NDBs for the

Wang Policies.  Syndicate 102, however, has not paid LRT's damages for breach of the CCI

contract, *i.e.,* the premiums paid by LRT to keep the Wang Policies in force (despite Syndicate

102's breach of its obligation to pay those premiums), LRT's loss of income, and other elements

of damage.

87.    Expert reports in the Wang Arbitration are due on April 30, 2008.  In

addition, Deposition discovery in the Wang arbitration has not yet taken place and is scheduled

to commence in May 2008, with a hearing on the merits scheduled for September 2008.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment)

88.    LRT reavers and incorporates herein by reference paragraphs 1 through 87.

89.    A case or actual controversy exists between LRT and Syndicate 102 as to (a)

whether the Recourse section of the CCI contracts precludes Syndicate 102 from asserting in an

arbitral or civil proceeding any defense to coverage of any kind, including any defense based on

any alleged fraud or misrepresentation by any person or entity and (b) whether Syndicate 102

can submit to arbitration any dispute as to its obligation to pay LRT's claims prior to paying LRT's claims and (c) whether Syndicate 102's sole and exclusive remedy for any losses is against the Servicer (Peachtree).

90.    By reason of the foregoing, LRT is entitled to a declaration pursuant to 28 U.S.C. § 2201, *et seq*., that the Recourse section of the CCI contracts precludes Syndicate 102 from asserting against LRT or any beneficiary of LRT in any arbitral or civil proceeding, any defense to coverage of any kind (other than (a) according to the issuing insurance company, such life insurance policy is no longer in force or (b) according to the issuing insurance company, LRT is not the owner of and beneficiary under such policy), including any defense based on any alleged fraud or misrepresentation by any person or entity.

91.    By reason of the foregoing LRT is also entitled to a declaration that Syndicate 102 may not submit any dispute to arbitration unless it first pays LRT's claims under the CCI contracts.

92.    By reason of the foregoing LRT is also entitled to a declaration that Syndicate 102's sole and exclusive remedy pursuant to paragraph 5 of the CCI contracts for any and all losses arising out of, in relation to or in connection with any and all breaches of warranty, misrepresentation or fraud is against the Servicer (Peachtree).

93.    A case or actual controversy exists between LRT and Syndicate 102 as to (a) whether the claims or defenses to payment asserted by Syndicate 102 in the Rescission Arbitration and the Wang Arbitration are arbitrable as to LRT and (b) whether the arbitration provision in the CCI contracts is ineffectual and a nullity after *Hall Street Associates*.

94.    By reason of the foregoing, LRT is entitled to a further declaration that none of the claims or defenses to payment of LRT's claims raised in the Rescission Arbitration or the Wang Arbitration are arbitrable as to LRT.

21

95.     LRT is further entitled to a declaration pursuant to 28 U.S.C. § 2201, *et seq.*, that the arbitration provision in the CCI contracts is ineffectual and a nullity under the Supreme Court's holding in *Hall Street Associates*.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract: Damages for
### Syndicate 102's Failure to Pay the Walter Claim)

96.     LRT reavers and incorporates herein by reference paragraphs 1 through 95.

97.     LRT has complied with any and all conditions precedent to coverage and contractual obligations to payment under CCI Contract 054.

98.     Syndicate 102 is obligated under CCI Contract 054 to pay the Walter Claim.

99.     By refusing to pay the Walter Claim, Syndicate 102 has materially breached its contractual obligations under CCI Contract 054.

100.    As a result of Syndicate 102's material breach of its contractual obligations under CCI Contract 054, LRT has suffered damages, including but not limited to (a) the amount of $5,000,000 constituting the NDB of the Walter Policy, (b) loss of income on the NDB of the Walter Policy from December 21, 2006, the date on which Syndicate 102's payment of the NDB of the Walter Policy was due under CCI Contract 054, and (c) the amount of premiums paid by LRT to maintain the Walter Policy in force since December 21, 2006, plus all interest and other costs.

101.    By reason of the foregoing, LRT is entitled to judgment against Syndicate 102 in an amount to be demonstrated at trial.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract: Damages for
### Syndicate 102's Failure to Pay the Mecca Claim)

102.    LRT reavers and incorporates herein by reference paragraphs 1 through 101.

103.    LRT has complied with any and all conditions precedent to coverage and contractual obligations to payment of the Mecca Claim under CCI Contract 122.

104.    Syndicate 102 is obligated under CCI Contract 122 to pay the Mecca Claim.

105.    By refusing to pay the Mecca Claim, Syndicate 102 has materially breached its contractual obligations under CCI Contract 122.

106.    As a result of Syndicate 102's material breach of its contractual obligations under CCI Contract 122, LRT has suffered damages, including but not limited to (a) the amount of $2,500,000 constituting the NDB of the Mecca Policy, (b) loss of income on the NDB of the Mecca Policy from October 2, 2006, the date on which Syndicate 102's payment of the NDB of the Mecca Policy was due under CCI Contract 122, and (c) the amount of premiums paid by LRT to maintain the Mecca Policy in force since October 2, 2006, plus all interest and other costs.

107.    By reason of the foregoing, LRT is entitled to judgment against Syndicate 102 in an amount to be demonstrated at trial.

## FOURTH CLAIM FOR RELIEF

### (Preliminary and Permanent Injunction
### of the Rescission Arbitration)

108.    LRT reavers and incorporates herein by reference paragraphs 1 through 95.

109.    As a first ground to enjoin the Rescission Arbitration, there is no agreement to arbitrate in light of the decision by the United States Supreme Court in *Hall Street Associates*, which has nullified the fundamental limitation on the authority provisionally granted to the

arbitration tribunal by rendering ineffectual the parties' specified right in the CCI contracts to appeal the arbitrators' errors of law to a court.

110.    As a second ground for enjoining the Rescission Arbitration as to LRT, the parties did not agree to the arbitration of Syndicate 102's claims in the Rescission Arbitration for rescission of its obligations to LRT under the CCI contracts or for damages.

111.    Under the CCI contracts, Syndicate 102's obligation to pay on these claims is "**absolute, unconditional and irrevocable**," not subject to any right of **rescission**, set-off, diminution or counterclaim or defense of any kind," (emphasis supplied) including for "fraud or misrepresentation by any person or entity" or failure to comply with any covenant or "breach of or inaccuracy in any representation, warranty, certification or statement."  Ex. 1 at Tabs A, B, C and D at 16.

112.    Because the CCI contracts eliminate any right of Syndicate 102 to assert claims of rescission of its obligations to LRT under the CCI contracts or for damages (which if brought in any court of law would be deemed frivolous), Syndicate 102's claims for rescission and damages are a nullity.  LRT has not agreed to the arbitration of these (or any future, similar) claims; they are outside the scope of the parties' arbitration agreement.

113.    As a third ground to enjoin the Rescission Arbitration, the "pay first, argue later" clause of the CCI contracts (para. 39, *supra*) restricts Syndicate 102's ability to submit disputes to arbitration by providing in relevant part that "**under no circumstances** . . .  shall [Syndicate 102] be entitled to submit any dispute as to [Syndicate 102's] obligation to pay a Claim under this Insurance to arbitration **prior to payment of such Claim** as set forth in the section entitled Claim Procedures."  *See* Ex. 1 at Tabs. A, B, C and D at 6 (emphasis added). The requirement of payment is a condition precedent to Syndicate 102's commencement of any arbitration.

114.    Notwithstanding the foregoing contractual restriction and its unjustified refusal to pay the Walter and Mecca Claims, Syndicate 102 has wrongfully attempted to submit to arbitration the dispute as to its obligation to pay the Walter and the Mecca Claims, and future claims by LRT.

115.    LRT has no adequate remedy at law and will be irreparably harmed if it is forced to arbitrate these legally nonexistent claims by Syndicate 102 for rescission and damages under an ineffectual arbitration provision.

116.    By reason of the foregoing, LRT is entitled to preliminary and permanent injunctive relief enjoining the Rescission Arbitration as against LRT pursuant to the Federal Arbitration Act and CPLR Article 75.

## FIFTH CLAIM FOR RELIEF

### (Preliminary and Permanent Injunction
### of the Wang Arbitration)

117.    LRT reavers and incorporates herein by reference paragraphs 1 through 95 and 108 through 116.

118.    There is no agreement to arbitrate in light of the decision by the United States Supreme Court in *Hall Street Associates*, which has nullified the fundamental limitation of the authority provisionally granted to the arbitration tribunal by rendering ineffectual the parties' specified right in the CCI contracts to appeal the arbitrators' errors of law to a court.

119.    LRT has no adequate remedy as law and will be irreparably harmed if forced to continue to participate in the Wang Arbitration.

120.    By reason of the foregoing, as well as for other reasons stated in the Fourth Claim for Relief herein, LRT is entitled to preliminary and permanent injunctive relief staying

proceedings in the Wang Arbitration as against LRT pursuant to the Federal Arbitration Act and

CPLR Article 75.

## PRAYER FOR RELIEF

WHEREFORE, LRT respectfully requests judgment against Syndicate 102:

(a)    On the First Claim for Relief, declaring (i) that the Recourse section of the

CCI contracts precludes Syndicate 102 from asserting in an arbitral or civil proceeding any

defense to coverage of any kind, including any defense based on any alleged fraud or

misrepresentation by any person or entity; (ii) that syndicate 102 may not submit any dispute to

arbitration as to its obligation to pay LRT's claims without first paying LRT's claims, (iii) that

Syndicate 102's sole and exclusive remedy for any and all losses arising out of, in relation to or

in connection with any and all breaches of warranty, misrepresentation or fraud is against

Peachtree; (iv) that the claims and defenses to payment of LRT' claims raised by Syndicate 102

in the Rescission Arbitration and the Wang Arbitration are not arbitrable as to LRT and

(v) declaring that the arbitration provision in the CCI contracts is ineffectual and a nullity;

(b)    On the Second Claim for Relief, awarding (i) compensatory damages in

the amount of $5,000,000, the NDB of the Walter Policy payable under CCI Contract 054,

(ii) compensatory damages for loss of income on the NDB of the Walter Policy as of December

21, 2006, the date on which Syndicate 102's payment of the NDB of the Walter Policy was due

under CCI Contract 054 and (iii) compensatory damages in an amount equal to premiums paid to

maintain the Walter Policy since December 21, 2006, together with all interest and other costs;

(c)    On the Third Claim for Relief, awarding (i) compensatory damages in the

amount of $2,500,000, the NDB of the Mecca Policy payable under CCI Contract 122,

(ii) compensatory damages for loss of income on the NDB of the Mecca Policy as of October 2,

2006, the date on which Syndicate 102's payment of the NDB for the Mecca Policy was due

under CCI Contract 122, and (iii) compensatory damages in an amount equal to any premiums paid to maintain the Mecca Policy since October 2, 2006, together with all interest and other costs;

(d)     On the Fourth Claim for Relief, preliminarily and permanently enjoining the Rescission Arbitration;

(e)     On the Fifth Claim of Relief, preliminarily and permanently enjoining the Wang Arbitration;

(f)     Awarding the attorneys' fees, costs and disbursements incurred in this action by LRT; and

(g)    Awarding such other and further relief as the Court deems just and proper.

New York, New York.
April 16, 2008

SEWARD & KISSEL LLP

Dale C. Christensen, Jr. (DC4441)
Bruce G. Paulsen (BP9563)
One Battery Park Plaza
New York, New York 10004
(212) 574-1200

*Attorneys for Plaintiff Life Receivables Trust*

Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL, 60611
John H. Mathias, Jr.
Robert T. Markowski
James T. Malysiak
      *Of Counsel*

SK 23236 0002 871903

EXHIBIT 1

TAB A-B

AMERICAN ARBITRATION ASSOCIATION
INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
---------------------------------------------------------------X

In the Matter of the Arbitration Between        :       ICDR No. _____
                                                :
GOSHAWK DEDICATED LIMITED, as sole              :
Member of Syndicate 102 at Lloyd's for the 2000 :
Year of Account, and KITE DEDICATED             :
LIMITED, f/k/a Goshawk Dedicated (No. 2)        :
Limited, as sole Member of Syndicate 102 at     :
Lloyd's for the 2001-2003 Years of Account,     :
                                                :
                    Claimants,                  :
                                                :
        -and-                                   :
                                                :
LIFE RECEIVABLES TRUST and                      :
LIFE SETTLEMENT CORPORATION,                    :
d/b/a Peachtree Life Settlements,               :
                                                :
                    Respondents.                :
                                                :
---------------------------------------------------------------X

## STATEMENT OF CLAIM

Claimants Goshawk Dedicated Limited, as sole Member of Syndicate 102 at

Lloyd's for the 2000 Year of Account, and Kite Dedicated Limited (f/k/a Goshawk Dedicated

(No. 2) Limited) as the sole Member of Syndicate 102 at Lloyd's for the 2001-2003 Years of

Account (together, "Syndicate 102"), by their attorneys Barger & Wolen LLP, respectfully

submit this Statement of Claim against Respondent Life Receivables Trust ("LRT"), and its

mutual agent, creator, and alter ego, Respondent Life Settlement Corporation d/b/a Peachtree

Life Settlements ("LSC/Peachtree").

#### The LRT CCI Program.

1. During the relevant period, LSC/Peachtree was a settlement provider. As such, it was engaged in the business of buying in the secondary market, for its own account and for the account of LRT, life insurance policies issued on the lives of terminally ill insureds ("viatical settlements") or the elderly ("life settlements"). The insured seller is called a "Viator" if he or she has a terminal illness and a "Senior" if he or she is of advanced age. Hereinafter, persons who are insureds on life policies sold into the secondary market, whether by a viatical settlement or a life settlement, are referred to as "life insureds."

2. A settlement provider buys each life insurance policy at a price that is discounted from the policy's face value to reflect various factors, particularly the settlement provider's estimate of the life insured's life expectancy and future premiums required to keep the life policy in force. Upon purchase, the life insured is immediately paid the agreed upon purchase price. The settlement provider then becomes the new policy owner and beneficiary on the life policy.

3. After the purchase of the life policy, the settlement provider or its assignee continues to pay the premiums to keep the policy in force until the life insured dies. When the life insured dies, the settlement provider or its assignee receives the net death benefit ("NDB") of the life insurance policy (which is usually the face value of the policy minus any policy loans), thereby realizing a profit (or loss) in the difference between the NDB of the policy and the settlement provider's costs, (chiefly the amount it paid to the original owner, the life insurance premiums it has paid to keep the policy in force, and various commissions and fees).

2

4. Settlement providers hire medical evaluators to perform a life expectancy ("LE") evaluation of a life insured. To determine the LE, medical evaluators use the life insured's medical records, which they undertake to assess by actuarial methods and medical evaluation independently of influence by the settlement provider.

5. The financial risk to the settlement provider or its assignee lies in the possibility that the life insured will live substantially beyond her or his LE. Purportedly to hedge this risk, LSC/Peachtree procured Contingency Cost Insurance ("CCI") for its assignee, LRT, through its brokers, Lester Kalmanson Agency LLC ("Kalmanson") and Tyser Special Risks Limited ("Tyser"). Beginning in September 2000, Syndicate 102 issued the CCI to LRT as a single insurance program consisting of four tranches: (a) CR010054; (b) CR010122; (c) CR020127; and (d) CR030057 (collectively referred to hereinafter as the "CCI" or "CCI Program") (Exs. A-D).[1]

6. Syndicate 102 understood and intended the CCI Program to cover the risk of aberrational life over-run on every qualified life policy bought by LSC/Peachtree for the benefit of LRT. Specifically, the CCI Program covered the contingency that one or more of the life insureds would live more than two years beyond the LE (*i.e.*, LE + 2 years = trigger date). If the life insured was still alive two years after his or her LE, Syndicate 102 undertook to pay to LRT the NDB of the life insurance policy, provided that LRT complied in all respects with the terms

---

[1] The four policies and an earlier policy that was cancelled *ab initio* were described by LSC/Peachtree and Tyser as "tranches," *i.e.*, portions of the whole, and were substantively the same from tranche to tranche, differing primarily by date, limits and the individual life insurance policies declared to them, but continuing in series. Policy CR010054 covered the period of September 20, 2000 through January 15, 2002, with a $5 million limit on any one life insured and $50 million in aggregate limits. Policies CR010122, CR020127, and CR030057 follow in succession, each one incepting after the termination date or the aggregate limits were reached on its predecessor.

3

of the CCI. Beneficial ownership of that life policy and the necessity of paying premiums to keep it in force would then pass to Syndicate 102.

7. LSC/Peachtree, through an affiliate, formed LRT as a Delaware business trust, in June 2000 to be its alter ego and assignee for all of the life policies declared to the CCI Program. LSC/Peachtree created LRT as a special purpose vehicle, which LSC/Peachtree used to carry on parts of LSC/Peachtree's business operations, including to be the recipient of third-party financing for purchasing the life insurance policy portfolio, and to be the holder of the purchased life polices and other assets, including the CCI.

8. LSC/Peachtree set LRT up as a passive entity with no employees to function in a manner "consistent with its nominee status." Having been so created, everything LRT "did" in terms of its business operations was in fact done for it by its creator, alter ego and doppelgänger, LSC/Peachtree. Thus, acting through its alter ego LSC/Peachtree, LRT performed the following critical tasks:

a)   LSC/Peachtree acted for LRT in "originating" (*i.e.*, negotiating for and purchasing) the life policies for the portfolio;

b)   LSC/Peachtree acted for LRT in obtaining the medical records of the original life insureds upon which the LEs were prepared;

c)   LSC/Peachtree acted for LRT in both hiring the Life Evaluators who produced the LEs on the original insureds under the purchased life policies and communicating with the Life Evaluators concerning the LEs;

d)   LSC/Peachtree acted for LRT, along with its broker Tyser, negotiating the CCI Program and procuring the CCI Policies from Syndicate 102; and

e)   LSC/Peachtree acted for LRT in preparing and supplying (through Tyser) to Syndicate 102 the bordereaux by which each LE was incorporated into, and became a term of, the CCI Policies.

4

**The Goldreyer Life Policy**

9. Among the life policies that LSC/Peachtree bought on behalf of LRT was a $2.5M survivorship life policy on the lives of Alfred Goldreyer and Janette Goldreyer (the "Goldreyer Policy").[2] *See* Endorsement No. 1 to CCI Policy CR010054 (Ex. A). To produce nearly all of the LEs for life policies to be declared to the CCI policies, including the LEs of Mr. and Mrs. Goldreyer, LSC/Peachtree selected and hired American Viatical Services, LLC ("AVS"). In February 2001 AVS provided LSC/Peachtree with Mortality Profiles for the Goldreyers, which gave both Mr. and Mr. Goldreyer LEs of 60 months. *See* the February 9, 2001 AVS Mortality Profiles of Mr. and Mrs. Goldreyer (Ex. E). As discussed below, these 60-month LEs provided by LSC/Peachtree from AVS were known and intended by LSC/Peachtree to be false.

**LEs Provided For the Goldreyers.**

10. Mr. and Mrs. Goldreyer continue to live today, some 85 months after AVS's issuance of the February 2001 Mortality Profiles containing the 60-month LEs.

11. As a single occurrence, Mr. and Mrs. Goldreyer's living more than two years beyond their 60-month LEs might have little statistical significance. In fact, however, the experience on Mr. and Mrs. Goldreyer's LEs is part of a pattern with arresting significance. Syndicate 102 has engaged a professional actuary to compare the numbers of observed maturities in the entire LRT portfolio at June 30, 2006, with expected maturities, that latter figure being based on the LEs that LRT, through LSC/Peachtree, provided to Syndicate 102. The actuary's

---

[2]     The issuer of a survivorship life policy undertakes to pay the policy's net death benefit on the death of the second to die.

5

analysis concluded that the probability of achieving the observed results given the initial expected LEs is minute—the odds are less than 1 in 1.7 billion.

12. That extraordinary incongruity between expected mortality and actual experience is evidence that the LEs incorporated into LRT's CCI policies by LSC/Peachtree's bordereaux are fundamentally and profoundly distorted. The observed differences cannot be explained by statistical fluctuations in the actual results versus initial assumptions. Instead, this extraordinary incongruity evidences a gross and telling misstatement of the original LEs.

13. LSC/Peachtree had various options for Life Evaluators it would hire on behalf of LRT, and chose AVS to provide the LEs on Mr. and Mrs. Goldreyer for use in declaring the Goldreyer Policy to the CCI Program. The accuracy of the LEs and the independence and integrity of their development were highly material, indeed critical, since they provided the basis for the insurance risk. Nevertheless, at the behest of LSC/Peachtree, AVS provided accommodating LEs for Mr. and Mrs. Goldreyer in particular and for LRT's life insurance policy portfolio in general. Those LEs were false, as such, misrepresentations.

14. LSC/Peachtree (and hence LRT) was well aware when it hired AVS to provide LEs that it could be relied upon to produce short LEs. In June 2000, LSC/Peachtree retained Richard Bergstrom of actuaries Milliman & Robertson ("Bergstrom") to conduct an audit of the LEs previously prepared by AVS for LSC/Peachtree. LSC/Peachtree advised Bergstrom that it was negotiating for CCI coverage from Syndicate 102. Bergstrom alerted LSC/Peachtree in July 2000, before Syndicate 102 issued the first tranche of the CCI, that the AVS LEs he had audited were materially short and commented on the effect that would have on the CCI insurer. Specifically, Bergstrom wrote "[O]f the 39 policies we could evaluate, my

average calculated LE was 93 months and those from AVS and [Navisys] were averaged 74 months, not an insignificant difference, especially when your reinsurance contract kicks in at LE + 2 years!!". In assessing AVS' LEs as short, Bergstrom measured them against a "most probable" standard, rather than the "85% Confidence Level" standard touted by AVS.[3]

15. Neither LSC/Peachtree nor LRT disclosed to the Syndicate during the drafting of the CCI or thereafter that AVS' LEs were substantially short. Indeed, LSC/Peachtree appears to have made a decision not to tell the Syndicate Underwriters what LSC/Peachtree had learned from Bergstrom about AVS's LE. This is evident from LSC/Peachtree having inserted into the CCI Slip Wording's section establishing LSC/Peachtree's full disclosure obligations a proviso that, "[I]t shall not be required to * * * * disclose any of its own internal or separately obtained analyses or projections or other actuarial information * * *". When LSC/Peachtree first purchased the CCI for LRT in September 2000, LSC/Peachtree (and hence LRT) therefore knew that AVS, far from producing conservative LEs at the "85% Confidence Level" expected by the Syndicate, could in fact be relied upon to produce short LEs.

## Complicity of LRT and LSC/Peachtree in the Bogus Goldreyer LE.

16. Only LRT benefits from artificially shortened LEs, as the LE of the life insured is the key determinant of whether and when LRT's life overrun risk stops and is converted into an insured loss to Syndicate 102. The shorter the LE, the more quickly LRT can obtain under the CCI Program the life policy's full net death benefit and stop paying premiums on that life policy.

---

[3]    An LE projected on a "most probable" basis is one set at the point when approximately half of a population of similarly impaired individuals would be expected to die before the LE and the other half beyond the LE. AVS' declared standard was different. It represented that it projected the LE for each subject life insured at the point when 85% of similarly situated individuals were expected to have died.

7

17. With respect to the Goldreyers, LSC/Peachtree wanted even shorter LEs than what it knew AVS would provide. Rather than reflecting the Goldreyers' medical condition and their true life expectancy in light thereof, their 60-month LEs were made to order by AVS to accommodate the financial objectives of LRT and LSC/Peachtree.

18. LSC/Peachtree had developed a model for the life policies it purchased or considered for purchase. The model enabled LSC/Peachtree to assess, among other things, how long it/LRT could maintain a given life policy in force without expending their own funds for life insurance premiums. The key to achieving this was by using the life policy's cash surrender value ("CSV") to pay premiums until a claim could be made on the CCI, *i.e.,* until LE + 2 years. Success in this regard was critical to LSC/Peachtree's cash flow projections. When LSC/Peachtree acquired the Goldreyer life policy, that policy had a substantial CSV.

19. On January 16, 2001, LSC/Peachtree provided its model for Mr. Goldreyer to Policy Funding, a company that regularly assisted LSC/Peachtree in its life settlement business. LSC/Peachtree told Policy Funding that it needed a 72-month LE for Mr. Goldreyer to "beat the CSV", and LSC/Peachtree's model showed that a 60-month LE would be even more likely to achieve that result. Policy Funding replied to LSC/Peachtree on January 22, 2001, that LSC/Peachtree should re-run its model using as an LE for Mr. Goldreyer 60, 54 and 48 months, stating "Our doctor is working on this with AVS today to get the husband's LE down and the wife's." On January 16, 2001, AVS had projected Mr. Goldreyer's LE at 72 months, but upon being contacted by the individual that Policy Funding had referred to as "Our doctor", AVS reduced that LE to 60 months. Indeed, AVS further accommodated LSC/Peachtree by providing LEs of 60 months for both Goldreyers, thus projecting their simultaneous deaths to occur on February 9, 2008.

8

20. Knowing that AVS could be relied upon to produce short LEs generally, and knowing the LEs for the Goldreyers had been engineered to fit its model for paying premiums from CSV and to serve its cash flow needs, LSC/Peachtree (and thus LRT) declared the Goldreyers policy to the CCI with LEs of 60 months. That declaration was made by a bordereaux and endorsement that effectively incorporated the bogus LEs as a term of the CCI. In making that declaration, LSC/Peachtree (and therefore LRT) committed insurance fraud because the declaration was false, was known by LSC/Peachtree (and thus LRT) to be false, and was intended by LSC/Peachtree (and thus LRT) to be relied upon by Syndicate 102. Syndicate 102 reasonably relied on LSC/Peachtree's declaration by agreeing to incorporate the Goldreyers' LEs into the CCI.

21. AVS reduced the Goldreyer LEs under the influence of LSC/Peachtree acting on behalf of LRT, including by inducing AVS not to follow AVS' declared standard operating procedure of projecting at the 85% confidence level. In accommodating LSC/Peachtree in this manner, AVS committed insurance fraud.

22. LSC/Peachtree's misrepresentation to Syndicate 102 of Mr. and Mrs. Goldreyer's life expectancies and its failure to disclose to Syndicate 102 the degree to which LSC/Peachtree had influenced the development and length of the Goldreyer LEs were material to the underwriting process and, indeed, went to the most critical element of the CCI Program arranged by LSC/Peachtree for the benefit of LRT.

23. The LSC/Peachtree-AVS collaboration in fabricating the Goldreyers LEs reveals the blueprint for their relationship. Viewed even in isolation, the fixing of the Goldreyer

9

LE between AVS and LSC/Peachtree is an act of utter dishonesty. Such dishonesty is
antithetical to the relationship of trust and confidence between assured and insurer.

**Effect of Misrepresentations by LRT and LSC/Peachtree.**

24. LRT, through LSC/Peachtree, breached its fundamental obligations with
respect to the CCI. Insurance by its very nature is a contract founded on trust and the insurers
reliance on the honesty of the insured in disclosing all facts material to the risk to be insured.
LRT, through its alter ego LSC Peachtree, violated the trust and confidence reposed by Syndicate
102 in LRT and LSC/Peachtree. It deprived Syndicate 102 of the very essence of what it
bargained for, and it defeated the declared object of the parties in entering into the CCI Program,
namely to provide insurance against the risk of life insureds living past their bona fide LEs. As
such, the fraudulent conduct and dishonesty of LSC/Peachtree (and thus LRT) discharges
Syndicate 102 from all further obligations under the CCI Program. Syndicate 102 hereby tenders
return of all premium received from LRT under the CCI Program unless the Panel determines
that premium need not be returned.

25.     LRT and LSC/Peachtree concealed the fraud described in this Statement
of Claim.

**LSC/Peachtree's Undertakings, Representations and Warranties.**

26. LSC/Peachtree is a party to the CCI, with its own undertakings, warranties
and representations. (Exs. A-D) LSC/Peachtree represented and warranted in the CCI that,
having diligently made inquiry, it would truthfully declare to syndicate 102 all material facts
known to it which would influence a reasonable Underwriter in determining: (a) whether or not
to accept the risk; (b) the premium; (c) the conditions, exclusions and limitations. *(See,* '054

10

Policy p. 4 [Ex. A]). Subsumed within this and other provisions in the CCI Policies was a representation by LSC/Peachtree that it would not knowingly provide false or misleading LEs to Syndicate 102 for the benefit of LRT. LSC/Peachtree did provide false LEs to Syndicate 102 and hid from Syndicate 102 the fact that it had influenced the LEs generated by AVS. LSC/Peachtree thereby breached those undertakings, representations, and warranties.

27. LSC/Peachtree breached the representations and warranties it had made to Syndicate 102 by, among other things, i) failing to disclose what it had learned from Bergstrom regarding the AVS LEs being short, ii) failing to disclose that AVS was not an independent evaluator of life expectancy, but was influenced by LSC/Peachtree in developing LEs for LRT, iii) failing to disclose that it had influenced the LEs generated by AVS on the Goldreyers and other life insureds whose policies LSC/Peachtree had purchased and declared to the CCI, and iv) deceitfully and dishonestly misrepresenting to Syndicate 102 the life expectancies of life insureds whose policies LSC/Peachtree and LRT declared to CCI.

## Further Examples of Misrepresentation: Mecca and Walter

### The Mecca Claim.

28. Another life policy acquired by LSC/Peachtree on behalf of LRT was that on the life of Peter Mecca issued by New York Life Insurance and Annuity Corporation with a face value of $2,500,000 (the "Mecca Policy"). The Mecca Policy was declared by LSC/Peachtree in the second tranche of the CCI Program, Policy No. CR010122 (the "'122 Policy"), as a "Qualified Life Insurance Policy" on October 11, 2001. By certifying that the Mecca Policy was a "Qualified Life Insurance Policy" under the CCI Program, LSC/Peachtree represented to Syndicate 102 that "any applicable Contestability Period [had] expired," and that the LE of

11

Mecca was "not less than 36 months." *See* pp. 9-10 of '122 Policy (Ex. B). LSC/Peachtree made that representation on behalf of and for the benefit of its alter ego, LRT.

29. On or about September 11, 2006, LSC/Peachtree made a claim on behalf of LRT under the '122 Policy in respect of the Mecca Policy, advising that Mr. Mecca was still living five years after AVS' issuance of its 36-month LE for Mr. Mecca.

30. Despite LSC/Peachtree's representations, the Contestability Period on the Mecca Policy had not expired at the time the Mecca Policy was declared to the CCI Program. Indeed, the "Verification of Coverage for Individual Policies," dated October 23, 2006 and signed by New York Life Insurance & Annuity Corporation stated that the Mecca Policy lapsed on July 11, 2001 (Ex. F). The Mecca Policy was reinstated on July 19, 2001. Since the Mecca Policy provides for a two-year period of contestability (*see* Mecca Policy at § 8.3 [Ex. F]), the Policy was contestable under New York law for a period of two years after it was reinstated on July 19, 2001. Thus, the Mecca Policy was not a "Qualified Life Insurance Policy" at the time it was declared to the CCI Program on October 11, 2001. LSC/Peachtree's representation that it was a Qualified Life Policy was false, was known by it to be false, and was made by LSC/Peachtree (and therefore LRT) with the intention that it be believed and relied upon by Syndicate 102

31. LSC/Peachtree also misrepresented the fact that Mr. Mecca had an LE of not less than 36 months. In December 2000, AVS gave Mr. Mecca a 30-month LE. The Syndicate is informed and believes that Mr. Mecca's 30-month LE was changed by AVS to 36 months at the urging of LSC/Peachtree so that the Mecca Policy would qualify for coverage under the CCI Program. As with the Goldreyers' LEs, LSC/Peachtree's misrepresentation to Syndicate 102 of

12

Mr. Mecca's life expectancy and its failure to disclose to Syndicate 102 the degree to which

LSC/Peachtree had influenced the development and length of the Mecca LE were in fact material

and, indeed, went to the most critical element of the CCI arranged by LSC/Peachtree for the

benefit of LRT.

32. Syndicate 102 denied the Mecca claim in December 2006 by letter that

described the bases for denial, including the misrepresentations concerning incontestability and

LE. LRT and LSC/Peachtree made no reply but have not withdrawn the claim.

**The Walter Claim.**

33. LSC/Peachtree acquired a policy issued by Hartford Life and Annuity

Company insuring the life of Louis Walter for $5,000,000 ("the Walter Policy"). The Walter

Policy was declared by LSC/Peachtree to the CCI Program as a "Qualified Life Insurance

Policy" on February 2, 2001. The Walter Policy was declared to the '054 Policy on the basis of

a 48-month LE provided by AVS for LSC/Peachtree.

34. On or about November 30, 2006, LSC/Peachtree made a claim on behalf of

LRT under the '054 Policy in respect of the Walter Policy, advising that Mr. Walter was still

living six years after AVS' issuance of its 48-month LE for Mr. Walter.

35. The Qualified Consulting Physician's report prepared by AVS on November

29, 2000, described Mr. Walter as "a 70-year-old Caucasian male who has a history of diabetes

mellitus (poorly controlled), alcoholic gastritis, hyperlipidemia, degenerative arthritis,

hypertension and coronary artery disease (with a stress test positive for ischemia in 1981). His

compliance appears poor, considering his weight of 260 pounds at 5 feet 8 inches tall (Ex. G).

13

36. The LE given for Mr. Walter in order to qualify as a "Qualified Life Insurance Policy" was false and in direct contradiction of Mr. Walter's signed application to Hartford on November 1, 2000, in which Mr. Walter gives his height at 5 foot 9 inches and his weight at 185 pounds (Ex. G). The AVS report is also contradictory to Mr. Walter's Driver's License, issued on July 17, 2000, which also gives his height and weight as 5 foot 9 inches and 185 pounds (Ex. G).

37. Since the November 29, 2000 AVS report obtained by LSC/Peachtree was based in major part on the effect of Mr. Walters' diabetes, hypertension and coronary artery disease, a 48-month LE based upon his weight of 260 pounds, when in fact he weighed only 185 pounds, was based on grossly inaccurate facts. Thus, like the Goldreyers' and Mecca's LEs, the 48-month Walter LE produced for LSC/Peachtree and LRT by AVS was bogus and fraudulent, depriving Syndicate 102 of the essence of what it bargained for and defeating the object of the parties in entering into the CCI Program. The only parties benefiting from a shortened LE are LRT and LSC/Peachtree, and it must be presumed that AVS's mischaracterization of Mr. Walter's health information was influenced by and intended to benefit LRT and LSC Peachtree.

38. Syndicate 102 denied the Walter claim in January 2007 by letter that described the bases for denial, including the misrepresentations concerning the LE. LRT and LSC/Peachtree made no reply but have not withdrawn the claim.

**Vicarious Responsibility of LRT and LSC/Peachtree for the Bogus Goldreyer LEs.**

39. AVS, in preparing LEs for LSC Peachtree and LRT, was the agent of LRT and LSC/Peachtree. LRT and LSC/Peachtree are therefore responsible vicariously for AVS' misconduct, whether fraudulent, reckless or negligent.

14

**LRT and LSC/Peachtree Are Parties to the Arbitration Clauses.**

40. LRT and LSC/Peachtree are proper parties to this arbitration as separate and individually identified parties to the CCI Policies. *See* '054 Policy, p. 2 and Appendix A-1 (Ex. A). Both LRT and LSC/Peachtree have admitted that they are parties to the Arbitration Clauses, which provide this Panel with broad authority to decide "all" disputes arising from the CCI Policies: "All disputes and differences arising under or in connection with this Insurance shall be referred to arbitration under the American Arbitration Association Rules." *See* '054 Policy, p. 23 (Ex. A).

WHEREFORE, Syndicate 102 requests: (1) a declaration from the Panel rescinding and discharging Syndicate 102 from all further obligations under all CCI issued to LRT by the Syndicate; (2) entry of a final award of compensatory damages in favor of the Syndicate and against LSC/Peachtree in an amount to be determined by the Panel for losses incurred by the Syndicate by reason of the bogus Goldreyer, Mecca, Walter and other LEs; and (3) such other and further relief as the Panel deems just and proper.

Dated: New York, New York
       March 28, 2008

                              Respectfully submitted,

                              BARGER & WOLEN LLP

                              By: _____
                                  R. Steven Anderson
                                  Evan L. Smoak
                                  10 East 40th Street, 40th Floor
                                  New York, NY 10016-0301
                                  (212) 557-2800
                                  Attorneys for Syndicate 102

15

PAGE 1 of 24

# TYSER & CO.

572
TYS

| POLICY NO. | REF. NO. |
|---|---|
| CR010054 | |

**UNIQUE MARKET REFERENCE**

CR010054

| | SUP REGISTRATION | | |
|---|---|---|---|
| | LLOYD'S | ILU | LIRMA |
| | | | |

| BINDING AUTHORITY REGISTRATION NO. & DATE | RISK CODE(S) |
|---|---|
| | |

| D.T.I. CODE | TDC TRIBUNAL | TERMS OF SETTLEMENT | | |
|---|---|---|---|---|
| | | SETTLEMENT DUE DATE | DEF | ADJ |
| | | / / | | |

**ASSURED/ACCOUNT**

**ADJUST. SCHEME**

| YES | NO |
|---|---|

| USS / NUS / | US | COUNTRY OF ORIGIN | VAT |
|---|---|---|---|

**OVERSEAS BROKER (NAME & ADDRESS)**

| CURRENCY | SIGNED LINE % | GROSS PREMIUM | |
|---|---|---|---|
| | | IN ALL | WAR ONLY |
| TOTAL | | | |
| LLOYD'S | | | |
| ILU | | | |
| LIRMA | | | |
| OTHER COMPANIES | | | |

**FOR FUTURE USE**

| C.P.A. | | SERIAL NO. | CERTIFICATE NOS. | |
|---|---|---|---|---|
| YES | NO | | | |
| EC | | EC | EC | EC |
| COI | | ESTABLISHMENT | SERVICES | N/A |
| BUREAU SCHEME NO. | | | BROKERS COVER NO. | |

| WRITTEN LINES | % PART | OF | ORDER WHOLE | ORDER | CLOSED FOR |
|---|---|---|---|---|---|
| | | | | 100 % | |

Also agreed that for all alterations or amendments or endorsements or rates (excluding increases in Underwriters' lines) or Return Premiums (including cancellations) or for the agreement of wordings the initials of the first two Underwriters (or, four Underwriters, two Lloyd's and two Companies when both Markets are interested) shall be binding upon the others.

The subscribing Insurers'/Reinsurers' obligations under contracts to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing Insurers/Reinsurers are not responsible for subscription of any co-subscribing Insurer/Reinsurer who for any reason does not satisfy all or part of its obligations. (LSW 1001 Several Liability Notice).



MARINE FAC

UMR REGISTRATION NO: CR010054                    page 2 of 24

**Effect Date:**            February 5, 2001

**Type:**                   Contingency Insurance

**Form:**                   J (A) NMA 2421 and as per slip wording.
                            No proposal form.
                            In the event of any conflict or inconsistency between the terms and conditions
                            of this Insurance (represented by this slip that has been stamped on behalf of
                            the Underwriters) and any policy form, jacket or wrapper issued by the
                            Underwriters, the terms and conditions of this Insurance shall govern to the
                            extent of such conflict or inconsistency.

**Underwriters:**           GOSHAWK SYNDICATE 102 AT LLOYDS.

                            It is understood and agreed that MERLIN UNDERWRITING AGENCY
                            LTD shall have the authority to act for and bind the Underwriters with
                            respect to any consent, confirmation, approval, amendment, waiver,
                            supplement or any other action or undertaking required or permitted to be
                            taken, given, granted or delivered by the Underwriters hereunder.

**Assured:**                Life Receivables Trust, formed under the Trust Agreement, dated as of
                            June 9, 2000 (the **"Trust Agreement"**) by and among Life Receivables I,
                            LLC, as Settlor and Initial Beneficiary, and The Bank of New York, as
                            trustee, as amended and in effect as of February 2, 2001 and
                            as further amended from time to time in accordance with its terms.

**Trustee:**                The Bank of New York as UTI Trustee and SUBI Trustee (as such terms
                            are defined in the Trust Agreement) or any successor trustee appointed in
                            accordance with the Trust Agreement.

**Originator:**             Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life
                            Settlements, a Georgia corporation).

**Servicer:**               Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life
                            Settlements, a Georgia corporation), and its successors and permitted
                            assigns.

**Back-Up Servicer:**       BNY Asset Solutions LLC or, if BNY Asset Solutions LLC shall no
                            longer be serving as Back-Up Servicer of Assured, such other party acting
                            in such capacity (as to the services to be performed in respect of this
                            Insurance, as set forth in Appendix A-2 hereto) and approved by
                            Underwriters in accordance with the terms of the Servicing Agreement. BNY
                            Asset Solutions LLC shall not be and not be deemed to be a party to this
                            Insurance.



page 3 of 24

**Period:**              This Insurance shall cover Qualified Life Insurance Policies purchased by
                         the Assured on or after September 20, 2000 (or, if later, declared on a
                         *bordereau* hereunder submitted on or after September 20, 2000) and
                         through and including the first to occur of (x) January 15, 2002 (or, if
                         such day is not a Business Day, the next succeeding Business Day) or (y) the
                         date on which the Maximum Aggregate Limit has been reached.

**Interest:**            To indemnify the Assured in respect of the Net Death Benefit at the time
                         of purchase by the Assured of each Qualified Life Insurance Policy (or
                         where a higher Net Death Benefit has been declared at the time of such
                         purchase to be payable at the end of the Deferred Period and the applicable
                         Contingency Insurance Premium is based and paid at the inception of this
                         Insurance on such higher amount, the Net Death Benefit as of the end of
                         the Deferred Period) acquired by the Assured where the Senior is not
                         deceased at the end of the Deferred Period.

**Limits:**              Up to but not exceeding US$ 5,000,000 Net Death Benefit for any one
                         Qualified Life Insurance Policy / any one Senior, unless approved in writing
                         by Underwriters (such approval not to be unreasonably withheld).

**Maximum Aggregate**
**Limit:**               The maximum aggregate limit of Net Death Benefit of all Qualified Life
                         Insurance Policies declared under this Insurance (the "Maximum
                         Aggregate Limit") shall be US$ 50,000,000.

**Deferred Period:**     24 months after the end of the Life Expectancy of each Senior in respect of
                         the relevant Qualified Life Insurance Policy relating to such Senior
                         declared hereunder, provided that in the case of a Survivorship Policy
                         where both Seniors are alive at the date the Qualified Life Insurance
                         Policy is purchased by the Assured, the Deferred Period shall be 36
                         months after the end of the Life Expectancy of the Senior with the longest
                         Life Expectancy, unless the Underwriters shall have previously agreed in
                         writing that the Deferred Period shall be 24 months after the end of the
                         Life Expectancy of the Senior with the longest Life Expectancy.

**Situation:**           Worldwide but in respect of policies acquired by the Assured issued by
                         insurance companies licensed within the United States of America, unless
                         noted hereon by special agreement.



UMR REGISTRATION NO: CR010054 . page 4 of 24

**Conditions Precedent:** Any life insurance policy proposed to be acquired by the Assured as to which (i) the Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in <u>Appendix B-1</u> hereto and (ii) the Back-Up Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in <u>Appendix B-2</u> hereto (each certificate of the type described in clause (i) or (ii) of this sentence is referred to in this Insurance as a "Coverage Certification") is hereby deemed to be accepted for coverage under this Insurance from and after the date of acquisition of such policy by the Assured, subject in each case to the Underwriters' right to terminate coverage with respect to such life insurance policy due to non-payment of the applicable Contingency Insurance Premium in accordance with the section entitled **Contingency Insurance Premium** below.

**Representations and
Warranties:**

By execution of this contract of Insurance and its acceptance of the duties specified in <u>Appendix A-1</u>, the Servicer represents and warrants as of the date hereof (and will be deemed to have represented and warranted with respect to each and every life insurance policy as of the date such life insurance policy is deemed accepted for coverage under this Insurance upon delivery of a Coverage Certification) that:

1.  It has truthfully declared all material facts actually known to it which would influence a reasonable Underwriter in determining:

    a)  whether or not to accept the risk
    b)  the premium
    c)  the conditions, exclusions and limitations,

    having diligently made all reasonably necessary inquiries to establish those facts provided that it shall not be required to (x) make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled **Medical Testing** below or (y) disclose any of its own internal or separately obtained analyses or projections or other actuarial information or (z) disclose any quotations or information or proposals provided by other underwriters or insurers.



**Representations and
Warranties Continued:**

2. It has no actual knowledge as of the date of the Coverage Certification
relating to a Qualified Life Insurance Policy of any undisclosed matter,
fact or circumstance actual or threatened, that materially increases or is
likely to materially increase the possibility of a Senior surviving his / her
Life Expectancy by more than 24 months provided that it shall have no
obligation or duty to make inquiry of any third party in relation to such
matter and provided it shall have no obligation or duty to make any
inquiries in relation to a Senior other than obtaining a statement of his /
her Life Expectancy in accordance with the section entitled **Medical
Testing** below.

3. It has declared that the information provided to the Underwriters, as part
of the proposal for this Insurance, is in all material respects true and
accurate and agrees that such information forms the basis of this
Insurance; provided that it does not represent or warrant that (w) any
sample polices provided to the Underwriters will necessarily be
representative of the policies that become subject to this Insurance; (x) it
has made any inquiries in relation to a Senior other than obtaining a
statement of his / her Life Expectancy in accordance with the section
entitled **Medical Testing** below; (y) it has disclosed any of its own
internal or separately obtained analyses or projections or other actuarial
information; or (z) it has disclosed any quotations or information or
proposals provided by other underwriters or insurers.

4. It has advised Underwriters of any change in the information detailed in
paragraph 3 of this section which took place prior to the date of the
Coverage Certification.

5. It has agreed to undertake to perform the activities and undertakings
as set forth in Appendix A-1.

6. The purchase price paid to a Senior in respect of any Qualified Life
Insurance Policy covered hereby is consistent with applicable legal
and regulatory requirements.

7. The amount of Contingency Insurance Premium payable with respect
to each Qualified Life Insurance Policy covered hereby will be the
subject of a notice of borrowing under the Credit Agreement referred
to in the section entitled **Certain Acknowledgments** below and is,
accordingly, expected to be paid within the time period specified
under **Contingency Insurance Premium** below.

**Claim Adjustment Period:**

On or prior to the 60th day before the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver drafts of a Claim Certification and Effective Assignment (each meeting the requirements set forth in the section entitled **Claim Procedures** below), a copy of the form issued by the relevant life insurance company which is proposed to be used to complete an Effective Assignment of the applicable Qualified Life Insurance Policy, and a copy of the complete Insurance Policy File with respect to such Qualified Life Insurance Policy (collectively, the **"Proposed Claim Documents"**). The Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will promptly provide such further information and documents with respect to the Proposed Claim Documents as the Underwriters and their representatives may reasonably request. If, upon review of the Proposed Claim Documents and any other information provided to the Underwriters, the Underwriters determine reasonably and in good faith that (a) according to the issuing insurance company, such Qualified Life Insurance Policy is no longer in force or (b) according to the issuing insurance company, the Assured is not the owner of and beneficiary under such Qualified Life Insurance Policy, then the Underwriters will have the right, exercisable on or prior to the 30th day prior to the expiration of the relevant Deferred Period by written notice to each Interested Person, to dispute the Underwriters' obligation to pay a Claim in respect of such Qualified Life Insurance Policy upon delivery of a Claim Certification with respect thereto (a **"Claim Dispute"**).

Each Claim Dispute will be promptly referred to arbitration in accordance with the applicable procedures set forth in the section entitled **Arbitration** below; provided, that any such Claim Dispute shall be automatically withdrawn in the event that the circumstances giving rise to such Claim Dispute have been cured by any Interested Person to the reasonable satisfaction of the Underwriters; and provided, further, that under no circumstances (other than for the reasons set forth in clause (a) or (b) of the immediately preceding sentence) shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim as set forth in the section entitled **Claim Procedures**.

**Claim Procedures:**

As soon as practicable following the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver a Claim Certification (as defined below) to substantiate the amount of loss claimed under this Insurance.



UMR REGISTRATION NO: CR010054

**Claim Procedures
Continued:**

The following procedures shall apply to each Claim made upon this Insurance (a "**Claim**"):

1. *Claim Certification.* Claims upon this Insurance shall be made upon presentation by the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, to Underwriters of a certificate of the Servicer in the form set out in Appendix C (a "**Claim Certification**").

2. *Effective Assignment.* Each Claim Certification shall be accompanied by an assignment (legally or beneficially in the manner provided in this paragraph 2) of the relevant Qualified Life Insurance Policy to Goshawk Syndicate 102, on behalf of the Underwriters, to the extent of the Assured's legal or beneficial interests therein. Failure so to assign said policy for any reason (other than negligence or wilful misconduct on the part of the Underwriters) will invalidate a Claim solely with respect to the Qualified Life Insurance Policy not so assigned. Assignment of a Qualified Life Insurance Policy in respect of a Senior who is not deceased at the end of the relevant Deferred Period shall be effective for purposes of fulfilling the requirements set forth in this paragraph 2 for payment of a Claim if the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured:

    a) Executes a change of beneficiary designation, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under each such Qualified Life Insurance Policy, naming Goshawk Syndicate 102 at Lloyds, as sole beneficiary and

    b) Either (i) executes an absolute assignment, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under such Qualified Life Insurance Policy of the ownership of such Qualified Life Insurance Policy to Goshawk Syndicate 102 at Lloyds; or (ii) if such assignment is restricted by the laws or regulations of any State or by the policies and procedures of the insurer under such Qualified Life Insurance Policy or is for any other reason (in the reasonable judgment of the Servicer or the Back-Up Servicer) not practicable, executes a collateral assignment to Goshawk Syndicate 102 at Lloyds, making the designation of Goshawk Syndicate 102 at Lloyds, as sole beneficiary under the Qualified Life Insurance Policy irrevocable and otherwise meeting the requirements of paragraph 4 below.



UMR REGISTRATION NO: CR010054

page 8 of 24

**Claim Procedures**
**Continued:**

Any assignment pursuant to this paragraph 2 shall be conditioned only upon payment of the related Claim in accordance with paragraph 3 of this section. An assignment meeting the requirements of this paragraph 2 is referred to herein as an "Effective Assignment."

3.   *Payment.* On or prior to the 15th Business Day after receipt of each Claim Certification (accompanied by an Effective Assignment), the Underwriters will pay an amount equal to the aggregate Net Death Benefit payable under the related Qualified Life Insurance Policy to the Collection Account by wire transfer of immediately available funds in US dollars.

4.   *Contingency Insurer Nominee Trust.* The Trust Agreement provides, and at all times will provide, that each Qualified Life Insurance Policy will on the date of payment by the Underwriters of the Claim relating to an Effective Assignment of such Qualified Life Insurance Policy to the Underwriters as set forth in paragraph 3 above be removed from the SUBI Trust (as defined in the Trust Agreement) and allocated to the Contingency Insurer Nominee Trust (as defined in the Trust Agreement) to be held in trust for the benefit of the Underwriters if (x) an Effective Assignment of the type described in paragraph 2(b)(i) above for whatever reason (including without limitation any failure or delay of the issuing insurance company to acknowledge or ratify such Effective Assignment) has not conveyed such Qualified Life Insurance Policy to the Underwriters as of such date or (y) an Effective Assignment of the type described in paragraph 2(b)(ii) above has been employed in connection with such Qualified Life Insurance Policy.

All life insurance policies held in the Contingency Insurer Nominee Trust will be held by the Assured as custodian and nominee for the Underwriters, and the Assured (or the Servicer or Back-Up Servicer acting as agent for the Assured) will (i) act (and refrain from acting) with respect to any such life insurance policy only at the direction of the Underwriters, (ii) irrevocably instruct the insurance company issuing such life insurance policy to make all payments thereunder to an account designated by the Underwriters and (iii) hold any payments made by the issuing insurance company with respect to such life insurance policy in trust for the Underwriters and promptly (and in no event later than one Business Day after receipt thereof) pay over such amounts to an account designated by the Underwriters.



**Cancellation:**    In the event of a material breach of this Insurance by the Assured or the Underwriters, the non-breaching party may, by giving 30 days prior notice of cancellation, cancel coverage in respect of Qualified Life Insurance Policies acquired after the expiry of such notice provided that if the breach is capable of remedy, the party not in breach shall first notify the other party (and each other Interested Person) of the breach and request the breach to be remedied. If the breach is not remedied within 14 days after such notice, the other party may then give 30 days written notice of cancellation. In the event of cancellation, the Underwriters shall cover under the terms and conditions of this Insurance all Qualified Life Insurance Policies upon which the Assured or Originator or Servicer has signed a binding agreement to purchase before the expiration of the 30 day cancellation period, regardless of when such purchase is finally consummated. Except as expressly provided in the section entitled **Contingency Insurance Premium** below, this policy may not be revoked or cancelled with respect to any policy as to which a Coverage Certification has been delivered and any cancellation of coverage by either party shall in no event affect existing coverage of Qualified Life Insurance Policies as to which a Coverage Certification has been delivered before expiration of the notice period contained in the cancellation notice.

**Medical Testing:**    All medical testing in connection with assessment of a Senior's Life Expectancy shall be undertaken by a Qualified Consulting Physician (as defined herein).

**Notices:**    Any notice required or permitted hereunder must be given in writing to each Interested Person either by personal delivery, guaranteed overnight courier or facsimile, and shall be deemed effectively given (i) in the case of personal delivery, upon delivery to the party to be notified, (ii) in the case of delivery by overnight courier, on the date of delivery guaranteed by such overnight courier, or (iii) in the case of notice by facsimile, upon telephone confirmation of receipt by the party to be notified. Any such notice shall be addressed to the relevant party at the address given on <u>Annex I</u> hereto or to such other address as such party has given to all Interested Persons in the manner specified in this section.

**Qualified Life
Insurance Policy
Criteria:**    A life insurance policy shall constitute a Qualified Life Insurance policy for purposes of this Insurance upon certification by the Servicer and the Back-Up (which certification shall be deemed made by the delivery by the Servicer and the Back-Up Servicer of a Coverage Certification with respect to such life insurance policy) that:



**Qualified Life
Insurance Policy
Criteria:**

1.  the Life Expectancy of the Senior (determined in accordance with the requirements set forth under Life Expectancy below), is not less than 36 months nor greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report; provided that in the case of a Survivorship Policy, unless the Underwriters have previously agreed in writing that the Deferred Period shall be 24 months in respect of such policy (instead of 36 months), the Life Expectancy of the Senior having the longest Life Expectancy may not exceed 108 months from and after the date of the relevant Qualified Consulting Physician's report;

2.  such life insurance policy is as of the date of the relevant Coverage Certification issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's; and

3.  such policy meets the following minimum qualifying criteria on the date of the relevant Coverage Certification:

    a)  Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums;

    b)  Such policy (i) provides for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (ii) has a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years; and

    c)  The Net Death Benefit of such policy shall be no larger than US$5,000,000 unless advance written approval is granted by Underwriters (such approval not to be unreasonably withheld); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000, even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000.



Qualified Life
Insurance Policy
Criteria:

In giving any certification as to the matters set forth in paragraph 3. above, the Back-Up Servicer (whether acting in its capacity as Back-Up Servicer or as Successor Servicer) shall be entitled to rely on the information included in applicable Insurance Policy Files with respect to giving such certification, and shall in no event be required to deliver any certificate other than as to the matters set forth in Appendix A-2 or in the form attached as Appendix B-2.

Each life insurance policy as to which a Coverage Certification shall have been delivered shall constitute a Qualified Life Insurance Policy hereunder without need for any additional action of any party.

Tracking:

Tracking of Seniors under each Qualified Life Insurance Policy shall be undertaken by the Servicer or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Tracking of Seniors under such Qualified Life Insurance Policy shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Tracking of such Seniors.

Monitoring:

Monitoring of all Qualified Life Insurance Policies is to be undertaken by the Servicer or Back-Up Servicer. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Monitoring of such Qualified Life Insurance Policy and payment of premiums thereon shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Monitoring of such Qualified Life Insurance Policy or pay premiums thereon (whether or not such Qualified Life Insurance Policy is held by the Contingency Insurer Nominee Trust as provided in the section entitled Claim Procedures above).



**Governing Law;**
**Waiver of Jury Trial;**
**Submission to**
**Jurisdiction and**
**Consent to Service**
**of Process:**

THIS INSURANCE SHALL BE SUBJECT TO, AND THIS CONTRACT SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, U.S.A. WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF. EACH PARTY TO THIS INSURANCE AND EACH PERSON LISTED ON ANNEX 1 HERETO HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INSURANCE OR ANY RELATED TRANSACTIONS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK CITY OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. EACH SUCH PARTY AND EACH SUCH PERSON HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS BY NOTICE IN THE MANNER SPECIFIED IN THE SECTION ENTITLED NOTICES ABOVE. EACH SUCH PARTY AND EACH SUCH PERSON IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

It is further agreed that service of process upon the Underwriters in any such legal action or proceeding may be made upon Mendes & Mount LLP, 750 7th Avenue, New York, NY 10019-6829, U.S.A. and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured or any other Interested Person to give a written undertaking to the Assured (or such Interested Person) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any other Interested Person arising out of this Insurance, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



UMR REGISTRATION NO: CR010054

**Reporting:**

All Qualified Life Insurance Policies from time to time covered by this Insurance will be reported by the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement) to Goshawk Syndicate 102 at Lloyds, by monthly *bordereaux* in the form attached hereto as Appendix D, delivered on or before the 15th day of each month (or if such day is not a Business Day, the next succeeding Business Day) during the Insurance period and such *bordereaux* will include (in the case of any policy that is the subject of the most recent Coverage Certification) copies of the Qualified Consulting Physician's report referred to in the section entitled **Medical Testing** above. Subject to the provisions of the section entitled **Cancellation** the Assured shall notify all Interested Persons when it no longer intends to declare Qualified Life Insurance Policies to this Insurance.

**Information:**

The Servicer will deliver to the Underwriters (i) all and any material information relating to this Insurance received by the Assured or the Servicer through routine Tracking procedures or other channels relating to the medical circumstances of each Senior within 7 days after request therefor and/or (ii) a current schedule of Seniors by the Underwriters within a reasonable period of time after request therefor; provided that no person shall be obligated to provide any requested information to the extent prohibited by law, regulation or court order.

**Limitations on Assignment:**

Policies comprising Qualified Life Insurance Policies may not be assigned, except as collateral to lenders (including without limitation Abbey National Treasury Services plc and any of its affiliates) or other funding providers (or their agents or trustees) of the Assured, in whole or in part, without the prior written consent of the Underwriters, which will not be unreasonably withheld or delayed; provided that this section shall not prohibit any assignment, for collateral to lenders or otherwise by outright assignment, of beneficial trust interests in the Assured and provided further that this section shall not prohibit the Assured from segregating any Qualified Life Insurance Policy or other property owned by it or the Insurance provided hereunder into a separate subtrust for a separate beneficiary or prohibit the appointment of a successor trustee for the Assured. This Insurance may not be assigned by the Underwriters without the prior written consent of the Lender.



**Certain
Acknowledgments;
Representations and
Warranties:**

The Underwriters acknowledge and understand that loans to be used for, among other things, the acquisition of life insurance policies by the Assured and payment of premiums and certain expenses in connection therewith are being provided by Abbey National Treasury Services plc (together with its successors and assigns, the "Lender") pursuant to a Credit Agreement, dated as of February 2, 2001, between the Lender and Life Receivables II, LLC, as Borrower, and that the Lender is being granted a first priority security interest in and charge over certain assets of Life Receivables II, LLC and of the Assured, including without limitation a certificate representing ownership of the beneficial interest in the SUBI Trust and interests of the Assured under the Servicing Agreement (together with the transactions contemplated thereby and all other documents and instruments entered into in connection therewith, the "Lending Transactions"). The Underwriters consent to the terms of the Lending Transactions and acknowledge the rights and remedies of the Lender and its agents thereunder, and agree that the Lender and its collateral agent shall be additional Loss Payees under this Insurance and have the benefit of the covenants and agreements of the Underwriters hereunder.

The Underwriters represent and warrant for the benefit of the Lender and its agents that (i) the execution, delivery and performance by the Underwriters of this Insurance are within the Underwriters' powers and have been duly authorized by all necessary action on the part of the Underwriters, (ii) this Insurance has been duly and validly executed and delivered by the Underwriters and (iii) this Insurance constitutes the legal, valid and obligation of the Underwriters, enforceable against the Underwriters in accordance with its terms.

**Servicer Duties:**

The Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer), on behalf of the Assured, shall maintain adequate records in connection with the subject matter insured hereunder.

**Subrogation:**

In the event of any payment under this Insurance with respect to a Qualified Life Insurance Policy, Underwriters shall (to the extent of their payment and to the extent that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign such Qualified Life Insurance Policy to the Underwriters) be subrogated to all the Assured's rights of recovery under such Qualified Life Insurance Policy and the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer) shall (at the Underwriters' expense) take such actions (in the case of the Back-Up Servicer, in accordance with the BNYAS Servicing Standard, as defined in the Servicing Agreement) reasonably requested by Underwriters (at such times as required herein) to confirm and assure such rights.



UMR REGISTRATION NO: CR010054                                      page 15 of 24

**Subrogation
Continued:**

The Underwriters shall have no recourse to the Assured in the event that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign the relevant Qualified Life Insurance Policy to the Underwriters.

**Loss Payees:**

Any payments due under the terms and conditions of this Insurance shall, upon notice given by the Lender (or its collateral agent serving in connection with the Lending Transactions) as Loss Payee hereunder, be made by the Underwriters directly to the Lender (or such collateral agent) instead of to the Collection Account. Timely payment in full of the Net Death Benefit (as provided above under **Interest and Claims Procedures**) by Underwriters to the Loss Payee(s) to an account specified pursuant to this section shall be a sufficient and complete discharge of all Underwriters' obligations to the Assured and Loss Payee(s) in connection with said losses.

**Mitigation:**

Underwriters reserve the right, if they so wish, to take such reasonable steps as they deem necessary to prevent, mitigate or minimise a loss; provided that such action is not in contravention of the terms of the Lending Transactions or any other agreement Assured has with the Lender or any other lenders or other funding providers (or their agents or trustees) or in violation of any applicable law, rule or regulation (including without limitation those relating to insurance or insurance brokerage).

**Bankruptcy
Proceedings:**

The Underwriters agree not to commence or join in any case or other proceeding against the Assured, Life Receivables II, LLC or any of their respective affiliates seeking liquidation, winding-up, reorganization or other relief with respect to such person or entity or its debts under any liquidation, insolvency, bankruptcy, moratorium, reorganization or similar law of any relevant jurisdiction applicable to such person or entity now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of such person or entity or any material part of its property prior to the date which is one year and one day after payment in full of all obligations owed by any such person or entity to the Lender or its agents or affiliates or their respective representatives in connection with any of the Lending Transactions.

**Recovery of Premium:** The Contingency Insurance Premium and any expense incurred in the formulation of a Claim hereunder shall not be a recoverable item.



Case 1:08-cv-03675-LAK    Document 1-2    Filed 04/17/2008    Page 32 of 91

Recourse:

1.  *Reduction of Payments.* The Underwriters will not be permitted to reduce any payments under this Insurance as a result of (i) any breach by the Servicer and/or the Originator of their representations, warranties, covenants or provisions herein (including without limitation those related to Tracking and Monitoring and those under Representations and Warranties) or in the Servicing Agreement, (ii) any breach by the Back-Up Servicer of its representations, warranties, covenants or provisions set forth herein or in the Servicing Agreement or (iii) except as provided in the immediately following sentence, any action or inaction on the part of the Assured or any other person or entity. Notwithstanding the foregoing, the Underwriters shall be permitted to reduce payments under this Insurance as expressly provided in clause (b) of the definition of "Net Death Benefit" below.

2.  *Obligations Unconditional.* Subject only to the section entitled Contingency Insurance Premium below, the Underwriters agree that each of their duty to accept for coverage any life insurance policy as to which a Coverage Certification has been delivered and their obligation to pay the full and complete Net Death Benefit to the Assured by payment into the Collection Account or to the Loss Payee within the time period specified after delivery of a Claim Certification and an accompanying Effective Assignment (A) is absolute, unconditional and irrevocable, (B) shall not be affected by any change in the legal existence, structure or ownership of the Assured, the Servicer, the Back-Up Servicer, the Originator, or any of their respective members, beneficial holders or stockholders or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any such person or entity or any resulting release or discharge of any obligation of any such person or entity, and (C) shall not be subject to any right of rescission, set-off, diminution or counterclaim or defense of any kind, including without limitation (i) fraud or misrepresentation by any person or entity, (ii) any failure by (or question or issue regarding the ability of) the Assured, the Servicer, the Back-Up Servicer or the Originator or any other person or entity or any of their respective officers, directors, members, agents or employees or representatives to comply with any covenant or agreement contained in this Insurance or the Servicing Agreement or in any other agreement or instrument or any applicable legal requirement, (iii) any breach of or inaccuracy in any representation, warranty, certification or statement made by the Assured, the Servicer, the Originator, the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or the Servicing Agreement or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance,



**Recourse**
**Continued:**

(iv) any negligence or misconduct by the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity or their respective affiliates or their respective directors, members, agents, employees or representatives, (v) any delay or failure by the insurer under a Qualified Life Insurance Policy which is the subject of an Effective Assignment in acknowledging the interests of the Underwriters thereunder, or (vi) any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Underwriters hereunder; it being understood and agreed that the Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.

3    *Servicer Indemnities.* Notwithstanding paragraphs 1 and 2 of this section, by its acceptance of the duties specified in <u>Appendix A-1</u>, the Servicer and the Originator agree to indemnify the Underwriters against losses in respect of any Qualified Life Insurance Policy as to which the Underwriters make payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy, provided, however, that the foregoing indemnity shall in no way be deemed to impose on any of the Originator or the Servicer any obligation, other than to the extent specifically resulting from the breach of the representation or warranty set forth herein of the rating of each insurer or from the inaccuracy of the Coverage Certification with respect to such rating), to reimburse the Underwriters for losses arising solely from the financial inability of the insurer of a Qualified Life Insurance Policy to make payment when due on such Qualified Life Insurance Policy, and provided, further, however, that no Back-Up Servicer shall have any obligations pursuant to this paragraph 3, whether acting as successor Servicer or otherwise. Neither the effect of any representation or warranty made by the Servicer pursuant to this Insurance nor the Servicer's obligations under this paragraph 3 nor any other recourse available against the Servicer under this Insurance shall be diminished by any access, investigation or due diligence inquiry conducted by the Underwriters or their representatives, including without limitation pursuant to the procedures described in the section entitled **Claim Adjustment Period** above.

The Underwriters shall have no obligation to assume the payment obligation of any insurer of a Qualified Life Insurance Policy that fails to make payment when due on such Qualified Life Insurance Policy solely as a result of the financial inability of such insurer to make such payment.



**Recourse
Continued:**

4.  *Insurer Approval of Effective Assignment.* No delay or failure by any
    insurer under a Qualified Life Insurance Policy in acknowledging or
    consenting to an Effective Assignment shall operate to excuse or relieve the
    Underwriters of the obligation to pay amounts due in respect of a Claim
    made in compliance with the procedures set forth in the section entitled
    Claim Procedures above.

5.  *Sole Remedy.* Paragraph 3 of this section sets forth the sole and
    exclusive remedy of the Underwriters for losses arising out of, in relation to
    or in connection with any and all (i) breaches of or inaccuracies in any
    representations, warranties, certifications or statements made by the
    Assured, the Servicer, the Originator or the Back-Up Servicer or their
    respective affiliates or their respective directors, members, agents,
    employees or representatives in this Insurance or in any Coverage
    Certification, monthly *bordereaux*, Claim Certification or other notice,
    certificate, report or other document delivered pursuant to or in connection
    with this Insurance, (ii) instances of fraud or misrepresentation committed
    by the Assured, the Servicer, the Originator or the Back-Up Servicer or their
    respective affiliates or their respective directors, members, agents,
    employees or representatives in connection with this Insurance, the
    Servicing Agreement or any Coverage Certification, monthly *bordereaux*,
    Claim Certification or other notice, certificate, report or other document
    delivered pursuant to or in connection with this Insurance, (iii) breaches of
    any covenants or agreements of the Assured, the Servicer, the Originator,
    the Back-Up Servicer or any other person or entity in this Insurance or the
    Servicing Agreement or any other agreement or instrument or of any legal
    requirement or (iv) any other matter covered in paragraph 2 of this section.
    In particular, the Underwriters shall have no right for any reason whatsoever
    (including without limitation those enumerated in the immediately preceding
    sentence) to reduce any amounts payable in respect of a Claim made in
    accordance with the claims procedures set forth in the section entitled
    Claim Procedures above or cancel or terminate coverage hereunder with
    respect to any Qualified Life Insurance Policy which is the subject of a
    Coverage Certification.



UMR REGISTRATION NO: CR010054                                page 19 of 24

**Amendments and**
**Waivers:**           Any term of this Insurance may be amended and the observance of any term of
                       this Insurance may be waived, with but only with, the written consent of (i) the
                       Underwriters, (ii) the Lender, (iii) if such amendment or waiver could reasonably
                       be expected to materially and adversely affect the Collateral Agent acting in
                       connection with the Lending Transactions in its capacity as such, the Collateral
                       Agent, (iv) if such amendment or waiver could reasonably be expected to
                       materially and adversely affect the Trustee of the Assured acting in its capacity
                       as such, the Trustee of the Assured, (v) if such amendment or waiver could
                       reasonably be expected to materially and adversely affect the Servicer or Back-
                       Up Servicer, the Servicer or Back-Up Servicer, as the case may be, and (vi) for so
                       long as no Event of Default under the Lending Transactions has occurred and is
                       in existence, the Assured. Unless otherwise specified in such waiver, a waiver
                       given hereunder shall be effective only in the specific instance and for the
                       specific purpose for which given. No failure or delay by any Interested Person in
                       exercising any right, power or privilege hereunder shall operate as a waiver
                       thereof, nor shall any single or partial exercise thereof preclude any other or
                       further exercise thereof or the exercise of any other right, power or privilege.

**Definitions:**       <u>Business Day</u>

                       Means a day (other than a Saturday or Sunday) on which commercial banks and
                       insurance companies are open for business in London and New York City.

                       <u>Collection Account</u>

                       Means the account of Life Receivables II, LLC maintained at the Collateral
                       Agent then acting in connection with the Lending Transactions and identified on
                       <u>Annex II</u> to this Insurance, or such different account as the Collateral Agent or
                       the Lender has from time to time designated by written notice to each other
                       Interested Person in accordance with the notice provisions of this Insurance.

                       <u>Contestability Period</u>

                       Means the period of time after the issuance of a Qualified Life Insurance Policy
                       established by the language of that Qualified Life Insurance Policy and/or state
                       or other applicable law, including any applicable suicide period, during which
                       the issuing insurer may contest the Senior's right to benefits under that Policy
                       (other than for non-payment of premiums by the Senior).

                       <u>Face Value</u>

                       Means the amount of a total death benefit payable under the Senior's life
                       insurance policy.



Definitions
Continued:

#### Insurance Policy File

Means a complete policy file meeting the requirements of Item 7 of <u>Appendix A-1</u> and containing all other documents and information necessary to determine whether the criteria set forth in <u>Schedule III</u> to the Credit Agreement have been satisfied with respect to each Eligible Life Insurance Policy (as defined therein).

#### Interested Persons

Means each person or entity listed on <u>Annex I</u> hereto together with the successors and permitted assigns of such person or entity.

#### Life Expectancy

Means the remaining period in months that the Senior is expected to live after the date of a Qualified Consulting Physician's report, as assessed and given by a Qualified Consulting Physician in writing within 90 days prior to the date of the Coverage Certification given with respect to the Qualified Life Insurance Policy insuring the life of such Senior. If the assessment is given as a range between two numbers of months, Life Expectancy will be the higher of the two numbers in the range. In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under the policy.

#### Loss Payee

Means the Assured, the Lender or the collateral agent then serving in connection with the Lending Transactions and any other person or entity who is named as an additional loss payee under this Insurance by notice to the Underwriters given with the prior written consent of the Lender, together with such person's successors and permitted assigns.

#### Monitoring

Means (1) the timely disbursement of amounts on deposit in applicable accounts maintained under the Lending Transactions to make periodic premium payments necessary to keep Qualified Life Insurance Policies in force through the date of any Effective Assignment to the Underwriters pursuant to the section entitled **Claim Procedures** above and (2) the timely filing of claims to the issuing insurance company after the death of the relevant Senior.



**Definitions
Continued:**

### Net Death Benefit

Means, in relation to a Qualified Life Insurance Policy, (1) the lesser of (a) the
Face Value of such Qualified Life Insurance Policy as of end of the Deferred
Period or (b) the amount listed as the Net Death Benefit in the *bordereau*
pertaining to such Qualified Life Insurance Policy plus (2) (a) any additional
value (or refund of premium) paid or payable pursuant to that Policy following
the relevant Senior's death minus (b) the amount (if any) of any premiums
necessary to keep such Qualified Life Insurance Policy in force which are due
and payable but not yet paid (and accrued interest thereon, if any), in each case
being outstanding as of the end of the Deferred Period.

### Premium Taxes

Means all taxes, duties, charges, assessments or withholdings imposed on any
amount due to the Underwriters under the section entitled Contingency
Insurance Premium below by the United States of America or any state or other
political subdivision thereof, but only to the extent claimed at least ten Business
Days prior to the date any such amount due to the Underwriters is payable in a
certificate signed by the Underwriters setting forth the taxing jurisdiction, and
the type and amount of such tax, duty, charge, assessment or withholding and
requesting payment thereof. In the event that the Servicer disputes the
applicability of Premium Taxes to such amounts, the Servicer and the
Underwriters shall jointly appoint a nationally recognized law firm or accounting
firm to determine the issue, and the decision of such firm shall be conclusive.

### Qualified Consulting Physician

Means (a) American Viatical Services of Woodstock, Georgia, USA, (b) Navisys
Guiding Insurance Solutions of Barrington, Illinois, (c) International
Underwriting Services or (d) any other independent third party consulting
physician or group of consulting physicians approved in advance by the
Underwriters in writing, such approval not to be unreasonably withheld.

### Qualified Life Insurance Policy

Means a life insurance policy which both the Servicer and Back-Up Servicer
have declared in a Coverage Certification conforms to the minimum qualifying
criteria set forth in the section entitled Qualified Life Insurance Policy Criteria
above.



**Definitions**
**Continued:**

<u>Senior</u>

Means an individual aged 65 or over on the date of purchase of a life insurance policy by the Assured (or, if the Underwriters shall have consented in writing, an individual aged 64 1/2 or over on the date of purchase of a life insurance policy by the Assured and who has been given a Life Expectancy in accordance with the section entitled **Qualified Life Insurance Policy Criteria** above by a Qualified Consulting Physician and, in the case of Survivorship Policies, shall mean the individual whose death would give rise to a claim under the relevant life insurance policy.

<u>Servicing Agreement</u>

Means the Servicing Agreement, dated as of February 2, 2001, among Life Settlement Corporation, BNY Asset Solutions LLC, Life Receivables II, LLC, Babcock & Brown LP and the Assured.

<u>Successor Servicer</u>

Has the meaning given in the Servicing Agreement.

<u>Survivorship Policy</u>

Means a Qualified Life Insurance policy which provides for payment of a Net Death Benefit upon the later to die of two Seniors.

<u>Tracking</u>

Means periodic (monthly in the case of remaining life expectancies of 24 months or less; quarterly in the case of remaining life expectancies of over 24 months) contact (of such nature as the Servicer or Back-Up Servicer may in its absolute discretion determine) with the Senior (or Seniors) insured under a Qualified Life Insurance Policy (or such Senior's representative), and shall include, in the case of any Senior with whom direct or indirect contact is impossible, commercially reasonable efforts to determine whether or not such Senior is deceased, in all cases, subject to any restrictions or limitations imposed by law or regulation.



UMR REGISTRATION NO: CR010054                    page 23 of 24

**Arbitration:**    1.  All disputes and differences arising under or in connection with this
Insurance shall be referred to arbitration under the American Arbitration
Association Rules. The Arbitration Tribunal shall consist of three arbitrators,
one to be appointed by the Claimant, one to be appointed by the Respondent
and the third to be appointed by the two appointed arbitrators. The third
member of the Tribunal shall be appointed as soon as practicable (and no later
than (i) three Business Days, in the case of a Claim Dispute, and (ii) 28 days,
in all other cases) after the appointment of the two party-appointed arbitrators.
The Tribunal shall be constituted upon the appointment of the third arbitrator.

2.  The arbitrators shall be persons (including those who have retired) with
not less than ten years' experience of insurance or reinsurance within the
industry or as lawyers or other professional advisers serving the industry;
provided, that the Assured or any other Interested Person shall have the right
to exclude any arbitrator who is then a member or employee of Equitas,
Lloyds of London or any underwriting syndicate or other entity of Lloyds of
London. Where a party fails to appoint an arbitrator within fourteen days
(two Business Days, in the case of a Claim Dispute) after being called upon to
do so (or by either party's written certification that a dispute exists under or in
connection with this Insurance) or where the two party-appointed arbitrators
fail to appoint a third within 28 days (three Business Days, in the case of a
Claim Dispute) after their appointment, then upon application the American
Arbitration Association will appoint an arbitrator to fill the vacancy. At any
time prior to the appointment by the American Arbitration Association the
party or arbitrators in default may make such appointment.

3.  The Arbitration Tribunal may in its sole discretion make such orders and
directions as it considers to be necessary for the final determination of the
matters in dispute; provided that the parties shall each retain the right to
appeal errors of law to a court of law having jurisdiction of the matters
addressed herein and, each party executing this Insurance hereby consents and
agrees that the state or federal courts located in New York shall have
exclusive jurisdiction to hear and determine any such matters. The Arbitration
Tribunal shall have the widest discretion permitted under the law governing
the arbitral procedure when making such orders or directions.

4.  The seat of arbitration shall be New York, New York, U.S.A. Each party shall
bear its own costs and expenses incurred in connection with any arbitration;
provided, however, that the losing party in any arbitration commenced under
the section entitled Claim Adjustment Period above or otherwise relating to
the payment of a Claim shall bear the costs and expenses of the other party
and all other Interested Persons involved in such arbitration.



UMR REGISTRATION NO: CR010054                    page 24 of 24

**Contingency Insurance**
**Premium:**          The premium for this Insurance shall be four percent (4%) of the Net Death
                      Benefit under each and all Qualified Life Insurance Policies acquired by the
                      Assured and declared hereunder, plus any related Premium Taxes (collectively,
                      the "Contingency Insurance Premium"). A minimum deposit premium of US$
                      100,000 plus Premium Taxes on such amount (if any) must be paid to
                      Underwriters within 30 days after inception of this Insurance. The minimum
                      deposit premium shall be credited against Contingency Insurance Premium due at
                      a rate of 4% of Net Death Benefit of each and all Qualified Life Insurance
                      Policies acquired by the Assured and declared hereunder, plus any related
                      Premium Taxes. Thereafter, the amount of the Contingency Insurance Premium
                      payable with respect to each Qualified Life Insurance Policy covered under this
                      insurance shall be payable on or before the fifteenth day of the calendar month
                      (or if such day is not a Business Day, the next succeeding Business Day) next
                      following the calendar month in which the Coverage Certification relating to
                      such Qualified Life Insurance Policy was submitted.

                      The Underwriters shall have the right, exercisable upon ten Business Days' prior
                      written notice to each Interested Person, to terminate coverage hereunder with
                      respect to any Qualified Life Insurance Policy as to which the requisite
                      Contingency Insurance Premium has not been paid within the time period
                      specified in the immediately preceding paragraph, subject, however, to the right
                      of the Lender and each other Interested Person to cure any such payment failure
                      during such ten Business Day period before the Underwriters shall be entitled to
                      terminate coverage in accordance with this paragraph.

**Deductible:**          Nil
*Brokerage*              0.50%.
**U.S. Classification:**  Surplus Lines: Lester Kalmanson Agency, Inc.
                          P.O. Box 940008
                          235 South Maitland Avenue, Suite 201
                          Maitland, Florida 32794. U.S.A.

**Information:**         As per Tyser Special Risks Ltd file.

                        The Servicer will be responsible for ensuring that all policies declared to this
                        Insurance comply with all the Insurance terms and provisions. Minimum
                        responsibilities are detailed in Appendix A-1. No Back-Up Servicer acting as
                        Servicer shall have any liability or obligations pursuant to this paragraph, apart
                        from its responsibilities set forth in Appendix A-2 and expressly provided for in
                        this Insurance or in the Servicing Agreement.

Merlin U/W Agency Ltd
on behalf of

GoshawK Syndicate 102

PLEASE MAKE ALL PAYMENTS TO:
GOSHAWK SECURITIES LTD

REF | D | 0 | 0 | 0 | 2 | A | 0 | 0 | A | A | E | A



| BROKER  TYS | BROKER L.P.S.O. No.  572 | | CURRENCY INSD: | | | GROSS PREMIUM | |
|---|---|---|---|---|---|---|---|
| | | | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR010054 | 001 | ENDORSEMENT REF. | | | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | | | LLOYD'S | | |
| SERIAL    BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | | ILU | | |
| ASSURED/ACCOUNT       Life Receivables Trust | | LEADING UWR (MVA) | | | LIRMA | | |
| | | | | | OTHER COMPANIES | | |

$\mathcal{D}$oo2Aoo$\mathcal{A}\mathcal{A}\mathcal{E}\mathcal{A}$  (2)

It is hereby noted and agreed that the following bordereau is declared to this Policy.

**Period:**          From inception to 24th April 2001.

Total Net Death Benefit                                    US$34,915,352.00
Premium calculated at 4% of Net Death Benefit:            US$ 1,396,614.08
Additional Premium due hereon:                          US$   866,095.08

**Information:**       Qualified Life Insurance Policies totalling US10,762,975 of Net
Death Benefit previously insured under Policy number:  CR000252 are covered hereunder
with effect from inception.

Policy number: CR000252 is cancelled with effect from inception

The Additional Premium of US$866,095.08 due hereon is calculated as follows:-
Total Net Death Benefit insured hereunder – US$34,915,352.00 – (as declared per Lori
Wengatz's email dated 24th April 2001).
Premium calculated at 4% of Net Death Benefit – US$1,396,614.08
Less US$430,519 (premium paid in respect of CR000252)
Less US$100,000 (minimum and deposit premium paid in respect of CR010054)
Therefore Additional Premium due US$866,095.08

All other terms and conditions remain unchanged.
U.S. CLASSIFICATION:
24th April 2001.

| T N T I A L | MH | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.0. NUMBER  AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A.  NUMBER AND DATE |
| PLANNED SETTLEMENT  DATE: | |

REDACTED

Life Settlement Corporation/Mix Pomhanue Life Settlements
Closing Policy Files Brentywoods 1st Advance

The undersigned, certifies that the premiums set forth in this bordereau and each Remittance are equal to amount and listing to premiums taken into account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) fully with respect to each policy, after providing any provisions set forth on such Remittance in account for the hold that the Deferred Period Date may be different from the premium anniversary date.

By: _____
Name: _____
Title: _____

REDACTED

Life Settlement Corporation d/b/a Peachtree Life Settlements
Closing Policy Files Breakdown - 2nd Addenda

| Seller | Insured 1 Borrower | Insured 2 Guarantor | Insured 1 U.E. | Borrower 1 U.E. | Insured 1 L.E. (Fender) | Insured 2 L.E. (Fender) | Insured 2 Policy AKB | Policy Type | Issuance Carrier | Reassuring Carrier Rating | Policy Issued Date | Policy Anniversary Date | Net Death Benefit | Insured 1 Age | Insured 2 Age | Contingency Premium | Premium Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UE | UE | AKB | AKB | AKB | Universal Life | United of Omaha | A+ | 1/28/05 | 2/28/04 | $3,692,375.00 | 82 | 76 | $ 100,000 | No Premium Due |
| | | | 82 | 82 | AKB | AKB | | Universal Life | ClearVoice Life Annuity | A+ | 5/05/05 | 3/05/04 | $1,968,967.00 | 85 | | $ 55,897 | No Premium Due |
| | | | 85 | 85 | AKB | | | Universal Life | ClearVoice Life Annuity | A+ | 6/1/04 | 4/05/04 | $2,968,487.00 | 78 | | $ 55,897 | No Premium Due |
| | | | 76 | 76 | AKB | | | Universal Life | ClearVoice Life Annuity | AAA | 9/1/04 | 4/1/04 | $5,968,647.00 | 76 | | $ 48,567 | No Premium Due |
| | | | 84 | 84 | AKB | | | Universal Life | ClearVoice Life Annuity | AA | 6/1/04 | 5/1/04 | $1,000,000.00 | | | $ 45,300 | 9 annual premiums due: $13,124.00 due 8/29/04 |
| | | | | | | | | | Victory Party Life Insurance Company | | | | | | | | $13,124.00 due 8/29/05 $13,124.00 due 8/29/05 |
| | | | | | | | | | | | | | | | | | $13,124.00 due 8/29/06 $13,124.00 due 8/29/07 |
| | | | | | | | | | | | | | | | | | $13,124.00 due 8/29/08 |

| Total: | | | 85 | 85 | AYK AKB | AYK AKB | | Universal Life Universal Life | American General Life Insurance Company Lincoln National Life Insurance Company | AAA A+ | 5/29/03 10/8/04 | 5/29/04 | $4,000,000.00 $3,000,000.00 | | 78 72 | $ 100,000 $ 230,000 | No Premium Due 713 annual premiums as follows: $91,540.00 due 9/7/03 |
| | | | | | | | | | | | | | | | | | $91,540.00 due 9/7/04 $91,540.00 due 9/7/05 $91,540.00 due 9/7/06 $91,540.00 due 9/7/07 $91,540.00 due 9/7/08 $91,540.00 due 9/7/09 $91,540.00 due 9/7/10 $91,540.00 due 9/7/11 |
| | | | | | | | | | | | | | $17,661,476.00 | | | 782,368 | $51,147.00 due 9/7/12 |

The undersigned, certifies that the premiums set forth in this borderexol and such illustrations are equal in amount and timing to premiums taken into account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) with respect to each policy, other prorating any premiums set forth in such illustration to account for the fact that the Deferred Period Date may be different than the premium anniversary date.

Life Settlement Corporation, as Originator and Servicer

By: _____

Name: _____
Title: _____

| BROKER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO: CR010054 | | ENDORSEMENT REF. 002 | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | LEADING U/WR | LIRMA | | |
| | | | OTHER COMPANIES | | |

D0002A004AEA (2)

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

MAY 2001:                     DEATH BENEFIT:                         US$ 12,995,430.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:               US$ 47,910,782.00

ADDITIONAL PREMIUM DUE HEREON CALCULATED AT 4% ON US$12,995,430.00:                                      US$     519,817.20

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

13th JUNE 2001
LB

U.S. CLASSIFICATION:

| N I T I A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND/COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED

Life Settlement Corporation d/b/a Peach™ Life Settlements
Closing Policy Files Bordereau

Life Settlements
Licences

| Insured 1 | Insured 1 DOB Date | Insured 1 Age | Insured 2 | Insured 2 DOB Date | Insured 2 Age | Insured 2 UL Provider | Insured 1 UL Provider | Policy Type Universal Life | Insurance Carrier / Issuing Company | Insurance Carrier Rating | Policy Issue Date | Policy Anniversary Date | Net Death Benefit | Insured 1 Age | Insured 2 Age | Contingency Insurance Premium | Premium Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10-Sep-01 | 65 | | | | AVS | AVS | Universal Life | John Hancock Life Insurance and Annuity Company | AA/Aa3 | 19-Feb-01 | 19-Feb-01 | $897,925.00 | 68 | | $62,925 | $2,450.00 due February 26, 2008 ... due February 26, 2011 |
| 7 | | 66 | | 25-Aug-01 | 55 | AVS | AVS | Universal Life | Transamerica Occidental Life Insurance Company | AA/Aa3 | 15-Jul-01 | 15-Jul-01 | $1,000,000.00 | 52 | 78 | $53,250 | $23,000.00 due February 15, 2008 ... due February 15, 2011 |
| | 22-Aug-01 | 66 | | 22-Sep-01 | | AVS | AVS | Universal Life | Transamerica Occidental Life Insurance Company | AA/Aa3 | 07-Jul-01 | 16-Apr-01 | $1,000,000.00 | 77 | | $42,950 | $22,400.00 due October 7, 2007 ... due October 7, 2010 |
| | 03-Apr-01 | 70 | | | | AVS | AVS | Universal Life | Clarica Life Insurance Company | AA/Aa3 | 03-Apr-01 | 30-Apr-01 | $500,000.00 | 81 | | $ | $4,642 |
| | 21-May-01 | 76 | | 24-May-01 | | AVS | AVS | Whole Life | Prudential Insurance Company of America | A-/A3 | 24-Apr-01 | 24-May-01 | $3,000,000.00 | 79 | 84 | $ | $30,000.00 |
| | 12-Aug-01 | 86 | | 13-May-01 | | AVS | AVS | Universal Life | Transamerica Occidental Life Insurance Company | AA/Aa3 | 30-Jul-01 | 23-May-01 | $650,000.00 | 83 | 79 | $ | $4,006 |
| Totals | | | | | | | | | | | | | $9,047,925.00 | | | $ | $19,917 |

The undersigned, certifies that the premiums set forth in this bordereau and each Illustration are equal in amount and timing to premiums taken into account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) with respect to such policy, after providing any premiums set forth as such Illustration to account for the fact that the Deferred Period Data may be different than the premium anniversary date:

Life Settlement Corporation, as Originator and Servicer

By: _____

Name: _____   Date: _____

Title: _____

| BROKER **TYS** | BROK... L.P.S.O. No. **572** | CURRENT... | | GROSS PREMIUM IN ALL | M |
|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010054 | ENDORSEMENT REF. 003 | TOTAL | | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT. DUE DATE | DEF. | ADJ. | ILU |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | LEADING UWR (MNA) | LIRMA OTHER COMPANIES | | |

DOOO2AOOAA EA

IT IS HEREBY NOTED AND AGREED THAT WITH EFFECT FROM 1ST JULY 2001, DEFERRED PERIOD HEREON IS AMENDED TO READ AS FOLLOWS:

Deferred Period:    24 months after the end of the Life Expectancy of each Senior in respect of the relevant Qualified Life Insurance Policy relating to such Senior declared hereunder; in the case of a Survivorship Policy where both Seniors are alive at the date the Qualified Life Insurance Policy is purchased by the Assured, the Deferred Period shall be 24 months after the end of the Life Expectancy of the Senior with the longest Life Expectancy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

U.S. CLASSIFICATION:

| N T A ND/COY | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

L.P.S.O. NUMBER AND DATE

I.L.U. NUMBER AND DATE

L.I.R.M.A. NUMBER AND DATE

PLANNED SETTLEMENT DATE:

UMR REGISTRATION NO: CR010122                                    page 2 of 24

| | |
|---|---|
| **Effect Date:** | August 15th, 2001 |
| **Type:** | Contingency Insurance |
| **Form:** | J (A) NMA 2421 and as per slip wording.<br>No proposal form.<br>In the event of any conflict or inconsistency between the terms and conditions of this Insurance (represented by this slip that has been stamped on behalf of the Underwriters) and any policy form, jacket or wrapper issued by the Underwriters, the terms and conditions of this Insurance shall govern to the extent of such conflict or inconsistency. |
| **Underwriters:** | GOSHAWK SYNDICATE 102 AT LLOYDS.<br><br>It is understood and agreed that MERLIN UNDERWRITING AGENCY LTD shall have the authority to act for and bind the Underwriters with respect to any consent, confirmation, approval, amendment, waiver, supplement or any other action or undertaking required or permitted to be taken, given, granted or delivered by the Underwriters hereunder. |
| **Assured:** | Life Receivables Trust, formed under the Trust Agreement, dated as of June 9, 2000 (the "Trust Agreement") by and among Life Receivables I, LLC, as Settlor and Initial Beneficiary, and The Bank of New York, as trustee, as amended and in effect as of February 2, 2001 and as further amended from time to time in accordance with its terms. |
| **Trustee:** | The Bank of New York as UTI Trustee and SUBI Trustee (as such terms are defined in the Trust Agreement) or any successor trustee appointed in accordance with the Trust Agreement. |
| **Originator:** | Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life Settlements, a Georgia corporation). |
| **Servicer:** | Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life Settlements, a Georgia corporation), and its successors and permitted assigns. |
| **Back-Up Servicer:** | BNY Asset Solutions LLC or, if BNY Asset Solutions LLC shall no longer be serving as Back-Up Servicer of Assured, such other party acting in such capacity (as to the services to be performed in respect of this Insurance, as set forth in Appendix A-2 hereto) and approved by Underwriters in accordance with the terms of the Servicing Agreement. BNY Asset Solutions LLC shall not be and not be deemed to be a party to this Insurance. |

UMR REGISTRATION NO: CR010122                                    page 3 of 24

**Period:** This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured on or after August 15, 2001 (or, if later, declared on a bordereau hereunder submitted on or after August 15, 2001) and through and including the first to occur of (x) February 14, 2002 (or, if such day is not a Business Day, the next succeeding Business Day) or (y) the date on which the Maximum Aggregate Limit has been reached.

**Interest:** To indemnify the Assured in respect of the Net Death Benefit at the time of purchase by the Assured of each Qualified Life Insurance Policy (or where a higher Net Death Benefit has been declared at the time of such purchase to be payable at the end of the Deferred Period and the applicable Contingency Insurance Premium is based and paid at the inception of this Insurance on such higher amount, the Net Death Benefit as of the end of the Deferred Period) acquired by the Assured where the Senior is not deceased at the end of the Deferred Period.

**Limits:** Up to but not exceeding US$ 5,000,000 Net Death Benefit for any one Qualified Life Insurance Policy / any one Senior, unless approved in writing by Underwriters (such approval not to be unreasonably withheld).

**Maximum Aggregate Limit:** The maximum aggregate limit of Net Death Benefit of all Qualified Life Insurance Policies declared under this Insurance (the "**Maximum Aggregate Limit**") shall be US$ 50,000,000.

**Deferred Period:** 24 months after the end of the Life Expectancy of each Senior in respect of the relevant Qualified Life Insurance Policy relating to such Senior declared hereunder; in the case of a Survivorship Policy where both Seniors are alive at the date the Qualified Life Insurance Policy is purchased by the Assured, the Deferred Period shall be 24 months after the end of the Life Expectancy of the Senior with the longest Life Expectancy.

**Situation:** Worldwide but in respect of policies acquired by the Assured issued by insurance companies licensed within the United States of America, unless noted hereon by special agreement.



UMR REGISTRATION NO: CR010122                          page 4 of 24

**Conditions Precedent:**  Any life insurance policy proposed to be acquired by the Assured as to which (i) the Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in <u>Appendix B-1</u> hereto and (ii) the Back-Up Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in <u>Appendix B-2</u> hereto (each certificate of the type described in clause (i) or (ii) of this sentence is referred to in this Insurance as a "Coverage Certification") is hereby deemed to be accepted for coverage under this Insurance from and after the date of acquisition of such policy by the Assured, subject in each case to the Underwriters' right to terminate coverage with respect to such life insurance policy due to non-payment of the applicable Contingency Insurance Premium in accordance with the section entitled **Contingency Insurance Premium** below.

**Representations and Warranties:**  By execution of this contract of Insurance and its acceptance of the duties specified in <u>Appendix A-1</u>, the Servicer represents and warrants as of the date hereof (and will be deemed to have represented and warranted with respect to each and every life insurance policy as of the date such life insurance policy is deemed accepted for coverage under this Insurance upon delivery of a Coverage Certification) that:

1.  It has truthfully declared all material facts actually known to it which would influence a reasonable Underwriter in determining:
    a)    whether or not to accept the risk
    b)    the premium
    c)    the conditions, exclusions and limitations,
    having diligently made all reasonably necessary inquiries to establish those facts provided that it shall not be required to (x) make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled **Medical Testing** below or (y) disclose any of its own internal or separately obtained analyses or projections or other actuarial information or (z) disclose any quotations or information or proposals provided by other underwriters or insurers.



UMR REGISTRATION NO: CR010122                    page 5 of 24

**Representations and**
**Warranties Continued:**

2.   It has no actual knowledge as of the date of the Coverage Certification relating to a Qualified Life Insurance Policy of any undisclosed matter, fact or circumstance actual or threatened, that materially increases or is likely to materially increase the possibility of a Senior surviving his / her Life Expectancy by more than 24 months provided that it shall have no obligation or duty to make inquiry of any third party in relation to such matter and provided it shall have no obligation or duty to make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled **Medical Testing** below.

3.   It has declared that the information provided to the Underwriters, as part of the proposal for this Insurance, is in all material respects true and accurate and agrees that such information forms the basis of this Insurance; provided that it does not represent or warrant that (w) any sample polices provided to the Underwriters will necessarily be representative of the policies that become subject to this Insurance; (x) it has made any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled **Medical Testing** below; (y) it has disclosed any of its own internal or separately obtained analyses or projections or other actuarial information; or (z) it has disclosed any quotations or information or proposals provided by other underwriters or insurers.

4.   It has advised Underwriters of any change in the information detailed in paragraph 3 of this section which took place prior to the date of the Coverage Certification.

5.   It has agreed to undertake to perform the activities and undertakings as set forth in Appendix A-1.

6.   The purchase price paid to a Senior in respect of any Qualified Life Insurance Policy covered hereby is consistent with applicable legal and regulatory requirements.

7.   The amount of Contingency Insurance Premium payable with respect to each Qualified Life Insurance Policy covered hereby will be the subject of a notice of borrowing under the Credit Agreement referred to in the section entitled **Certain Acknowledgments** below and is, accordingly, expected to be paid within the time period specified under **Contingency Insurance Premium** below.

UMR REGISTRATION NO: CR010122                     page 6 of 24

**Claim Adjustment Period:**

On or prior to the 60th day before the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver drafts of a Claim Certification and Effective Assignment (each meeting the requirements set forth in the section entitled Claim Procedures below), a copy of the form issued by the relevant life insurance company which is proposed to be used to complete an Effective Assignment of the applicable Qualified Life Insurance Policy, and a copy of the complete Insurance Policy File with respect to such Qualified Life Insurance Policy (collectively, the "Proposed Claim Documents"). The Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will promptly provide such further information and documents with respect to the Proposed Claim Documents as the Underwriters and their representatives may reasonably request. If, upon review of the Proposed Claim Documents and any other information provided to the Underwriters, the Underwriters determine reasonably and in good faith that (a) according to the issuing insurance company, such Qualified Life Insurance Policy is no longer in force or (b) according to the issuing insurance company, the Assured is not the owner of and beneficiary under such Qualified Life Insurance Policy, then the Underwriters will have the right, exercisable on or prior to the 30th day prior to the expiration of the relevant Deferred Period by written notice to each Interested Person, to dispute the Underwriters' obligation to pay a Claim in respect of such Qualified Life Insurance Policy upon delivery of a Claim Certification with respect thereto (a "Claim Dispute").

Each Claim Dispute will be promptly referred to arbitration in accordance with the applicable procedures set forth in the section entitled Arbitration below; provided, that any such Claim Dispute shall be automatically withdrawn in the event that the circumstances giving rise to such Claim Dispute have been cured by any Interested Person to the reasonable satisfaction of the Underwriters; and provided, further, that under no circumstances (other than for the reasons set forth in clause (a) or (b) of the immediately preceding sentence) shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim as set forth in the section entitled Claim Procedures.

**Claim Procedures:**

As soon as practicable following the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver a Claim Certification (as defined below) to substantiate the amount of loss claimed under this Insurance.

**Claim Procedures
Continued:**

The following procedures shall apply to each Claim made upon this Insurance (a "Claim"):

1. *Claim Certification.* Claims upon this Insurance shall be made upon presentation by the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, to Underwriters of a certificate of the Servicer in the form set out in Appendix C (a "Claim Certification").

2. *Effective Assignment.* Each Claim Certification shall be accompanied by an assignment (legally or beneficially in the manner provided in this paragraph 2) of the relevant Qualified Life Insurance Policy to Goshawk Syndicate 102, on behalf of the Underwriters, to the extent of the Assured's legal or beneficial interests therein. Failure so to assign said policy for any reason (other than negligence or wilful misconduct on the part of the Underwriters) will invalidate a Claim solely with respect to the Qualified Life Insurance Policy not so assigned. Assignment of a Qualified Life Insurance Policy in respect of a Senior who is not deceased at the end of the relevant Deferred Period shall be effective for purposes of fulfilling the requirements set forth in this paragraph 2 for payment of a Claim if the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured:

   a) Executes a change of beneficiary designation, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under each such Qualified Life Insurance Policy, naming Goshawk Syndicate 102 at Lloyds, as sole beneficiary and

   b) Either (i) executes an absolute assignment, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under such Qualified Life Insurance Policy of the ownership of such Qualified Life Insurance Policy to Goshawk Syndicate 102 at Lloyds; or (ii) if such assignment is restricted by the laws or regulations of any State or by the policies and procedures of the insurer under such Qualified Life Insurance Policy or is for any other reason (in the reasonable judgment of the Servicer or the Back-Up Servicer) not practicable, executes a collateral assignment to Goshawk Syndicate 102 at Lloyds, making the designation of Goshawk Syndicate 102 at Lloyds, as sole beneficiary under the Qualified Life Insurance Policy irrevocable and otherwise meeting the requirements of paragraph 4 below.

**Claim Procedures**
**Continued:**

> Any assignment pursuant to this paragraph 2 shall be conditioned only upon payment of the related Claim in accordance with paragraph 3 of this section. An assignment meeting the requirements of this paragraph 2 is referred to herein as an "Effective Assignment."

3.    *Payment.* On or prior to the 15th Business Day after receipt of each Claim Certification (accompanied by an Effective Assignment), the Underwriters will pay an amount equal to the aggregate Net Death Benefit payable under the related Qualified Life Insurance Policy to the Collection Account by wire transfer of immediately available funds in US dollars.

4.    *Contingency Insurer Nominee Trust.* The Trust Agreement provides, and at all times will provide, that each Qualified Life Insurance Policy will on the date of payment by the Underwriters of the Claim relating to an Effective Assignment of such Qualified Life Insurance Policy to the Underwriters as set forth in paragraph 3 above be removed from the SUBI Trust (as defined in the Trust Agreement) and allocated to the Contingency Insurer Nominee Trust (as defined in the Trust Agreement) to be held in trust for the benefit of the Underwriters if (x) an Effective Assignment of the type described in paragraph 2(b)(i) above for whatever reason (including without limitation any failure or delay of the issuing insurance company to acknowledge or ratify such Effective Assignment) has not conveyed such Qualified Life Insurance Policy to the Underwriters as of such date or (y) an Effective Assignment of the type described in paragraph 2(b)(ii) above has been employed in connection with such Qualified Life Insurance Policy.

All life insurance policies held in the Contingency Insurer Nominee Trust will be held by the Assured as custodian and nominee for the Underwriters, and the Assured (or the Servicer or Back-Up Servicer acting as agent for the Assured) will (i) act (and refrain from acting) with respect to any such life insurance policy only at the direction of the Underwriters, (ii) irrevocably instruct the insurance company issuing such life insurance policy to make all payments thereunder to an account designated by the Underwriters and (iii) hold any payments made by the issuing insurance company with respect to such life insurance policy in trust for the Underwriters and promptly (and in no event later than one Business Day after receipt thereof) pay over such amounts to an account designated by the Underwriters.



UMR REGISTRATION NO: CR010122                                    page 9 of 24

**Cancellation:**        In the event of a material breach of this Insurance by the Assured or the Underwriters, the non-breaching party may, by giving 30 days prior notice of cancellation, cancel coverage in respect of Qualified Life Insurance Policies acquired after the expiry of such notice provided that if the breach is capable of remedy, the party not in breach shall first notify the other party (and each other Interested Person) of the breach and request the breach to be remedied. If the breach is not remedied within 14 days after such notice, the other party may then give 30 days written notice of cancellation. In the event of cancellation, the Underwriters shall cover under the terms and conditions of this Insurance all Qualified Life Insurance Policies upon which the Assured or Originator or Servicer has signed a binding agreement to purchase before the expiration of the 30 day cancellation period, regardless of when such purchase is finally consummated. Except as expressly provided in the section entitled **Contingency Insurance Premium** below, this policy may not be revoked or cancelled with respect to any policy as to which a Coverage Certification has been delivered and any cancellation of coverage by either party shall in no event affect existing coverage of Qualified Life Insurance Policies as to which a Coverage Certification has been delivered before expiration of the notice period contained in the cancellation notice.

**Medical Testing:**     All medical testing in connection with assessment of a Senior's Life Expectancy shall be undertaken by a Qualified Consulting Physician (as defined herein).

**Notices:**             Any notice required or permitted hereunder must be given in writing to each Interested Person either by personal delivery, guaranteed overnight courier or facsimile, and shall be deemed effectively given (i) in the case of personal delivery, upon delivery to the party to be notified, (ii) in the case of delivery by overnight courier, on the date of delivery guaranteed by such overnight courier, or (iii) in the case of notice by facsimile, upon telephone confirmation of receipt by the party to be notified. Any such notice shall be addressed to the relevant party at the address given on <u>Annex I</u> hereto or to such other address as such party has given to all Interested Persons in the manner specified in this section.

**Qualified Life
Insurance Policy
Criteria:**              A life insurance policy shall constitute a Qualified Life Insurance policy for purposes of this Insurance upon certification by the Servicer and the Back-Up (which certification shall be deemed made by the delivery by the Servicer and the Back-Up Servicer of a Coverage Certification with respect to such life insurance policy) that:



UMR REGISTRATION NO: CR010122

**Qualified Life
Insurance Policy
Criteria:**

1.  the Life Expectancy of the Senior (determined in accordance with the requirements set forth under Life Expectancy below), is not less than 36 months nor greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report; in the case of a Survivorship Policy, the Life Expectancy of the Senior having the longest Life Expectancy may not exceed 120 months from and after the date of the relevant Qualified Consulting Physician's report;

2.  such life insurance policy is as of the date of the relevant Coverage Certification issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's; and

3.  such policy meets the following minimum qualifying criteria on the date of the relevant Coverage Certification:

    a)  Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums;

    b)  Such policy (i) provides for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (ii) has a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years; and

    c)  The Net Death Benefit of such policy shall be no larger than US$5,000,000 unless advance written approval is granted by Underwriters (such approval not to be unreasonably withheld); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000, even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000.

IMR REGISTRATION NO: CR010122

page 11 of 24

**Qualified Life Insurance Policy Criteria:**

In giving any certification as to the matters set forth in paragraph 3. above, the Back-Up Servicer (whether acting in its capacity as Back-Up Servicer or as Successor Servicer) shall be entitled to rely on the information included in applicable Insurance Policy Files with respect to giving such certification, and shall in no event be required to deliver any certificate other than as to the matters set forth in Appendix A-2 or in the form attached as Appendix B-2.

Each life insurance policy as to which a Coverage Certification shall have been delivered shall constitute a Qualified Life Insurance Policy hereunder without need for any additional action of any party.

**Tracking:**

Tracking of Seniors under each Qualified Life Insurance Policy shall be undertaken by the Servicer or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Tracking of Seniors under such Qualified Life Insurance Policy shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Tracking of such Seniors.

**Monitoring:**

Monitoring of all Qualified Life Insurance Policies is to be undertaken by the Servicer or Back-Up Servicer. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Monitoring of such Qualified Life Insurance Policy and payment of premiums thereon shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Monitoring of such Qualified Life Insurance Policy or pay premiums thereon (whether or not such Qualified Life Insurance Policy is held by the Contingency Insurer Nominee Trust as provided in the section entitled Claim Procedures above).

Governing Law;
Waiver of Jury Trial;
Submission to
Jurisdiction and
Consent to Service
of Process:

THIS INSURANCE SHALL BE SUBJECT TO, AND THIS CONTRACT
SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF
NEW YORK, U.S.A. WITHOUT GIVING EFFECT TO CONFLICT OF LAWS
PRINCIPLES THEREOF.   EACH PARTY TO THIS INSURANCE AND
EACH PERSON LISTED ON ANNEX I HERETO HEREBY IRREVOCABLY
AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT
OF OR RELATING TO THIS INSURANCE OR ANY RELATED
TRANSACTIONS MAY BE BROUGHT IN THE COURTS OF THE STATE
OF NEW YORK LOCATED IN NEW YORK CITY OR OF THE UNITED
STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK
AND   HEREBY   EXPRESSLY   SUBMITS   TO   THE   PERSONAL
JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES
THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER
VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN
INCONVENIENT FORUM.   EACH SUCH PARTY AND EACH SUCH
PERSON HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF
PROCESS OF ANY OF THE AFOREMENTIONED COURTS BY NOTICE IN
THE MANNER SPECIFIED IN THE SECTION ENTITLED NOTICES
ABOVE.     EACH  SUCH  PARTY  AND  EACH  SUCH  PERSON
IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY
LAW, ANY RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION OR
PROCEEDING.

It is further agreed that service of process upon the Underwriters in any such legal
action or proceeding may be made upon Mendes & Mount LLP, 750 7th Avenue,
New York, NY 10019-6829, U.S.A. and that in any suit instituted against any
one of them upon this contract, Underwriters will abide by the final decision of
such Court or of any Appellate Court in the event of an appeal.  The above-
named are authorized and directed to accept service of process on behalf of
Underwriters in any such suit and/or upon the request of the Assured or any other
Interested Person to give a written undertaking to the Assured (or such Interested
Person) that they will enter a general appearance upon Underwriters' behalf in the
event such a suit shall be instituted.  Further, pursuant to any statute of any state,
territory or district of the United States which makes provision therefor, the
Underwriters hereby designate the Superintendent, Commissioner or Director of
Insurance or other officer specified for that purpose in the statute, or his successor
or successors in office, as their true and lawful attorney upon whom may be
served any lawful process in any action, suit or proceeding instituted by or on
behalf of the Assured or any other Interested Person arising out of this Insurance,
and hereby designate the above-named as the person to whom the said officer is
authorized to mail such process or a true copy thereof.



UMR REGISTRATION NO: CR010122                              page 13 of 24

**Reporting:**           All Qualified Life Insurance Policies from time to time covered by this
                         Insurance will be reported by the Servicer (or, if the Back-Up Servicer shall
                         have assumed the duties of Servicer under the Servicing Agreement, the
                         Back-Up Servicer or its designated subservicer as set forth in the Servicing
                         Agreement) to Goshawk Syndicate 102 at Lloyds, by monthly *bordereaux* in
                         the form attached hereto as <u>Appendix D</u>, delivered on or before the 15th day of
                         each month (or if such day is not a Business Day, the next succeeding Business
                         Day) during the Insurance period and such *bordereaux* will include (in the case of
                         any policy that is the subject of the most recent Coverage Certification) copies of
                         the Qualified Consulting Physician's report referred to in the section entitled
                         **Medical Testing** above. Subject to the provisions of the section entitled
                         **Cancellation** the Assured shall notify all Interested Persons when it no longer
                         intends to declare Qualified Life Insurance Policies to this Insurance.

**Information:**         The Servicer will deliver to the Underwriters (i) all and any material
                         information relating to this Insurance received by the Assured or the Servicer
                         through routine Tracking procedures or other channels relating to the medical
                         circumstances of each Senior within 7 days after request therefor and/or (ii) a
                         current schedule of Seniors by the Underwriters within a reasonable period of
                         time after request therefor; <u>provided</u> that no person shall be obligated to
                         provide any requested information to the extent prohibited by law, regulation
                         or court order.

**Limitations on
Assignment:**           Policies comprising Qualified Life Insurance Policies may not be assigned,
                         except as collateral to lenders (including without limitation Abbey National
                         Treasury Services plc and any of its affiliates) or other funding providers (or their
                         agents or trustees) of the Assured, in whole or in part, without the prior written
                         consent of the Underwriters, which will not be unreasonably withheld or delayed;
                         provided that this section shall not prohibit any assignment, for collateral to
                         lenders or otherwise by outright assignment, of beneficial trust interests in the
                         Assured and provided further that this section shall not prohibit the Assured from
                         segregating any Qualified Life Insurance Policy or other property owned by it or
                         the Insurance provided hereunder into a separate subtrust for a separate
                         beneficiary or prohibit the appointment of a successor trustee for the Assured.
                         This Insurance may not be assigned by the Underwriters without the prior written
                         consent of the Lender.

UMR REGISTRATION NO: CR010122                                    page 14 of 24

**Certain Acknowledgments; Representations and Warranties:**

The Underwriters acknowledge and understand that loans to be used for, among other things, the acquisition of life insurance policies by the Assured and payment of premiums and certain expenses in connection therewith are being provided by Abbey National Treasury Services plc (together with its successors and assigns, the "Lender") pursuant to a Credit Agreement, dated as of February 2, 2001, between the Lender and Life Receivables II, LLC, as Borrower, and that the Lender is being granted a first priority security interest in and charge over certain assets of Life Receivables II, LLC and of the Assured, including without limitation a certificate representing ownership of the beneficial interest in the SUBI Trust and interests of the Assured under the Servicing Agreement (together with the transactions contemplated thereby and all other documents and instruments entered into in connection therewith, the "Lending Transactions"). The Underwriters consent to the terms of the Lending Transactions and acknowledge the rights and remedies of the Lender and its agents thereunder, and agree that the Lender and its collateral agent shall be additional Loss Payees under this Insurance and have the benefit of the covenants and agreements of the Underwriters hereunder.

The Underwriters represent and warrant for the benefit of the Lender and its agents that (i) the execution, delivery and performance by the Underwriters of this Insurance are within the Underwriters' powers and have been duly authorized by all necessary action on the part of the Underwriters, (ii) this Insurance has been duly and validly executed and delivered by the Underwriters and (iii) this Insurance constitutes the legal, valid and obligation of the Underwriters, enforceable against the Underwriters in accordance with its terms.

**Servicer Duties:**

The Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer), on behalf of the Assured, shall maintain adequate records in connection with the subject matter insured hereunder.

**Subrogation:**

In the event of any payment under this Insurance with respect to a Qualified Life Insurance Policy, Underwriters shall (to the extent of their payment and to the extent that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign such Qualified Life Insurance Policy to the Underwriters) be subrogated to all the Assured's rights of recovery under such Qualified Life Insurance Policy and the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer) shall (at the Underwriters' expense) take such actions (in the case of the Back-Up Servicer, in accordance with the BNYAS Servicing Standard, as defined in the Servicing Agreement) reasonably requested by Underwriters (at such times as required herein) to confirm and assure such rights.

UMR REGISTRATION NO: CR010122                         page 15 of 24

**Subrogation**
**Continued:**

The Underwriters shall have no recourse to the Assured in the event that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign the relevant Qualified Life Insurance Policy to the Underwriters.

**Loss Payees:**

Any payments due under the terms and conditions of this Insurance shall, upon notice given by the Lender (or its collateral agent serving in connection with the Lending Transactions) as Loss Payee hereunder, be made by the Underwriters directly to the Lender (or such collateral agent) instead of to the Collection Account. Timely payment in full of the Net Death Benefit (as provided above under **Interest and Claims Procedures**) by Underwriters to the Loss Payee(s) to an account specified pursuant to this section shall be a sufficient and complete discharge of all Underwriters' obligations to the Assured and Loss Payee(s) in connection with said losses.

**Mitigation:**

Underwriters reserve the right, if they so wish, to take such reasonable steps as they deem necessary to prevent, mitigate or minimise a loss; provided that such action is not in contravention of the terms of the Lending Transactions or any other agreement Assured has with the Lender or any other lenders or other funding providers (or their agents or trustees) or in violation of any applicable law, rule or regulation (including without limitation those relating to insurance or insurance brokerage).

**Bankruptcy**
**Proceedings:**

The Underwriters agree not to commence or join in any case or other proceeding against the Assured, Life Receivables II, LLC or any of their respective affiliates seeking liquidation, winding-up, reorganization or other relief with respect to such person or entity or its debts under any liquidation, insolvency, bankruptcy, moratorium, reorganization or similar law of any relevant jurisdiction applicable to such person or entity now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of such person or entity or any material part of its property prior to the date which is one year and one day after payment in full of all obligations owed by any such person or entity to the Lender or its agents or affiliates or their respective representatives in connection with any of the Lending Transactions.

**Recovery of Premium:** The Contingency Insurance Premium and any expense incurred in the formulation of a Claim hereunder shall not be a recoverable item.



Recourse:

1. *Reduction of Payments.* The Underwriters will not be permitted to reduce any payments under this Insurance as a result of (i) any breach by the Servicer and/or the Originator of their representations, warranties, covenants or provisions herein (including without limitation those related to Tracking and Monitoring and those under Representations and Warranties) or in the Servicing Agreement, (ii) any breach by the Back-Up Servicer of its representations, warranties, covenants or provisions set forth herein or in the Servicing Agreement or (iii) except as provided in the immediately following sentence, any action or inaction on the part of the Assured or any other person or entity. Notwithstanding the foregoing, the Underwriters shall be permitted to reduce payments under this Insurance as expressly provided in clause (b) of the definition of "Net Death Benefit" below.

2. *Obligations Unconditional.* Subject only to the section entitled Contingency Insurance Premium below, the Underwriters agree that each of their duty to accept for coverage any life insurance policy as to which a Coverage Certification has been delivered and their obligation to pay the full and complete Net Death Benefit to the Assured by payment into the Collection Account or to the Loss Payee within the time period specified after delivery of a Claim Certification and an accompanying Effective Assignment (A) is absolute, unconditional and irrevocable, (B) shall not be affected by any change in the legal existence, structure or ownership of the Assured, the Servicer, the Back-Up Servicer, the Originator, or any of their respective members, beneficial holders or stockholders or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any such person or entity or any resulting release or discharge of any obligation of any such person or entity, and (C) shall not be subject to any right of rescission, set-off, diminution or counterclaim or defense of any kind, including without limitation (i) fraud or misrepresentation by any person or entity, (ii) any failure by (or question or issue regarding the ability of) the Assured, the Servicer, the Back-Up Servicer or the Originator or any other person or entity or any of their respective officers, directors, members, agents or employees or representatives to comply with any covenant or agreement contained in this Insurance or the Servicing Agreement or in any other agreement or instrument or any applicable legal requirement, (iii) any breach of or inaccuracy in any representation, warranty, certification or statement made by the Assured, the Servicer, the Originator, the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or the Servicing Agreement or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance,



REGISTRATION NO: CR010122                          page 17 of 24

Recourse
Continued:

(iv) any negligence or misconduct by the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity or their respective affiliates or their respective directors, members, agents, employees or representatives, (v) any delay or failure by the insurer under a Qualified Life Insurance Policy which is the subject of an Effective Assignment in acknowledging the interests of the Underwriters thereunder, or (vi) any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Underwriters hereunder; it being understood and agreed that the Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.

3    *Servicer Indemnities.* Notwithstanding paragraphs 1 and 2 of this section, by its acceptance of the duties specified in Appendix A-1, the Servicer and the Originator agree to indemnify the Underwriters against losses in respect of any Qualified Life Insurance Policy as to which the Underwriters make payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy, provided, however, that the foregoing indemnity shall in no way be deemed to impose on any of the Originator or the Servicer any obligation, other than to the extent specifically resulting from the breach of the representation or warranty set forth herein of the rating of each insurer or from the inaccuracy of the Coverage Certification with respect to such rating), to reimburse the Underwriters for losses arising solely from the financial inability of the insurer of a Qualified Life Insurance Policy to make payment when due on such Qualified Life Insurance Policy, and provided, further, however, that no Back-Up Servicer shall have any obligations pursuant to this paragraph 3, whether acting as successor Servicer or otherwise. Neither the effect of any representation or warranty made by the Servicer pursuant to this Insurance nor the Servicer's obligations under this paragraph 3 nor any other recourse available against the Servicer under this Insurance shall be diminished by any access, investigation or due diligence inquiry conducted by the Underwriters or their representatives, including without limitation pursuant to the procedures described in the section entitled **Claim Adjustment Period** above.

The Underwriters shall have no obligation to assume the payment obligation of any insurer of a Qualified Life Insurance Policy that fails to make payment when due on such Qualified Life Insurance Policy solely as a result of the financial inability of such insurer to make such payment.



Recourse
Continued:

4. *Insurer Approval of Effective Assignment.* No delay or failure by any insurer under a Qualified Life Insurance Policy in acknowledging or consenting to an Effective Assignment shall operate to excuse or relieve the Underwriters of the obligation to pay amounts due in respect of a Claim made in compliance with the procedures set forth in the section entitled **Claim Procedures** above.

5. *Sole Remedy.* Paragraph 3 of this section sets forth the sole and exclusive remedy of the Underwriters for losses arising out of, in relation to or in connection with any and all (i) breaches of or inaccuracies in any representations, warranties, certifications or statements made by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (ii) instances of fraud or misrepresentation committed by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in connection with this Insurance, the Servicing Agreement or any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (iii) breaches of any covenants or agreements of the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity in this Insurance or the Servicing Agreement or any other agreement or instrument or of any legal requirement or (iv) any other matter covered in paragraph 2 of this section. In particular, the Underwriters shall have no right for any reason whatsoever (including without limitation those enumerated in the immediately preceding sentence) to reduce any amounts payable in respect of a Claim made in accordance with the claims procedures set forth in the section entitled **Claim Procedures** above or cancel or terminate coverage hereunder with respect to any Qualified Life Insurance Policy which is the subject of a Coverage Certification.



UMR REGISTRATION NO: CR010122                    page 19 of 24

**Amendments and**
**Waivers:**        Any term of this Insurance may be amended and the observance of any term of
this Insurance may be waived, with but only with, the written consent of (i) the
Underwriters, (ii) the Lender, (iii) if such amendment or waiver could reasonably
be expected to materially and adversely affect the Collateral Agent acting in
connection with the Lending Transactions in its capacity as such, the Collateral
Agent, (iv) if such amendment or waiver could reasonably be expected to
materially and adversely affect the Trustee of the Assured acting in its capacity as
such, the Trustee of the Assured, (v) if such amendment or waiver could
reasonably be expected to materially and adversely affect the Servicer or Back-
Up Servicer, the Servicer or Back-Up Servicer, as the case may be, and (vi) for so
long as no Event of Default under the Lending Transactions has occurred and is
in existence, the Assured. Unless otherwise specified in such waiver, a waiver
given hereunder shall be effective only in the specific instance and for the
specific purpose for which given. No failure or delay by any Interested Person in
exercising any right, power or privilege hereunder shall operate as a waiver
thereof, nor shall any single or partial exercise thereof preclude any other or
further exercise thereof or the exercise of any other right, power or privilege.

**Definitions:**       <u>Business Day</u>

Means a day (other than a Saturday or Sunday) on which commercial banks and
insurance companies are open for business in London and New York City.

<u>Collection Account</u>

Means the account of Life Receivables II, LLC maintained at the Collateral
Agent then acting in connection with the Lending Transactions and identified on
<u>Annex II</u> to this Insurance, or such different account as the Collateral Agent or
the Lender has from time to time designated by written notice to each other
Interested Person in accordance with the notice provisions of this Insurance.

<u>Contestability Period</u>

Means the period of time after the issuance of a Qualified Life Insurance Policy
established by the language of that Qualified Life Insurance Policy and/or state or
other applicable law, including any applicable suicide period, during which the
issuing insurer may contest the Senior's right to benefits under that Policy (other
than for non-payment of premiums by the Senior).

<u>Face Value</u>

Means the amount of a total death benefit payable under the Senior's life
insurance policy.



**Definitions**
**Continued:**

### Insurance Policy File

Means a complete policy file meeting the requirements of Item 7 of <u>Appendix A-1</u> and containing all other documents and information necessary to determine whether the criteria set forth in <u>Schedule III</u> to the Credit Agreement have been satisfied with respect to each Eligible Life Insurance Policy (as defined therein).

### Interested Persons

Means each person or entity listed on <u>Annex I</u> hereto together with the successors and permitted assigns of such person or entity.

### Life Expectancy

Means the remaining period in months that the Senior is expected to live after the date of a Qualified Consulting Physician's report, as assessed and given by a Qualified Consulting Physician in writing within 90 days prior to the date of the Coverage Certification given with respect to the Qualified Life Insurance Policy insuring the life of such Senior. If the assessment is given as a range between two numbers of months, Life Expectancy will be the higher of the two numbers in the range. In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under the policy.

### Loss Payee

Means the Assured, the Lender or the collateral agent then serving in connection with the Lending Transactions and any other person or entity who is named as an additional loss payee under this Insurance by notice to the Underwriters given with the prior written consent of the Lender, together with such person's successors and permitted assigns.

### Monitoring

Means (1) the timely disbursement of amounts on deposit in applicable accounts maintained under the Lending Transactions to make periodic premium payments necessary to keep Qualified Life Insurance Policies in force through the date of any Effective Assignment to the Underwriters pursuant to the section entitled **Claim Procedures** above and (2) the timely filing of claims to the issuing insurance company after the death of the relevant Senior.



**Definitions**
**Continued:**

### Net Death Benefit

Means, in relation to a Qualified Life Insurance Policy, (1) the lesser of (a) the Face Value of such Qualified Life Insurance Policy as of end of the Deferred Period or (b) the amount listed as the Net Death Benefit in the *bordereau* pertaining to such Qualified Life Insurance Policy plus (2) (a) any additional value (or refund of premium) paid or payable pursuant to that Policy following the relevant Senior's death minus (b) the amount (if any) of any premiums necessary to keep such Qualified Life Insurance Policy in force which are due and payable but not yet paid (and accrued interest thereon, if any), in each case being outstanding as of the end of the Deferred Period.

### Premium Taxes

Means all taxes, duties, charges, assessments or withholdings imposed on any amount due to the Underwriters under the section entitled **Contingency Insurance Premium** below by the United States of America or any state or other political subdivision thereof, but only to the extent claimed at least ten Business Days prior to the date any such amount due to the Underwriters is payable in a certificate signed by the Underwriters setting forth the taxing jurisdiction, and the type and amount of such tax, duty, charge, assessment or withholding and requesting payment thereof. In the event that the Servicer disputes the applicability of Premium Taxes to such amounts, the Servicer and the Underwriters shall jointly appoint a nationally recognized law firm or accounting firm to determine the issue, and the decision of such firm shall be conclusive.

### Qualified Consulting Physician

Means (a) American Viatical Services of Woodstock, Georgia, USA, (b) any other independent third party consulting physician or group of consulting physicians approved in advance by the Underwriters in writing, such approval not to be unreasonably withheld.

### Qualified Life Insurance Policy

Means a life insurance policy which both the Servicer and Back-Up Servicer have declared in a Coverage Certification conforms to the minimum qualifying criteria set forth in the section entitled **Qualified Life Insurance Policy Criteria** above.

**Definitions**
**Continued:**

### Senior

Means an individual aged 65 or over on the date of purchase of a life insurance policy by the Assured (or, if the Underwriters shall have consented in writing, an individual aged 64 1/2 or over on the date of purchase of a life insurance policy by the Assured and who has been given a Life Expectancy in accordance with the section entitled Qualified Life Insurance Policy Criteria above by a Qualified Consulting Physician and, in the case of Survivorship Policies, shall mean the individual whose death would give rise to a claim under the relevant life insurance policy.

### Servicing Agreement

Means the Servicing Agreement, dated as of February 2, 2001, among Life Settlement Corporation, BNY Asset Solutions LLC, Life Receivables II, LLC, Babcock & Brown LP and the Assured.

### Successor Servicer

Has the meaning given in the Servicing Agreement.

### Survivorship Policy

Means a Qualified Life Insurance policy which provides for payment of a Net Death Benefit upon the later to die of two Seniors.

### Tracking

Means periodic (monthly in the case of remaining life expectancies of 24 months or less; quarterly in the case of remaining life expectancies of over 24 months) contact (of such nature as the Servicer or Back-Up Servicer may in its absolute discretion determine) with the Senior (or Seniors) insured under a Qualified Life Insurance Policy (or such Senior's representative), and shall include, in the case of any Senior with whom direct or indirect contact is impossible, commercially reasonable efforts to determine whether or not such Senior is deceased, in all cases, subject to any restrictions or limitations imposed by law or regulation.

UMR REGISTRATION NO: CR010122                              page 23 of 24

**Arbitration:**

1. All disputes and differences arising under or in connection with this Insurance shall be referred to arbitration under the American Arbitration Association Rules. The Arbitration Tribunal shall consist of three arbitrators, one to be appointed by the Claimant, one to be appointed by the Respondent and the third to be appointed by the two appointed arbitrators. The third member of the Tribunal shall be appointed as soon as practicable (and no later than (i) three Business Days, in the case of a Claim Dispute, and (ii) 28 days, in all other cases) after the appointment of the two party-appointed arbitrators. The Tribunal shall be constituted upon the appointment of the third arbitrator.

2. The arbitrators shall be persons (including those who have retired) with not less than ten years' experience of insurance or reinsurance within the industry or as lawyers or other professional advisers serving the industry; provided, that the Assured or any other Interested Person shall have the right to exclude any arbitrator who is then a member or employee of Equitas, Lloyds of London or any underwriting syndicate or other entity of Lloyds of London. Where a party fails to appoint an arbitrator within fourteen days (two Business Days, in the case of a Claim Dispute) after being called upon to do so (or by either party's written certification that a dispute exists under or in connection with this Insurance) or where the two party-appointed arbitrators fail to appoint a third within 28 days (three Business Days, in the case of a Claim Dispute) after their appointment, then upon application the American Arbitration Association will appoint an arbitrator to fill the vacancy. At any time prior to the appointment by the American Arbitration Association the party or arbitrators in default may make such appointment.

3. The Arbitration Tribunal may in its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute; provided that the parties shall each retain the right to appeal errors of law to a court of law having jurisdiction of the matters addressed herein and, each party executing this Insurance hereby consents and agrees that the state or federal courts located in New York shall have exclusive jurisdiction to hear and determine any such matters. The Arbitration Tribunal shall have the widest discretion permitted under the law governing the arbitral procedure when making such orders or directions.

4. The seat of arbitration shall be New York, New York, U.S.A. Each party shall bear its own costs and expenses incurred in connection with any arbitration; provided, however, that the losing party in any arbitration commenced under the section entitled **Claim Adjustment Period** above or otherwise relating to the payment of a Claim shall bear the costs and expenses of the other party and all other Interested Persons involved in such arbitration.



UMR REGISTRATION NO: CR010122                              page 24 of 24

**Contingency Insurance**
**Premium:**              The premium for this Insurance shall be four percent (4%) of the Net Death
                          Benefit under each and all Qualified Life Insurance Policies acquired by the
                          Assured and declared hereunder, plus any related Premium Taxes (collectively,
                          the "**Contingency Insurance Premium**"). A minimum deposit premium of
                          US$100,000 plus Premium Taxes on such amount (if any) must be paid to
                          Underwriters within 30 days after inception of this Insurance. The minimum
                          deposit premium shall be credited against Contingency Insurance Premium due at
                          a rate of 4% of Net Death Benefit of each and all Qualified Life Insurance
                          Policies acquired by the Assured and declared hereunder, plus any related
                          Premium Taxes. Thereafter, the amount of the Contingency Insurance Premium
                          payable with respect to each Qualified Life Insurance Policy covered under this
                          insurance shall be payable on or before the fifteenth day of the calendar month (or
                          if such day is not a Business Day, the next succeeding Business Day) next
                          following the calendar month in which the Coverage Certification relating to such
                          Qualified Life Insurance Policy was submitted.

                          The Underwriters shall have the right, exercisable upon ten Business Days' prior
                          written notice to each Interested Person, to terminate coverage hereunder with
                          respect to any Qualified Life Insurance Policy as to which the requisite
                          Contingency Insurance Premium has not been paid within the time period
                          specified in the immediately preceding paragraph, subject, however, to the right
                          of the Lender and each other Interested Person to cure any such payment failure
                          during such ten Business Day period before the Underwriters shall be entitled to
                          terminate coverage in accordance with this paragraph.

**Deductible:**           Nil

**Brokerage:**            5%

**U.S. Classification:**  Surplus Lines:  Lester Kalmanson Agency, Inc.
                                          P.O. Box 940008
                                          235 South Maitland Avenue, Suite 201
                                          Maitland, Florida 32794. U.S.A.

**Information:**          As per Tyser Special Risks Ltd file.

                          The Servicer will be responsible for ensuring that all policies declared to this
                          Insurance comply with all the Insurance terms and provisions. Minimum
                          responsibilities are detailed in Appendix A-1. No Back-Up Servicer acting as
                          Servicer shall have any liability or obligations pursuant to this paragraph, apart
                          from its responsibilities set forth in Appendix A-2 and expressly provided for in
                          this Insurance or in the Servicing Agreement.

August 2, 2001
MH




Merlin U/W Agency Ltd
on behalf of

GoshawK Syndicate 102

PLEASE MAKE ALL PAYMENTS TO
GOSHAWK SECURITIES LTD



| BROKER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR010122 | 012 | ENDORSEMENT REF. | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | LEADING UWR | LIRMA | | |
| | | | OTHER COMPANIES | | |

D ⊖ O ₁ ᒪ ᱨ ⊖ ᒐ ᴀ ᴀ ᑐ ᴀ  (S)

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

FEBRUARY 2002 TO MAY 2002:    DEATH BENEFIT:    US$ 15,750,000.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:    US$ 99,204,962.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$15,750,000.00):    US$    630,000.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

20TH MAY 2002
LW/MH

U.S. CLASSIFICATION:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| INTL T A S D/COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | IN ALL | GROSS PREMIUM MARINE WAR |
|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | ENDORSEMENT REF. 011 | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU |
| ASSURED/ACCOUNT | | LEADING U/WR | LIRMA | | |
| LIFE RECEIVABLES TRUST | | | OTHER COMPANIES | | |

$\mathcal{D}$ ০০ $\mathcal{L}$ X ০১ AREA $\quad$ $\mathcal{S}$

IT IS NOTED AND AGREED THAT THE PERIOD DURING WHICH THE INSURED MAY PURCHASE
POLICIES IN RESPECT OF THIS POLICY IS EXTENDED TO 15th MAY 2002. THEREFORE, PERIOD
HEREON IS AMENDED TO READ

Period:    This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured on or after
August 15, 2001 (or, if later, declared on a bordereau hereunder submitted on or after August 15,
2001) and through and including the first to occur of (x) May 15, 2002 (or, if such day is not
a Business Day, the next succeeding Business Day) or (y) the date on which the Maximum
Aggregate Limit has been reached.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

3rd May 2002.
LW/MH

U.S. CLASSIFICATION:

| I N T A | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.0. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | IN ALL | GROSS PREMIUM MARINE WAR |
|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | ENDORSEMENT REF. 010 | TOTAL | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | LLOYD'S | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. ADJ. | ILU | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | LEADING U/WR | | LIRMA | |
| | | | | OTHER COMPANIES | |

Dooo2A ooAAEA (S)

IT IS NOTED AND AGREED THAT WITH EFFECT FROM INCEPTION THE DEFINITION OF LIFE EXPECTANCY IS AMENDED TO READ AS FOLLOWS:

**Life Expectancy**

Means the remaining period in months that the Senior is expected to live after the date of a Qualified Consulting Physician's report, as assessed and given by a Qualified Consulting Physician in writing within 120 days prior to the date of the Coverage Certification given with respect to the Qualified Life Insurance Policy insuring the life of such Senior. If the assessment is given as a range between two numbers of months, Life Expectancy will be the higher of the two numbers in the range. In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under the policy.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

27TH March 2002.
LW/MH

U.S. CLASSIFICATION:

| N I T I A SYND./COY | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

| _P.S.0. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | | CURRENCY INSD | | | IN ALL | | MARINE |
|---|---|---|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | | ENDORSEMENT REF. 009 | | TOTAL | | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | | |
| ASSURED/ACCOUNT   LIFE RECEIVABLES TRUST | | | LEADING UNWR | | LIRMA | | | |
| | | | | | OTHER COMPANIES | | | |

D0002A00AA0A (5)

IT IS NOTED AND AGREED THAT THE PERIOD DURING WHICH THE INSURED MAY PURCHASE POLICIES IN RESPECT OF THIS POLICY IS EXTENDED TO 14th MAY 2002. THEREFORE, PERIOD HEREON IS AMENDED TO READ

Period:     This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured on or after August 15, 2001 (or, if later, declared on a bordereau hereunder submitted on or after August 15, 2001) and through and including the first to occur of (x) May 14, 2002 (or, if such day is not a Business Day, the next succeeding Business Day) or (y) the date on which the Maximum Aggregate Limit has been reached.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

8th March 2002
LW/MH

U.S. CLASSIFICATION:

| N I T I A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

| BROKER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | | IN ALL | MARINE WAR |
|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | ENDORSEMENT REF. 008 | TOTAL | | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | LEADING UWR | LIRMA | | | |
| | | OTHER COMPANIES | | | |

D 0002 A 0 0 A M E A ( 5 )

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

JANUARY 2002:               DEATH BENEFIT:           US$ 12,000,000.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:      US$ 83,454,962.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$12,000,000.00):           US$   480,000.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

18th January 2002.
LW

U.S. CLASSIFICATION:

| N T I A | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

Life Settlement Corporation d/b/a Peachtree Life Settlement
Closing Policy Files Bookmaker - 8th Advance

| Insured 1 | Insured 2 | Insured 5 LE Date | Insured 5 LE | Insured 6 Provider | Insured 7 LE | Insured 8 LE Date | Insured 8 LE Provider | Policy Type | Insurance Carrier | S&P Rating | Moody's Rating | Policy Issue Date | LE Solvent Date | Net Death Benefit | Insured F Age | Insured 2 Age | Contingency Insurance Premium Premium Breakdown |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 100 | 6/26/08 | AVR | | | | Universal Life | American General Life Insurance Company | AAA | Aa3 | 10/12/05 | 20/23/05 | 15,000,000.00 | 66 | | $300,000.00 due October 15,2008, $40,000.00 due October ... |
| | | 90 | 1/30/06 | AVR | | | | Universal Life | Lincoln Benefit Life Company | AA+ | Aa2 | 12/17/01 | 12/6/2031 | 16,000,000.00 | 74 | | $300,000.00 due October ... |
| | | 94 | 1/30/06 | AVR | | | | Survival Life | West Coast Life Insurance Company | AA | A1 | 3/23/99 | 6/49/2035 | 32,000,000.00 | 80 | 77 | 140,000.00 ... |
| Totals | | | | | | | | | | | | | | $63,000,000.00 | | | $466,040.00 |

The undersigned, certifies that the premiums set forth in this bookmaker and such municipals are equal in amount and timing to premiums taken from this account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) with respect to each policy, after providing any premiums set forth in each Illustration to account for the fact that the Deemed Policy Data may be different than the premium necessary rates.

Life Settlement Corporation, as Originator and Servicer

By: _____
Name: _____    Date: _____
Title: _____

| ROKER TYS | BROKER L.P.S.O. No. 572 | | CURRENCY INSD: | | | | GROSS PREMIUM | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | IN ALL | | MARINE WAR |
| TTACHING TO POLICY NO. CR010122 | | ENDORSEMENT REF. 007 | | | TOTAL | | | |
| EGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | | |
| ERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | | |
| SSURED/ACCOUNT | | | LEADING U/WR | | LIRMA | | | |
| | LIFE RECEIVABLES TRUST | | | | OTHER COMPANIES | | | |

D Ꝺ O 2 A ꝍ Ꝺ A A ꞓ A (𝔍)

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

DECEMBER 2001:                    DEATH BENEFIT:              US$ 12,370,000.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:                     US$ 71,454,962.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$12,370,000.00):                               US$    494,800.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

28TH DECEMBER 2001
LW

U.S. CLASSIFICATION:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| A | | | | | | | | |
| SYND./COY | | | | | | | | |
| | | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED

Life Settlement Corporation d/b/a Peachtree Life Settlements
Closing Policy Flow Bordereaux - 7th Advance

| Insured 1 | Insured 2 | Insured 1 LE Date | Insured 1 LE # | Insured 1 LE Date | Insured 2 LE # | Insured 2 LE Provider | Internal 1 LE Provider | Insured 2 LE Provider | Policy Type / Whole Life | Insurance Carrier / Product Name | S&P Rating | Moody's Rating | Premium Due Date | Policy Anniversary Date | Net Death Benefit | Insured 1 Age | Insured 2 Age |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Survivor Life | Prudential Insurance Company of America | AA+ | A1 | | | | 76 | 62 |
| | | | | | AVS | | AVS | | Universal Life | Allmerica General Life Insurance Company | AA | A3 | | | | 40 | |
| | | | | | AVS | | AVS | | Universal Life | Empire General Life Assurance Corporation | AA | A3 | | | | 68 | |
| | | | | | AVS | | AVS | | Universal Life | Lincoln Benefit Life Company | AA+ | A2 | | | | 74 | |
| | | | | AVS | AVS | | AVS | | Universal Life | American Mutual Life Insurance Company | AA+ | A1 | | | | 81 | |
| | | | | AVS | AVS | | AVS | | Universal Life | United States Life Insurance Co. in the City of NY | AA | A3 | | | | 79 | 76 |
| | | | | AVS | AVS | | AVS | | Universal Life | Germania General Life Insurance Company | AA | A3 | | | | 69 | |
| | | | | AVS | AVS | | AVS | | Universal Life | Columbian General Life Insurance Company | AA | A3 | | | | 63 | 82 |
| | | | | AVS | AVS | | AVS | | Universal Life | MetLife Insurance Co. for Life and Health Ins. of NY | AA | A2 | | | | 74 | |
| | | | | AVS | AVS | | AVS | | Universal Life | Security Connecticut Life Insurance Company | AA+ | A2 | | | | 76 | 76 |

The undersigned, certifies that the premiums set forth in the foregoing and such illustrations are equal in amount and timing to premiums taken into account for purposes of computing the Hypothecated Unfunded Premium Account (as defined in the Credit Agreement) with respect to such policy, after prorating any premiums set with on such illustration to account for the fact that the Channel Period Date may be different than the premium anniversary date.

Life Settlement Corporation, as Original Lot Servicer

By: _____   Date: _____
Name: _____
Title: _____

| TYS | L.P.S.O. No. 572 | | CURRENCY INSD: | | | IN ALL | | MARINE WAR |
|---|---|---|---|---|---|---|---|---|
| TTACHING TO POLICY NO. CR010122 | | 006 | ENDORSEMENT REF. | | TOTAL | | | |
| EGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | | |
| ERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | | |
| SSURED/ACCOUNT LIFE RECEIVABLES TRUST | | | LEADING U/WR | | ORMA | | | |
| | | | | | OTHER COMPANIES | | | |

D oɔɔzA ooAA E A (S)

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

NOVEMBER 2001:                    DEATH BENEFIT:                    US$ 15,762,009.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:                    US$ 59,084,962.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$15,762,009.00):                    US$    630,480.36

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

14th NOVEMBER 2001
LB

J.S. CLASSIFICATION:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| NNED SETTLEMENT DATE: | |

| BROKER TYS | L.P.S.O. No. 572 | | CURRENCY INSD: | | | IN ALL | MARINE WAR |
|---|---|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | 005 | ENDORSEMENT REF. | | TOTAL | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT | | | LEADING U/WR | | LIRMA | | |
| | LIFE RECEIVABLES TRUST | | | | OTHER COMPANIES | | |

D00002 A00 AAEA (S)

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

OCTOBER 2001:                    DEATH BENEFIT:                    US$ 12,220,000.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:                    US$ 43,322,953.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$12,220,000.00):                    US$    488,800.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

15th October 2001
MH/LB

U.S. CLASSIFICATION:

| N I T I A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| .P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| .ANNED SETTLEMENT DATE: | |

REDACTED

Life Settlement Corporation d/b/a Peachtree Life Settlements.
Closing Policy Final Reaffirmance - Life Agreement

The undersigned, certifies that the premiums set forth in this instrument and such illustrations are equal to amount and listing in premiums taken into account for purposes of accepting the Hypothetical Unfunded Premium Account (as defined in the Credit Agreement) with respect to each policy, after proration any premiums set forth on such illustrations to insure for the fact that the Deferred Paid Date may be different than the premium anniversary date:
Life Settlement Corporation, a d/b/a Peachtree and Peachtree

By: _____
Name: _____
Title: _____

| | | | | | IN ALL | MARINE WAR |
|---|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | ENDORSEMENT REF. 004 | | TOTAL | | |
| REGISTRATION | | V.A.T. | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. No. & DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| | | / | / | | LIRMA | | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | | LEADING U/WR. 31 MUA | | OTHER COMPANIES | | |

D0002AOOAAEA (5)

IT IS HEREBY NOTED AND AGREED THAT WITH EFFECT FROM INCEPTION, THE FOLLOWING AMENDMENT HAS BEEN MADE TO THIS POLICY:-

Maximum
Aggregate
Limit:                    The maximum aggregate limit of Net Death Benefit of all Qualified Life
                          Insurance Policies declared under this Insurance (the "Maximum
                          Aggregate Limit") shall be US$ 105,000,000.

ALL OTHER TERMS AND CONDITIONS REMAIN UNALTERED

03 October 2001
MH

U.S. CLASSIFICATION:

| N T I A | | | | | | |
|---|---|---|---|---|---|---|
| SYND./COY | | | | | | |
| | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |

PLANNED SETTLEMENT DATE

| BROKER TYS | | L.P.S.O. No. 572 | | CURRENCY INSD. | | IN ALL | MARINE WAR |
|---|---|---|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | | | ENDORSEMENT REF. 003 | | TOTAL | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | | LEADING U/WR | | LIRMA | | |
| | | | | | OTHER COMPANIES | | |

CANCEL AND REPLACEMENT

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

SEPTEMBER 2001:                DEATH BENEFIT:              US$  14,932,000.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:              US$  31,102,953.00

ADDITIONAL PREMIUM DUE HEREON (CALCULATED AT 4% ON US$14,932,000):                              US$     597,280.00

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

24TH SEPTEMBER 2001
MH

U.S. CLASSIFICATION:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED

Life Settlement Corporation d/b/a Peachtree Life Settlements
Closing Policy Flash Sheet/Level +20 Advance

The undersigned, certifies that the premiums and both in this Instrument and said illustration are equal in amount; and among the premiums taken into account for purposes of computing the Hypothetical Unlevered Premium Amount as defined in the Credit Agreement/Credit request to such policy, after providing any premiums set forth on such illustration in amount for the field that the Deferral Period Date may be different than the premium anniversary date; Life Settlement corporation, as Originator and Servicer

By:_____
Name:_____
Title:_____

| | IN ALL | MARIN |
|---|---|---|

| ATTACHING TO POLICY NO. CR010122 | ENDORSEMENT REF. 002 | TOTAL | | |
|---|---|---|---|---|
| REGISTRATION | V.A.T. | T.O.C. TRIBUNAL | LLOYD'S | |
| SERIAL | BINDING AUTHORITY REG. No. & DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | |
| | | / / | | | IRMA | |
| ASSURED/ACCOUNT LIFE RECEIVABLES TRUST | | READING UW 31 | MUA | OTHER COMPANIES | |

D0002A00 AAEA (5)

IT IS HEREBY NOTED AND AGREED THAT WITH EFFECT FROM INCEPTION, APPENDIX B-1, APPENDIX B-2 AND APPENDIX C HAVE BEEN AMENDED TO READ MORE CORRECTLY AS ATTACHED.

ALL OTHER TERMS AND CONDITIONS REMAIN UNALTERED.

21 August 2001
MH

CLASSIFICATION:

| N T A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| | |

PLANNED SETTLEMENT DATE:

APPENDIX B-1

FORM OF COVERAGE CERTIFICATION – Servicer

The undersigned, in its capacity as Servicer under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR010122) (the "**Insurance**") that (i) the Servicing Agreement has been complied with with respect to each such policy, (ii) it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, (iii) the information specified in <u>Appendix A-1</u> to the Insurance is accurate with respect to each such policy, (iv) each such policy is a Qualified Life Insurance Policy as defined in the Insurance, and (v) each such policy is (and as of the applicable Ramp-Up Date will be) an Eligible Life Insurance Policy as defined in the Credit Agreement. Capitalized terms used and not defined in this Coverage Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the Servicer has caused this Coverage Certification to be duly executed as of the ___ day of _____.

[                           ], as Servicer

By: _____
    Name:
    Title:



## APPENDIX B-2

### FORM OF COVERAGE CERTIFICATION – Back-Up Servicer

The undersigned, in its capacity as Back-Up Servicer under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR010122) (the "**Insurance**") that it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, and that, based on the information set forth in the applicable Insurance Policy File, (i) the Servicing Agreement has been complied with in respect to each such policy, (ii) it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, (iii) the information specified in Appendix A-2 to the Insurance is accurate with respect to each such policy, (iv) each such policy is a Qualified Life Insurance Policy as defined in the Insurance, and (v) each such policy is (and as of the applicable Ramp-Up Date will be) an Eligible Life Insurance Policy as defined in the Credit Agreement, subject to the following assumptions and exceptions with respect to the eligibility criteria set forth on Schedule III to the Credit Agreement:

(a)      with respect to eligibility criterion (a), it is assumed that such policy has been accepted for coverage under the applicable Contingency Insurance Policy;

(b)      with respect to eligibility criterion (j), it is assumed that the date such policy is Purchased by the SUBI Trust and the date such policy has been accepted for coverage under the applicable Contingency Insurance Policy shall be the proposed applicable Ramp-Up Date;

(c)      with respect to eligibility criteria (k), (m), and (o)(iii), the delivery by the Servicer to the Back-Up Servicer of the Servicer's Coverage Certification as to eligibility as of the Ramp-Up Date, without respect to actual date, shall satisfy such eligibility criteria; and

(d)      with respect to eligibility criterion (q), the Back-Up Servicer does not certify as to the allocation of such policy to the SUBI Trust.

Capitalized terms used and not defined in this Coverage Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the Back-Up Servicer has caused this Coverage Certification to be duly executed as of the ___ day of _____.

[                                    ], as Back-Up Servicer

By: _____
    Name:
    Title:



## APPENDIX C

### FORM OF CLAIM CERTIFICATION

The undersigned, in its capacity as Servicer or Back-Up Servicer, as the case may be, under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR010122) (the "Insurance") that:

1.          Attached hereto is an Effective Assignment of a Qualified Life Insurance Policy relating to the _____, a Senior.

2.          On the date hereof, based on Tracking and Monitoring performed by the Servicer and the Back-Up Servicer as required by the Insurance, the Deferred Period applicable to such Senior has expired.

3.          All premiums due under such Qualified Life Insurance Policy have been paid through and including the date hereof, and no loans are outstanding under such Qualified Life Insurance Policy.

4.          The amount of the Claim hereby submitted is $ ._____.

Capitalized terms used and not defined in this Claim Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the [Servicer] [Back-Up Servicer] has caused this Claim Certification to be duly executed as of the ___ day of _____.

>                    [                          ],
>                    as [Servicer] [Back-Up Servicer]
>
>
>         By:        _____
>                    Name:
>                    Title:

| BROKER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | IN ALL | |
|---|---|---|---|---|
| ATTACHING TO POLICY NO. CR010122 | ENDORSEMENT REF. 001 | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | |
| ASSURED/ACCOUNT | | LEADING U/W'S | LIRMA | |
| LIFE RECEIVABLES TRUST | | | OTHER COMPANIES | |

D BO⊃CA BOA A⊂A

IT IS HEREBY NOTED AND AGREED THAT THE FOLLOWING BORDEREAUX HAVE BEEN DECLARED TO THIS POLICY:

AUGUST 2001:                          DEATH BENEFIT:                          US$ 16,170,953.00

TOTAL AGGREGATE DEATH BENEFIT THEREFORE:                          US$ 16,170,953.00

MINIMUM AND DEPOSIT PREMIUM DUE HEREON:                          US$       100,000.00

ADDITIONAL PREMIUM DUE HEREON CALCULATED AT 4%
ON US$16,170,953.00 (INCLUDING MINIMUM AND DEPOSIT PREMIUM):    US$    646,838.12

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

13TH AUGUST 2001
LB

U.S. CLASSIFICATION:

| N T A SYND./COY | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED

Life Settlement Corporation d/b/a Peachtree Life Settlements
Closing Policy Plus Biodeaths - All Accounts



The undersigned, certifies that the premiums set forth in this instrument and such Biopremiums are equal in amount and timing to premiums taken into account for purposes of computing the Hypothetical Unbundled Premium Amount (as defined by the Credit Agreement) with respect to each policy, after providing any premiums are held on each Biensurance to account for the fact that its Deferred Period Date may be different than the premium anniversary date.
Life Settlement corporation, as Originator and Servicer

By: _____  Date: _____
Name: _____
Title: _____

EXHIBIT 1

TAB C-D

UMR REGISTRATION NO: CR020127                           page 2 of 24

**Effect Date:**      May 22nd, 2002

**Type:**             Contingency Insurance

**Form:**             J (A) NMA 2421 and as per slip wording.
                      No proposal form.
                      In the event of any conflict or inconsistency between the terms and conditions
                      of this Insurance (represented by this slip that has been stamped on behalf of
                      the Underwriters) and any policy form, jacket or wrapper issued by the
                      Underwriters, the terms and conditions of this Insurance shall govern to the
                      extent of such conflict or inconsistency.

**Underwriters:**     GOSHAWK SYNDICATE 102 AT LLOYDS.

                      It is understood and agreed that MERLIN UNDERWRITING AGENCY LTD
                      shall have the authority to act for and bind the Underwriters with respect to
                      any consent, confirmation, approval, amendment, waiver, supplement or any
                      other action or undertaking required or permitted to be taken, given, granted or
                      delivered by the Underwriters hereunder.

**Assured:**          Life Receivables Trust, formed under the Trust Agreement, dated as of June 9,
                      2000 (the "Trust Agreement") by and among Life Receivables I, LLC, as
                      Settlor and Initial Beneficiary, and The Bank of New York, as trustee, as
                      amended and in effect as of February 2, 2001 and as further amended from
                      time to time in accordance with its terms.

**Trustee:**          The Bank of New York as UTI Trustee and SUBI Trustee (as such terms are
                      defined in the Trust Agreement) or any successor trustee appointed in
                      accordance with the Trust Agreement.

**Originator:**       Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life
                      Settlements, a Georgia corporation).

**Servicer:**         Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life
                      Settlements, a Georgia corporation), and its successors and permitted assigns.

**Back-Up Servicer:** BNY Asset Solutions LLC or, if BNY Asset Solutions LLC shall no longer be
                      serving as Back-Up Servicer of Assured, such other party acting in such
                      capacity (as to the services to be performed in respect of this Insurance, as set
                      forth in Appendix A-2 hereto) and approved by Underwriters in accordance
                      with the terms of the Servicing Agreement.   BNY Asset Solutions LLC shall
                      not be and not be deemed to be a party to this Insurance.



UMR REGISTRATION NO: CR020127                                        page 3 of 24

**Period:** This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured on or after May 16, 2002 (or, if later, declared on a bordereau hereunder submitted on or after May 16, 2002) and through and including the first to occur of (x) November 15, 2002 (or, if such day is not a Business Day, the next succeeding Business Day) or (y) the date on which the Maximum Aggregate Limit has been reached.

**Interest:** To indemnify the Assured in respect of the Net Death Benefit at the time of purchase by the Assured of each Qualified Life Insurance Policy (or where a higher Net Death Benefit has been declared at the time of such purchase to be payable at the end of the Deferred Period and the applicable Contingency Insurance Premium is based and paid at the inception of this Insurance on such higher amount, the Net Death Benefit as of the end of the Deferred Period) acquired by the Assured where the Senior is not deceased at the end of the Deferred Period.

**Limits:** Up to but not exceeding US$ 5,000,000 Net Death Benefit for any one Qualified Life Insurance Policy / any one Senior, unless approved in writing by Underwriters (such approval not to be unreasonably withheld).

**Maximum Aggregate Limit:** The maximum aggregate limit of Net Death Benefit of all Qualified Life Insurance Policies declared under this Insurance (the "Maximum Aggregate Limit") shall be US$ 50,000,000.

**Deferred Period:** 24 months after the end of the Life Expectancy of each Senior in respect of the relevant Qualified Life Insurance Policy relating to such Senior declared hereunder; in the case of a Survivorship Policy where both Seniors are alive at the date the Qualified Life Insurance Policy is purchased by the Assured, the Deferred Period shall be 24 months after the end of the Life Expectancy of the Senior with the longest Life Expectancy.

**Situation:** Worldwide but in respect of policies acquired by the Assured issued by insurance companies licensed within the United States of America, unless noted hereon by special agreement.



**Conditions Precedent:** Any life insurance policy proposed to be acquired by the Assured as to which (i) the Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in Appendix B-1 hereto and (ii) the Back-Up Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in Appendix B-2 hereto (each certificate of the type described in clause (i) or (ii) of this sentence is referred to in this Insurance as a "Coverage Certification") is hereby deemed to be accepted for coverage under this Insurance from and after the date of acquisition of such policy by the Assured, subject in each case to the Underwriters' right to terminate coverage with respect to such life insurance policy due to non-payment of the applicable Contingency Insurance Premium in accordance with the section entitled **Contingency Insurance Premium** below.

**Representations and Warranties:** By execution of this contract of Insurance and its acceptance of the duties specified in Appendix A-1, the Servicer represents and warrants as of the date hereof (and will be deemed to have represented and warranted with respect to each and every life insurance policy as of the date such life insurance policy is deemed accepted for coverage under this Insurance upon delivery of a Coverage Certification) that:

1. It has truthfully declared all material facts actually known to it which would influence a reasonable Underwriter in determining:
   a)    whether or not to accept the risk
   b)    the premium
   c)    the conditions, exclusions and limitations,
having diligently made all reasonably necessary inquiries to establish those facts provided that it shall not be required to (x) make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled **Medical Testing** below or (y) disclose any of its own internal or separately obtained analyses or projections or other actuarial information or (z) disclose any quotations or information or proposals provided by other underwriters or insurers.



**Representations and
Warranties Continued:**

2.   It has no actual knowledge as of the date of the Coverage Certification
relating to a Qualified Life Insurance Policy of any undisclosed matter,
fact or circumstance actual or threatened, that materially increases or is
likely to materially increase the possibility of a Senior surviving his / her
Life Expectancy by more than 24 months provided that it shall have no
obligation or duty to make inquiry of any third party in relation to such
matter and provided it shall have no obligation or duty to make any
inquiries in relation to a Senior other than obtaining a statement of his /
her Life Expectancy in accordance with the section entitled **Medical
Testing** below.

3.   It has declared that the information provided to the Underwriters, as part
of the proposal for this Insurance, is in all material respects true and
accurate and agrees that such information forms the basis of this
Insurance; provided that it does not represent or warrant that (w) any
sample polices provided to the Underwriters will necessarily be
representative of the policies that become subject to this Insurance; (x) it
has made any inquiries in relation to a Senior other than obtaining a
statement of his / her Life Expectancy in accordance with the section
entitled Medical Testing below; (y) it has disclosed any of its own
internal or separately obtained analyses or projections or other actuarial
information; or (z) it has disclosed any quotations or information or
proposals provided by other underwriters or insurers.

4.   It has advised Underwriters of any change in the information detailed in
paragraph 3 of this section which took place prior to the date of the
Coverage Certification.

5.   It has agreed to undertake to perform the activities and undertakings
as set forth in Appendix A-1.

6.   The purchase price paid to a Senior in respect of any Qualified Life
Insurance Policy covered hereby is consistent with applicable legal and
regulatory requirements.

7.   The amount of Contingency Insurance Premium payable with respect to
each Qualified Life Insurance Policy covered hereby will be the subject of a
notice of borrowing under the Credit Agreement referred to in the section
entitled **Certain Acknowledgments** below and is, accordingly, expected to be
paid within the time period specified under **Contingency Insurance Premium**
below.

UMR REGISTRATION NO: CR020127

page 6 of 24

**Claim Adjustment Period:**

On or prior to the 60th day before the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver drafts of a Claim Certification and Effective Assignment (each meeting the requirements set forth in the section entitled Claim Procedures below), a copy of the form issued by the relevant life insurance company which is proposed to be used to complete an Effective Assignment of the applicable Qualified Life Insurance Policy, and a copy of the complete Insurance Policy File with respect to such Qualified Life Insurance Policy (collectively, the "Proposed Claim Documents"). The Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will promptly provide such further information and documents with respect to the Proposed Claim Documents as the Underwriters and their representatives may reasonably request. If, upon review of the Proposed Claim Documents and any other information provided to the Underwriters, the Underwriters determine reasonably and in good faith that (a) according to the issuing insurance company, such Qualified Life Insurance Policy is no longer in force or (b) according to the issuing insurance company, the Assured is not the owner of and beneficiary under such Qualified Life Insurance Policy, then the Underwriters will have the right, exercisable on or prior to the 30th day prior to the expiration of the relevant Deferred Period by written notice to each Interested Person, to dispute the Underwriters' obligation to pay a Claim in respect of such Qualified Life Insurance Policy upon delivery of a Claim Certification with respect thereto (a "Claim Dispute").

Each Claim Dispute will be promptly referred to arbitration in accordance with the applicable procedures set forth in the section entitled Arbitration below; provided, that any such Claim Dispute shall be automatically withdrawn in the event that the circumstances giving rise to such Claim Dispute have been cured by any Interested Person to the reasonable satisfaction of the Underwriters; and provided, further, that under no circumstances (other than for the reasons set forth in clause (a) or (b) of the immediately preceding sentence) shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim as set forth in the section entitled Claim Procedures.

**Claim Procedures:**

As soon as practicable following the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver a Claim Certification (as defined below) to substantiate the amount of loss claimed under this Insurance.



UMR REGISTRATION NO: CR020127                                          page 7 of 24

**Claim Procedures**
**Continued:**

The following procedures shall apply to each Claim made upon this Insurance (a "Claim"):

1.  *Claim Certification.* Claims upon this Insurance shall be made upon presentation by the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, to Underwriters of a certificate of the Servicer in the form set out in <u>Appendix C</u> (a "Claim Certification").

2.  *Effective Assignment.* Each Claim Certification shall be accompanied by an assignment (legally or beneficially in the manner provided in this paragraph 2) of the relevant Qualified Life Insurance Policy to Goshawk Syndicate 102, on behalf of the Underwriters, to the extent of the Assured's legal or beneficial interests therein. Failure so to assign said policy for any reason (other than negligence or wilful misconduct on the part of the Underwriters) will invalidate a Claim solely with respect to the Qualified Life Insurance Policy not so assigned. Assignment of a Qualified Life Insurance Policy in respect of a Senior who is not deceased at the end of the relevant Deferred Period shall be effective for purposes of fulfilling the requirements set forth in this paragraph 2 for payment of a Claim if the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured:

    a)  Executes a change of beneficiary designation, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under each such Qualified Life Insurance Policy, naming Goshawk Syndicate 102 at Lloyds, as sole beneficiary and

    b)  Either (i) executes an absolute assignment, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under such Qualified Life Insurance Policy of the ownership of such Qualified Life Insurance Policy to Goshawk Syndicate 102 at Lloyds; or (ii) if such assignment is restricted by the laws or regulations of any State or by the policies and procedures of the insurer under such Qualified Life Insurance Policy or is for any other reason (in the reasonable judgment of the Servicer or the Back-Up Servicer) not practicable, executes a collateral assignment to Goshawk Syndicate 102 at Lloyds, making the designation of Goshawk Syndicate 102 at Lloyds, as sole beneficiary under the Qualified Life Insurance Policy irrevocable and otherwise meeting the requirements of paragraph 4 below.





UMR REGISTRATION NO: CR020127                                    page 8 of 24

**Claim Procedures**
**Continued:**

Any assignment pursuant to this paragraph 2 shall be conditioned only upon payment of the related Claim in accordance with paragraph 3 of this section. An assignment meeting the requirements of this paragraph 2 is referred to herein as an **"Effective Assignment."**

3.  *Payment.* On or prior to the 15th Business Day after receipt of each Claim Certification (accompanied by an Effective Assignment), the Underwriters will pay an amount equal to the aggregate Net Death Benefit payable under the related Qualified Life Insurance Policy to the Collection Account by wire transfer of immediately available funds in US dollars.

4.  *Contingency Insurer Nominee Trust.* The Trust Agreement provides, and at all times will provide, that each Qualified Life Insurance Policy will on the date of payment by the Underwriters of the Claim relating to an Effective Assignment of such Qualified Life Insurance Policy to the Underwriters as set forth in paragraph 3 above be removed from the SUBI Trust (as defined in the Trust Agreement) and allocated to the Contingency Insurer Nominee Trust (as defined in the Trust Agreement) to be held in trust for the benefit of the Underwriters if (x) an Effective Assignment of the type described in paragraph 2(b)(i) above for whatever reason (including without limitation any failure or delay of the issuing insurance company to acknowledge or ratify such Effective Assignment) has not conveyed such Qualified Life Insurance Policy to the Underwriters as of such date or (y) an Effective Assignment of the type described in paragraph 2(b)(ii) above has been employed in connection with such Qualified Life Insurance Policy.

All life insurance policies held in the Contingency Insurer Nominee Trust will be held by the Assured as custodian and nominee for the Underwriters, and the Assured (or the Servicer or Back-Up Servicer acting as agent for the Assured) will (i) act (and refrain from acting) with respect to any such life insurance policy only at the direction of the Underwriters, (ii) irrevocably instruct the insurance company issuing such life insurance policy to make all payments thereunder to an account designated by the Underwriters and (iii) hold any payments made by the issuing insurance company with respect to such life insurance policy in trust for the Underwriters and promptly (and in no event later than one Business Day after receipt thereof) pay over such amounts to an account designated by the Underwriters.



| | |
|---|---|
| **Cancellation:** | In the event of a material breach of this Insurance by the Assured or the Underwriters, the non-breaching party may, by giving 30 days prior notice of cancellation, cancel coverage in respect of Qualified Life Insurance Policies acquired after the expiry of such notice provided that if the breach is capable of remedy, the party not in breach shall first notify the other party (and each other Interested Person) of the breach and request the breach to be remedied. If the breach is not remedied within 14 days after such notice, the other party may then give 30 days written notice of cancellation. In the event of cancellation, the Underwriters shall cover under the terms and conditions of this Insurance all Qualified Life Insurance Policies upon which the Assured or Originator or Servicer has signed a binding agreement to purchase before the expiration of the 30 day cancellation period, regardless of when such purchase is finally consummated. Except as expressly provided in the section entitled **Contingency Insurance Premium** below, this policy may not be revoked or cancelled with respect to any policy as to which a Coverage Certification has been delivered and any cancellation of coverage by either party shall in no event affect existing coverage of Qualified Life Insurance Policies as to which a Coverage Certification has been delivered before expiration of the notice period contained in the cancellation notice. |
| **Medical Testing:** | All medical testing in connection with assessment of a Senior's Life Expectancy shall be undertaken by two of the Qualified Consulting Physicians (as defined herein). |
| **Notices:** | Any notice required or permitted hereunder must be given in writing to each Interested Person either by personal delivery, guaranteed overnight courier or facsimile, and shall be deemed effectively given (i) in the case of personal delivery, upon delivery to the party to be notified, (ii) in the case of delivery by overnight courier, on the date of delivery guaranteed by such overnight courier, or (iii) in the case of notice by facsimile, upon telephone confirmation of receipt by the party to be notified. Any such notice shall be addressed to the relevant party at the address given on <u>Annex I</u> hereto or to such other address as such party has given to all Interested Persons in the manner specified in this section. |
| **Qualified Life Insurance Policy Criteria:** | A life insurance policy shall constitute a Qualified Life Insurance policy for purposes of this Insurance upon certification by the Servicer and the Back-Up (which certification shall be deemed made by the delivery by the Servicer and the Back-Up Servicer of a Coverage Certification with respect to such life insurance policy) that: |



**Qualified Life
Insurance Policy
Criteria:**

1. the Life Expectancy of the Senior (determined in accordance with the requirements set forth under Life Expectancy below), is not less than 36 months nor greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report; in the case of a Survivorship Policy, the Life Expectancy of the Senior having the longest Life Expectancy may not exceed 120 months from and after the date of the relevant Qualified Consulting Physician's report;

2. such life insurance policy is as of the date of the relevant Coverage Certification issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's; and

3. such policy meets the following minimum qualifying criteria on the date of the relevant Coverage Certification:

   a) Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums;

   b) Such policy (i) provides for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (ii) has a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years; and

   c) The Net Death Benefit of such policy shall be no larger than US$5,000,000 unless advance written approval is granted by Underwriters (such approval not to be unreasonably withheld); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000, even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000.

**Qualified Life
Insurance Policy
Criteria:**

In giving any certification as to the matters set forth in paragraph 3. above, the Back-Up Servicer (whether acting in its capacity as Back-Up Servicer or as Successor Servicer) shall be entitled to rely on the information included in applicable Insurance Policy Files with respect to giving such certification, and shall in no event be required to deliver any certificate other than as to the matters set forth in Appendix A-2 or in the form attached as Appendix B-2.

Each life insurance policy as to which a Coverage Certification shall have been delivered shall constitute a Qualified Life Insurance Policy hereunder without need for any additional action of any party.

**Tracking:**

Tracking of Seniors under each Qualified Life Insurance Policy shall be undertaken by the Servicer or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Tracking of Seniors under such Qualified Life Insurance Policy shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Tracking of such Seniors.

**Monitoring:**

Monitoring of all Qualified Life Insurance Policies is to be undertaken by the Servicer or Back-Up Servicer. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Monitoring of such Qualified Life Insurance Policy and payment of premiums thereon shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Monitoring of such Qualified Life Insurance Policy or pay premiums thereon (whether or not such Qualified Life Insurance Policy is held by the Contingency Insurer Nominee Trust as provided in the section entitled Claim Procedures above).

**Governing Law;**
**Waiver of Jury Trial;**
**Submission to**
**Jurisdiction and**
**Consent to Service**
**of Process:**

THIS INSURANCE SHALL BE SUBJECT TO, AND THIS CONTRACT SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, U.S.A. WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF. EACH PARTY TO THIS INSURANCE AND EACH PERSON LISTED ON <u>ANNEX I</u> HERETO HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INSURANCE OR ANY RELATED TRANSACTIONS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK CITY OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. EACH SUCH PARTY AND EACH SUCH PERSON HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS BY NOTICE IN THE MANNER SPECIFIED IN THE SECTION ENTITLED NOTICES ABOVE. EACH SUCH PARTY AND EACH SUCH PERSON IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

It is further agreed that service of process upon the Underwriters in any such legal action or proceeding may be made upon <u>Mendes & Mount LLP, 750 7th Avenue, New York, NY 10019-6829, U.S.A.</u> and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured or any other Interested Person to give a written undertaking to the Assured (or such Interested Person) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any other Interested Person arising out of this Insurance, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



UMR REGISTRATION NO: CR020127                    page 13 of 24

**Reporting:**         All Qualified Life Insurance Policies from time to time covered by this Insurance will be reported by the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement) to Goshawk Syndicate 102 at Lloyds, by monthly *bordereaux* in the form attached hereto as Appendix D, delivered on or before the 15th day of each month (or if such day is not a Business Day, the next succeeding Business Day) during the Insurance period and such *bordereaux* will include (in the case of any policy that is the subject of the most recent Coverage Certification) copies of the Qualified Consulting Physician's report referred to in the section entitled **Medical Testing** above. Subject to the provisions of the section entitled **Cancellation** the Assured shall notify all Interested Persons when it no longer intends to declare Qualified Life Insurance Policies to this Insurance.

**Information:**      The Servicer will deliver to the Underwriters (i) all and any material information relating to this Insurance received by the Assured or the Servicer through routine Tracking procedures or other channels relating to the medical circumstances of each Senior within 7 days after request therefor and/or (ii) a current schedule of Seniors by the Underwriters within a reasonable period of time after request therefor; provided that no person shall be obligated to provide any requested information to the extent prohibited by law, regulation or court order.

**Limitations on Assignment:**    Policies comprising Qualified Life Insurance Policies may not be assigned, except as collateral to lenders (including without limitation Abbey National Treasury Services plc and any of its affiliates) or other funding providers (or their agents or trustees) of the Assured, in whole or in part, without the prior written consent of the Underwriters, which will not be unreasonably withheld or delayed; provided that this section shall not prohibit any assignment, for collateral to lenders or otherwise by outright assignment, of beneficial trust interests in the Assured and provided further that this section shall not prohibit the Assured from segregating any Qualified Life Insurance Policy or other property owned by it or the Insurance provided hereunder into a separate subtrust for a separate beneficiary or prohibit the appointment of a successor trustee for the Assured. This Insurance may not be assigned by the Underwriters without the prior written consent of the Lender.





UMR REGISTRATION NO: CR020127                          page 14 of 24

**Certain
Acknowledgments;
Representations and
Warranties:**

The Underwriters acknowledge and understand that loans to be used for, among other things, the acquisition of life insurance policies by the Assured and payment of premiums and certain expenses in connection therewith are being provided by Abbey National Treasury Services plc (together with its successors and assigns, the "Lender") pursuant to a Credit Agreement, dated as of February 2, 2001, between the Lender and Life Receivables II, LLC, as Borrower, and that the Lender is being granted a first priority security interest in and charge over certain assets of Life Receivables II, LLC and of the Assured, including without limitation a certificate representing ownership of the beneficial interest in the SUBI Trust and interests of the Assured under the Servicing Agreement (together with the transactions contemplated thereby and all other documents and instruments entered into in connection therewith, the "**Lending Transactions**"). The Underwriters consent to the terms of the Lending. Transactions and acknowledge the rights and remedies of the Lender and its agents thereunder, and agree that the Lender and its collateral agent shall be additional Loss Payees under this Insurance and have the benefit of the covenants and agreements of the Underwriters hereunder.

The Underwriters represent and warrant for the benefit of the Lender and its agents that (i) the execution, delivery and performance by the Underwriters of this Insurance are within the Underwriters' powers and have been duly authorized by all necessary action on the part of the Underwriters, (ii) this Insurance has been duly and validly executed and delivered by the Underwriters and (iii) this Insurance constitutes the legal, valid and obligation of the Underwriters, enforceable against the Underwriters in accordance with its terms.

**Servicer Duties:**

The Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer), on behalf of the Assured, shall maintain adequate records in connection with the subject matter insured hereunder.

**Subrogation:**

In the event of any payment under this Insurance with respect to a Qualified Life Insurance Policy, Underwriters shall (to the extent of their payment and to the extent that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign such Qualified Life Insurance Policy to the Underwriters) be subrogated to all the Assured's rights of recovery under such Qualified Life Insurance Policy and the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer) shall (at the Underwriters' expense) take such actions (in the case of the Back-Up Servicer, in accordance with the BNYAS Servicing Standard, as defined in the Servicing Agreement) reasonably requested by Underwriters (at such times as required herein) to confirm and assure such rights.



UMR REGISTRATION NO: CR020127                          page 15 of 24

**Subrogation Continued:**

The Underwriters shall have no recourse to the Assured in the event that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign the relevant Qualified Life Insurance Policy to the Underwriters.

**Loss Payees:**

Any payments due under the terms and conditions of this Insurance shall, upon notice given by the Lender (or its collateral agent serving in connection with the Lending Transactions) as Loss Payee hereunder, be made by the Underwriters directly to the Lender (or such collateral agent) instead of to the Collection Account. Timely payment in full of the Net Death Benefit (as provided above under Interest and Claims Procedures) by Underwriters to the Loss Payee(s) to an account specified pursuant to this section shall be a sufficient and complete discharge of all Underwriters' obligations to the Assured and Loss Payee(s) in connection with said losses.

**Mitigation:**

Underwriters reserve the right, if they so wish, to take such reasonable steps as they deem necessary to prevent, mitigate or minimise a loss; provided that such action is not in contravention of the terms of the Lending Transactions or any other agreement Assured has with the Lender or any other lenders or other funding providers (or their agents or trustees) or in violation of any applicable law, rule or regulation (including without limitation those relating to insurance or insurance brokerage).

**Bankruptcy Proceedings:**

The Underwriters agree not to commence or join in any case or other proceeding against the Assured, Life Receivables II, LLC or any of their respective affiliates seeking liquidation, winding-up, reorganization or other relief with respect to such person or entity or its debts under any liquidation, insolvency, bankruptcy, moratorium, reorganization or similar law of any relevant jurisdiction applicable to such person or entity now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of such person or entity or any material part of its property prior to the date which is one year and one day after payment in full of all obligations owed by any such person or entity to the Lender or its agents or affiliates or their respective representatives in connection with any of the Lending Transactions.

**Recovery of Premium:** The Contingency Insurance Premium and any expense incurred in the formulation of a Claim hereunder shall not be a recoverable item.



**Recourse:**    1.  *Reduction of Payments.*  The Underwriters will not be permitted to reduce any payments under this Insurance as a result of (i) any breach by the Servicer and/or the Originator of their representations, warranties, covenants or provisions herein (including without limitation those related to Tracking and Monitoring and those under Representations and Warranties) or in the Servicing Agreement, (ii) any breach by the Back-Up Servicer of its representations, warranties, covenants or provisions set forth herein or in the Servicing Agreement or (iii) except as provided in the immediately following sentence, any action or inaction on the part of the Assured or any other person or entity. Notwithstanding the foregoing, the Underwriters shall be permitted to reduce payments under this Insurance as expressly provided in clause (b) of the definition of "Net Death Benefit" below.

2.  *Obligations Unconditional.*  Subject only to the section entitled **Contingency Insurance Premium** below, the Underwriters agree that each of their duty to accept for coverage any life insurance policy as to which a Coverage Certification has been delivered and their obligation to pay the full and complete Net Death Benefit to the Assured by payment into the Collection Account or to the Loss Payee within the time period specified after delivery of a Claim Certification and an accompanying Effective Assignment (A) is absolute, unconditional and irrevocable, (B) shall not be affected by any change in the legal existence, structure or ownership of the Assured, the Servicer, the Back-Up Servicer, the Originator, or any of their respective members, beneficial holders or stockholders or any insolvency, bankruptcy, reorganization or other similar proceeding affecting any such person or entity or any resulting release or discharge of any obligation of any such person or entity, and (C) shall not be subject to any right of rescission, set-off, diminution or counterclaim or defense of any kind, including without limitation (i) fraud or misrepresentation by any person or entity, (ii) any failure by (or question or issue regarding the ability of) the Assured, the Servicer, the Back-Up Servicer or the Originator or any other person or entity or any of their respective officers, directors, members, agents or employees or representatives to comply with any covenant or agreement contained in this Insurance or the Servicing Agreement or in any other agreement or instrument or any applicable legal requirement, (iii) any breach of or inaccuracy in any representation, warranty, certification or statement made by the Assured, the Servicer, the Originator, the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or the Servicing Agreement or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance,

Case 1:08-cv-03675-LAK    Document 1-3    Filed 04/17/2008    Page 17 of 80

**Recourse**
**Continued:**

(iv) any negligence or misconduct by the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity or their respective affiliates or their respective directors, members, agents, employees or representatives, (v) any delay or failure by the insurer under a Qualified Life Insurance Policy which is the subject of an Effective Assignment in acknowledging the interests of the Underwriters thereunder, or (vi) any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Underwriters hereunder; it being understood and agreed that the Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.

3    *Servicer Indemnities.* Notwithstanding paragraphs 1 and 2 of this section, by its acceptance of the duties specified in <u>Appendix A-1</u>, the Servicer and the Originator agree to indemnify the Underwriters against losses in respect of any Qualified Life Insurance Policy as to which the Underwriters make payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy, provided, however, that the foregoing indemnity shall in no way be deemed to impose on any of the Originator or the Servicer any obligation, other than to the extent specifically resulting from the breach of the representation or warranty set forth herein of the rating of each insurer or from the inaccuracy of the Coverage Certification with respect to such rating), to reimburse the Underwriters for losses arising solely from the financial inability of the insurer of a Qualified Life Insurance Policy to make payment when due on such Qualified Life Insurance Policy, and provided, further, however, that no Back-Up Servicer shall have any obligations pursuant to this paragraph 3, whether acting as successor Servicer or otherwise. Neither the effect of any representation or warranty made by the Servicer pursuant to this Insurance nor the Servicer's obligations under this paragraph 3 'nor any other recourse available against the Servicer under this Insurance shall be diminished by any access, investigation or due diligence inquiry conducted by the Underwriters or their representatives, including without limitation pursuant to the procedures described in the section entitled **Claim Adjustment Period** above.

The Underwriters shall have no obligation to assume the payment obligation of any insurer of a Qualified Life Insurance Policy that fails to make payment when due on such Qualified Life Insurance Policy solely as a result of the financial inability of such insurer to make such payment.

**Recourse**
**Continued:**

4. *Insurer Approval of Effective Assignment.* No delay or failure by any insurer under a Qualified Life Insurance Policy in acknowledging or consenting to an Effective Assignment shall operate to excuse or relieve the Underwriters of the obligation to pay amounts due in respect of a Claim made in compliance with the procedures set forth in the section entitled **Claim Procedures** above.

5. *Sole Remedy.* Paragraph 3 of this section sets forth the sole and exclusive remedy of the Underwriters for losses arising out of, in relation to or in connection with any and all (i) breaches of or inaccuracies in any representations, warranties, certifications or statements made by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (ii) instances of fraud or misrepresentation committed by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in connection with this Insurance, the Servicing Agreement or any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (iii) breaches of any covenants or agreements of the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity in this Insurance or the Servicing Agreement or any other agreement or instrument or of any legal requirement or (iv) any other matter covered in paragraph 2 of this section. In particular, the Underwriters shall have no right for any reason whatsoever (including without limitation those enumerated in the immediately preceding sentence) to reduce any amounts payable in respect of a Claim made in accordance with the claims procedures set forth in the section entitled **Claim Procedures** above or cancel or terminate coverage hereunder with respect to any Qualified Life Insurance Policy which is the subject of a Coverage Certification.



**Amendments and Waivers:**

Any term of this Insurance may be amended and the observance of any term of this Insurance may be waived, with but only with, the written consent of (i) the Underwriters, (ii) the Lender, (iii) if such amendment or waiver could reasonably be expected to materially and adversely affect the Collateral Agent acting in connection with the Lending Transactions in its capacity as such, the Collateral Agent, (iv) if such amendment or waiver could reasonably be expected to materially and adversely affect the Trustee of the Assured acting in its capacity as such, the Trustee of the Assured, (v) if such amendment or waiver could reasonably be expected to materially and adversely affect the Servicer or Back-Up Servicer, the Servicer or Back-Up Servicer, as the case may be, and (vi) for so long as no Event of Default under the Lending Transactions has occurred and is in existence, the Assured. Unless otherwise specified in such waiver, a waiver given hereunder shall be effective only in the specific instance and for the specific purpose for which given. No failure or delay by any Interested Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Definitions:**

<u>Business Day</u>

Means a day (other than a Saturday or Sunday) on which commercial banks and insurance companies are open for business in London and New York City.

<u>Collection Account</u>

Means the account of Life Receivables II, LLC maintained at the Collateral Agent then acting in connection with the Lending Transactions and identified on <u>Annex II</u> to this Insurance, or such different account as the Collateral Agent or the Lender has from time to time designated by written notice to each other Interested Person in accordance with the notice provisions of this Insurance.

<u>Contestability Period</u>

Means the period of time after the issuance of a Qualified Life Insurance Policy established by the language of that Qualified Life Insurance Policy and/or state or other applicable law, including any applicable suicide period, during which the issuing insurer may contest the Senior's right to benefits under that Policy (other than for non-payment of premiums by the Senior).

<u>Face Value</u>

Means the amount of a total death benefit payable under the Senior's life insurance policy.

UMR REGISTRATION NO: CR020127                    page 20 of 24

**Definitions**
**Continued:**

### Insurance Policy File

Means a complete policy file meeting the requirements of Item 7 of <u>Appendix A-1</u> and containing all other documents and information necessary to determine whether the criteria set forth in <u>Schedule III</u> to the Credit Agreement have been satisfied with respect to each Eligible Life Insurance Policy (as defined therein).

### Interested Persons

Means each person or entity listed on <u>Annex I</u> hereto together with the successors and permitted assigns of such person or entity.

### Life Expectancy

Means the remaining period in months that the Senior is expected to live after the date of a Qualified Consulting Physician's report, as assessed and given by two Qualified Consulting Physicians in writing within 120 days prior to the date of the Coverage Certification given with respect to the Qualified Life Insurance Policy insuring the life of such Senior. For the purpose of this insurance, the longest of the Life Expectancies given by the two Qualified Consulting Physicians must be used as the Life Expectancy of the Senior, and if the assessment is given as a range between two numbers of months, Life Expectancy will be the higher of the two numbers in the range. In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under the policy.

### Loss Payee

Means the Assured, the Lender or the collateral agent then serving in connection with the Lending Transactions and any other person or entity who is named as an additional loss payee under this Insurance by notice to the Underwriters given with the prior written consent of the Lender, together with such person's successors and permitted assigns.

### Monitoring

Means (1) the timely disbursement of amounts on deposit in applicable accounts maintained under the Lending Transactions to make periodic premium payments necessary to keep Qualified Life Insurance Policies in force through the date of any Effective Assignment to the Underwriters pursuant to the section entitled Claim Procedures above and (2) the timely filing of claims to the issuing insurance company after the death of the relevant Senior.

UMR REGISTRATION NO: CR020127

**Definitions Continued:**

### Net Death Benefit

Means, in relation to a Qualified Life Insurance Policy, (1) the lesser of (a) the Face Value of such Qualified Life Insurance Policy as of end of the Deferred Period or (b) the amount listed as the Net Death Benefit in the *bordereau* pertaining to such Qualified Life Insurance Policy plus (2) (a) any additional value (or refund of premium) paid or payable pursuant to that Policy following the relevant Senior's death minus (b) the amount (if any) of any premiums necessary to keep such Qualified Life Insurance Policy in force which are due and payable but not yet paid (and accrued interest thereon, if any), in each case being outstanding as of the end of the Deferred Period.

### Premium Taxes

Means all taxes, duties, charges, assessments or withholdings imposed on any amount due to the Underwriters under the section entitled Contingency Insurance Premium below by the United States of America or any state or other political subdivision thereof, but only to the extent claimed at least ten Business Days prior to the date any such amount due to the Underwriters is payable in a certificate signed by the Underwriters setting forth the taxing jurisdiction, and the type and amount of such tax, duty, charge, assessment or withholding and requesting payment thereof. In the event that the Servicer disputes the applicability of Premium Taxes to such amounts, the Servicer and the Underwriters shall jointly appoint a nationally recognized law firm or accounting firm to determine the issue, and the decision of such firm shall be conclusive.

### Qualified Consulting Physician

Means (a) 21st Services of Minneapolis, Minnesota, USA, (b) American Viatical Services of Woodstock, Georgia, USA, (c) Examination Management Services, Inc. of Waco, Texas, USA, (d) Fasano Associates of Washington, DC, USA, (e) Systems for Advanced Risk Analysis of San Antonio, Texas, USA or (f) any other independent third party consulting physician or group of consulting physicians approved in advance by the Underwriters in writing, such approval not to be unreasonably withheld.

### Qualified Life Insurance Policy

Means a life insurance policy which both the Servicer and Back-Up Servicer have declared in a Coverage Certification conforms to the minimum qualifying criteria set forth in the section entitled Qualified Life Insurance Policy Criteria above.



**Definitions
Continued:**

### Senior

Means an individual aged 65 or over on the date of purchase of a life insurance policy by the Assured (or, if the Underwriters shall have consented in writing, an individual aged 64 1/2 or over on the date of purchase of a life insurance policy by the Assured and who has been given a Life Expectancy in accordance with the section entitled **Qualified Life Insurance Policy Criteria** above by a Qualified Consulting Physician and, in the case of Survivorship Policies, shall mean the individual whose death would give rise to a claim under the relevant life insurance policy.

### Servicing Agreement

Means the Servicing Agreement, dated as of February 2, 2001, among Life Settlement Corporation, BNY Asset Solutions LLC, Life Receivables II, LLC, Babcock & Brown LP and the Assured.

### Successor Servicer

Has the meaning given in the Servicing Agreement.

### Survivorship Policy

Means a Qualified Life Insurance policy which provides for payment of a Net Death Benefit upon the later to die of two Seniors.

### Tracking

Means periodic (monthly in the case of remaining life expectancies of 24 months or less; quarterly in the case of remaining life expectancies of over 24 months) contact (of such nature as the Servicer or Back-Up Servicer may in its absolute discretion determine) with the Senior (or Seniors) insured under a Qualified Life Insurance Policy (or such Senior's representative), and shall include, in the case of any Senior with whom direct or indirect contact is impossible, commercially reasonable efforts to determine whether or not such Senior is deceased, in all cases, subject to any restrictions or limitations imposed by law or regulation.

**Arbitration:**

1. All disputes and differences arising under or in connection with this Insurance shall be referred to arbitration under the American Arbitration Association Rules. The Arbitration Tribunal shall consist of three arbitrators, one to be appointed by the Claimant, one to be appointed by the Respondent and the third to be appointed by the two appointed arbitrators. The third member of the Tribunal shall be appointed as soon as practicable (and no later than (i) three Business Days, in the case of a Claim Dispute, and (ii) 28 days, in all other cases) after the appointment of the two party-appointed arbitrators. The Tribunal shall be constituted upon the appointment of the third arbitrator.

2. The arbitrators shall be persons (including those who have retired) with not less than ten years' experience of insurance or reinsurance within the industry or as lawyers or other professional advisers serving the industry; provided, that the Assured or any other Interested Person shall have the right to exclude any arbitrator who is then a member or employee of Equitas, Lloyds of London or any underwriting syndicate or other entity of Lloyds of London. Where a party fails to appoint an arbitrator within fourteen days (two Business Days, in the case of a Claim Dispute) after being called upon to do so (or by either party's written certification that a dispute exists under or in connection with this Insurance) or where the two party-appointed arbitrators fail to appoint a third within 28 days (three Business Days, in the case of a Claim Dispute) after their appointment, then upon application the American Arbitration Association will appoint an arbitrator to fill the vacancy. At any time prior to the appointment by the American Arbitration Association the party or arbitrators in default may make such appointment.

3. The Arbitration Tribunal may in its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute; provided that the parties shall each retain the right to appeal errors of law to a court of law having jurisdiction of the matters addressed herein and, each party executing this Insurance hereby consents and agrees that the state or federal courts located in New York shall have exclusive jurisdiction to hear and determine any such matters. The Arbitration Tribunal shall have the widest discretion permitted under the law governing the arbitral procedure when making such orders or directions.

4. The seat of arbitration shall be New York, New York, U.S.A. Each party shall bear its own costs and expenses incurred in connection with any arbitration; provided, however, that the losing party in any arbitration commenced under the section entitled **Claim Adjustment Period** above or otherwise relating to the payment of a Claim shall bear the costs and expenses of the other party and all other Interested Persons involved in such arbitration.



**Contingency Insurance
Premium:**
The premium for this Insurance shall be four percent (4%) of the Net Death Benefit under each and all Qualified Life Insurance Policies acquired by the Assured and declared hereunder, plus any related Premium Taxes (collectively, the "**Contingency Insurance Premium**"). A minimum deposit premium of US$100,000 plus Premium Taxes on such amount (if any) must be paid to Underwriters within 60 days after inception of this Insurance. The minimum deposit premium shall be credited against Contingency Insurance Premium due at a rate of 4% of Net Death Benefit of each and all Qualified Life Insurance Policies acquired by the Assured and declared hereunder, plus any related Premium Taxes. Thereafter, the amount of the Contingency Insurance Premium payable with respect to each Qualified Life Insurance Policy covered under this insurance shall be payable on or before the fifteenth day of the calendar month (or if such day is not a Business Day, the next succeeding Business Day) next following the calendar month in which the Coverage Certification relating to such Qualified Life Insurance Policy was submitted.

The Underwriters shall have the right, exercisable upon ten Business Days' prior written notice to each Interested Person, to terminate coverage hereunder with respect to any Qualified Life Insurance Policy as to which the requisite Contingency Insurance Premium has not been paid within the time period specified in the immediately preceding paragraph, subject, however, to the right of the Lender and each other Interested Person to cure any such payment failure during such ten Business Day period before the Underwriters shall be entitled to terminate coverage in accordance with this paragraph.

**Deductible:**    Nil

**U.S. Classification:**    Surplus Lines:  Lester Kalmanson Agency, Inc.
                                            P.O. Box 940008
                                            235 South Maitland Avenue, Suite 201
                                            Maitland, Florida 32794. U.S.A.

**Brokerage:**    5%

**Information:**    As per Tyser Special Risks Ltd file.

The Servicer will be responsible for ensuring that all policies declared to this Insurance comply with all the Insurance terms and provisions. Minimum responsibilities are detailed in Appendix A-1. No Back-Up Servicer acting as Servicer shall have any liability or obligations pursuant to this paragraph, apart from its responsibilities set forth in Appendix A-2 and expressly provided for in this Insurance or in the Servicing Agreement.

21st June 2002.
MH



Merlin U/W Agency Ltd
on behalf of

GoshawK Syndicate 102

PLEASE MAKE ALL PAYMENTS TO
GOSHAWK SECURITIES LTD

REF| D | 0 | 0 | 0 | 2 | A | 0 | 0 | A | B | 0 | A

| ER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ACHING TO POLICY NO. CR020127 | ENDORSEMENT REF. 007 | | TOTAL | | |
| STRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| AL. BINDING AUTHORITY REQ. NO.& DATE | SETT.DUE DATE | DEF. ADJ. | ILU | | |
| JRED/ACCOUNT Life Receivables Trust | LEADING U/WR | | LIRMA | | |
| | | | OTHER COMPANIES | | |

Doooza~o ABoA (F)

It is noted and agreed by Underwriters hereon that the period has been amended to read as follows:

**PERIOD:**     This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured on or after May 16, 2002 (or, if later, declared on a bordereau hereunder submitted on or after May 16, 2002) and through and including the first to occur of (x) December 31, 2002 (or, if such day is not a Business Day, the next succeeding Business Day) or (y) the date on which the Maximum Aggregate Limit has been reached.

All other terms and conditions remain unchanged.

20th November 2002.
LW

U.S. CLASSIFICATION:

| N A | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| .P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| 'LANNED SETTLEMENT DATE: | |

| BROKER TYS | BROKER L.P.S.O. No. 572 | CURRENCY INSD: | | IN ALL | GROSS PREMIUM MARINE WAR |
|---|---|---|---|---|---|
| TTACHING TO POLICY NO. CR020127 | ENDORSEMENT REF. 006 | TOTAL | | | |
| EGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| ERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT. DUE DATE | DEF. | ADJ. | ILU |
| SSURED/ACCOUNT Life Receivables Trust | | LEADING U/WR MUA | LIRMA OTHER COMPANIES | | |

D0002A@0A£0A(4)

It is noted and agreed that the following bordereaux have been declared to this Policy:

November 2002                 Total Face Value         US$ 3,612,043.00

Additional premium due hereon calculated at 4% on
US$3,612,043.00:                                       US$   144,481.72


Additional premium due hereon =                       US$   144,481.72


Information:      Insured's email dated 14th November 2002 seen and noted by Insurers.

Total aggregate face value to date US$49,363,105.00

All other terms and conditions remain unchanged.

15th November 2002.
LW

U.S. CLASSIFICATION:

| N | | | | | | |
|---|---|---|---|---|---|---|
| J A L | | | | | | |
| SYND./COY | | | | | | |
| | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED





| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR020127 | | ENDORSEMENT REF. 005 | TOTAL | | |
| REGISTRATION | | VAT  T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL  BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE  DEF.  ADJ. | | ILU | | |
| ASSURED/ACCOUNT  Life Receivables Trust | | LEADING UWR | LIRMA | | |
| | | | OTHER COMPANIES | | |

D0002A00AB0A (4)

It is noted and agreed that the following bordereaux have been declared to this Policy:

October 2002                    Total Face Value        US$ 9,000,000.00

Additional premium due hereon calculated at 4% on
US$9,000,000.00:                                        **US$   360,000.00**


Additional premium due hereon =                        **US$   360,000.00**


**Information:**        Insured's email dated 13th September 2002 seen and noted by Insurers.

                       Total aggregate face value to date US$45,751,062.00

All other terms and conditions remain unchanged.

10th October 2002.
LW

U.S. CLASSIFICATION:

| N  T  I  A | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER  AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT  DATE: | |

REDACTED





| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR020127 | ENDORSEMENT REF. 004 | | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT Life Receivables Trust | | LEADING U/WR MUA | LIRMA | | |
| | | | OTHER COMPANIES | | |

D○○○ ᒿ A ○○ A ᔑ ○ A    ⊕

It is noted and agreed by Underwriters hereon that with effect from inception the maximum aggregate limit has been amended to read as follows:

**Maximum
Aggregate
Limit:**    The maximum aggregate limit of Net Death Benefit of all Qualified Life Insurance Policies declared under this Insurance (the **"Maximum Aggregate Limit"**) shall be US$80,000,000

**Information:**    Insured's email dated 27th September 2002 has been seen and noted by Insurers.

All other terms and conditions remain unchanged.

1st October 2002.
LW

U.S. CLASSIFICATION:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| N T I A | | | | | | | |
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR020127 | | ENDORSEMENT REF. 003 | TOTAL | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT | | LEADING U/WR | | LIRMA | | |
| Life Receivables Trust | | | | OTHER COMPANIES | | |

D0002A00 A0A (4)

It is noted and agreed that the following bordereaux have been declared to this Policy:

September 2002          Total Face Value          US$ 8,836,492.00

Additional premium due hereon calculated at 4% on
US$8,836,492.00:                                   US$   353,459.68

Additional premium due hereon =                    US$   353,459.68

**Information:**      Insured's email dated 13th September 2002 seen and noted by Insurers.

Total aggregate face value to date US$36,751,062.00

All other terms and conditions remain unchanged.

16th September 2002.
LW

U.S. CLASSIFICATION:

| N I T I A L | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | | |
| | | | | | | | | |
| L.P.S.O. NUMBER AND DATE | | | | I.L.U. NUMBER AND DATE | | | | |
| | | | | L.I.R.M.A. NUMBER AND DATE | | | | |
| PLANNED SETTLEMENT DATE: | | | | | | | | |

REDACTED



| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | IN ALL | | MARINE WAR |

| ATTACHING TO POLICY NO. CR020127 | ENDORSEMENT REF. 002 | TOTAL | | |
|---|---|---|---|---|
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | |
| ASSURED/ACCOUNT | | LEADING U/WR | LIRMA | | |
| Life Receivables Trust | | | OTHER COMPANIES | | |

Ɗ ∞∞2 A ∞ A 8 ∞ A ( 4 )

It is noted and agreed that the following bordereaux have been declared to this Policy:

August 2002          Total Face Value          US$ 12,414,570.00

Additional premium due hereon calculated at 4% on US$12,414,570.00:                    **US$    496,582.80**

Additional premium due hereon =                    **US$    496,582.80**

**Information:**          Insured's email dated 19th August 2002 seen and noted by Insurers.

Total aggregate face value to date US$27,914,570.00

All other terms and conditions remain unchanged.

20th August 2002.
LW

U.S. CLASSIFICATION:

| N I T I A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

Life Settlement Corporation d/b/a Peachtree Life Settlements
Closing Policy (First Business) – 12th Advance

The undersigned, certifies that the premiums set forth in this settlement and such illustrations are equal in amount and timing to premiums taken into account for purposes of computing the Hypothetical Unfunded Premium Amount pursuant to the Credit Agreement) with respect to such policy, after providing any premiums and terms on such illustration to exceed, for the fact that the Deferred Period Gross may be allowed less the premium satisfactory debt.
Life Settlement corporation, as Originator And Servicer

By: _____
Name: _____    Date: _____
Title: _____

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR020127 | ENDORSEMENT REF. 001 | TOTAL | | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. ADJ. | ILU | |
| ASSURED/ACCOUNT Life Receivables Trust | | LEADING UWR | LIRMA OTHER COMPANIES | | |

D ooo2Aoo A6oA (4)

It is noted and agreed that the following bordereaux have been declared to this Policy:

July 2002                     Total Face Value                     US$ 15,500,000.00

Additional premium due hereon calculated at 4% on
US$15,500,000.00:                                          US$      620,000.00

Total premium due:                                         US$      620,000.00
Less M& D premium paid:                                    US$      100,000.00

Therefore additional premium due hereon =                  US$      520,000.00

Information:          Insured's email dated 10th July seen and noted by Insurers.

Total aggregate face value to date US$15,500,000.00

All other terms and conditions remain unchanged.

U.S. CLASSIFICATION:
18th July 2002
LW

| N I T I A | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | LL.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED



u/w

PAGE 1 of ............ 24

| TYSERS | 572 TYS |
|---|---|

| POLICY NO. | REF. NO. |
|---|---|
| CRO30057 | |

| UNIQUE MARKET REFERENCE | SLIP REGISTRATION | | |
|---|---|---|---|
| CRO30057 | LLOYD'S | ILU | LIRMA |

| BINDING AUTHORITY REGISTRATION NO. & DATE | RISK CODE(S) | . |
|---|---|---|

| D.T.I. CODE | TOC TRIBUNAL | TERMS OF SETTLEMENT | | |
|---|---|---|---|---|
| | | SETTLEMENT DUE DATE | DEF | ADJ |
| | | /      / | | |

| ASSURED/ACCOUNT | ADJUST. SCHEME |
|---|---|
| LIFE RECEIVABLES TRUST | YES   NO |

| USB / NUS / US | COUNTRY OF ORIGIN | VAT |
|---|---|---|

OVERSEAS BROKER (NAME & ADDRESS)

| CURRENCY | SIGNED LINE % | GROSS PREMIUM | | |
|---|---|---|---|---|
| | | IN ALL | WAR ONLY | |
| TOTAL | | | | |
| LLOYD'S | | | | |
| ILU | | | | |
| LIRMA | | | | |
| OTHER COMPANIES | | | | |

CURRENCY EXCHANGE RATE

FOR FUTURE USE

| EC CCI | EC . ESTABLISHMENT | EC SERVICES | EC N/A |
|---|---|---|---|
| BUREAU SCHEME NO. | | BROKERS COVER NO. | |

| WRITTEN LINES | % PART | OF | ORDER WHOLE | ORDER | CLOSED FOR |
|---|---|---|---|---|---|

Subject to renewal being required. Leading Underwriters Agreement (NMA)

Agreed to accept increases automatically as from date accepted by leading Office (or date of advice from Assured or Reassured) provided Underwriters and Companies total liability hereon does not exceed written lines plus 10% subject to Agreement by the Leader as soon as is practicable.

All wordings, Schedules, Proposals, Endorsements, Reductions, Signings, Signing Slips and T.O.R. Signings to be agreed by the Leader only. Agree to allow Renewal Policy to be issued without production of old slip or policy.

Subject otherwise to the terms of the C.L.U.A. (92) and C.A.I.C. (93)

Agree Slip Policy to be issued.

NON MARINE FA

| | |
|---|---|
| **Effect Date:** | March 17th, 2003 |
| **Type:** | Contingency Insurance |
| **Form:** | J (A) NMA 2421 and as per slip wording. No proposal form. In the event of any conflict or inconsistency between the terms and conditions of this Insurance (represented by this slip that has been stamped on behalf of the Underwriters) and any policy form, jacket or wrapper issued by the Underwriters, the terms and conditions of this Insurance shall govern to the extent of such conflict or inconsistency. |
| **Underwriters:** | GOSHAWK SYNDICATE 102 AT LLOYDS. It is understood and agreed that MERLIN UNDERWRITING AGENCY LTD shall have the authority to act for and bind the Underwriters with respect to any consent, confirmation, approval, amendment, waiver, supplement or any other action or undertaking required or permitted to be taken, given, granted or delivered by the Underwriters hereunder. |
| **Assured:** | Life Receivables Trust, formed under the Trust Agreement, dated as of June 9, 2000 (the "Trust Agreement") by and among Life Receivables I, LLC, as Settlor and Initial Beneficiary, and The Bank of New York, as trustee, as amended and in effect as of February 2, 2001 and as further amended from time to time in accordance with its terms. |
| **Trustee:** | The Bank of New York as UTI Trustee and SUBI Trustee (as such terms are defined in the Trust Agreement) or any successor trustee appointed in accordance with the Trust Agreement. |
| **Originator:** | Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life Settlements, a Georgia corporation). |
| **Servicer:** | Life Settlement Corporation, a Georgia corporation (d/b/a Peachtree Life Settlements, a Georgia corporation), and its successors and permitted assigns. |
| **Back-Up Servicer:** | BNY Asset Solutions LLC or, if BNY Asset Solutions LLC shall no longer be serving as Back-Up Servicer of Assured, such other party acting in such capacity (as to the services to be performed in respect of this Insurance, as set forth in Appendix A-2 hereto) and approved by Underwriters in accordance with the terms of the Servicing Agreement. BNY Asset Solutions LLC shall not be and not be deemed to be a party to this Insurance. |

UMR REGISTRATION NO: CR030057                              · page 3 of 24

**Period:**                This Insurance shall cover Qualified Life Insurance Policies purchased by the
                           Assured on or after March 17, 2003 (or, if later, declared on a bordereau
                           hereunder submitted on·or after March 17, 2003) and through and including
                           the first to occur of (x) September 16, 2003 (or, if such day is not a Business
                           Day, the next succeeding Business Day) or (y) the date on which the
                           Maximum Aggregate Limit has been reached.

**Interest:**              To indemnify the Assured in respect of the Net Death Benefit at the time of
                           purchase by the Assured of each Qualified Life Insurance Policy (or where a
                           higher Net Death Benefit has been declared at the time of such purchase to be
                           payable at the end of the Deferred Period and the applicable Contingency
                           Insurance Premium is based and paid at the inception of this Insurance on such
                           higher amount, the Net Death Benefit as of the end of the Deferred Period)
                           acquired by the Assured where the Senior is not deceased at the end of the
                           Deferred Period.

**Limits:**                Up to but not exceeding US$ 5,000,000 Net Death Benefit for any one
                           Qualified Life Insurance Policy / any one Senior, (subject to a sub-limit of
                           US$250,000 any one Qualified Life Insurance Policy / any one Senior where
                           said Insured Person has been diagnosed as having HIV/AIDS) unless approved
                           in writing by Underwriters (such approval not to be unreasonably withheld).

**Maximum Aggregate
Limit:**                   The maximum aggregate limit of Net Death Benefit of all Qualified Life
                           Insurance Policies declared under this Insurance (the "Maximum Aggregate
                           Limit") shall be US$ 50,000,000 (subject to a sub-limit of US$5,000,000 in
                           respect of Qualified Life Insurance Policy(s) where Seniors have been
                           diagnosed as having HIV/AIDS)

**Deferred Period:**       24 months after the end of the Life Expectancy of each Senior in respect of the
                           relevant Qualified Life Insurance Policy relating to such Senior declared
                           hereunder; in the case of a Survivorship Policy where both Seniors are alive at
                           the date the Qualified Life Insurance Policy is purchased by the Assured, the
                           Deferred Period shall be 24 months after the end of the Life Expectancy of the
                           Senior with the longest Life Expectancy.

**Situation:**             Worldwide but in respect of policies acquired by the Assured issued by
                           insurance companies licensed within the United States of America, unless
                           noted hereon by special agreement.

UMR REGISTRATION NO: CR030057                                page 4 of 24

**Conditions Precedent:** Any life insurance policy proposed to be acquired by the Assured as to which (i) the Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate in the form set forth in Appendix B-1 hereto and (ii) the Back-Up Servicer has, on or before (but no earlier than 10 Business Days before) the date of such acquisition, executed and delivered a certificate set forth in Appendix B-2 hereto (each certificate of the type described in clause (i) or (ii) of this sentence is referred to in this Insurance as a "Coverage Certification") is hereby deemed to be accepted for coverage under this Insurance from and after the date of acquisition of such policy by the Assured, subject in each case to the Underwriters' right to terminate coverage with respect to such life insurance policy due to non-payment of the applicable Contingency Insurance Premium in accordance with the section entitled Contingency Insurance Premium below.

**Representations and Warranties:** By execution of this contract of Insurance and its acceptance of the duties specified in Appendix A-1, the Servicer represents and warrants as of the date hereof (and will be deemed to have represented and warranted with respect to each and every life insurance policy as of the date such life insurance policy is deemed accepted for coverage under this Insurance upon delivery of a Coverage Certification) that:

1.  It has truthfully declared all material facts actually known to it which would influence a reasonable Underwriter in determining:
    a)  whether or not to accept the risk
    b)  the premium
    c)  the conditions, exclusions and limitations,

    having diligently made all reasonably necessary inquiries to establish those facts provided that it shall not be required to (x) make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled Medical Testing below or (y) disclose any of its own internal or separately obtained analyses or projections or other actuarial information or (z) disclose any quotations or information or proposals provided by other underwriters or insurers.



UMR REGISTRATION NO: CR030057                    page 5 of 24

**Representations and
Warranties Continued:**

2.  It has no actual knowledge as of the date of the Coverage Certification relating to a Qualified Life Insurance Policy of any undisclosed matter, fact or circumstance actual or threatened, that materially increases or is likely to materially increase the possibility of a Senior surviving his / her Life Expectancy by more than 24 months provided that it shall have no obligation or duty to make inquiry of any third party in relation to such matter and provided it shall have no obligation or duty to make any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled Medical Testing below.

3.  It has declared that the information provided to the Underwriters, as part of the proposal for this Insurance, is in all material respects true and accurate and agrees that such information forms the basis of this Insurance; provided that it does not represent or warrant that (w) any sample polices provided to the Underwriters will necessarily be representative of the policies that become subject to this Insurance; (x) it has made any inquiries in relation to a Senior other than obtaining a statement of his / her Life Expectancy in accordance with the section entitled Medical Testing below; (y) it has disclosed any of its own internal or separately obtained analyses or projections or other actuarial information; or (z) it has disclosed any quotations or information or proposals provided by other underwriters or insurers.

4.  It has advised Underwriters of any change in the information detailed in paragraph 3 of this section which took place prior to the date of the Coverage Certification.

5.  It has agreed to undertake to perform the activities and undertakings as set forth in Appendix A-1.

6.  The purchase price paid to a Senior in respect of any Qualified Life Insurance Policy covered hereby is consistent with applicable legal and regulatory requirements.

7.  The amount of Contingency Insurance Premium payable with respect to each Qualified Life Insurance Policy covered hereby will be the subject of a notice of borrowing under the Credit Agreement referred to in the section entitled Certain Acknowledgments below and is, accordingly, expected to be paid within the time period specified under Contingency Insurance Premium below.



**Claim Adjustment**
**Period:**

On or prior to the 60th day before the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver drafts of a Claim Certification and Effective Assignment (each meeting the requirements set forth in the section entitled Claim Procedures below), a copy of the form issued by the relevant life insurance company which is proposed to be used to complete an Effective Assignment of the applicable Qualified Life Insurance Policy, and a copy of the complete Insurance Policy File with respect to such Qualified Life Insurance Policy (collectively, the "Proposed Claim Documents"). The Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will promptly provide such further information and documents with respect to the Proposed Claim Documents as the Underwriters and their representatives may reasonably request. If, upon review of the Proposed Claim Documents and any other information provided to the Underwriters, the Underwriters determine reasonably and in good faith that (a) according to the issuing insurance company, such Qualified Life Insurance Policy is no longer in force or (b) according to the issuing insurance company, the Assured is not the owner of and beneficiary under such Qualified Life Insurance Policy, then the Underwriters will have the right, exercisable on or prior to the 30th day prior to the expiration of the relevant Deferred Period by written notice to each Interested Person, to dispute the Underwriters' obligation to pay a Claim in respect of such Qualified Life Insurance Policy upon delivery of a Claim Certification with respect thereto (a "Claim Dispute").

Each Claim Dispute will be promptly referred to arbitration in accordance with the applicable procedures set forth in the section entitled Arbitration below; provided, that any such Claim Dispute shall be automatically withdrawn in the event that the circumstances giving rise to such Claim Dispute have been cured by any Interested Person to the reasonable satisfaction of the Underwriters; and provided, further, that under no circumstances (other than for the reasons set forth in clause (a) or (b) of the immediately preceding sentence) shall the Underwriters be entitled to submit any dispute as to the Underwriters' obligation to pay a Claim under this Insurance to arbitration prior to payment of such Claim as set forth in the section entitled Claim Procedures.

**Claim Procedures:**

As soon as practicable following the expiration of any Deferred Period, the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured, will deliver a Claim Certification (as defined below) to substantiate the amount of loss claimed under this Insurance.



**Claim Procedures**
**Continued:**

The following procedures shall apply to each Claim made upon this Insurance (a "Claim"):

1. *Claim Certification.* Claims upon this Insurance shall be made upon presentation by the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, to Underwriters of a certificate of the Servicer in the form set out in <u>Appendix C</u> (a "'Claim Certification").

2. *Effective Assignment.* Each Claim Certification shall be accompanied by an assignment (legally or beneficially in the manner provided in this paragraph 2) of the relevant Qualified Life Insurance Policy to Goshawk Syndicate 102, on behalf of the Underwriters, to the extent of the Assured's legal or beneficial interests therein. Failure so to assign said policy for any reason (other than negligence or wilful misconduct on the part of the Underwriters) will invalidate a Claim solely with respect to the Qualified Life Insurance Policy not so assigned. Assignment of a Qualified Life Insurance Policy in respect of a Senior who is not deceased at the end of the relevant Deferred Period shall be effective for purposes of fulfilling the requirements set forth in this paragraph 2 for payment of a Claim if the Servicer or, if the Back-Up Servicer is serving as Successor Servicer, the Back-Up Servicer, acting as agent of the Assured:

   a) Executes a change of beneficiary designation, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under each such Qualified Life Insurance Policy, naming Goshawk Syndicate 102 at Lloyds, as sole beneficiary and

   b) Either (i) executes an absolute assignment, in a form approved by, or reasonably believed by the Servicer or the Back-Up Servicer to be acceptable to, the insurer under such Qualified Life Insurance Policy of the ownership of such Qualified Life Insurance Policy to Goshawk Syndicate 102 at Lloyds; or (ii) if such assignment is restricted by the laws or regulations of any State or by the policies and procedures of the insurer under such Qualified Life Insurance Policy or is for any other reason (in the reasonable judgment of the Servicer or the Back-Up Servicer) not practicable, executes a collateral assignment to Goshawk Syndicate 102 at Lloyds, making the designation of Goshawk Syndicate 102 at Lloyds, as sole beneficiary under the Qualified Life Insurance Policy irrevocable and otherwise meeting the requirements of paragraph 4 below.



UMR REGISTRATION NO: CR030057                                      page 8 of 24

**Claim Procedures**
**Continued:**

Any assignment pursuant to this paragraph 2 shall be conditioned only upon payment of the related Claim in accordance with paragraph 3 of this section. An assignment meeting the requirements of this paragraph 2 is referred to herein as an "Effective Assignment."

3.  *Payment.* On or prior to the 15th Business Day after receipt of each Claim Certification (accompanied by an Effective Assignment), the Underwriters will pay an amount equal to the aggregate Net Death Benefit payable under the related Qualified Life Insurance Policy to the Collection Account by wire transfer of immediately available funds in US dollars.

4.  *Contingency Insurer Nominee Trust.* The Trust Agreement provides, and at all times will provide, that each Qualified Life Insurance Policy will on the date of payment by the Underwriters of the Claim relating to an Effective Assignment of such Qualified Life Insurance Policy to the Underwriters as set forth in paragraph 3 above be removed from the SUBI Trust (as defined in the Trust Agreement) and allocated to the Contingency Insurer Nominee Trust (as defined in the Trust Agreement) to be held in trust for the benefit of the Underwriters if (x) an Effective Assignment of the type described in paragraph 2(b)(i) above for whatever reason (including without limitation any failure or delay of the issuing insurance company to acknowledge or ratify such Effective Assignment) has not conveyed such Qualified Life Insurance Policy to the Underwriters as of such date or (y) an Effective Assignment of the type described in paragraph 2(b)(ii) above has been employed in connection with such Qualified Life Insurance Policy.

All life insurance policies held in the Contingency Insurer Nominee Trust will be held by the Assured as custodian and nominee for the Underwriters, and the Assured (or the Servicer or Back-Up Servicer acting as agent for the Assured) will (i) act (and refrain from acting) with respect to any such life insurance policy only at the direction of the Underwriters, (ii) irrevocably instruct the insurance company issuing such life insurance policy to make all payments thereunder to an account designated by the Underwriters and (iii) hold any payments made by the issuing insurance company with respect to such life insurance policy in trust for the Underwriters and promptly (and in no event later than one Business Day after receipt thereof) pay over such amounts to an account designated by the Underwriters.



UMR REGISTRATION NO: CR030057

**Cancellation:** In the event of a material breach of this Insurance by the Assured or the Underwriters, the non-breaching party may, by giving 30 days prior notice of cancellation, cancel coverage in respect of Qualified Life Insurance Policies acquired after the expiry of such notice provided that if the breach is capable of remedy, the party not in breach shall first notify the other party (and each other Interested Person) of the breach and request the breach to be remedied. If the breach is not remedied within 14 days after such notice, the other party may then give 30 days written notice of cancellation. In the event of cancellation, the Underwriters shall cover under the terms and conditions of this Insurance all Qualified Life Insurance Policies upon which the Assured or Originator or Servicer has signed a binding agreement to purchase before the expiration of the 30 day cancellation period, regardless of when such purchase is finally consummated. Except as expressly provided in the section entitled Contingency Insurance Premium below, this policy may not be revoked or cancelled with respect to any policy as to which a Coverage Certification has been delivered and any cancellation of coverage by either party shall in no event affect existing coverage of Qualified Life Insurance Policies as to which a Coverage Certification has been delivered before expiration of the notice period contained in the cancellation notice.

**Medical Testing:** All medical testing in connection with assessment of a Senior's Life Expectancy shall be undertaken by two of the Qualified Consulting Physicians (as defined herein).

**Notices:** Any notice required or permitted hereunder must be given in writing to each Interested Person either by personal delivery, guaranteed overnight courier or facsimile, and shall be deemed effectively given (i) in the case of personal delivery, upon delivery to the party to be notified, (ii) in the case of delivery by overnight courier, on the date of delivery guaranteed by such overnight courier, or (iii) in the case of notice by facsimile, upon telephone confirmation of receipt by the party to be notified. Any such notice shall be addressed to the relevant party at the address given on Annex I hereto or to such other address as such party has given to all Interested Persons in the manner specified in this section.

**Qualified Life Insurance Policy Criteria:** A life insurance policy shall constitute a Qualified Life Insurance policy for purposes of this Insurance upon certification by the Servicer and the Back-Up (which certification shall be deemed made by the delivery by the Servicer and the Back-Up Servicer of a Coverage Certification with respect to such life insurance policy) that:



**Qualified Life
Insurance Policy
Criteria:**

1. the Life Expectancy of the Senior (determined in accordance with the requirements set forth under Life Expectancy below), is not less than 36 months nor greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report; in the case of a Survivorship Policy, the Life Expectancy of the Senior having the longest Life Expectancy may not exceed 120 months from and after the date of the relevant Qualified Consulting Physician's report;

2. such life insurance policy is as of the date of the relevant Coverage Certification issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's; and

3. such policy meets the following minimum qualifying criteria on the date of the relevant Coverage Certification:

   a) Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums;

   b) Such policy (i) provides for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (ii) has a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years; and

   c) The Net Death Benefit of such policy shall be no larger than US$5,000,000 , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS) unless advance written approval is granted by Underwriters (such approval not to be unreasonably withheld); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000 (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS,) even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000 , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS)



**Qualified Life
Insurance Policy
Criteria:**

In giving any certification as to the matters set forth in paragraph 3. above, the Back-Up Servicer (whether acting in its capacity as Back-Up Servicer or as Successor Servicer) shall be entitled to rely on the information included in applicable Insurance Policy Files with respect to giving such certification, and shall in no event be required to deliver any certificate other than as to the matters set forth in Appendix A-2 or in the form attached as Appendix B-2.

Each life insurance policy as to which a Coverage Certification shall have been delivered shall constitute a Qualified Life Insurance Policy hereunder without need for any additional action of any party.

**Tracking:**

Tracking of Seniors under each Qualified Life Insurance Policy shall be undertaken by the Servicer or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Tracking of Seniors under such Qualified Life Insurance Policy shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Tracking of such Seniors.

**Monitoring:**

Monitoring of all Qualified Life Insurance Policies is to be undertaken by the Servicer or Back-Up Servicer. Upon payment of a Claim with respect to a Qualified Life Insurance Policy by the Underwriters in accordance with paragraph 3 of the section entitled Claim Procedures above, Monitoring of such Qualified Life Insurance Policy and payment of premiums thereon shall be undertaken by the Underwriters or such parties as the Underwriters from time to time appoint in their sole discretion and neither the Assured nor the Servicer nor the Back-Up Servicer shall have any further obligation to carry out Monitoring of such Qualified Life Insurance Policy or pay premiums thereon (whether or not such Qualified Life Insurance Policy is held by the Contingency Insurer Nominee Trust as provided in the section entitled Claim Procedures above).



**Governing Law;**
**Waiver of Jury Trial;**
**Submission to**
**Jurisdiction and**
**Consent to Service**
**of Process:**

THIS INSURANCE SHALL BE SUBJECT TO, AND THIS CONTRACT SHALL BE GOVERNED BY, THE INTERNAL LAWS OF THE STATE OF NEW YORK, U.S.A. WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF. EACH PARTY TO THIS INSURANCE AND EACH PERSON LISTED ON <u>ANNEX 1</u> HERETO HEREBY IRREVOCABLY AGREES THAT ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INSURANCE OR ANY RELATED TRANSACTIONS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK CITY OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND HEREBY EXPRESSLY SUBMITS TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS FOR THE PURPOSES THEREOF AND EXPRESSLY WAIVES ANY CLAIM OF IMPROPER VENUE AND ANY CLAIM THAT SUCH COURTS ARE AN INCONVENIENT FORUM. EACH SUCH PARTY AND EACH SUCH PERSON HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OF ANY OF THE AFOREMENTIONED COURTS BY NOTICE IN THE MANNER SPECIFIED IN THE SECTION ENTITLED NOTICES ABOVE. EACH SUCH PARTY AND EACH SUCH PERSON IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING.

It is further agreed that service of process upon the Underwriters in any such legal action or proceeding may be made upon <u>Mendes & Mount LLP, 750 7th Avenue, New York, NY 10019-6829, U.S.A.</u> and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured or any other Interested Person to give a written undertaking to the Assured (or such Interested Person) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted. Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any other Interested Person arising out of this Insurance, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.



**Reporting:**  All Qualified Life Insurance Policies from time to time covered by this Insurance will be reported by the Servicer (or, if the Back-Up Servicer shall have assumed the duties of Servicer under the Servicing Agreement, the Back-Up Servicer or its designated subservicer as set forth in the Servicing Agreement) to Goshawk Syndicate 102 at Lloyds, by monthly *bordereaux* in the form attached hereto as Appendix D, delivered on or before the 15th day of each month (or if such day is not a Business Day, the next succeeding Business Day) during the Insurance period and such *bordereaux* will include (in the case of any policy that is the subject of the most recent Coverage Certification) copies of the Qualified Consulting Physician's report referred to in the section entitled Medical Testing above. Subject to the provisions of the section entitled Cancellation the Assured shall notify all Interested Persons when it no longer intends to declare Qualified Life Insurance Policies to this Insurance.

**Information:**  The Servicer will deliver to the Underwriters (i) all and any material information relating to this Insurance received by the Assured or the Servicer through routine Tracking procedures or other channels relating to the medical circumstances of each Senior within 7 days after request therefor and/or (ii) a current schedule of Seniors by the Underwriters within a reasonable period of time after request therefor; provided that no person shall be obligated to provide any requested information to the extent prohibited by law, regulation or court order.

**Limitations on
Assignment:**  Policies comprising Qualified Life Insurance Policies may not be assigned, except as collateral to lenders (including without limitation Abbey National Treasury Services plc and any of its affiliates) or other funding providers (or their agents or trustees) of the Assured, in whole or in part, without the prior written consent of the Underwriters, which will not be unreasonably withheld or delayed; provided that this section shall not prohibit any assignment, for collateral to lenders or otherwise by outright assignment, of beneficial trust interests in the Assured and provided further that this section shall not prohibit the Assured from segregating any Qualified Life Insurance Policy or other property owned by it or the Insurance provided hereunder into a separate subtrust for a separate beneficiary or prohibit the appointment of a successor trustee for the Assured. This Insurance may not be assigned by the Underwriters without the prior written consent of the Lender.



UMR REGISTRATION NO: CR030057                                    page 14 of 24

**Certain**
**Acknowledgments;**
**Representations and**
**Warranties:**       The Underwriters acknowledge and understand that loans to be used for, among
                      other things, the acquisition of life insurance policies by the Assured and payment
                      of premiums and certain expenses in connection therewith are being provided by
                      Abbey National Treasury Services plc (together with its successors and assigns,
                      the "Lender") pursuant to a Credit Agreement, dated as of February 2, 2001,
                      between the Lender and Life Receivables II, LLC, as Borrower, and that the
                      Lender is being granted a first priority security interest in and charge over certain
                      assets of Life Receivables II, LLC and of the Assured, including without
                      limitation a certificate representing ownership of the beneficial interest in the
                      SUBI Trust and interests of the Assured under the Servicing Agreement (together
                      with the transactions contemplated thereby and all other documents and
                      instruments entered into in connection therewith, the "Lending Transactions").
                      The Underwriters consent to the terms of the Lending Transactions and
                      acknowledge the rights and remedies of the Lender and its agents thereunder, and
                      agree that the Lender and its collateral agent shall be additional Loss Payees
                      under this Insurance and have the benefit of the covenants and agreements of the
                      Underwriters hereunder.

                      The Underwriters represent and warrant for the benefit of the Lender and its
                      agents that (i) the execution, delivery and performance by the Underwriters of
                      this Insurance are within the Underwriters' powers and have been duly authorized
                      by all necessary action on the part of the Underwriters, (ii) this Insurance has
                      been duly and validly executed and delivered by the Underwriters and (iii) this
                      Insurance constitutes the legal, valid and obligation of the Underwriters,
                      enforceable against the Underwriters in accordance with its terms.

**Servicer Duties:**  The Servicer (or, if the Back-Up Servicer shall have assumed the duties of
                      Servicer under the Servicing Agreement, the Back-Up Servicer), on behalf of the
                      Assured, shall maintain adequate records in connection with the subject matter
                      insured hereunder.

**Subrogation:**      In the event of any payment under this Insurance with respect to a Qualified Life
                      Insurance Policy, Underwriters shall (to the extent of their payment and to the
                      extent that an Effective Assignment does not upon payment by the Underwriters
                      in fact operate to directly or collaterally assign such Qualified Life Insurance
                      Policy to the Underwriters) be subrogated to all the Assured's rights of recovery
                      under such Qualified Life Insurance Policy and the Servicer (or, if the Back-Up
                      Servicer shall have assumed the duties of Servicer under the Servicing
                      Agreement, the Back-Up Servicer) shall (at the Underwriters' expense) take such
                      actions (in the case of the Back-Up Servicer, in accordance with the BNYAS
                      Servicing Standard, as defined in the Servicing Agreement) reasonably requested
                      by Underwriters (at such times as required herein) to confirm and assure such
                      rights.



UMR REGISTRATION NO: CR030057                                        page 15 of 24

**Subrogation Continued:**

The Underwriters shall have no recourse to the Assured in the event that an Effective Assignment does not upon payment by the Underwriters in fact operate to directly or collaterally assign the relevant Qualified Life Insurance Policy to the Underwriters.

**Loss Payees:**

Any payments due under the terms and conditions of this Insurance shall, upon notice given by the Lender (or its collateral agent serving in connection with the Lending Transactions) as Loss Payee hereunder, be made by the Underwriters directly to the Lender (or such collateral agent) instead of to the Collection Account. Timely payment in full of the Net Death Benefit (as provided above under Interest and Claims Procedures) by Underwriters to the Loss Payee(s) to an account specified pursuant to this section shall be a sufficient and complete discharge of all Underwriters' obligations to the Assured and Loss Payee(s) in connection with said losses.

**Mitigation:**

Underwriters reserve the right, if they so wish, to take such reasonable steps as they deem necessary to prevent, mitigate or minimise a loss; provided that such action is not in contravention of the terms of the Lending Transactions or any other agreement Assured has with the Lender or any other lenders or other funding providers (or their agents or trustees) or in violation of any applicable law, rule or regulation (including without limitation those relating to insurance or insurance brokerage).

**Bankruptcy Proceedings:**

The Underwriters agree not to commence or join in any case or other proceeding against the Assured, Life Receivables II, LLC or any of their respective affiliates seeking liquidation, winding-up, reorganization or other relief with respect to such person or entity or its debts under any liquidation, insolvency, bankruptcy, moratorium, reorganization or similar law of any relevant jurisdiction applicable to such person or entity now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of such person or entity or any material part of its property prior to the date which is one year and one day after payment in full of all obligations owed by any such person or entity to the Lender or its agents or affiliates or their respective representatives in connection with any of the Lending Transactions.

**Recovery of Premium:** The Contingency Insurance Premium and any expense incurred in the formulation of a Claim hereunder shall not be a recoverable item.



UMR REGISTRATION NO: CR030057                        page 16 of 24

Recourse:        1.  *Reduction of Payments.* The Underwriters will not be permitted to reduce
                     any payments under this Insurance as a result of (i) any breach by the
                     Servicer and/or the Originator of their representations, warranties, covenants
                     or provisions herein (including without limitation those related to Tracking
                     and Monitoring and those under Representations and Warranties) or in the
                     Servicing Agreement, (ii) any breach by the Back-Up Servicer of its
                     representations, warranties, covenants or provisions set forth herein or in the
                     Servicing Agreement or (iii) except as provided in the immediately
                     following sentence, any action or inaction on the part of the Assured or any
                     other person or entity. Notwithstanding the foregoing, the Underwriters
                     shall be permitted to reduce payments under this Insurance as expressly
                     provided in clause (b) of the definition of "Net Death Benefit" below.

                 2.  *Obligations Unconditional.* Subject only to the section entitled
                     Contingency Insurance Premium below, the Underwriters agree that each
                     of their duty to accept for coverage any life insurance policy as to which a
                     Coverage Certification has been delivered and their obligation to pay the full
                     and complete Net Death Benefit to the Assured by payment into the
                     Collection Account or to the Loss Payee within the time period specified
                     after delivery of a Claim Certification and an accompanying Effective
                     Assignment (A) is absolute, unconditional and irrevocable, (B) shall not be
                     affected by any change in the legal existence, structure or ownership of the
                     Assured, the Servicer, the Back-Up Servicer, the Originator, or any of their
                     respective members, beneficial holders or stockholders or any insolvency,
                     bankruptcy, reorganization or other similar proceeding affecting any such
                     person or entity or any resulting release or discharge of any obligation of any
                     such person or entity, and (C) shall not be subject to any right of rescission,
                     set-off, diminution or counterclaim or defense of any kind, including without
                     limitation (i) fraud or misrepresentation by any person or entity, (ii) any
                     failure by (or question or issue regarding the ability of) the Assured, the
                     Servicer, the Back-Up Servicer or the Originator or any other person or
                     entity or any of their respective officers, directors, members, agents or
                     employees or representatives to comply with any covenant or agreement
                     contained in this Insurance or the Servicing Agreement or in any other
                     agreement or instrument or any applicable legal requirement, (iii) any breach
                     of or inaccuracy in any representation, warranty, certification or statement
                     made by the Assured, the Servicer, the Originator, the Back-Up Servicer or
                     their respective affiliates or their respective directors, members, agents,
                     employees or representatives in this Insurance or the Servicing Agreement or
                     in any Coverage Certification, monthly *bordereaux*, Claim Certification or
                     other notice, certificate, report or other document delivered pursuant to or in
                     connection with this Insurance,



Recourse
Continued:

(iv) any negligence or misconduct by the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity or their respective affiliates or their respective directors, members, agents, employees or representatives, (v) any delay or failure by the insurer under a Qualified Life Insurance Policy which is the subject of an Effective Assignment in acknowledging the interests of the Underwriters thereunder, or (vi) any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Underwriters hereunder; it being understood and agreed that the Lender is relying upon the absolute and unconditional nature of the obligations of the Underwriters in entering into the Lending Transactions and providing financing thereunder.

3    *Servicer Indemnities.* Notwithstanding paragraphs 1 and 2 of this section, by its acceptance of the duties specified in Appendix A-1, the Servicer and the Originator agree to indemnify the Underwriters against losses in respect of any Qualified Life Insurance Policy as to which the Underwriters make payment to the extent such losses result from the breach by the Servicer and the Originator of specified representations, warranties, covenants or provisions herein that materially and adversely affect the amounts realised as proceeds of such Qualified Life Insurance Policy, provided, however, that the foregoing indemnity shall in no way be deemed to impose on any of the Originator or the Servicer any obligation, other than to the extent specifically resulting from the breach of the representation or warranty set forth herein of the rating of each insurer or from the inaccuracy of the Coverage Certification with respect to such rating), to reimburse the Underwriters for losses arising solely from the financial inability of the insurer of a Qualified Life Insurance Policy to make payment when due on such Qualified Life Insurance Policy, and provided, further, however, that no Back-Up Servicer shall have any obligations pursuant to this paragraph 3, whether acting as successor Servicer or otherwise. Neither the effect of any representation or warranty made by the Servicer pursuant to this Insurance nor the Servicer's obligations under this paragraph 3 nor any other recourse available against the Servicer under this Insurance shall be diminished by any access, investigation or due diligence inquiry conducted by the Underwriters or their representatives, including without limitation pursuant to the procedures described in the section entitled Claim Adjustment Period above.

The Underwriters shall have no obligation to assume the payment obligation of any insurer of a Qualified Life Insurance Policy that fails to make payment when due on such Qualified Life Insurance Policy solely as a result of the financial inability of such insurer to make such payment.



UMR REGISTRATION NO: CR030057                                page 18 of 24

Recourse
Continued:

4.  *Insurer Approval of Effective Assignment.* No delay or failure by any insurer under a Qualified Life Insurance Policy in acknowledging or consenting to an Effective Assignment shall operate to excuse or relieve the Underwriters of the obligation to pay amounts due in respect of a Claim made in compliance with the procedures set forth in the section entitled Claim Procedures above.

5.  *Sole Remedy.* Paragraph 3 of this section sets forth the sole and exclusive remedy of the Underwriters for losses arising out of, in relation to or in connection with any and all (i) breaches of or inaccuracies in any representations, warranties, certifications or statements made by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in this Insurance or in any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (ii) instances of fraud or misrepresentation committed by the Assured, the Servicer, the Originator or the Back-Up Servicer or their respective affiliates or their respective directors, members, agents, employees or representatives in connection with this Insurance, the Servicing Agreement or any Coverage Certification, monthly *bordereaux*, Claim Certification or other notice, certificate, report or other document delivered pursuant to or in connection with this Insurance, (iii) breaches of any covenants or agreements of the Assured, the Servicer, the Originator, the Back-Up Servicer or any other person or entity in this Insurance or the Servicing Agreement or any other agreement or instrument or of any legal requirement or (iv) any other matter covered in paragraph 2 of this section. In particular, the Underwriters shall have no right for any reason whatsoever (including without limitation those enumerated in the immediately preceding sentence) to reduce any amounts payable in respect of a Claim made in accordance with the claims procedures set forth in the section entitled Claim Procedures above or cancel or terminate coverage hereunder with respect to any Qualified Life Insurance Policy which is the subject of a Coverage Certification.



**Amendments and
Waivers:**

Any term of this Insurance may be amended and the observance of any term of this Insurance may be waived, with but only with, the written consent of (i) the Underwriters, (ii) the Lender, (iii) if such amendment or waiver could reasonably be expected to materially and adversely affect the Collateral Agent acting in connection with the Lending Transactions in its capacity as such, the Collateral Agent, (iv) if such amendment or waiver could reasonably be expected to materially and adversely affect the Trustee of the Assured acting in its capacity as such, the Trustee of the Assured, (v) if such amendment or waiver could reasonably be expected to materially and adversely affect the Servicer or Back-Up Servicer, the Servicer or Back-Up Servicer, as the case may be, and (vi) for so long as no Event of Default under the Lending Transactions has occurred and is in existence, the Assured. Unless otherwise specified in such waiver, a waiver given hereunder shall be effective only in the specific instance and for the specific purpose for which given. No failure or delay by any Interested Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Definitions:**

**Business Day**

Means a day (other than a Saturday or Sunday) on which commercial banks and insurance companies are open for business in London and New York City.

**Collection Account**

Means the account of Life Receivables II, LLC maintained at the Collateral Agent then acting in connection with the Lending Transactions and identified on Annex II to this Insurance, or such different account as the Collateral Agent or the Lender has from time to time designated by written notice to each other Interested Person in accordance with the notice provisions of this Insurance.

**Contestability Period**

Means the period of time after the issuance of a Qualified Life Insurance Policy established by the language of that Qualified Life Insurance Policy and/or state or other applicable law, including any applicable suicide period, during which the issuing insurer may contest the Senior's right to benefits under that Policy (other than for non-payment of premiums by the Senior).

**Face Value**

Means the amount of a total death benefit payable under the Senior's life insurance policy.

**Definitions**
**Continued:**

<u>Insurance Policy File</u>

Means a complete policy file meeting the requirements of Item 7 of <u>Appendix A-1</u> and containing all other documents and information necessary to determine whether the criteria set forth in <u>Schedule III</u> to the Credit Agreement have been satisfied with respect to each Eligible Life Insurance Policy (as defined therein).

<u>Interested Persons</u>

Means each person or entity listed on <u>Annex I</u> hereto together with the successors and permitted assigns of such person or entity.

<u>Life Expectancy</u>

Means the remaining period in months that the Senior is expected to live after the date of a Qualified Consulting Physician's report, as assessed and given by two Qualified Consulting Physicians in writing within 120 days prior to the date of the Coverage Certification given with respect to the Qualified Life Insurance Policy insuring the life of such Senior. For the purpose of this insurance, the longest of the Life Expectancies given by the two Qualified Consulting Physicians must be used as the Life Expectancy of the Senior, and if the assessment is given as a range between two numbers of months, Life Expectancy will be the higher of the two numbers in the range. In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under the policy.

<u>Loss Payee</u>

Means the Assured, the Lender or the collateral agent then serving in connection with the Lending Transactions and any other person or entity who is named as an additional loss payee under this Insurance by notice to the Underwriters given with the prior written consent of the Lender, together with such person's successors and permitted assigns.

<u>Monitoring</u>

Means (1) the timely disbursement of amounts on deposit in applicable accounts maintained under the Lending Transactions to make periodic premium payments necessary to keep Qualified Life Insurance Policies in force through the date of any Effective Assignment to the Underwriters pursuant to the section entitled Claim Procedures above and (2) the timely filing of claims to the issuing insurance company after the death of the relevant Senior.



**Definitions**
**Continued:**

### Net Death Benefit

Means, in relation to a Qualified Life Insurance Policy, (1) the lesser of (a) the Face Value of such Qualified Life Insurance Policy as of end of the Deferred Period or (b) the amount listed as the Net Death Benefit in the *bordereau* pertaining to such Qualified Life Insurance Policy plus (2) (a) any additional value (or refund of premium) paid or payable pursuant to that Policy following the relevant Senior's death minus (b) the amount (if any) of any premiums necessary to keep such Qualified Life Insurance Policy in force which are due and payable but not yet paid (and accrued interest thereon, if any), in each case being outstanding as of the end of the Deferred Period.

### Premium Taxes

Means all taxes, duties, charges, assessments or withholdings imposed on any amount due to the Underwriters under the section entitled Contingency Insurance Premium below by the United States of America or any state or other political subdivision thereof, but only to the extent claimed at least ten Business Days prior to the date any such amount due to the Underwriters is payable in a certificate signed by the Underwriters setting forth the taxing jurisdiction, and the type and amount of such tax, duty, charge, assessment or withholding and requesting payment thereof. In the event that the Servicer disputes the applicability of Premium Taxes to such amounts, the Servicer and the Underwriters shall jointly appoint a nationally recognized law firm or accounting firm to determine the issue, and the decision of such firm shall be conclusive.

### Qualified Consulting Physician

Means (a) 21st Services of Minneapolis, Minnesota, USA, (b) American Viatical Services of Woodstock, Georgia, USA, (c) Examination Management Services, Inc. of Waco, Texas, USA, (d) Fasano Associates of Washington, DC, USA, (e) Systems for Advanced Risk Analysis of San Antonio, Texas, USA or (f) any other independent third party consulting physician or group of consulting physicians approved in advance by the Underwriters in writing, such approval not to be unreasonably withheld.

### Qualified Life Insurance Policy

Means a life insurance policy which both the Servicer and Back-Up Servicer have declared in a Coverage Certification conforms to the minimum qualifying criteria set forth in the section entitled Qualified Life Insurance Policy Criteria above.



**Definitions**
**Continued:**

### Senior

Means an individual aged 65 or over on the date of purchase of a life insurance policy by the Assured (or, if the Underwriters shall have consented in writing, an individual aged 64 1/2 or over on the date of purchase of a life insurance policy by the Assured and who has been given a Life Expectancy in accordance with the section entitled Qualified Life Insurance Policy Criteria above by a Qualified Consulting Physician and, in the case of Survivorship Policies, shall mean the individual whose death would give rise to a claim under the relevant life insurance policy.

### Servicing Agreement

Means the Servicing Agreement, dated as of February 2, 2001, among Life Settlement Corporation, BNY Asset Solutions LLC, Life Receivables II, LLC, Babcock & Brown LP and the Assured.

### Successor Servicer

Has the meaning given in the Servicing Agreement.

### Survivorship Policy

Means a Qualified Life Insurance policy which provides for payment of a Net Death Benefit upon the later to die of two Seniors.

### Tracking

Means periodic (monthly in the case of remaining life expectancies of 24 months or less; quarterly in the case of remaining life expectancies of over 24 months) contact (of such nature as the Servicer or Back-Up Servicer may in its absolute discretion determine) with the Senior (or Seniors) insured under a Qualified Life Insurance Policy (or such Senior's representative), and shall include, in the case of any Senior with whom direct or indirect contact is impossible, commercially reasonable efforts to determine whether or not such Senior is deceased, in all cases, subject to any restrictions or limitations imposed by law or regulation.



UMR REGISTRATION NO: CR030057                    page 23 of 24

Arbitration:

1. All disputes and differences arising under or in connection with this Insurance shall be referred to arbitration under the American Arbitration Association Rules. The Arbitration Tribunal shall consist of three arbitrators, one to be appointed by the Claimant, one to be appointed by the Respondent and the third to be appointed by the two appointed arbitrators. The third member of the Tribunal shall be appointed as soon as practicable (and no later than (i) three Business Days, in the case of a Claim Dispute, and (ii) 28 days, in all other cases) after the appointment of the two party-appointed arbitrators. The Tribunal shall be constituted upon the appointment of the third arbitrator.

2. The arbitrators shall be persons (including those who have retired) with not less than ten years' experience of insurance or reinsurance within the industry or as lawyers or other professional advisers serving the industry; provided, that the Assured or any other Interested Person shall have the right to exclude any arbitrator who is then a member or employee of Equitas, Lloyds of London or any underwriting syndicate or other entity of Lloyds of London. Where a party fails to appoint an arbitrator within fourteen days (two Business Days, in the case of a Claim Dispute) after being called upon to do so (or by either party's written certification that a dispute exists under or in connection with this Insurance) or where the two party-appointed arbitrators fail to appoint a third within 28 days (three Business Days, in the case of a Claim Dispute) after their appointment, then upon application the American Arbitration Association will appoint an arbitrator to fill the vacancy. At any time prior to the appointment by the American Arbitration Association the party or arbitrators in default may make such appointment.

3. The Arbitration Tribunal may in its sole discretion make such orders and directions as it considers to be necessary for the final determination of the matters in dispute; provided that the parties shall each retain the right to appeal errors of law to a court of law having jurisdiction of the matters addressed herein and, each party executing this Insurance hereby consents and agrees that the state or federal courts located in New York shall have exclusive jurisdiction to hear and determine any such matters. The Arbitration Tribunal shall have the widest discretion permitted under the law governing the arbitral procedure when making such orders or directions.

4. The seat of arbitration shall be New York, New York, U.S.A. Each party shall bear its own costs and expenses incurred in connection with any arbitration; provided, however, that the losing party in any arbitration commenced under the section entitled Claim Adjustment Period above or otherwise relating to the payment of a Claim shall bear the costs and expenses of the other party and all other Interested Persons involved in such arbitration.



UMR REGISTRATION NO: CR030057                                    page 24 of 24

**Contingency Insurance Premium:**  The premium for this Insurance shall be five percent (5%) of the Net Death Benefit under each and all Qualified Life Insurance Policies acquired by the Assured and declared hereunder, plus any related Premium Taxes (collectively, the "Contingency Insurance Premium"). A minimum deposit premium of US$100,000 plus Premium Taxes on such amount (if any) must be paid to Underwriters within 60 days after inception of this Insurance. The minimum deposit premium shall be credited against Contingency Insurance Premium due at a rate of 5% of Net Death Benefit of each and all Qualified Life Insurance Policies acquired by the Assured and declared hereunder, plus any related Premium Taxes. Thereafter, the amount of the Contingency Insurance Premium payable with respect to each Qualified Life Insurance Policy covered under this insurance shall be payable on or before the fifteenth day of the calendar month (or if such day is not a Business Day, the next succeeding Business Day) next following the calendar month in which the Coverage Certification relating to such Qualified Life Insurance Policy was submitted.

The Underwriters shall have the right, exercisable upon ten Business Days' prior written notice to each Interested Person, to terminate coverage hereunder with respect to any Qualified Life Insurance Policy as to which the requisite Contingency Insurance Premium has not been paid within the time period specified in the immediately preceding paragraph, subject, however, to the right of the Lender and each other Interested Person to cure any such payment failure during such ten Business Day period before the Underwriters shall be entitled to terminate coverage in accordance with this paragraph.

**Deductible:**  Nil

**U.S. Classification:**  Surplus Lines:  Lester Kalmanson Agency, Inc.
P.O. Box 940008
235 South Maitland Avenue, Suite 201
Maitland, Florida 32794. U.S.A.

**Brokerage:**  5%

**Information:**  As per Tyser Special Risks Ltd file.

The Servicer will be responsible for ensuring that all policies declared to this Insurance comply with all the Insurance terms and provisions. Minimum responsibilities are detailed in Appendix A-1. No Back-Up Servicer acting as Servicer shall have any liability or obligations pursuant to this paragraph, apart from its responsibilities set forth in Appendix A-2 and expressly provided for in this Insurance or in the Servicing Agreement.

17th March, 2003.
MH



## ANNEX I

### INTERESTED PERSONS

Underwriters:

Merlin Underwriting Agency Ltd
38 St Mary Axe
London EC3A 8EX, England
Tel: 020 7621 0777
Fax: 020 7621 6359
Attention: Steve Mitchell

Assured:

The Bank of New York, as Trustee for the Life Receivables Trust
101 Barclay Street, Floor 12 East/ABS
New York, New York 10286  USA
Tel: (212) 815-5766
Fax: (212) 815-5544
Attention: Mauro Palladino, Vice President, Structured Services

with a copies to:

Life Settlement Corporation, as Servicer
5085 Avalon Parkway, Ste. 600
Norcross, Georgia 30071  USA
Tel: (800) 600-9161
Fax: (800) 600-7161
Attention:

and

Babcock & Brown LP
Two Harrison Street
San Francisco, California 94105  USA
Tel: (415) 512 -1515
Fax: (415) 267-1500
Attention: General Counsel

Lender:

Abbey National Treasury Services plc
Abbey House
215-229 Baker Street
London NW1 6XL England
Tel: 011-44-207-612-3324
Fax: 011-44-207-486-6872
Attention: Alastair Tyler, Manager, Structured Finance



Collateral Agent:    The Bank of New York, as Collateral Agent
                     101 Barclay Street, Floor 12 East/ABS
                     New York, New York 10286  USA
                     Tel:  (212) 815-5766
                     Fax:  (212) 815-5544
                     Attention: Mauro Palladino, Vice President, Structured Services

Back-Up Servicer:    BNY Asset Solutions, LLC
                     6550 Rock Spring Drive
                     Bethesda, Maryland  20817 USA
                     Tel:  (972) 401-8625
                     Fax:  (972) 401-8554
                     Attention: Kyle B. Beaty

ANNEX II

COLLECTION ACCOUNT INFORMATION

The Bank of New York, as Collateral Agent
New York, New York
ABA# 021-000-018
GLA# 111-565
Account Number: 351010
Reference: LIFE REC TRUST COLL ACCT

## APPENDIX A-1
## RESPONSIBILITIES OF SERVICER

Servicer (and not Back-Up Servicer acting as Successor Servicer) will be responsible for ensuring that all policies submitted for coverage under this Insurance comply with the policy terms and conditions set forth in paragraphs 1 through 7 below, and for certifying in a Coverage Certification that each such policy complies with the following terms and conditions:

1.  The Life Expectancy of a Senior insured under any life insurance policy submitted for coverage under this Insurance shall be not less than 36 months nor greater than 120 months after the date of the report of a Qualified Consulting Physician dated not more than 120 days prior to the date of the Coverage Certification with respect to the related Qualified Life Insurance Policy (or, in the case of a Survivorship Policy, the Life Expectancy of the Senior having the longest Life Expectancy shall not be greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report). In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under such life insurance policy.

2.  The Senior insured under any life insurance policy submitted for coverage under this Insurance shall be not less than 65 years old (or if the Underwriters shall have consented in writing, not less than 64 1/2 years old) on the date of the relevant Coverage Certification.

3.  Any life insurance policy submitted for coverage under this Insurance shall be issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's as of the date of the Coverage Certification.

4.  Any life insurance policy submitted for coverage under this Insurance shall either (a) provide for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (b) have a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon, and measured from, a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years.

5.  Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums.

6.  Any life insurance policy submitted for coverage under this Insurance must have a Net Death Benefit of no more than Five Million Dollars (U.S. $5,000,000.00) (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS) unless advance written approval is granted by Underwriters (such approval not to be unreasonably withheld); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000 (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS) even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000 , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS)



7.    Each Insurance Policy File shall contain the items set forth below or evidence satisfactory to the Servicer that the Originator has verified the items set forth below. Satisfactory evidence shall include a Verification of Coverage in the form approved by the issuing insurance company completed by such insurance company or broker, a change of ownership form, a change of beneficiary form or other document issued by the insurance carrier.

a)    copy of insurance policy

b)    copy of executed change of beneficiary form in favor of Life Receivables Trust, together with acknowledgement from insurance company of the change in beneficiary;

c)    copy of policy assignment form in favor of Life Receivables Trust, together with acknowledgement from insurance company of the change in ownership;

d)    copy of Verification of Coverage form approved by the relevant insurance company completed by the issuing insurance company or broker, as applicable;

e)    copy of an extract from an in force illustration for such policy, setting forth the applicable Net Death Benefit and estimated premiums with respect thereto, dated (unless accompanied by a written waiver from the Underwriters, which waiver has been included in the Insurance Policy File) no earlier than 120 days before the date of the Coverage Certification;

f)    Life Expectancy Report issued by a Qualified Consulting Physician;

g)    copy of application for sale of insurance policy;

h)    copy of contract of sale;

i)    verification that the Net Death Benefit as reflected in the Verification of Coverage and policy illustration is greater than or equal to the Net Death Benefit claimed in the applicable *bordereau* and Insurance Policy File;

j)    verification that the declared policy is in force and is assignable;

k)    verification that the assignment of policy ownership and change in beneficiary have been acknowledged by the insurance company and, where required by law or by the terms of the insurance policy, consented to by all beneficiaries;

l)    verification that the premiums set forth in the in force illustration referred to in e) above are equal in amount and timing to premiums certified by the Servicer to have been taken into account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) with respect to such policy, after prorating any premiums set forth on such illustration to account for the fact that the Deferred Period Date may be different than the premium anniversary date;

m)    documentation or a provision of the policy itself setting forth the address where the premium payments are to be sent;

n)    confirmation that the policy is free of liens or loans; and

o)    verification (using commercially reasonable efforts) that the applicable Senior is not deceased on the date of acquisition of the policy by the Assured.

Any capitalized terms used herein and not otherwise defined have the meaning assigned to them in the Insurance.

By acknowledgement of its responsibilities hereunder, Life Settlement Corporation agrees to the indemnification provided to the Underwriters as provided in the Section entitled Recourse of this Insurance with respect to any policy certified (pursuant to a Coverage Certification) as a Qualified Life Insurance Policy.



Accepted and Acknowledged:

LIFE SETTLEMENT CORPORATION, as Originator

By: _____
    Name:
    Title:

LIFE SETTLEMENT CORPORATION, as Servicer

By: _____
    Name:
    Title:

## APPENDIX A-2
### RESPONSIBILITIES OF BACK-UP SERVICER

Back-Up Servicer (in its capacity as Back-Up Servicer and if serving as Successor Servicer) will be responsible for verifying, based on information set forth in the Insurance Policy File, that all policies submitted for coverage under this Insurance comply with the policy terms and conditions set forth in paragraphs 1 through 7 below, and for certifying in a Coverage Certification that each such policy complies with the following terms and conditions:

1.    The Life Expectancy of a Senior insured under any life insurance policy submitted for coverage under this Insurance shall be not less than 36 months nor greater than 120 months after the date of the report of a Qualified Consulting Physician dated not more than 120 days prior to the date of the Coverage Certification with respect to the related Qualified Life Insurance Policy (or, in the case of a Survivorship Policy, the Life Expectancy of the Senior having the longest Life Expectancy shall not be greater than 120 months from and after the date of the relevant Qualified Consulting Physician's report). In the case of a Survivorship Policy, the Life Expectancy will be the longer of the Life Expectancies of each insured Senior under such life insurance policy.

2.    The Senior insured under any life insurance policy submitted for coverage under this Insurance shall be not less than 65 years old (or if the Underwriters shall have consented in writing, not less than 64 1/2 years old) on the date of the relevant Coverage Certification.

3.    Any life insurance policy submitted for coverage under this Insurance shall be issued by a life insurance company licensed under the laws of any state of the United States of America and having a financial strength rating of no less than "A" by Standard and Poor's rating services or "A3" by Moody's as of the date of the Coverage Certification.

4.    Any life insurance policy submitted for coverage under this Insurance shall either (a) provide for "permanent" life insurance benefits, at issue (e.g., whole life and universal life) or through a non-cancelable conversion feature not requiring future proof of insurability, or (b) have a minimum non-cancelable term of the longer of (x) three times Life Expectancy (based upon, and measured from, a written certification or statement from a Qualified Consulting Physician) or (y) ten (10) years.

5.    Any applicable Contestability Period shall have expired, and such policy shall contain no provisions limiting the future realisation of the Net Death Benefit (either at issue or after any conversion privilege exercisable at the sole option of the Assured) upon the death of the Senior (or in the case of a Survivorship Policy, the second Senior to die) other than for non-payment of premiums.

6.    Any life insurance policy submitted for coverage under this Insurance must have a Net Death Benefit of no more than Five Million Dollars (U.S. $5,000,000.00) , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS); provided that this provision shall be satisfied if the amount of the Net Death Benefit declared on the applicable *bordereau* does not exceed $5,000,000 , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS) even though the Net Death Benefit payable under such life insurance policy may for any period be greater than $5,000,000 , (subject to a sub-limit of US$250,000 any one Qualified Life Insurance Policy / any one Senior where said Insured Person has been diagnosed as having HIV/AIDS)



7.   Each Insurance Policy File shall contain the items set forth below or evidence satisfactory to the Back-Up Servicer that the Originator has verified the items set forth below. Satisfactory evidence shall include a Verification of Coverage in the form approved by the issuing insurance company completed by such insurance company or broker, a change of ownership form, a change of beneficiary form or other document issued by the insurance carrier.

a)   copy of insurance policy

b)   copy of executed change of beneficiary form in favor of Life Receivables Trust, together with acknowledgement from insurance company of the change in beneficiary;

c)   copy of policy assignment form in favor of Life Receivables Trust, together with acknowledgement from insurance company of the change in ownership;

d)   copy of Verification of Coverage form approved by the relevant insurance company completed by the issuing insurance company or broker, as applicable;·

e)   copy of an extract from an in force illustration for such policy, setting forth the applicable Net Death Benefit and estimated premiums with respect thereto, dated (unless accompanied by a written waiver from the Underwriters, which waiver has been included in the Insurance Policy File) no earlier than 120 days before the date of the Coverage Certification;

f)   Life Expectancy Report issued by a Qualified Consulting Physician;

g)   copy of application for sale of insurance policy;

h)   copy of contract of sale;

i)   verification that the Net Death Benefit as reflected in the Verification of Coverage and policy illustration is greater than or equal to the Net Death Benefit claimed in the applicable *bordereau* and Insurance Policy File;

j)   verification that the declared policy is in force and is assignable;

k)   verification that the assignment of policy ownership and change in beneficiary have been acknowledged by the insurance company and, where required by the terms of the insurance policy, consented to by all beneficiaries;

l)   verification that the premiums set forth in the in force illustration referred to in e) above are equal in amount and timing to premiums certified by the Servicer to have been taken into account for purposes of computing the Hypothetical Unfunded Premium Amount (as defined in the Credit Agreement) with respect to such policy, after prorating any premiums set forth on such illustration to account for the fact that the Deferred Period Date may be different than the premium anniversary date;

m)   documentation or a provision of the policy itself setting forth the address where the premium payments are to be sent; and

n)   confirmation that the policy is free of liens or loans.

Any capitalized terms used herein and not otherwise defined have the meaning assigned to them in the Insurance.



APPENDIX B-1

## FORM OF COVERAGE CERTIFICATION - Servicer

The undersigned, in its capacity as Servicer under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR030057) (the "Insurance") that (i) the Servicing Agreement has been complied with respect to each such policy, (ii) it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, (iii) the information specified in <u>Appendix A-1</u> to the Insurance is accurate with respect to each such policy, (iv) each such policy is a Qualified Life Insurance Policy as defined in the Insurance, and (v) each such policy is (and as of the applicable Ramp-Up Date will be) an Eligible Life Insurance Policy as defined in the Credit Agreement. Capitalized terms used and not defined in this Coverage Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the Servicer has caused this Coverage Certification to be duly executed as of the ___ day of _____.

[                              ], as Servicer

By:     _____
    Name:
    Title:



APPENDIX B-2

FORM OF COVERAGE CERTIFICATION – Back-Up Servicer

The undersigned, in its capacity as Back-Up Servicer under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR030057) (the "Insurance") that it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, and that, based on the information set forth in the applicable Insurance Policy File, (i) the Servicing Agreement has been complied with in respect to each such policy, (ii) it has examined the Insurance Policy Files relating to the policies listed in the attached schedule, (iii) the information specified in Appendix A-2 to the Insurance is accurate with respect to each such policy, (iv) each such policy is a Qualified Life Insurance Policy as defined in the Insurance, and (v) each such policy is (and as of the applicable Ramp-Up Date will be) an Eligible Life Insurance Policy as defined in the Credit Agreement, subject to the following assumptions and exceptions with respect to the eligibility criteria set forth on Schedule III to the Credit Agreement:

(a)     with respect to eligibility criterion (a), it is assumed that such policy has been accepted for coverage under the applicable Contingency Insurance Policy;

(b)     with respect to eligibility criterion (j), it is assumed that the date such policy is Purchased by the SUBI Trust and the date such policy has been accepted for coverage under the applicable Contingency Insurance Policy shall be the proposed applicable Ramp-Up Date;

(c)     with respect to eligibility criteria (k), (m), and (o)(iii), the delivery by the Servicer to the Back-Up Servicer of the Servicer's Coverage Certification as to eligibility as of the Ramp-Up Date, without respect to actual date, shall satisfy such eligibility criteria; and

(d)     with respect to eligibility criterion (q), the Back-Up Servicer does not certify as to the allocation of such policy to the SUBI Trust.

Capitalized terms used and not defined in this Coverage Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the Back-Up Servicer has caused this Coverage Certification to be duly executed as of the ___ day of _____.

[                          ], as Back-Up Servicer

By: _____
    Name:
    Title:



## APPENDIX C

### FORM OF CLAIM CERTIFICATION

The undersigned, in its capacity as Servicer or Back-Up Servicer, as the case may be, under the Servicing Agreement, hereby certifies in connection with the Contingency Insurance Programme (UMR Registration No. CR030057) (the "**Insurance**") that:

1.     Attached hereto is an Effective Assignment of a Qualified Life Insurance Policy relating to the _____, a Senior.

2.     On the date hereof, based on Tracking and Monitoring performed by the Servicer and the Back-Up Servicer as required by the Insurance, the Deferred Period applicable to such Senior has expired.

3.     All premiums due under such Qualified Life Insurance Policy have been paid through and including the date hereof, and no loans are outstanding under such Qualified Life Insurance Policy.

4.     The amount of the Claim hereby submitted is $_____.

Capitalized terms used and not defined in this Claim Certification have the meanings given in the Insurance.

IN WITNESS WHEREOF, the [Servicer] [Back-Up Servicer] has caused this Claim Certification to be duly executed as of the ____ day of _____.

[                              ],
as [Servicer] [Back-Up Servicer]

By:     _____
        Name:
        Title:



## APPENDIX D

### Form of Bordereau

| Insured name (surname) | Insured name (first name) | Date Of Birth | Sex | Insurance Company | Life Policy Number | Life Policy Issue Date | Insurance Company Rating | Life Policy Type | Net Death Benefit or Face Value | Purchase Date |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| Report Date Physician 1. (report date) | Report Date Physican 2. (report date) | Illness (If Applicable) | Last Day of Deferred Period | Life Policy Premium | Contingency Insurance - Premium |
|---|---|---|---|---|---|
| | | | | | |

| BROKER TYS | BROKER L.P.S.O. No. 572 | | CURRENCY INSD: | | | | GROSS PREMIUM | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | IN ALL | | MARINE WAR |
| ATTACHING TO POLICY NO. CR030057 | | ENDORSEMENT REF. 002 | | | TOTAL | | | |
| REGISTRATION | | VAT | T.O.C. TRIBUNAL | | LLOYD'S | | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEF. | ADJ. | ILU | | | |
| ASSURED/ACCOUNT Life Receivables Trust | | | LEADING U/WR | | LIRMA | | | |
| | | | | | OTHER COMPANIES | | | |

D○○○2A○○ACYA ③

It is noted and agreed that the following bordereaux have been declared to this Policy:

May 2003                    Total Face Value                    US$ 7,682,073.00

Premium due hereon calculated at 5% on
US$7,682,073.00:                                                US$    384,103.65

Therefore additional premium due hereon =                      US$    384,103.65

Information:          Insured's email dated 9th May 2003 seen and noted by Insurers.

                     Total aggregate face value to date US$16,075,911.00

All other terms and conditions remain unchanged.

12 May 2003
MH/DT

U.S. CLASSIFICATION:

| N | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| T | | | | | | | | |
| A | | | | | | | | |
| SYND./COY | | | | | | | | |
| | | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | |
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

Life Settlement Corporation d/b/a Peachtree Life Settlement
Closing Policy Flow Benchmark - 17th Advance

| Seller | Insured 1 | Insured 1 DOB | Insured 1 Sex | Insured 3 | Insured 2 DOB | Insured 2 Sex | Insurance Carrier | Policy Number | Policy Issue Date | S&P Rating | Moody's Rating | Policy Type | Net Death Benefit $ | Purchase Date | Ins LE Insured 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Female | | | Male | Transamerica Occidental Life Insurance Company | 62020072 | 4/16/98 | AA | Aa3 | Universal Life | 500,000.00 | 5/14/2003 | 109 |
| | | | Female | | | Male | Old Line Life Insurance Company of America (The) | PB5D200311 | 9/28/00 | AA+ | Aa1 | Universal Life | 644,143.00 | 5/14/2003 | 83 |
| | | | Male | | | Female | Manufacturers Life Insurance Company (U.S.A.)(The) | 18902420 | 9/1/00 | AA+ | Aa2 | Universal Life | 1,012,371.00 | 5/14/2003 | 73 |
| | | | Female | | | n/a | Transamerica Occidental Life Insurance Company | 60344433 | 9/23/99 | AA | Aa3 | Universal Life | 1,435,000.00 | 5/14/2003 | 111 |
| | | | Male | | | Female | Transamerica Occidental Life Insurance Company | 92269280 | 7/9/91 | AA | Aa3 | Universal Life | 1,000,000.00 | 5/14/2003 | 108 |
| | | | Male | | | Female | Travelers Life and Annuity Company | 7391990 | 5/14/98 | AA+ | Aa1 | Universal Life | 500,000.00 | 5/14/2003 | 108 |
| | | | Male | | | Female | Manufacturers Life Insurance Company (U.S.A.)(The) | 58603784 | 3/4/99 | AA+ | Aa2 | Universal Life | 1,000,000.00 | 5/14/2003 | 96 |
| | | | Male | | | Female | Manufacturers Life Insurance Company (U.S.A.)(The) | 58644723 | 12/25/98 | AA+ | Aa2 | Universal Life | 1,000,000.00 | 5/14/2003 | 96 |
| Totals | | | | | | | | | | | | | 7,682,072.00 | | |

REDACTED

US Settlement Corporation a/k/a Providers Life Settlement
Closing Policy Face Businesses - CPs Advance

| Collar | Insured 1 | 1st LS Date Insured 1 | 1st LS Provider Insured 1 | 2nd LS Insured 1 | 2nd LS Date Insured 1 | 2nd LS Provider Insured 1 | Illness Insured 1 | 1st LS Insured 2 | 1st LS Date Insured 2 | 1st LS Provider Insured 2 | 2nd LS Insured 2 | 2nd LS Date Insured 2 | 2nd LS Provider Insured 2 | 21st LS Provider Insured 2 | Illness Insured 2 | US Referral Date | Maturity Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | AVS | 83 | 4/2/03 | 21st Services | allergic rhinitis, lower leg muscle cramps, mild episode of acute bronchiospasmosis and excision of pigmented nelanotic tumor and excised bilateral BCC, had had insufficiency, atherosclerosis, hypotension and hypertension. | 64 | | AVS | 4 | 4/2/03 | 21st Services | performed arthroscopic, carotid endarterectomy, epilepsy, hepatitis B, hypertension ESD, anemic macular degeneration, CAD with single vessel angioplasty, A-V fistula and 16 degree AV block had had diverticulosis, leiomyomata and anal bowel adjustment with revision. | 5/26/03 | 5/15/04 |
| | | | AVS | 72 | 4/3/03 | 21st Services | hyperthyroidism, status asteroid/disc, hyperlipidemia, fibrocystic breast disease, borderline low vitamin B12, porous aortic stenosis, knee plaque and an episode of acute onset high phlebitis, squamous cell cancer removed from his head & DxCs for post-menstrual bleeding and a insufficiency. | 73 | | AVS | 11 | 4/3/03 | 21st Services | communication hips, 21st LS hips, anxiety, depression and CAD, patent ductus arteriosus, hip replacement CAD, benign prostatic hyperplasia, right carotid bruit post-carotid doppler showing minimal disease, hyperpigmented lesions, all removed by biopsy, osteoarthritis, hernia repair, appendectomy, iron repair, wholesome cyst removal and a insufficiency. | 2/4/03 | 5/13/02 |
| | | | AVS | 52 | 4/3/03 | 21st Services | immunodeficile type, B12 deficient unable, single-vessel CAD, patent clinical right lymphatica, benign prostatic hypertrophy, right carotid bruit post carotid doppler showing clinical disease, hyperpigmented lesions, all removed by biopsy, appendectomy, hernia repair, wholesome cyst removal and jaundice. | 83 | | AVS | 72 | 4/3/03 | 21st Services | hyperlipidemia, severe osteoarthritis, hyperlipidemia, fibrocystic breast disease, borderline low vitamin B12, porous aortic stenosis, knee plaque and an episode of acute onset high phlebitis, squamous cell cancer removed from his head & DxCs for post-menopausal bleeding and a insufficiency. | 2/4/03 | 5/13/02 |
| | | | AVS | 106 | 1/23/03 | 21st Services | high cholesterol, high triglycerides, benign right osteoarthritis, elevated right knee and poorly controlled hypertension | | | AVS | 90 | 1/23/03 | 21st Services | | 3/5/03 | 7/15/04 |
| | | | AVS | 77 | 1/23/03 | 21st Services | hypercardia, hypercholesterolemia, benign prostatic hypertrophy and gastroesophageal reflux disease. | 113 | | 21st Services | 90 | 4/7/03 | AVS | | protozooophageal reflux disease, chronic lymphatic leukemia, osteoporosis, breast cancer, anxiety and depression. | 1/22/03 | 7/15/04 |
| | | | AVS | 77 | 1/23/03 | 21st Services | hypertension, hypercholesterolemia, benign prostatic hypertrophy and gastroesophageal reflux disease. | 113 | | 21st Services | 90 | 4/7/03 | AVS | | gastroesophageal reflux disease, chronic lymphatic leukemia, osteoporosis, breast cancer, anxiety and depression. | 1/23/03 | 7/15/04 |
| | | | AVS | 52 | 2/6/03 | 21st Services | arthritis, cervical spondylosis, had had excisions | 113 | | AVS | 93 | 3/9/03 | 21st Services | uncontrolled lumbar spine and left hip, congestive stomach, degenerative/anxiety disorder and "mild and ongoing stomach problems some of her adult life, has several diagnosed". Painful spondylosingic and chronic pneumatic left insufficiency failure. | 1/14/03 | 3/13/04 |
| | | | AVS | 52 | 2/6/03 | 21st Services | arthritis, cervical spondylosis, had had excisions | 113 | | AVS | 93 | 3/9/03 | 21st Services | uncontrolled lumbar spine and left hip, congestive stomach, degenerative/anxiety disorder and "mild and ongoing stomach problems some of her adult life, has several diagnosed". Painful spondylosingic and chronic pneumatic or restrictive failure. | 1/14/03 | 7/15/04 |
| Totals | | | | | | | | | | | | | | | | |

√ 3, 51 73

LTx Settlement Corporation d/b/a PeachTree Life Settlement
Closing Policy / Sale Summary – 1704 Arizona

| Seller | Insured 1 | Policy Proceeds / Premiums due | Contingency Insurance Premium |
|---|---|---|---|
| | | | $1,000.00 |
| | | | $3,307.10 |
| | | | $9,146.15 |
| | | | $9,150.00 |
| | | | $20,000.00 |
| | | | $21,000.00 |
| | | | $20,000.00 |
| | | | $50,000.00 |
| | | Total | $294,103.65 |

| BROKER **TYS** | BROKER L.P.S.O. No. **572** | CURRENCY INSD: | | GROSS PREMIUM | |
|---|---|---|---|---|---|
| | | | | IN ALL | MARINE WAR |
| ATTACHING TO POLICY NO. CR030057 | ENDORSEMENT REF. 001 | | TOTAL | | |
| REGISTRATION | VAT | T.O.C. TRIBUNAL | LLOYD'S | | |
| SERIAL | BINDING AUTHORITY REG. NO.& DATE | SETT.DUE DATE | DEP. | ADJ. | ILU | | |
| ASSURED/ACCOUNT Life Receivables Trust | LEADING U/WR | LIRMA | | | |
| | | | OTHER COMPANIES | | |

D 0002A08 ACYA 3

It is noted and agreed that the following bordereaux have been declared to this Policy:

April 2003                    Total Face Value                    US$  8,393,838.00

Premium due hereon calculated at 5% on
US$8,393,838.00:                                                 US$    419,691.90

Total premium due:                                              US$    419,691.90
Less M& D premium paid:                                         US$    100,000.00

Therefore additional premium due hereon =                       US$    319,691.90

**Information:**        Insured's facsimile dated 15th April 2003 seen and noted by Insurers.

Total aggregate face value to date US$8,393,838.00

All other terms and conditions remain unchanged.

U.S. CLASSIFICATION 17 April 2003
MH/DT

| N I T I A L | | | | | | | |
|---|---|---|---|---|---|---|---|
| SYND./COY | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| L.P.S.O. NUMBER AND DATE | I.L.U. NUMBER AND DATE |
|---|---|
| | L.I.R.M.A. NUMBER AND DATE |
| PLANNED SETTLEMENT DATE: | |

REDACTED

# EXHIBIT 1

# TAB E-G

**AMERICAN VIATICAL SERVICES**
280 Heritage Walk
Woodstock, Georgia 30188-3875

**MORTALITY PROFILE**

Report on:                                Goldreyer

Social Security Number:
Date of Birth:

Report Requested By:        Peachtree Life Settlements
                            5085 Avalon Ridge Parkway
                            Suite 200
                            Norcross, Georgia 30071

Attention:
Phone:                      Jason Weinick
Fax:                        (800) 600-9161
                            (800) 600-7161

American Viatical Services has reviewed in detail the medical records forwarded to our company on
Goldreyer by Peachtree Life Settlements including the attending physician's medical records,
laboratory records and radiology reports dated 04/15/97 through 12/15/00.

Goldreyer is an 82-year old male with a history of arteriosclerotic heart disease with coronary
artery disease, myocardial infarction status post coronary artery bypass graft (date and details unknown),
benign prostatic hypertrophy (normal PSA values), atherosclerosis, degenerative disease of the thoracic
spine, hypertension (controlled), hyperlipidemia (controlled), macular degeneration (legally blind), carotid
bruits and a grade 1/6 systolic ejection murmur. He had cataract extraction in April 1999. He weighed
186 pounds at 5 feet 9.5 inches tall in December 2000. Family, alcohol and tobacco histories were not
documented.

Summary of Physician's Findings:

Mr. Goldreyer had a colonoscopy in May 2000 with removal of eight adenomatous and hyperplastic
polyps. In November 2000 he experienced vertigo diagnosed as probable inner ear dysfunction. His
EKG at that time showed nonspecific ST-T wave changes. In December 2000 a carotid Doppler indicated
no significant stenosis. Echocardiogram showed moderate aortic stenosis with trace-to-mild aortic, mild
mitral and tricuspid regurgitation and concentric left ventricular hypertrophy with ejection fraction at the
lower limits of normal. He is stable. His prognosis is fair.

Impression:

The projected life expectancy for    Goldreyer is 60 months.

## AMERICAN VIATICAL SERVICES
### 280 Heritage Walk
Woodstock, Georgia 30188-3875

**MORTALITY PROFILE**

Report on:                              Goldreyer

Social Security Number:
Date of Birth:

Current Prognosis for Mortality Profile:          60 months
Table Rating:                                     200%

_____          February 9, 2001
Marie Laure Ferru                         Date

State of Georgia

County of Cobb

I, _____, a notary public in and for said state and county do hereby certify that Marie Laure Ferru, personally known to me to be the same person whose name is subscribed to the foregoing statement, appeared before me this day in person, and acknowledged that he signed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _____ day of _____, A.D. 2001.

_____
Notary Public

My Commission Expires: _____

## AMERICAN VIATICAL SERVICES
280 Heritage Walk
Woodstock, Georgia 30188-3875

### MORTALITY PROFILE

Report on:                          Goldreyer

Social Security Number:
Date of Birth:

Report Requested By:                Peachtree Life Settlements
                                    5085 Avalon Ridge Parkway
                                    Suite 200
                                    Norcross, Georgia 30071

Attention:                          Jason Weinick
Phone:                              (800) 600-9161
Fax:                                (800) 600-7161

American Viatical Services has reviewed in detail the medical records forwarded to our company on Goldreyer by Peachtree Life Settlements including the attending physician's medical records, laboratory records and radiology reports dated 12/14/95 through 12/26/00.

Goldreyer is a 79-year-old female with a history of hypertension, esophagitis with esophageal ulcer, osteoarthritis of the hands, cataract surgery and transient ischemic attack.

### Summary of physician's findings:

According to physician's records, Ms. Goldreyer was doing well in August 1997. She had lost weight after a diet and weighed 173 pounds (her height is not recorded in her file). In August 1998, she had an esophagogastroduodenoscopy (EGD) with biopsy that revealed Barrett's esophagus and sliding hiatal hernia; inside Barrett's esophagus was an area of low-grade dysplasia. *Helicobacter pylori* was negative. The doctor recommended she stay on Prevacid and Propulsid indefinitely. In March 1999, a repeat EGD showed improvement. In May 1999, she fell and experienced multiple nondisplaced rib fractures. In July 1999, her laboratory tests showed an elevation of her BUN at 34 mg/dl while her total protein was decreased at 6.3 g/dl, indicating renal insufficiency. She had repeat EGD with biopsy in March 2000 and still had high-grade dysplasia. She had a transient ischemic attack in May 2000. However, MRA of her carotids and brain were both negative. MRI of her brain revealed lateral left cerebellar and posteromedial right cerebellar chronic small infarcts. In June 2000, she started photodynamic therapy for Barrett's high-grade dysplasia. In June 2000, Cozaar was added to her medical regimen. Repeat EGD with biopsy in September 2000 showed marked improvement, but still areas of dysplasia. In December 2000, her BUN and creatinine were elevated respectively at 55 mg/dl and 1.3 mg/dl, indicating worsening of her renal insufficiency. She was also experiencing discomfort in her left flank. Her last office visit was in December 2000. Her weight was down to 159 pounds. Her blood pressure was controlled at 132/75 mm Hg. An ultrasound of her pancreas and kidneys only visualized bilateral renal cysts. Her prognosis is guarded.

### Impression:

The projected life expectancy for Jeanette Goldreyer is 60 months.

**AMERICAN VIATICAL SERVICES**
280 Heritage Walk
Woodstock, Georgia 30188-3875

**MORTALITY PROFILE**

Report on:                                    Goldreyer

Social Security Number:
Date of Birth:

Current Prognosis for Mortality Profile:        60 months
Table Rating:                                   300%
                                                without a terminal illness

_____
Marie Laure Ferru                               February 9, 2001
                                                Date

State of Georgia

County of Cobb

I, _June Denard_____, a notary public in and for said state and county do
hereby certify that Marie Laure Ferru, personally known to me to be the same person whose name is
subscribed to the foregoing statement, appeared before me this day in person, and acknowledged that he
signed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein
set forth.

Given under my hand and official seal, this _____9th_____ day of _February_, A.D. 2001.

_____June M Denard_____
Notary Public

My Commission Expires: __3-9-2003__

Peachtree Life Settlements

# VERIFICATION OF COVERAGE
# FOR INDIVIDUAL POLICIES

## Section One:
*(To be completed by the Life Settlement Provider or Life Settlement Broker)*

Insurance Company: New York Life Insurance and Annuity Corporation
Name of Policyowner: <u>Life Receivables Trust</u>

Policy Number: (
Owner's Social Security Number:

Name of Insured:      · Mecca,

Policyowner's Address:

Insured's date of birth:

Please provide the information requested in Section Two (below) with regard to the policy identified above and in accordance with the attached authorization.

In addition, please provide the forms checked below which are available from your company to complete a life settlement transaction:

☐     Absolute Assignment/Change of Ownership/Life Settlement Assignment Form
☐     Change of Beneficiary
☐     Release of Irrevocable Beneficiary (if applicable)
☐     Waiver of Premium Claim Form
☐     Disability Waiver of Premium Approval Letter
☐     Inforce Illustration as per policy type and format spelled out in cover letter

Life Receivables Trust dated 6/9/00
Bank of New York, Trustee
Settlement Funding, LLC as attorney in fact

By: Stephen A. Kirkwood                                          Date  10/19/2006
Its: Associate General Counsel

<u>3301 Quantum Boulevard, 2nd Floor</u>

<u>Boynton Beach, FL 33426</u>

3301 Quantum Blvd, 2nd Floor, Boynton Beach, FL. 33426   1-800-444-9820 Fax 800-821-7391

Peachtree Life Settlements                                     2

## Section Two:
*(To be completed by the life insurance company)*

1) Face amount of policy: $2,500,000

2) Original date of issue: 10 / 10 / 98 *(Month/Date/Year)*

3) Policy Number: 62 772 790

4) Policy Owner: Life Receivables Trust Dtd 6/9/00

   a. If the policy owner is a trust or corporation, please list trustees or corporate officers authorized to make changes to the policy:

   Any 2 trustees with it noted that they are the trustees

5) Was face amount increased after original issue date? ☒ no    ☐ yes

   a) If yes, when: _____ / _____ / _____

6) Type of policy: Universal Life *(Term/Whole Life/Universal Life/Variable Life)*

7) Is policy participating? ☒ no    ☐ yes

   a) If yes, what is current dividend election? _____

8) Current net death benefit: $2,500,000 *(Enter full amount payable, including any additional insurance, and/or dividends accumulated at interest, minus policy loans, outstanding interest on policy loans and/or accelerated death benefits paid)*

9) a) Current cash value: $109,837.07 *(Enter full amount, including cash value of any additional insurance and/or dividends accumulated at interest, minus policy loans and outstanding interest on policy loans)*
   b) Current surrender value: $80,322.07

10) Terms of policy loans:

   a) Amount of policy loans: $ ⊘

   b) Amount of outstanding interest on policy loan: $_____

   c) Current interest rate: _____

11) Is the policy beyond the contestability and suicide period? Yes

12) What is the Current Death Benefit Option: Level

   a) Is the current death benefit option a level death benefit? Yes

13) Is this a M.E.C. policy? NO

14) Has policy lapsed? ☒ yes

   a) If yes, when did policy lapse? 7 / 11 / 01

Peachtree Life Settlements                                          3

If policy has lapsed, is coverage continued under non-forfeiture option?

☒ no  ☐ yes   If yes, indicate which option, amount of coverage, duration, etc.:_____

_____

_____

15) Is policy in force?  ☐ no   ☒ yes
   a) If yes, has the policy been reinstated within the last two years? ☒ no  ☐ yes
   If yes, date of reinstatement:  ___/___/___

16) Amount of contract/scheduled premiums: $ *286,547.00*

17) Current premium mode: ___*Annual*___ *(Monthly, semi-annually, etc.)*
   a) When is next premium due? ___*10 / 10 / 06*___ *(Month/Day/Year)*
   b) Total premiums paid since the last anniversary date: *128,500.00 occas 9/6/06*

18) Does the policy include a disability premium waiver provision/rider? ☒ no  ☐ yes
   a) If yes, are premiums currently being waived? ☐ no  ☐ yes
   b) If yes, since when? ___/___/___
   c) How often is continued eligibility reviewed? _____
   d) When is next review?  ___/___/___

19) Can payment of all or part of the death benefit be accelerated under this policy?
   ☒ no   ☐ yes
   a) If yes, by what method is the benefit calculated, the lien method or the discount method?_
   _____
   b) If lien method, what is the interest rate? _____
   c) Can any remaining death benefit be assigned? ☐ no  ☐ yes

20) Has a claim for accelerated death benefit been submitted? ☒ no   ☐ yes
   a) If yes, was payment made under this provision? ☐ no   ☐ yes
   Amount paid: _____  Date paid: _____

21) Do current records show any assignments of record? ☒ no   ☐ yes

22) Do current records show any outstanding liens or encumbrances of record?
   ☒ no  ☐ yes

23) Please identify current primary beneficiaries: *Life Receivables Trust dated 6/9/00*
   a) Are they named irrevocably, or is owner otherwise limited in designation of new
   beneficiaries? ☒ no  ☐ yes

24) Have any riders been added to this policy after issue? ☒ no   ☐ yes
If yes, please identify:_____

Peachtree Life Settlements                                            4

25) Based on the information provided, do you intend to pursue an investigation for fraud in the underlying insurance contract? *Not presently.*

26) If an ownership or beneficiary change or assignment were to be made on this policy, to whom would the completed forms be sent?

Name: *Barb Flanagan*            Title: *Cust Svc Mgr.*

Company Name: *New York Life*    Department: *Titles*

Address (No P.O. Box, please) *14600 Detroit Rd*

City: *Lakewood*    ST: *OH*    ZIP: *44107*

Telephone No: *800 695-9873*    FAX: *have to have originals*

The answers provided reflect information contained in the company's records as of:

*10/23/06*

(date)

Signature: *Myra M. Cox*    Name: (Printed) *MYRA M. Cox*

Title: *AVP*

Company: *New York Life*

Direct Telephone No: *800 695-9873*    Direct FAX No: *216 529-3417*

Please return this completed form to:

Robert J. Marsello
Cavell Management Services, Ltd.
9-13 Fenchurch Building, 4th Floor
London
EC3M 5HR

☐    Inforce Illustration attached

☐    Inforce Illustration to be sent under separate cover

☐    Inforce Illustration request forwarded to another department

_____ (Contact person/department)

```
INSURED        —        MECCA
POLICY NUMBER —
POLICY DATE    — OCTOBER 10, 1998
```

# New York Life Insurance and Annuity Corporation

(A Delaware Corporation)

**The Corporation** will pay the benefits of this policy in accordance with its provisions. These benefits consist of:

-Life insurance proceeds, which we pay to the beneficiary when we have proof that the Insured died before the Maturity Date, and while this policy was in force.

-Cash value proceeds, which we pay to the Owner on the Maturity Date, if this policy is in force and if the Insured is living on that date. The Maturity Date is the policy anniversary nearest the Insured's age 100.

**10 Day Right to Examine Policy.** Please examine your policy. Within 10 days after delivery, you can return the policy THIS PROVISION DOES NOT APPLY with a written request for a full refund of premium. Upon such a request, the policy will be void from the start, and a full premium refund will be made.

**Payment of Premiums.** While this policy is in force, premiums can be paid at any time before the Maturity Date, and while the Insured is living. They can be paid at any interval or by any method we make available, subject to the Premiums section. The amount and interval of planned premiums, as stated in the application for this policy, are shown on the Policy Data page and are subject to any limits we set.

**Illustrative Report to Owner.** On request, we will furnish you with an illustrative report which, based on the then current non-guaranteed factors, shows the results for at least the next 20 years, but not beyond the policy anniversary nearest the Insured's age 100. Each report will take into account the cash value of the policy when the report is prepared, the interest rates, the maximum cost of insurance rates, and any other fees and charges in effect at that time. This report will also give you other facts required by state law or regulation. We may charge a reasonable fee for this report.

**READ YOUR POLICY CAREFULLY. THE LIFE INSURANCE BENEFITS AS WELL AS THE CASH VALUE BENEFITS OF THIS POLICY MAY CHANGE IN ACCORDANCE WITH ITS PROVISIONS. WE VALUE YOUR BUSINESS. IF YOU HAVE QUESTIONS OR CONCERNS ABOUT YOUR POLICY, PLEASE CALL US AT 1-800-695-9873.**

*Frederick J. Sievert*

President

*Catherine A. Marrion*

Secretary

**Universal Life Insurance Policy**

Adjustable Life Insurance Benefits-Flexible Premium Payments.
Life Insurance Benefit Payable if Insured Dies Before Maturity Date.
Cash Value Payable if Insured is Living on Maturity Date.
Interest Credited on Cash Value at Rate Set by Corporation.
No Premiums Payable on or After Age 100.

Policy is Non-Participating.

REDACTED

INSURED –            . MECCA

INSURED'S AGE
AT ISSUE – 84   MALE

POLICY NUMBER –

POLICY DATE –   OCTOBER 10, 1998
ISSUE DATE –   OCTOBER 19, 1998

INSURED'S CLASS
OF RISK –  SELECT STANDARD

PLAN –   UNIVERSAL LIFE NYLIAC PROTECTOR

INITIAL FACE AMOUNT –     $2,500,000.00

LIFE INSURANCE BENEFIT OPTION –  1

OWNER–  LIFE RECEIVABLES TRUST DTD

BENEFICIARY (subject to change)
AS DESIGNATED ON APPLICATION, OR AS SUBSEQUENTLY CHANGED
IN ACCORDANCE WITH THE CHANGE OF BENEFICIARY PROVISIONS

<u>ADDITIONAL BENEFITS</u>

PAGE 2
9850-2            POLICY DATA    NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION

INITIAL PREMIUM PAID (INCLUDING THE FIRST PLANNED PREMIUM, IF APPLICABLE) --    $479,946.00

PLANNED
PREMIUMS       AT   ANNUAL       INTERVALS
   BEGINNING AS OF
   MO    DAY   YEAR
   10-   10-   1998            $479,946.00


PREMIUMS CANNOT BE PAID ON OR AFTER THE MATURITY DATE WHICH IS OCTOBER 10, 2014

PERCENT OF PREMIUM EXPENSE CHARGE NOT TO EXCEED 6% OF ANY PREMIUM PAID

MONTHLY DEDUCTION CHARGE CONSISTS OF:
   -MONTHLY COST OF INSURANCE FOR BASIC POLICY
   -AN ADMINISTRATIVE FEE NOT TO EXCEED $9.00
   -MONTHLY COST FOR ANY RIDERS

MONTHLY DEDUCTION DAY  TENTH DAY OF EACH CALENDAR MONTH.


* COVERAGE MAY EXPIRE PRIOR TO THE MATURITY DATE SHOWN, IF PREMIUMS ARE INSUFFICIENT TO CONTINUE
COVERAGE TO SUCH DATE OR WHERE A LOAN OR PARTIAL SURRENDER IS MADE. COVERAGE WILL ALSO BE
AFFECTED IF CURRENT VALUES CHANGE.


THE INTEREST RATE REFERRED TO IN THE BASIS OF COMPUTATION PROVISION IS 4% PER YEAR.


PAGE 2(Cont.)  POLICY DATA    NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION
9850-2

POLICY NUMBER –                              INSURED –        MECCA

SURRENDER CHARGE PREMIUM:   $147,575.00      @

### TABLE OF MAXIMUM SURRENDER CHARGES

| Policy Year | Percentage Applied | Surrender Charges |
|---|---|---|
| 1 | 50% | $118,060.00 |
| 2 | 50% | $118,060.00 |
| 3 | 50% | $118,060.00 |
| 4 | 50% | $118,060.00 |
| 5 | 45% | $88,545.00 |
| 6 | 40% | $73,787.50 |
| 7 | 35% | $59,030.00 |
| 8 | 30% | $44,272.50 |
| 9 | 27.5% | $29,515.00 |
| 10 | 25% | $14,757.50 |
| 11 | 22.5% | $0.00 |
| 12 | 20% | $0.00 |
| 13 | 17.5% | $0.00 |
| 14 | 15% | $0.00 |
| 15 | 12.5% | $0.00 |
| 16 | 10% | $0.00 |
| 17 | 7.5% | $0.00 |
| 18 | 5% | $0.00 |
| 19 | 2.5% | $0.00 |
| 20 | 0% | $0.00 |

THIS TABLE APPLIES TO THE INITIAL FACE AMOUNT FOR THE NUMBER OF YEARS SHOWN ABOVE. ADDITIONAL CHARGES WILL APPLY TO EACH INCREASE IN THE INITIAL FACE AMOUNT AFTER THE EFFECTIVE DATE OF THE INCREASE. WE WILL TELL YOU THE AMOUNT AND DURATION OF THESE CHARGES WHEN YOU APPLY FOR THE INCREASE IN FACE AMOUNT.

@ THE SURRENDER CHARGE PREMIUM MAY CHANGE IF THE FACE AMOUNT OF THIS POLICY IS INCREASED OR DECREASED.

THE SURRENDER CHARGE IS CALCULATED AS A PERCENTAGE OF THE LESSER OF (1) CUMULATIVE PREMIUMS PAID OR (2) TWO TIMES THE SURRENDER CHARGE PREMIUM, AS SHOWN ABOVE IN THE PERCENTAGE APPLIED COLUMN.

A $25.00 SERVICE CHARGE IS MADE FOR PARTIAL CASH SURRENDER VALUE BENEFITS. THE MINIMUM PARTIAL CASH SURRENDER VALUE BENEFIT IS $500.00.

TABLE OF GUARANTEED MAXIMUM MONTHLY COST OF INSURANCE RATES
(PER $1,000)
GUARANTEED

MALE
SELECT STANDARD AND STANDARD CLASSIFICATION

| AGE | | AGE | | AGE | |
|---|---|---|---|---|---|
| 0 | .35 | 34 | .21 | 67 | 3.67 |
| 1 | .09 | 35 | .22 | 68 | 3.98 |
| 2 | .08 | 36 | .23 | 69 | 4.31 |
| 3 | .08 | 37 | .25 | 70 | 4.68 |
| 4 | .08 | 38 | .28 | 71 | 5.09 |
| 5 | .08 | 39 | .30 | 72 | 5.56 |
| 6 | .07 | 40 | .33 | 73 | 6.09 |
| 7 | .07 | 41 | .36 | 74 | 6.67 |
| 8 | .06 | 42 | .40 | 75 | 7.32 |
| 9 | .06 | 43 | .44 | 76 | 7.99 |
| 10 | .06 | 44 | .48 | 77 | 8.68 |
| 11 | .06 | 45 | .52 | 78 | 9.37 |
| 12 | .07 | 46 | .57 | 79 | 10.09 |
| 13 | .08 | 47 | .62 | 80 | 10.86 |
| 14 | .10 | 48 | .68 | 81 | 11.71 |
| 15 | .14 | 49 | .74 | 82 | 12.67 |
| 16 | .16 | 50 | .80 | 83 | 13.74 |
| 17 | .17 | 51 | .87 | 84 | 14.89 |
| 18 | .18 | 52 | .96 | 85 | 16.08 |
| 19 | .19 | 53 | 1.05 | 86 | 17.27 |
| 20 | .19 | 54 | 1.16 | 87 | 18.46 |
| 21 | .19 | 55 | 1.27 | 88 | 19.77 |
| 22 | .19 | 56 | 1.40 | 89 | 21.09 |
| 23 | .19 | 57 | 1.52 | 90 | 22.43 |
| 24 | .18 | 58 | 1.66 | 91 | 23.82 |
| 25 | .18 | 59 | 1.80 | 92 | 25.33 |
| 26 | .17 | 60 | 1.96 | 93 | 27.31 |
| 27 | .17 | 61 | 2.13 | 94 | 29.94 |
| 28 | .17 | 62 | 2.33 | 95 | 33.93 |
| 29 | .17 | 63 | 2.56 | 96 | 41.28 |
| 30 | .18 | 64 | 2.81 | 97 | 56.04 |
| 31 | .18 | 65 | 3.09 | 98 | 83.33 |
| 32 | .19 | 66 | 3.37 | 99 | 83.33 |
| 33 | .20 | | | | |

THESE MAXIMUMS MUST BE INCREASED BY ANY TEMPORARY FLAT EXTRA CHARGES THAT MAY APPLY.
NOTE: THESE RATES ALSO APPLY TO ANY SUPPLEMENTARY TERM RIDER AND ANY OTHER COVERED INSURED
IN THIS CLASS OF RISK.

**WE & YOU**
In this policy, the words "we", "our" or "us" refer to New York Life Insurance and Annuity Corporation, and the words "you" or "your" refer to the Owner of this policy.

When you write to us, please include the policy number, the insured's full name, and your current address.

## CONTENTS

| SECTION | PROVISIONS | PAGE |
|---------|-----------|------|
| | POLICY DATA PAGES | |
| ONE | LIFE INSURANCE BENEFITS | 4 |
| TWO | OWNER AND BENEFICIARY | 5 |
| THREE | POLICY CHANGES | 6 |
| FOUR | PREMIUMS | 7 |
| FIVE | CASH VALUE AND LOANS | 9 |
| SIX | CALCULATION OF COST OF INSURANCE | 12 |
| SEVEN | PAYMENT OF POLICY PROCEEDS | 13 |
| EIGHT | GENERAL PROVISIONS | 16 |
| | APPLICATION - Attached to the Policy | |
| | RIDERS OR ENDORSEMENTS (IF ANY) - Attached to the Policy | |

**Note:** This policy is a legal contract between the policyowner and the Corporation. **PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

## SECTION ONE - LIFE INSURANCE BENEFITS

**1.1**  **Is A Life Insurance Benefit Payable Under This Policy?** We will pay the life insurance proceeds to the beneficiary promptly, when we have proof that the Insured died before the Maturity Date and while the life insurance under this policy was in effect, subject to the General Provisions section of this policy.

**1.2**  **What Is The Amount Of Life Insurance Proceeds Which Is Payable Under This Policy?** The proceeds payable under this policy consist of the life insurance benefit of the policy plus the death benefit payable under any riders in effect on the date of the Insured's death. We will deduct any unpaid loan and accrued interest from this amount. The life insurance benefit is based on the Life Insurance Benefit Option in effect and the policy's initial face amount shown on the Policy Data page, and will also reflect any changes to the face amount made in accordance with the provisions of this policy.

**1.3**  **What Are The Life Insurance Benefit Options Which Are Available Under This Policy?** The life insurance benefit payable under this policy will be determined in accordance with one of the following options:

**Option 1** - This option provides a life insurance benefit equal to the greater of the face amount of the policy or the cash value equal to the minimum necessary for this policy to qualify as life insurance under the guideline premium and cash value corridor requirements as defined under Section 7702 of the Internal Revenue Code of 1986, as amended . (See the following table for these percentages.)

**Option 2** - This option provides a life insurance benefit equal to the greater of the face amount of the policy plus the cash value or a percentage of the cash value equal to the minimum necessary for this policy to qualify as life insurance under the guideline premium and cash value corridor requirements as defined under Section 7702 of the Internal Revenue Code of 1986, as amended. (See the following table for these percentages.)

| Insured's Age on Policy Anniversary | % of Cash Value | Insured's Age on Policy Anniversary | % of Cash Value |
|---|---|---|---|
| 0-40 | 250 | 68 | 117 |
| 41 | 243 | 69 | 116 |
| 42 | 236 | 70 | 115 |
| 43 | 229 | 71 | 113 |
| 44 | 222 | 72 | 111 |
| 45 | 215 | 73 | 109 |
| 46 | 209 | 74 | 107 |
| 47 | 203 | 75 | 105 |
| 48 | 197 | 76 | 105 |
| 49 | 191 | 77 | 105 |
| 50 | 185 | 78 | 105 |
| 51 | 178 | 79 | 105 |
| 52 | 171 | 80 | 105 |
| 53 | 164 | 81 | 105 |
| 54 | 157 | 82 | 105 |
| 55 | 150 | 83 | 105 |
| 56 | 146 | 84 | 105 |
| 57 | 142 | 85 | 105 |
| 58 | 138 | 86 | 105 |
| 59 | 134 | 87 | 105 |
| 60 | 130 | 88 | 105 |
| 61 | 128 | 89 | 105 |
| 62 | 126 | 90 | 105 |
| 63 | 124 | 91 | 104 |
| 64 | 122 | 92 | 103 |
| 65 | 120 | 93 | 102 |
| 66 | 119 | 94 | 101 |
| 67 | 118 | 95 & over | 100 |

# SECTION ONE - LIFE INSURANCE BENEFITS (Continued)

**1.4**   **What Is The Maturity Benefit?**  We will pay the cash surrender value proceeds to the Owner on the Maturity Date, if this policy is in force and if the Insured is living on that date. Any unpaid loan will be deducted from these proceeds.  This policy will end on the Maturity Date.

**1.5**   **What Is The Maturity Date?**  The Maturity Date of this policy is the policy anniversary nearest the Insured's age 100.

It is possible that this policy will end prior to the Maturity Date if the premiums paid or the cash surrender value is not sufficient to continue coverage to such date.

**1.6**   **Can The Maturity Benefit Be Canceled?**  Yes.  However, a written notice to cancel the Maturity Benefit must be received by us at least 6 months before the policy anniversary which is on, or immediately precedes, the Maturity Date of this policy.

**1.7**   **What Changes Occur To The Policy If The Maturity Benefit Is Canceled?**  After the Maturity Benefit is canceled, this policy will continue in force.  However, the provisions of this policy that refer to the Maturity Benefit and the Maturity Date will no longer apply.  In addition, the face amount of this policy shown on the Policy Data page will no longer apply.  Instead, on the policy anniversary which is on or nearest to the Insured's age 100, the following will occur:

1.  The life insurance proceeds payable under this policy will be the policy's cash value on the date of death of the Insured;
2.  No more premium payments will be permitted and monthly cost of insurance charges will no longer be imposed against the policy.  However the monthly administrative fee will continue to be deducted from the cash value;
3.  The cash value of the policy will continue to be credited with interest in accordance with the terms of the policy;
4.  Any term insurance on an Other Covered Insured, provided by a rider attached to the policy, which is still in effect will end as of the Maturity Date.  However, if an Other Covered Insured is younger than age 70 when the rider ends, that Insured can convert the term insurance at that time as provided in the rider; and
5.  Any other supplementary benefits provided by a rider attached to the policy, which are still in effect, will end as of the Maturity Date.

We will pay the life insurance proceeds to the beneficiary promptly when we have received proof that the Insured died while this policy was in effect.  We will deduct any unpaid loan and accrued interest from the proceeds.

# SECTION TWO - OWNER AND BENEFICIARY

**2.1**   **Who Is The Owner Of This Policy?**  The owner of this policy is stated on the Policy Data page.  In this policy, the words "you" and "your" refer to the policyowner.

**2.2**   **Can A Successor To The Owner Be Named?**  A successor owner can be named in the application, or in a notice you sign which gives us the facts that we need.  If you die before the successor owner, the successor owner will become the new owner.  If no successor owner survives you and you die before the Insured, your estate becomes the new owner.

**2.3**   **How Do You Change The Owner Of This Policy?**  You may change the owner of this policy, from yourself to a new owner, in a notice you sign which gives us the facts that we need.  This change will take effect as of the date you signed the notice, subject to any payment we made or action we took before recording this change.  When this change takes effect, all rights of ownership will pass to the new owner.  Changing the owner cancels any prior choice of owner, but does not change the beneficiary.

## SECTION TWO - OWNER AND BENEFICIARY (Continued)

**2.4**  **May More Than One Beneficiary Be Named For This Policy?** One or more beneficiaries for any life insurance proceeds may be named in the application. If more than one beneficiary is named, they can be classed as first, second and so on. If 2 or more are named in a class, their shares in the proceeds are equal, unless you state otherwise. The stated shares of the proceeds will be paid to any first beneficiaries who survive the Insured. If no first beneficiaries survive, payment will be made to any beneficiaries surviving in the second class, and so on.

**2.5**  **May You Change A Beneficiary?** While the Insured is living, you can change a beneficiary in a notice you sign which gives us the facts that we need. This change will take effect as of the date you signed the notice, subject to any payment we made or action we took before recording the change.

**2.6**  **What Happens If No Beneficiaries Are Living When The Proceeds Become Payable?** If no beneficiary for the life insurance proceeds survives the Insured, the right to these proceeds will pass to you. If you are no longer living, this right will pass to your estate.

**2.7**  **What If The Beneficiary And The Insured Die At The Same Time?** Unless stated otherwise in the policy or in your signed notice which is in effect at the Insured's death, if any beneficiary dies at the same time as the Insured, or within 15 days after that Insured but before we receive proof of the Insured's death, we will pay the proceeds as though that beneficiary died first.

## SECTION THREE - POLICY CHANGES

**3.1**  **What Changes May You Make To This Policy?** You can apply in writing to have the face amount increased or decreased (without changing the Life Insurance Benefit Option), or have the Life Insurance Benefit Option changed. We reserve the right to limit these changes in the first policy year, on a uniform basis by class. Changes may only be made while the Insured is living, and only if this policy would continue to qualify as life insurance, as defined under the guideline premium requirements as defined under Section 7702 of the Internal Revenue Code of 1986, as amended. See Section 5.7 for further information regarding decreases in face amount and changes in the Life Insurance Benefit Option.

**3.2**  **What Happens When You Apply To Increase The Policy Face Amount?** You can have the face amount of this policy increased, if we agree, subject to our minimum amount requirements. To increase the face amount, we must have your written application, also signed by the Insured, together with any proof of insurability that we require. We reserve the right to limit increases in the face amount. Any increase will take effect on the Monthly Deduction Day on or after the day we approve the application for the increase.

## SECTION THREE - POLICY CHANGES (Continued)

The cost of insurance for each increase will be based on the Insured's age, sex, and class of risk at the time the increase takes effect, as well as the duration since the increase. A new set of surrender charges will apply to the increased face amount. We will tell you the amount of these charges when you apply for the increase. They will also be shown on new Policy Data pages when the increase takes effect. For the amount of the increase, new Incontestability and Suicide Exclusion periods will apply, beginning on the effective date of such increase.

3.3     **What Happens When You Decrease The Face Amount?** You can decrease the face amount, provided the new face amount is at least $25,000. We reserve the right to limit decreases in the face amount. Any decrease will take effect on the Monthly Deduction Day on or after the day we receive your signed request.

The decrease will first be applied to reduce the most recent increase in the face amount. It will then be applied to reduce other increases in the face amount in the reverse order in which they took place, and then to the initial face amount.

When the face amount is decreased, we will deduct from the cash value a surrender charge equal to the difference between the surrender charge immediately before the decrease and the surrender charge immediately after the decrease. In assessing this surrender charge, we first take into account the surrender charge associated with any increases in face amount in the reverse order made, and then the initial face amount.

3.4     **What Happens When You Change The Life Insurance Benefit Option?** You can change the Life Insurance Benefit Option of this policy. We reserve the right to limit the number of changes in the Life Insurance Benefit Option. Any change of Option will take effect on the Monthly Deduction Day on or after the date we receive your signed request. If you change from Option 1 to Option 2, a surrender charge will be deducted and the face amount of the policy will be decreased by the cash value. If you change from Option 2 to Option 1, the face amount will be increased by the cash value. We reserve the right to limit changes in the Life Insurance Benefit Option which would cause the face amount to fall below $25,000.

You may not change from Option 1 to Option 2 if Option 1 was selected because the Supplementary Term Rider was included in this policy at time of issue, even if the Supplementary Term Rider ends or is terminated.

## SECTION FOUR - PREMIUMS

4.1     **Are There Any Limitations To The Premiums That May Be Paid?** Premium payments may be made on a planned or unplanned basis, but may not be made if such payments would disqualify the policy as Life Insurance, as defined under the guideline premium requirements as defined under Section 7702 of the Internal Revenue Code of 1986, as amended.

If the premium paid during any policy year exceeds the maximum permitted under the Internal Revenue Code, we will return any such excess within 60 days after the end of the policy year with interest at a rate of not less than 4% a year.

4.2     **How Do You Pay Premiums?** At any time before the policy anniversary on which the Insured is age 100, and while the Insured is living, premiums can be paid at any interval or by any method we make available. You may pay planned premiums and/or unplanned premiums. Premiums are payable at our Home Office or at any other location that we indicate to you in writing. The cash value and amount of insurance under this policy are based on the amount and interval of the premiums that have been paid. Please refer to the Cash Value and Loans section of this policy for full details.

## SECTION FOUR - PREMIUMS (Continued)

**4.3**    **What Are Planned Premiums?**  The amount and interval of any planned premiums, as stated in the application, are shown on the Policy Data pages. The first planned premium is payable as of the policy date. A planned premium does not have to be paid to keep this policy in force if the cash surrender value is enough to cover the charges made on the Monthly Deduction Day. The amount of any planned premium may be increased or decreased subject to the limits we set. The frequency of premium payments may also be changed subject to our minimum premium rules.

**4.4**    **What Are Unplanned Premiums?**  From time to time, you may make unplanned premium payments which are in addition to planned premiums. If an unplanned premium payment would result in an increase in the life insurance benefit greater than the increase in the cash value, we reserve the right to require proof of insurability before accepting that payment. We also reserve the right to limit the number and amount of any unplanned premiums.

**4.5**    **What Happens If You Stop Making Premium Payments?**  When premium payments are not made as planned, this policy will continue in effect as long as the cash surrender value is sufficient to pay Monthly Deduction Charges.

**4.6**    **What Is The Late Period?**  If, on a Monthly Deduction Day, the cash surrender value is less than the Monthly Deduction Charge for the next policy month, the policy will continue for a late period of 62 days after that Monthly Deduction Day. If we do not receive payment before the end of the late period, we will mail a notice to you at your last known address at least 31 days before the end of the late period. We will also mail a copy of the notice to the last known address of any assignee on our records.

**4.7**    **What If The Insured Dies During The Late Period?**  If the Insured dies during the late period, we will pay the life insurance proceeds to the beneficiary. However, these proceeds will be reduced by the amount of any unpaid loan and accrued interest and the Monthly Deduction Charges for the full policy month or months that run from the beginning of the late period through the policy month in which the Insured died.

**4.8**    **What Happens During The Late Period If The Policy Has Cash Surrender Value Remaining?**  If we do not receive a payment before the end of the late period, and the policy has cash surrender value remaining at the beginning of the late period, it will continue as extended insurance, provided it is available as described in Section 4.9, but any insurance or benefits from riders will end.

Instead of extended insurance, paid-up insurance (see Section 4.10) can be elected in your signed notice. We must receive this notice no later than the end of the late period.

**4.9**    **What Is Extended Insurance?**  Extended insurance is term insurance which is payable to the beneficiary when we have proof that the Insured died before the end of the term period but at least 62 days after the Monthly Deduction Day when the cash surrender value was less than the Monthly Deduction Charge. Extended insurance has no loan value.

After the policy continues as extended insurance, we will continue to deduct from the cash value the guaranteed cost of insurance charges for the policy on each Monthly Deduction Day, as described in Sections 6.1 and 6.2 of the policy. These cost of insurance charges are based on the maximum rates shown in the Table of Guaranteed Maximum Monthly Cost of Insurance Rates on the Policy Data page. Interest will be credited to the policy at a rate of 4% per year. We will discontinue all other monthly deductions referred to in Section 6.1 of the policy.

The amount of extended insurance will equal the life insurance benefit calculated as of the beginning of the late period, based on the Life Insurance Benefit Option in effect at that time. This life insurance benefit will also be reduced by the amount of any unpaid loan and accrued interest at that time. This amount may be increased, if necessary, so that the policy continues to qualify as life insurance under Section 7702 of the Internal Revenue Code, as described in the Life Insurance Benefits Section of this policy.

# SECTION FOUR - PREMIUMS (Continued)

Once this policy has been changed to extended insurance, no more premiums may be paid under this policy, the Life Insurance Benefit Option selected under the policy will no longer apply and no insurance on benefits from riders will be provided. In addition, loans and partial withdrawals will no longer be available. However, you may surrender the extended insurance and receive the full cash value which remains at that time. No surrender charges will apply to this surrender.

**4.10** **What Is Paid-Up Insurance?** Paid-up life insurance begins as of the date we record your notice electing it or begins at the beginning of the late period if later. No more premiums are due. It is payable to the beneficiary when we have proof that the insured died while the paid-up insurance is in effect.

After the policy continues as paid-up insurance, we will continue to deduct from the cash value the guaranteed cost of insurance charges for the policy on each Monthly Deduction Day, as described in Sections 6.1 and 6.2 of the policy. These cost of insurance charges are based on the rates shown in the Table of Guaranteed Maximum Monthly Cost of Insurance Rates on the Policy Data page. Interest will be credited to the policy at a rate of 4% per year. We will discontinue all other monthly deductions referred to in Section 6.1 of the policy.

We calculate the amount of paid-up insurance as of the beginning of the late period. We do this by applying the sum of the remaining cash surrender value, which is already reduced by the amount of any unpaid loan and accrued interest, at the net single premium rate for the insured's age and sex based on the 1980 CSO Table of Mortality at 4%. This amount may be increased, if necessary, so that the policy continues to qualify as life insurance under Section 7702 of the Internal Revenue Code, as described in the Life Insurance Benefits Section of this policy.

Once this insurance has been changed to paid-up insurance, the Life Insurance Benefit Option selected under the policy will no longer apply and loans and partial withdrawals will no longer be available. No insurance or benefits from riders will be provided under this paid-up insurance goes into effect. You may surrender the paid-up insurance at any time for the full cash value which remains at that time. No surrender charges will apply to this surrender. All insurance will end when you send us your signed request for the cash value.

**4.11** **Can You Reinstate The Policy If It Ends?** Within 5 years after this policy has ended, you may apply, in writing, to reinstate the policy (and any other benefits provided by riders) if you did not surrender it. When you apply for reinstatement, you must provide proof of insurability that is acceptable to us. However, if the required payment is made within 31 days after the end of the late period, no proof of insurability is required.

**4.12** **What Payment Is Required To Reinstate The Policy?** In order to reinstate this policy, a payment must be made in an amount which is sufficient to keep this policy in force for at least 2 months. This payment will be in lieu of the payment of all premiums in arrears. Any unpaid loan must also be repaid, together with loan interest at 6% compounded once each year from the end of the late period to the date of reinstatement. If a policy loan interest rate of less than 6% is in effect when the policy is reinstated, the interest rate for any unpaid loan at the time of reinstatement will be the same as the policy loan interest rate.

The effective date of reinstatement will be the Monthly Deduction Day on or following the date we approve your signed request for reinstatement.

# SECTION FIVE - CASH VALUE AND LOANS

**5.1** **What Is The Cash Value Of This Policy?** The cash value of this policy at any time is calculated as described in Section 5.2 and Section 5.3. When you ask us, we will tell you how much cash value there is.

# SECTION FIVE - CASH VALUE AND LOANS (Continued)

**5.2    What Is The Cash Value On Each Monthly Deduction Day?** The first Monthly Deduction Day is the issue date of the policy. Thereafter, the Monthly Deduction Day for each calendar month is shown on the Policy Data page. The cash value on the policy date is determined by subtracting the Monthly Deduction Charge and the premium expense charge from the initial premium.

The cash value on each Monthly Deduction Day after the issue date is determined as follows. First, from the cash value as of the prior Monthly Deduction Day, subtract any partial cash surrender value benefits paid, and any service or other charges made since that day. Add all premiums received since the prior Monthly Deduction Day less any premium expense charges. Add to this sum any interest credited for the prior month. Subtract the Monthly Deduction Charge.

**5.3    What Is The Cash Value On Other Than A Monthly Deduction Day?** The cash value on any other day is determined as follows. First, from the cash value, as of the prior Monthly Deduction Day, subtract any partial cash surrender value benefits paid, and any service or other charges made since that day. Add all premiums received since the prior Monthly Deduction Day, less any premium expense charges. Add to this any interest credited to the cash value for the number of days since the prior Monthly Deduction Day.

**5.4    What Is The Premium Expense Charge?** The premium expense charge will not exceed that shown on the Policy Data pages. This charge will be deducted from each premium when that premium is received.

**5.5    Can You Surrender This Policy For Its Cash Surrender Value?** At any time after this policy has cash value, and while the insured is living, you may surrender it for its cash surrender value. The cash surrender value is equal to the cash value less any surrender charges which may apply, less any unpaid loan and accrued interest, subject to the provisions of Section One of this policy. A table of maximum surrender charges is shown on Policy Data page 2.1. The cash value and the surrender charges will be calculated as of the date on which we receive your signed request. All insurance will end on the date we receive your surrender request.

**5.6    Is A Partial Cash Surrender Value Benefit Available?** You can apply for a partial cash surrender value benefit up to an amount equal to the full cash surrender value, provided at least $500 of cash surrender value or an amount equal to 2 Monthly Deduction Charges remains after we pay this benefit. The minimum partial cash surrender value benefit available is $500. To do this, we must have your signed request. For Option 1 policies, the face amount is reduced by the amount of the partial cash surrender value benefit. The cash value is reduced by the partial cash surrender value benefit and by the surrender charge assessed. For Option 2 policies, the face amount is not affected by the amount of the partial cash surrender value benefit. The cash value is reduced by the partial cash surrender value benefit.

Any decrease in face amount caused by payment of this benefit will first be applied against the most recent increase in the face amount. It will then be applied to other increases in the face amount and then to the initial face amount in the reverse order in which they took place.

Each time we pay you a partial cash surrender value benefit, we will deduct a $25 service charge from the cash value that remains under this policy.

**5.7    How Is The Surrender Charge Determined?** For the number of years shown on Policy Data page 2.1, a surrender charge will be assessed when there is a full surrender or any time the face amount is decreased, whether due to a partial withdrawal of the cash surrender value, a change in the Life Insurance Benefit Option or requested decreases in the face amount. The surrender charge applied will be based on a percent of premiums paid but will never be more than the maximum charges shown in the table of maximum surrender charges on Policy Data page 2.1. A separate surrender charge is calculated separately for the initial face amount and for each increase in the face amount.

# SECTION FIVE - CASH VALUE AND LOANS (Continued)

**5.8    What Is The Loan Value Of This Policy?** Using this policy as sole security, you can borrow any amount up to the loan value of this policy. The loan value on any given date is equal to the cash surrender value, less one Monthly Deduction Charge, and less loan interest on the new loan and any outstanding loans to the next Monthly Deduction Day. Extended Insurance has no loan value.

**5.9    What Is The Loan Interest Rate For The Policy?** Unless we set a lower rate for any period, the effective annual loan interest rate is 8%, which is payable in arrears. Loan interest for the policy year in which a loan is taken will be due on the next policy anniversary. Loan interest accrues each day and is payable on the anniversary, on the date of death, surrender, the date the policy ends, or on the date of a loan increase or loan repayment. Loan interest not paid when due will be charged as a new unpaid loan.

**5.10    If The Loan Interest Rate Is Reduced, Can It Subsequently Increase?** Yes. If we have set a rate lower than 8% per year, any subsequent increase in the interest rate will be subject to the following conditions:

    (1)  The effective date of any increase in the interest rate shall not be earlier than one year after the effective date of the establishment of the previous rate.

    (2)  The amount by which the interest rate may be increased will not exceed one percent per year, but the rate of interest shall in no event ever exceed 8%.

    (3)  We will give notice of the interest rate in effect when a loan is made and when sending notice of loan interest due.

    (4)  If a loan is outstanding 40 days or more before the effective date of an increase in the interest rate, we will notify you of that increase at least 30 days prior to the effective date of the increase.

    (5)  We will give notice of any increase in the interest rate when a loan is made during the 40 days before the effective date of the increase.

**5.11    Can Loan Repayments Be Made To The Policy?** All or part of an unpaid loan can be repaid before the Insured's death or the Maturity Date, or before we pay the full cash surrender value benefit. We will deduct any unpaid loan when life insurance or full cash surrender value proceeds are paid. If the policy is being continued as extended or paid-up insurance, any loan which we deducted in determining that insurance may be repaid only if the policy is reinstated. If that loan is not repaid, we will not deduct it again when policy proceeds are payable.

**5.12    What Happens If A Loan Is Not Repaid?** If a loan is outstanding when the life insurance benefit becomes payable, we will deduct the amount of the unpaid loan plus accrued interest from these proceeds. The cash surrender value reflects a deduction of any outstanding policy loan and accrued interest. In addition, it may happen in a given policy year that, based on the loan interest rate in effect when that year began (ignoring any subsequent increase in the rate during that year), any unpaid loan plus accrued interest exceeds the cash value of this policy less surrender charges. In that event, we will mail a notice to you at your last known address, and a copy to the last known assignee on our records. All insurance will end 31 days after the date on which we mail that notice to you if the excess of the unpaid loan plus accrued interest over the cash value less surrender charges is not paid within that 31 days.

However, if a higher interest rate or rates take effect during the policy year, this policy will not end any sooner than it would have if the rate had not changed.

**5.13    Can Payment Of A Loan Or Surrender Proceeds Be Deferred?** We may defer paying you any partial or full cash surrender value benefits, or defer any loan except to pay a premium due us, for up to 6 months from the date we receive your request. Interest will be paid on any amount deferred beyond that date. We will set the interest rate to be at least 4% per year.

# SECTION SIX - CALCULATION OF COST OF INSURANCE

**6.1    What Monthly Deductions Are Made Against The Cash Value?** On each Monthly Deduction Day, the following deductions are made:

    (a) the monthly cost of insurance for the face amount of this policy;
    (b) the monthly cost for any riders attached to this policy;
    (c) an administrative fee which will not exceed the amount shown on the Policy Data pages.

A deduction may also be made for any temporary flat extras which may apply. The amount and duration of these flat extras, if any, are shown in a footnote on the Policy Data pages.

The Monthly Deduction Day for this policy is shown on the Policy Data pages. The first Monthly Deduction Day is the issue date of the policy. If the issue date and the policy date of the policy are different, deductions made on the issue date will include the monthly deductions specified in (a) through (c) above which would have been made on each Monthly Deduction Day for the period from the policy date to the issue date as if the policy were issued on the policy date.

**6.2    How Is The Cost Of Insurance For This Policy Calculated?** The cost of insurance is calculated each month on each Monthly Deduction Day. We will do this even if a premium is not paid in that month. The monthly cost of insurance for the initial face amount of insurance and for each subsequent increase in this amount, is calculated separately. The monthly cost of insurance for each such amount of insurance is equal to (1) multiplied by the result of (2) minus (3), where:

    (1) is the monthly cost of insurance rate per $1,000 of insurance;
    (2) is the number of thousands of life insurance benefit (as defined in the applicable Option 1 or Option 2 in Section One) divided by 1.00327; and
    (3) is the number of thousands of cash value as of the Monthly Deduction Day (before this cost of insurance and the monthly cost of any Monthly Deduction Waiver rider, and after any applicable administrative fee and the monthly cost of any other riders, are subtracted).

If there have been one or more increases in the face amount, the cash value is part of the life insurance benefit based on the initial face amount. If the cash value exceeds this benefit, the excess shall then be considered part of each additional increase in the face amount in the order that these increases were made.

**6.3    What Is The Cost Of Insurance Rate?** A separate rate is used to obtain the cost of insurance for the initial face amount, and for each increase in the face amount. Each rate is based on the Insured's age, sex, the duration since the policy date and class of risk at the time the initial face amount or increase took effect. The monthly rates that apply to the cost of insurance for the initial face amount at all ages, will not be greater than the maximum rates shown in the Table of Guaranteed Maximum Monthly Cost of Insurance Rates attached to this policy. The actual rate will be set by us, in advance, at least once a year. Any change in the cost of insurance rate will be on a uniform basis for insureds of the same classification, such as, attained age, sex and risk classification, as well as the duration since the policy date or date of increase.

**6.4    What Is The Monthly Cost Of Riders?** The monthly cost of any riders attached to this policy is described in the rider or on the Policy Data pages.

# SECTION SEVEN - PAYMENT OF POLICY PROCEEDS

**7.1**   **How Will Policy Proceeds Be Paid?**  The proceeds of this policy will be paid in one sum, or if elected, all or part of these proceeds can be placed under one or more of the options described in this section.  If we agree, the proceeds may be placed under some other method of payment instead.

Any life insurance proceeds paid in one sum will bear interest compounded each year from the Insured's death to the date of payment.  We set the interest rate each year.  This rate will be at least 3% per year, and will not be less than required by law.

**7.2**   **How Do You Elect An Optional Method Of Payment?**  While the Insured is living, you can elect or change an option.  You can also elect or change one or more beneficiaries who will be the payee or payees under that option.

After the Insured dies, any person who is to receive proceeds in one sum (other than an assignee) can elect an option and name payees.  The person who elects an option can also name one or more successor payees to receive any amount remaining at the death of the payee.  Naming these payees cancels any prior choice of successor payees.

A payee who did not elect the option does not have the right to advance or assign payments, take the payments in one sum, or make any other change.  However, the payees may be given the right to do one or more of these things if the person who elects the option tells us in writing and we agree.

**7.3**   **How Can An Option Be Changed?**  If we agree, a payee who elects Option 1A, 1B or 2 may later elect to have any amount we still have, or the present value of any elected payments, placed under some other option described in this section.

**7.4**   **Who Can Be Named Payees?**  Only individuals who are to receive payments on their own behalf may be named as payees or successor payees, unless we agree otherwise.  We may require proof of the age or the survival of a payee.

**7.5**   **What Happens If The Payee Dies Before All Proceeds Have Been Paid?**  It may happen that when the last surviving payee dies, we still have an unpaid amount, or there are some payments which remain to be made.  If so, we will pay the unpaid amount with interest to the date of payment, or pay the present value of the remaining payments, to that payee's estate in one sum.  The present value of the remaining payments is based on the interest rate used to compute them, and is always less than their sum.

**7.6**   **Is There A Minimum Payment The Company Will Make?**  When any payment under an option would be less than $100, we may pay any unpaid amount or present value in one sum.

## SECTION SEVEN - PAYMENT OF POLICY PROCEEDS (Continued)

**7.7     What Are The Proceeds At Interest Options (1A and 1B)?** The policy proceeds may be left with us at interest. We will set the interest rate each year. This rate will be at least 3% per year.

For the Interest Accumulation Option (Option 1A), we credit interest each year on the amount we still have. This amount can be withdrawn at any time in sums of $100 or more. We pay interest to the date of withdrawal on sums withdrawn.

For the Interest Payment Option (Option 1B), we pay interest once each month, every 3 months, every 6 months, or once each year, as chosen, based on the amount we still have.

**7.8     What Is The Life Income Option (2)?** We make equal payments each month during the lifetime of the payee or payees. We determine the amount of the monthly payment by applying the policy proceeds to purchase a corresponding single premium life annuity policy which is being issued when the first payment is due. Payments are based on the appropriately adjusted annuity premium rate in effect at that time, but will not be less than the corresponding minimum shown in the Option 2 Table. These minimum amounts are based on the 1983 Table "a" with Projection Scale G, and with interest compounded each year at 3%.

When asked, we will state in writing what the minimum amount of each monthly payment would be under this option. It is based on the sex and adjusted age of the payee or payees.

To find the adjusted age in the year the first payment is due, we increase or decrease the payee's age at that time, as follows:

| 1998-2005 | 2006-2015 | 2016-25 | 2026-35 | 2036 & later |
|-----------|-----------|---------|---------|--------------|
| +1        | 0         | -1      | -2      | -3           |

We make a payment each month during the lifetime of the payee. Payments do not change, and are guaranteed for 10 years, even if that payee dies sooner.

## SECTION SEVEN - PAYMENT OF POLICY PROCEEDS (Continued)

### OPTION 2 TABLE

Minimum Monthly Payment per $1,000 of Proceeds Guaranteed for 10 Years

| Payee's Adjusted Age | MALE | FEMALE |
|---|---|---|
| 60 | 4.46 | 4.03 |
| 61 | 4.55 | 4.11 |
| 62 | 4.66 | 4.19 |
| 63 | 4.76 | 4.27 |
| 64 | 4.87 | 4.37 |
| 65 | 4.99 | 4.46 |
| 66 | 5.11 | 4.57 |
| 67 | 5.24 | 4.67 |
| 68 | 5.38 | 4.79 |
| 69 | 5.52 | 4.91 |
| 70 | 5.66 | 5.04 |
| 71 | 5.81 | 5.18 |
| 72 | 5.96 | 5.32 |
| 73 | 6.12 | 5.47 |
| 74 | 6.28 | 5.63 |
| 75 | 6.45 | 5.79 |
| 76 | 6.61 | 5.96 |
| 77 | 6.78 | 6.14 |
| 78 | 6.96 | 6.32 |
| 79 | 7.13 | 6.51 |
| 80 | 7.30 | 6.70 |
| 81 | 7.46 | 6.89 |
| 82 | 7.63 | 7.07 |
| 83 | 7.78 | 7.26 |
| 84 | 7.93 | 7.44 |
| 85 & over | 8.07 | 7.62 |

# SECTION EIGHT - GENERAL PROVISIONS

**8.1**   **What Constitutes The Entire Contract?** The entire contract consists of this policy, any attached riders or endorsements, and the attached copy of the application. Also, any application used to apply for increases in the policy face amount will be attached to and made a part of this policy. Only our Chairman, President, Secretary, or one of our Vice Presidents is authorized to change the contract, and then, only in writing. No change will be made to this contract without your consent. No agent is authorized to change this contract.

**8.2**   **How Important Is The Information You Provide In The Application For This Policy?** In issuing this policy, we have relied on the statements made in the application. All such statements are deemed to be representations and not warranties. We assume these statements are true and complete to the best of the knowledge and belief of those who made them. No statement made in connection with the application will be used by us to void this policy unless that statement is a material misrepresentation and is part of the application.

**8.3**   **Will We Be Able To Contest This Policy?** We will not contest the payment of the life insurance proceeds, based on the initial face amount, after this policy has been in force during the lifetime of the insured for 2 years from the issue date.

It may happen that the face amount of this policy is increased as described in the Policy Changes section. In this case, the 2 year contestable period for each increase will begin on the effective date of such increase. We may contest the payment of that amount only on the basis of those statements made in the application for such increase in face amount. No new contestable period will apply if the face amount increase was due solely to a change in the Life Insurance Benefit Option.

**8.4**   **Does This Policy Cover Suicide Of The Insured?** Suicide of the insured, while sane or insane within 2 years of the issue date, is not covered by this policy. In that event, this policy will end and the only amount payable will be the premiums paid to us, less any unpaid loan and any partial surrender benefits paid.

It may happen that the face amount of this policy is increased as described in the Policy Changes section. In this case, the 2 year suicide exclusion period for each increase will begin on the effective date of such increase. If the suicide exclusion period applies to such an increase, the only amount payable with respect to that increase will be the total cost of insurance we deducted for the increase. No new suicide exclusion period will apply if the face amount increase was due solely to a change in the Life Insurance Benefit Option.

**8.5**   **How Are The Dates Referred To In This Policy Measured?** Policy years, months, and anniversaries are measured from the policy date, unless otherwise stated.

**8.6**   **How Is A Person's Age Calculated For The Purposes Of This Policy?** When we refer to a person's age in this policy on a policy anniversary, we mean his or her age on the birthday which is nearest that date. At any other time, age means the age on the birthday nearest to the previous policy anniversary.

# SECTION EIGHT - GENERAL PROVISIONS (Continued)

**8.7** **What Happens If A Person's Age Or Sex Has Been Stated Incorrectly?** If we would pay too little or too much because the age or sex of the Insured is not correct as stated, we will adjust the proceeds, up or down, to reflect the correct age or sex. The amount of the death benefit shall be that which would be purchased by the most recent mortality charge at the correct age and sex.

**8.8** **May You Assign Or Transfer The Policy?** While the Insured is living, you may assign this policy, or any interest in it. If you do this, your interest, and anyone else's is subject to that of the assignee. As owner, you still have the rights of ownership which have not been assigned.

**8.9** **May The Assignee Change The Owner Or Beneficiary?** An assignee cannot change the owner or beneficiary of this policy, and may not elect or change an optional method of payment of proceeds. Any amount payable to the assignee will be paid in one sum.

**8.10** **How Do You Assign The Policy?** You must provide us with a copy of the assignment. We are not responsible for the validity of any assignment. Any assignment will be subject to any payment we make or other action we take before we record the assignment.

**8.11** **Are The Payments Made Under This Policy Protected Against Creditors?** Payments we make under this policy are, to the extent the law permits, exempt from the claims, attachments, or levies of any creditors.

**8.12** **To Whom Should Payments For This Policy Be Made?** Any payment made to us by check or money order must be payable to New York Life Insurance and Annuity Corporation. When asked, we will provide a countersigned receipt, signed by our President or Secretary, for any premium paid to us.

**8.13** **Is This Policy Subject To Any Law?** This policy is subject to all laws which apply.

**8.14** **Are Any Dividends Payable On This Policy?** This is a non-participating policy on which no dividends are payable.

**8.15** **Will You Be Updated Regarding The Status Of Your Policy?** Each policy year after the first, while this policy is in force and the Insured is living, we will send a written report to you within 30 days after the policy anniversary. It will show, as of that anniversary, the cash value, the cash surrender value and the amount of any unpaid loan and accrued interest. This report will also give you any other facts required by state law or regulation.

**8.16** **What Is The Basis Used For Computation Of Policy Values?** All minimum cash surrender values and maximum cost of insurance rates referred to in this policy are based on the 1980 CSO Male and Female, Smoker and Non-Smoker Tables of Mortality if the Insured is in a standard class of risk. Separate scales of maximum cost of insurance rates apply to substandard risk classes. Continuous functions are used, with interest as stated on the Policy Data pages. We have filed a statement with the insurance official in the state or district in which this policy is delivered. It describes, in detail, how we compute policy benefits and cash surrender values.

**NEW YORK LIFE INSURANCE COMPANY (NYLIC)**
**NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION (NYLIAC-A DELAWARE CORP.)**

# ENDORSEMENT

**MODIFICA-TION OF SPOUSES' PAID-UP INSURANCE PURCHASE OPTION (SPPO) RIDER**

This endorsement is made a part of the policy to which it is attached.

It may happen that the Owner of this policy is a beneficiary for life insurance proceeds under this policy, and is not the Insured's spouse. In this case, even if the SPPO Rider attached to this policy states otherwise, the Owner-beneficiary has the right to purchase paid-up life insurance on the life of the spouse. This purchase must be made within the 90 days after the Insured's death, in accordance with the provisions of the rider. The application for this insurance, signed by the Insured's spouse, must be received by the Company while the spouse is living. If it is not so received, and even if the SPPO Rider states otherwise, no paid-up life insurance will be payable under this endorsement or the rider, even if the Insured's spouse dies within the 90 days after the Insured's death.

It may happen that a Trust is the Owner and is a beneficiary for life insurance proceeds under this policy, and is authorized by the terms of the Trust Instrument to purchase insurance on the life of the Insured's spouse. In this case, even if the SPPO Rider states otherwise, the Trust may purchase the paid-up life insurance. This purchase must be made in accordance with the provisions of the rider and as described in this endorsement. The Company has the right to obtain a copy of the Trust Instrument.

Unless stated otherwise in this policy or in the policy for the paid-up insurance described in this endorsement, the beneficiary for that insurance will be the Owner, if living; otherwise, the estate of the Owner.

**NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION**

By _____
                              President

_____
                              Secretary

**NEW YORK LIFE INSURANCE COMPANY**

By _____
                              President

_____
                              Secretary

5933-83

# ENDORSEMENT

This policy is issued in place of a previously issued policy with the same policy number or in place of part of a previously issued policy with the same policy number.

**NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION**

BY _Theodore J. Sweet_

_____
President

_Catherine A. Marrion_

_____
Secretary

New York,  JUNE 15, 2006
_____

8446-92

# RIDER

● **SPOUSE'S PAID-UP INSURANCE PURCHASE OPTION (SPPO)**

**Definitions** Any reference to an Insured under this rider includes both the Insured under the basic policy and any Other Covered Insured under any Term Insurance on Other Covered Insured rider attached to this policy.

**Benefit** If this rider is in effect at an Insured's death, the person who at that time is that Insured's spouse, has the right to purchase, without proof of insurability, a level amount of new paid-up life insurance on his or her own life, in accordance with the provisions of this rider. That Insured's spouse must be a beneficiary to whom all or part of the life insurance proceeds resulting from that Insured's death under this policy or its riders will be payable in one sum.

**How Much Insurance May Be Purchased**
The largest amount of paid-up life insurance which may be purchased is the amount of the insurance proceeds, applicable to that Insured, which is payable in one sum, to that Insured's spouse who is the beneficiary. The amount of insurance refers to amounts provided by the basic plan of insurance and/or by any Term Insurance on Other Covered Insured rider attached to the policy, plus any insurance (excluding accidental death benefits) from riders or dividends and which is payable in one sum (prior to deducting any unpaid loan). However, the amount of paid-up insurance which may be purchased will be reduced by any increase in the life insurance benefit resulting from any unscheduled premiums paid under the basic policy during the 24 month period prior to the date of the Insured's death.

In addition, the actual amount which can be purchased on any one person must meet our minimum amount requirements.

The maximum amount of insurance which can be purchased on any one person can never be greater than the lesser of: (a) the amount which can be purchased by the life insurance proceeds (prior to deducting any unpaid loan) which the Insured's spouse is entitled to receive in one sum because of that Insured's death, or (b) 5 million dollars.

**Premium for New Insurance** The single premium rate for the new paid-up life insurance is based on the spouse's age and sex on the date the new insurance takes effect. This rate will not be more than 105% of the net single premium for paid-up life insurance, defined in the Values provision of this rider.

**Purchase of New Insurance** The Insured's spouse can apply to purchase the new paid-up life insurance before we have paid life insurance proceeds under the policy to him or her. However, he or she must apply within the 90 days after the Insured's death.

The new paid-up life insurance will be available in a policy issued by New York Life Insurance Company or by one of its affiliated companies. It will have the same provisions as are in the series of policies being issued by the new insuring company on its policy date.

The paid-up life insurance will take effect on the date when all three of the following events have taken place:

1.  The spouse's signed application is received by us while he or she is living.

2.  We determine the life insurance proceeds payable to the spouse.

3.  The entire single premium for the paid-up life insurance purchased under this rider has been received by us.

We will reduce the life insurance proceeds in item 2 to pay the single premium for the paid-up life insurance. If these proceeds are not sufficient to pay that entire single premium, then the balance of that premium must be paid to us before any such insurance will take effect.

It may happen that an Insured's spouse, who has the right to apply for paid-up life insurance under this rider, dies at the same time as that Insured, or within 90 days after that date and before that paid-up insurance takes effect. In these cases, provided the Insured's spouse's death did not result from suicide, while sane or insane, we will pay the maximum amount of

(over)

919-385

**SPOUSE'S PAID-UP INSURANCE PURCHASE OPTION (continued)**

paid-up life insurance that the spouse could have applied for under this rider, less the applicable single premium for that insurance.

The beneficiary for any paid-up life insurance payable under a policy issued in connection with this rider will be the estate of that insured's spouse, unless stated otherwise in the policy for that insurance.

**Availability of Riders**  Riders may not be included with the new paid-up life insurance.

**Suicide Exclusion**  Suicide of the insured's spouse, while sane or insane, within two years after the date of the insured's death, is not covered by this rider. In the event of the spouse's suicide within that two year period, any single premium paid for any new paid-up life insurance will be refunded.

**Values**  The new paid-up life insurance has cash value and loan value, and is eligible for dividends. However, it is not expected that any dividends will be payable on this insurance.

The net single premiums and the cash values for the paid-up insurance are based on the 1980 CSO Tables of Mortality. Continuous functions are used. Interest is compounded each year at 4%.

**Contract**  The rider is made a part of the policy to which it is attached at issue of the policy. If added to a policy which is already in force, this rider is made a part of that policy, based on the application for the rider.

**Incontestability of Rider**  We will not contest this rider if it is attached at issue of the policy.

If this rider is added to a policy which is already in force, we will not contest the rider after it has been in force during the lifetime of the insured for 2 years from the date of issue of the rider.

**Dates**  This rider and the basic policy have the same date of issue, unless the rider is added to a policy which is already in force. In this case, the date of issue of this rider is shown in an add-on rider which we put in the basic policy.

**When Rider Ends**  You can cancel this rider as of any date. To do this, a signed notice must be sent to us within 31 days of that date. This rider ends if the basic policy ends, is surrendered, or is exchanged for a new policy.

NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION

By _____

_____
President

_____
Secretary

**New York Life Insurance and Annuity Corporation**

51 Madison Avenue
New York, N.Y. 10010

A Stock Company Incorporated in Delaware

**Universal Life Insurance Policy**

Adjustable Life Insurance Benefits-Flexible
Premium Payments. Life Insurance Benefit
Payable if Insured Dies Before Maturity Date.
Cash Value Payable if Insured is Living on
Maturity Date. Interest Credited on Cash Value
at Rate Set by Corporation.
No Premiums Payable on or After Age 100

Policy is Non-Participating

898-50A.14

Q0444185

**LIFE INSURANCE APPLICATION (PART I) TO:**

NEW YORK LIFE

☐ NEW YORK LIFE INSURANCE COMPANY (NYLIC)   51 Madison Ave., New York, N.Y. 10010
☐ NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION (NYLIAC) (A Delaware Corp.) 51 Madison Ave., N.Y., N.Y. 10010

☑ New Application   ☐ Amend Application Dated / /   ☐ Reinstatement   ☐ Change Request }  Pol. No. _____   ☐ Conversion ☐ Att age ☐ Orig age
☐ GIO/PPO/GIR/SPO

**1. PERSON PROPOSED FOR COVERAGE**

| Present Occupation and Duties | Mecca Farms owner |

☐ Proposed insured is also an OCI under OCI or 5YT Rider(s)

Sex ☑ M ☐ F   Title ☑ Mr. ☐ Mrs ☐ Ms ☐
First/MI Name
LAST NAME   M E C C A
☐ Maiden ☐ Known as
Born MO/Y
Soc. Sec.
Address Street
City
State F L  Zip 3 3 4 6 2   Time Yrs/Mos 0 2 / 0 0
Prev Str (within 5 yrs)
City
State   Zip   Time Yrs/Mos

Employer Address Street
City
State   Zip   Time Yrs/Mos
Prev Occupation(s) and Duties (within 2 yrs)
Previous Employer
Previous Street
City
State   Zip   Time Yrs/Mos
Mail Addr ☐ Res ☐ Bus
Telephone (Home)
Telephone (Business)
Best time to call between 7AM-9PM EST   ☐ AM   ☐ PM

Birthplace State, City, BUFFALO, NY

**2.**

| | NYLIC | NYLIC | NYLIC | NYLIC | | NYLIC | NYLIC | NYLIC |
|---|---|---|---|---|---|---|---|---|
| PLAN | ☐ WL ☐ MPWL | ☐ IPT | ☐ ART70 | ☐ 5YT | | ☐ VUL | ☐ VL P | ☐ SPL |
| Amount | $ | $ | $ | $ | | $ | $2,500,000 | $ |
| DF | | | | | | OPTION ☐ 1 ☐ 2 | OPTION ☐ 1 ☐ 2 | $ |
| Premium | $ | $ | $ | $ | | | | $ |
| APL | ☐ Yes ☐ No | | | | | | | |
| RIDERS | ☐ WP | ☐ WP | ☐ WP | ☐ WP | | Sched. | Sched. | |
| | ☐ ADB | ☐ ADB | ☐ ADB | ☐ ADB | | Initial | Initial | |
| | $ | $ | $ | $ | | $ | $ | |
| | ☐ OPP ☐ COM | ☐ PPO | ☐ LBR | ☐ 5YTR PI | | | | |
| | Scheduled Bill | $ | ☐ | $ | | ☐ MDW | ☐ MDW | ☐ LBR |
| | $ | ☐ LBR | | ☐ LBR | | ☐ ADB | ☐ ADB | ☐ |
| | Unscheduled (Lump Sum) | ☐ | | ☐ | | $ | $ | |
| | $ | | | | | ☐ GIR | ☐ GIR | |
| | ☐ DOT | | | | | $ | $ | |
| | $ | | | | | ☐ OCI PI | ☐ OCI PI | |
| | ☐ PPO | | | | | $ | $ | |
| | $ | | | | | ☐ LBR | ☐ LBR | |
| | ☐ 5YTR PI | | | | | ☐ | ☐ | |
| | $ | | | | | | | |
| | ☐ IPTR | | | | | | | |
| | $ | | | | | | | |
| | ☐ LBR | | | | | | | |
| | ☐ UR* | *PLEASE ANSWER Q.18(a) IF UR RIDER IS CHOSEN | | | | | | |

Note: For Riders covering other insureds, use Multilife application form

DIVIDEND OPTION (Select one)   ☐ 1YT & ☐ Pd. Up Addn ☐ Accum ☐ Premium ☐ Cash ☐   Note: For NYLIC plans only

1

Q0444185

## INSURANCE IN FORCE OR PENDING

|  | Yes | No |  |
|---|---|---|---|
| Do you have other Life Insurance (all Companies) in force? | ☑ | ☐ | If "Yes", Total Amount in all Companies $ 3,000,000 |

|  | Yes | No |  |
|---|---|---|---|
| Do you have other Life Ins. (all Cos.) pending or issued in last year? | ☑ | ☐ | If "Yes", Company Travelers |
|  |  |  | Amount $ 1,000,000 Plan U.L. No. |

## 3. ENDORSEMENTS AND OTHER REQUESTS

| U.S. Tax Qualified: | ☐ TSA | ☐ Pens. Trust | ☐ Keogh | ☐ Keogh with Lt. Jt. Control ☐ |
|---|---|---|---|---|
| Split Dollar: | ☐ Basic | ☐ Estate | ☐ Contributory | ☐ Non-Contributory |
| Pension Option | ☐. Yes | "Non-Trsf." Option ☐ Yes | Reduced Pd. Up at lapse | ☐ Yes |

Preliminary Term to Mo / Dy / Yr    /    /    (available on WL, MPWL only)    Note: Policy Date question is not applicable if prelim. term

## 4. MODE ☑ Ann ☐ Semi ☐ Qrtly ☐ COM ☐ Nyla ☐ Govt ☐ Arr. for U.S. Tax Qual. Plan ☐

## 5. POLICY DATE If no "other date" is shown, policy date is:
(a) later date of Part I and any required Part II, if cash paid with Part I; or
(b) the policy's date of issue, if cash not paid; or
(c) the option date, if insurability option being exercised; or
(d) OTHER . . Mo / Dy / Yr
DATE    /    /
(e) the policy's date of issue, if the policy is a Variable Adjustable Life policy.

## 6. REPLACEMENT
Is the insurance applied for intended to replace, in whole or in part, any existing insurance or annuity?  ☐ Yes ☑ No
Company                    Pol. No.                    Plan                    Amount $
Is it a 1035 Exchange?  ☐ Yes ☑ No    If more than one policy being replaced, use Details, Q. 18.

## 7. BENEFICIARY (Subject to change. Complete as applicable.)

| ☐ Spouse | ☑ Estate |
|---|---|
| ☐ 1st. Spouse | ☐ 1st. Spouse |
| 2nd. Children of marriage | 2nd. Children of marriage and legally adopted |
| ☐ 1st. Spouse | ☐ 1st. Spouse |
| 2nd. Children of marriage and named children | 2nd. Named children |

For children, if trustee during minority is to be named:
Name of Trustee ..                    Relationship of Trustee to Insured

| ☐ Named Beneficiaries (indicate Order as 1st, 2nd, etc.) | |
|---|---|
| Order    Full Name | Relationship |

Note: For the following designations, use the above section
- Fractions (Specify order, shares, full names and relationships)
- Trust Agreement (give Name of Trustee and Date of Trust)
- Last Will and Testament (Indicate "Testamentary Trust")

- Uniform Transfers to Minors (recommend Estate of Insured)
- Creditors (——"as interest may appear; bal, if any, to"——)
- Split Dollar. (Pt A, bus. Pt B, pers; recommend B, Est of Insd
- Other        if Basic; Est of last surv bene if Est Tx)

## 8. CURRENT HEALTH

|  | Yes | No |
|---|---|---|
| (a) In the last 2 years: have you been unable to work or unable to attend school or been disabled for one month or more? | ☐ | ☑ |
| (b) In the last 2 years, have you been in a hospital or other medical facility for more than 5 consecutive days? | ☐ | ☑ |
| (c) Are you consulting or intending to consult a physician for any reason (excluding minor colds)? | ☐ | ☑ |

Note: If "Yes" to question 8(a) or 8(b), cash CAN NOT be paid and an Application Part II must be completed in all cases.

9(a) Answer if cash is intended to be paid with this application. Is it agreed that cash will be received subject to the terms of the
attached receipt, that any coverage will be provided only as stated in the attached receipt and only if all conditions to
coverage are met, and that any such coverage will be temporary and limited in amount?
If "No" to 9(a), or if Questions 8(a) or 8(b) are answered "Yes", cash can not be paid.

Yes ☐  No ☑

(b) TOTAL CASH PAID? $                    If amendment, cash previously paid: $

997-501.15                    2

Q0444185

**10.** Is a spouse or dependent child applying for SCI/CI Ins. coverage? (If yes, this form must not be used; use MultiLife application form) Yes ☐ No ☑

| 11. INSURANCE ON CHILD? Answer if Proposed Insured is under 14 yrs. 6 mos. (Explain any "No" in Details, Q. 18.) | Yes | No |
|---|---|---|
| (a) Is Applicant a parent or legal guardian (attach proof of guardianship) of Proposed Insured? | ☐ | ☐ |
| (b) Is Applicant employed and providing Proposed Insured's main support? | ☐ | ☐ |
| (c) Is all life insurance in force on Applicant at least equal to that on Proposed Insured? | ☐ | ☐ |
| If Child resides in NY and age is over 4 yrs 6 mos is amount in force on applicant at least equal to amount on Child? | ☐ | ☐ |
| If Child resides in NY and age is under 4 yrs 6 mos is amount in force on applicant at least equal to 2 times amount on Child? | ☐ | ☐ |
| (d) Are all other children in family insured or to be insured for an amount at least equal to that on Proposed Insured? | ☐ | ☐ |

**12. TOBACCO/NICOTINE**

| | Yes | No |
|---|---|---|
| If age 20 or over on Policy Date, have you used tobacco or nicotine in any form in the last 5 years? | ☐ | ☑ |
| If "Yes", indicate type used _____ date of last use (Mo/Yr) / | | |

**13. UNDERWRITING DATA**

(a) In last 2 years, have you engaged in or do you now intend to engage in? If "Yes", submit Form 7663
aircraft flying other than

| | | | | | |
|---|---|---|---|---|---|
| as a passenger | ☐ Yes ☑ No | scuba diving | ☐ Yes ☑ No | ultralight flying | ☐ Yes ☑ No |
| motorcycle driving | ☐ Yes ☑ No | ballooning | ☐ Yes ☑ No | mountaineering | ☐ Yes ☑ No |
| snowmobile driving | ☐ Yes ☑ No | parachuting | ☐ Yes ☑ No | rodeo riding | ☐ Yes ☑ No |
| motorized racing | ☐ Yes ☑ No | hang gliding | ☐ Yes ☑ No | | |

Each part of this ques. is answered: ☑ No

(b) In last 5 years, have you been arrested, convicted or imprisoned for any reason or had your driver's license suspended or revoked? Yes ☐ No ☑
If yes, give details, dates, driver's lic. # and State of lic. in Details, Q. 18.

(c) In last 2 years, have you been declined for issue, reinstatement or renewal of any type of Life or Health insurance? Yes ☐ No ☑
If "Yes", give Company name and reason in Details, Q. 18.

(d) In last 2 years, have you traveled or resided outside the U.S. or Canada or do you intend to do so within the next 12 mos? Yes ☐ No ☑
If "Yes", give Where, When, How long in Details, Q. 18.

Details are required for all "Yes" answers to Ques. 14-17. Do not answer Ques. 14-17 if a Part II is required.

**14. MEDICAL UNDERWRITING**

(a) In last 10 years have you had or been treated for:

| | | | | | |
|---|---|---|---|---|---|
| heart trouble | ☐ Yes ☑ No | irregular pulse | ☐ Yes ☑ No | cancer | ☐ Yes ☑ No |
| angina | ☐ Yes ☑ No | hypertension | ☑ Yes ☐ No | tumor | ☐ Yes ☑ No |
| stroke | ☐ Yes ☑ No | diabetes | ☐ Yes ☑ No | | |

Each part of this ques. is answered: ☐ No

(b) In last 10 years have you been counseled, treated, or hospitalized for:

| | | | | | |
|---|---|---|---|---|---|
| psychiatric condition | ☐ Yes ☑ No | emotional condition | ☐ Yes ☑ No | mental health condition | ☐ Yes ☑ No |

Each part of this ques. is answered: ☐ No

(c) In last 10 years have you used cocaine,

| | | | |
|---|---|---|---|
| or other controlled substance | ☐ Yes ☑ No | or have you been counseled, treated or | ☐ Yes ☑ No |
| | ☐ Yes ☑ No | hospitalized for drug use | |

Each part of this ques. is answered: ☐ No

(d) In last 10 years have you been absent from work because of alcohol use

| | | |
|---|---|---|
| or have you been counseled, treated or hospitalized for alcohol use | ☐ Yes ☑ No | |
| | ☐ Yes ☑ No | |

Each part of this ques. is answered: ☐ No

**15.** In last 2 years have you had or been treated for:

(a) unexplained weight loss ☐ Yes ☑ No

| | | | | | |
|---|---|---|---|---|---|
| swollen glands | ☐ Yes ☑ No | recurring fever | ☐ Yes ☑ No | pneumonia | ☐ Yes ☑ No |
| recurring diarrhea | ☐ Yes ☑ No | recurring infection | ☐ Yes ☑ No | thrush | ☐ Yes ☑ No |
| | | persistent cough | ☐ Yes ☑ No | | |

Each part of this ques. is answered: ☑ No

(b) edema ☐ Yes ☑ No

| | | | | | |
|---|---|---|---|---|---|
| transient visual loss | ☐ Yes ☑ No | muscle weakness | ☐ Yes ☑ No | shortness of breath | ☐ Yes ☑ No |
| | | back or spine disorder | ☐ Yes ☑ No | internal bleeding | ☐ Yes ☑ No |

Each part of this ques. is answered: ☐ No

**16.** In last 5 years have you been diagnosed by a member of the medical profession for:

(a) chronic respiratory disorder ☐ Yes ☑ No

| | | | | | |
|---|---|---|---|---|---|
| kidney disorder | ☐ Yes ☑ No | blood disorder | ☐ Yes ☑ No | seizures | ☐ Yes ☐ No |
| intestinal disorder | ☐ Yes ☑ No | circulatory disorder | ☐ Yes ☑ No | other nervous system disorder | ☐ Yes ☐ No |

Each part of this ques. is answered: ☐ No

(b) liver disorder ☐ Yes ☑ No

| | | |
|---|---|---|
| pancreas disorder | ☐ Yes ☑ No | immune system disorder (including AIDS or AIDS-Related Complex) ☐ Yes ☐ No |

Each part of this ques. is answered: ☐ No

**17.** Your height (ft., in.) 5  8    Your weight (lbs.) 152

997-501-15

3

Q0444185

18. Details: Give nature and severity, dates and duration, treatment, including prescription medication, and results for each "Yes" answer to questions 14, 15 and 16. Also use this space for any other additional details and special requests. (Indicate Ques. No. if applicable).

| Q.# | Details | Name, Addr of Dr./Hosp. |
|---|---|---|
| 14A | high blood pressure dx ~5 yrs ago | Dr. Palilla, Lake Worth, FL |

18(a) Answer For UR rider only:
2  Have you been continuously employed for the past two years?  ☐ Yes  ☐ No
   Have you received unemployment benefits in the last two years?  ☐ Yes  ☐ No

18(b) You may designate a secondary addressee, as follows:
1/20 Name:
     Address:

**19. APPLICANT (if not Prop. Insd)**

First/Mid Name
LAST NAME & Suffix
Born M/D/Y  |  /  |  /
Soc Sec  |  -  |  -  |  Tax ID#  |  -  |
Relationship to Proposed Insured
☐ Spouse  ☐ Parent  ☐ Employer  ☐

Address  ☐ Same as PI Res  ☐ Same as PI Bus  ☐ other as follows

Street
City
State  |  Zip  |  +  |
Employer
Business Street
City
State  |  Zip  |  +  |  Mail Addr  ☐ Res  ☐ Bus

**20. OWNER (if not Prop. Insd)**

First/Mid Name
LAST NAME & Suffix
Born M/D/Y  |  /  |  /
Soc Sec  |  -  |  -  |  Tax ID#  |  -  |
Relationship to Proposed Insured
☐ Spouse  ☐ Parent  ☐ Employer  ☐

Mail Addr  ☐ Same as PI's  ☐ Same as Applic's  ☐ Other as follows
☐ Check if multiple owners. Give add'l name, birthdate, SS#, relationship in Details, Q. 18. Unless otherwise specified in Question 18, if more than one owner is shown, ownership will be joint with right of survivorship.

Street
City
State  |  Zip  |  +  |
If Corp. Place Inc.
Successor Owner  ☐ PI  ☐ as below
Relationship to Prop Insd
Name
Date Inc.  |  MO  DAY  YR

997-501.15

4

REDACTED

**AMERICAN VIATICAL SERVICES**
280 Heritage Walk
Woodstock, Georgia 30188-3875

**MORTALITY PROFILE**

Report on:                                    Walter

Social Security Number:
Date of Birth:

Report Requested By:              Peachtree Settlement Funding
                                  5085 Avalon Ridge Parkway
                                  Suite 600
                                  Norcross, Georgia 30071

Attention:                        Tim Pritts
Phone:                            (800) 600-9161
Fax:                              (800) 600-7161

American Viatical Services has reviewed in detail the medical records forwarded to our company on Louis Walter by Peachtree Settlement Funding including the attending physician's medical records, laboratory records and radiology reports dated 12/09/92 through 07/18/00.

Louis Walter is a 79-year-old Caucasian male who has a history of diabetes mellitus (poorly controlled), alcoholic gastritis, hyperlipidemia, degenerative arthritis, hypertension and coronary artery disease (with a stress test positive for ischemia in 1981). His compliance appears poor, considering his weight of 260 pounds at 5 feet 8 inches tall.

<u>Summary of Physician's Findings:</u>

According to the medical records, in April 2000, Louis Walter's blood pressure was elevated at 185/90 mm Hg. He had recently undergone disc surgery and an EKG showed multiple premature ventricular contractions. He continued to be treated with Glucophage, Glucotrol and Vasotec; Rezulin was changed to Evandia. Mr. Walter also experienced an increasing blood urea nitrogen level (indicating early renal dysfunction). The following day, he started insulin and Lipitor. Despite the addition of Evandia to his medical regimen, his blood glucose was still elevated at 174 mg/dl in May 2000; the physician increased his doses. In July 2000, he presented with ongoing "bad neuropathy" while taking 3 to 5 Neurontin per day. He was told to persist and increase his doses. Results from an MRI of his lumbar spine with Gadolinium showed postoperative changes, diffuse degenerative changes (most significant at L2-L3) and a small extrusion present at L3-L4. After receiving increased doses of Neurontin and an epidural injection, he felt amelioration in late July 2000. It is noteworthy that he physician's notes were highly illegible.

<u>Impression:</u> The projected life expectancy for Louis Walter is 48 months.

REDACTED

**AMERICAN VIATICAL SERVICES**
280 Heritage Walk
Woodstock, Georgia 30188-3875

**MORTALITY PROFILE**

Report on:                     . Walter

Social Security Number:
Date of Birth:

**Current Prognosis for Mortality Profile:**          48 months
**Table Rating: (M&R)**                               760%
                                                      Without a life threatening illness

_____          November 29, 2000
J. Herbert West, MD                       Date

State of Georgia

County of Cobb

I, _Louise Leinmiller_____, a notary public in and for said state and county do
hereby certify that J. Herbert West, MD, personally known to me to be the same person whose name is
subscribed to the foregoing statement, appeared before me this day in person, and acknowledged that he
signed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein
set forth.

Given under my hand and official seal, this __29th__ day of _November_ A.D. 2000.

_____
Notary Public

My Commission Expires: _____**June 15, 2004**

REDACTED



**Hartford Life and Annuity Insurance Company**

National Service Center
505 Highway 169 North
Mpls, MN 55441-6400

TEAM #   VP-HAF

Hartford Life Insurance Company

FOR POLICY :                         ~ Walter

The Hartford Life Insurance Companies are hereby authorized to modify my
application for this policy. This modification is to form a part of my application
and a copy attached to the policy so that this policy is issued with:

Answers to questions 5g & 8; Policy is a Internal Replacement / Section 1035
Exchange from
contract number U01560549 on the life of          Walter

Date of Issue is  July 28, 1998 for face amount of  $5,000,000.00

The Suicide and Incontestability provisions have been amended to read:
"for two years from the Date of Issue indicated on this Modification."

☐ Hartford Life Insurance Company
☒ Hartford Life and Annuity Insurance Company

Hartford Life

## PART A

### 1. PROPOSED INSURED INFORMATION -Complete for all Applications.

| a. Name of Proposed Insured  *WALTER* | b. Age *78* | c. Sex *M* | f. Date of Birth | h. Social Sec. No. |
| | d. Height *5'9"* | e. Weight *185* | g. Place of Birth  *TEXAS* | |
| i. Residence Address | j. How Long? *4+ yes.* | | k. Former Residence | l. How Long? *30+ yes.* |
| m. City. State Zip | | | n. City, State Zip | |
| o. Occupation/Duties  *REAL ESTATE DEVELOPER* | p. How Long? *40+ yes.* | | q. Employer's Name and Address | |

### 2. PROPOSED JOINT INSURED / OTHER COVERED INSURED INFORMATION Complete if Applicable.

| a. Name of Proposed Insured | b. Age | c. Sex | f. Date of Birth | h. Social Sec. No. |
| | d. Height | e. Weight | g. Place of Birth | |
| i. Residence Address (if different from above) | j. How Long? | | k. Former Residence | l. How Long? |
| m. City, State Zip | | | n. City, State Zip | |
| o. Occupation/Duties | p. How Long? | | q. Employer's Name and Address | |

### 3. OWNER / BENEFICIARY INFORMATION- Complete for all Applications.

| a. Policy Owner Name and Address. | b. Soc. Sec. No. or Tax ID | c. Relationship to Proposed Insured(s) |
| | d. Owner is:  ☒ Individual  ☐ Partnership  ☐ Corporation  ☐ Trustee | |
| e. Primary Beneficiary(s).  Name(s) / Address / Soc. Sec. # | f. Relationship to Proposed Insured(s) | g. % of Death Benefit  *100* |
| h. Contingent Beneficiary.  Name(s) / Address / Soc. Sec. # | i. Relationship to Proposed Insured(s) | |

### 4. LIFE INSURANCE PLAN INFORMATION -Complete for all Applications.

| a. Name of Basic Policy  *STAG PROTECTOR VUL* | b. Face Amount of Policy (Indicate amount of Basic Face Amount and Supplemental Face Amount, if applicable)  *5,000,000* | h. Send Billing/Correspondence to Proposed Insured's  ☐ Residence  ☐ Business  ☒ Policy Owner  ☐ Other:_____ |

**c. Death Benefit Options** (Choose One)
☒ Option A (Level)        ☐ Option C ( Return of Premium)
☐ Option B (Return of Account Value)    ☐ Other

**d. Automatic Premium Loan** ☐ Yes  ☐ No  *N/A*

**e. Is this Insurance Part of a Qualified Retirement Plan?**  ☐ Yes  ☒ No
If "Yes", do you work on a full time basis?  ☐ Yes  ☐ No

**f. Is this Insurance Part of a Corporate Owned Life Insurance Plan?**  ☐ Yes  ☒ No
If "Yes", If you are an employee, have you been actively at work at least 30 hours per week for the past 90 days doing your usual duties at your normal place of work?  ☐ Yes  ☐ No

**g. Premiums to be Paid:**
☒ Annually  ☐ Semi-annually  ☐ Quarterly  ☐ COM

**i. Additional Benefits:**
☐ Waiver of Premium    ☐ Accidental Death Benefit
☐ _____% Increase in Face Amount for _____ Year(s)
  (Last Survivor Interest Sensitive Life Plans Only)
☐ Increase in Coverage Option Rider
  (Individual Variable Life Plans Only)
☐ Additional Insurance Benefit
  $ _____ Premium for _____ Year(s).
☐ Other: _____  ☐ See Attached Sheet

**j. Issue Policy if offered on a Special Class Basis ?** ☐ Yes ☐ No
Requested Policy Date: *8/22/00*

**k. Special Requests** (Attach Additional sheet if necessary.)
*INTERNAL EXCH FROM POL#*
*00157.0549*

Form HL-14622

APPLICATION CONTINUED

Printed in U.S.A.

**Part B**

## ANSWER THE FOLLOWING QUESTIONS AND GIVE DETAILS OF "YES" ANSWERS UNDER #[7] BELOW

| | Proposed Insured | | Proposed Joint /Other Covered Insured | |
|---|---|---|---|---|
| **5.** | YES | NO | YES | NO |
| a. **DURING THE PAST 5 YEARS HAVE YOU CONSULTED A PHYSICIAN OR VISITED A CLINIC OR HOSPITAL AS A PATIENT?** | ☐ | ☐ | ☐ | ☐ |
| b. Have you had insurance rejected or offered with an extra premium? | ☐ | ☐ | ☐ | ☐ |
| c. Do you plan to travel or reside outside the United States?(If yes, state when, where, how long.) | ☐ | ☐ | ☐ | ☐ |
| d. Have you smoked cigarettes in the past 12 months? | ☐ | ☐ | ☐ | ☐ |
| e. Have you used any other form of tobacco or nicotine replacement therapy in the past 12 months (for example - cigars, pipes, chewing tobacco, nicorette gum, nicotine patch or nasal spray)?  (If yes, specify substance(s).) | ☐ | ☐ | ☐ | ☐ |
| f. Have you ever been arrested for drug possession, or had or been advised to have treatment for alcohol or drug abuse? | ☐ | ☐ | ☐ | ☐ |
| g. Will you replace or change life insurance or annuities in any company if this policy is issued? If "yes", give details. | ☐ | ☐ | ☐ | ☐ |
| 6.  **HAVE YOU EVER HAD OR BEEN TREATED FOR:** | | | | |
| a. Diabetes, heart attack, angina, chest pain, stroke, heart murmur, high blood pressure, or other heart, blood or circulatory disorder? | ☐ | ☐ | ☐ | ☐ |
| b. Emotional or nervous disorder, epilepsy, convulsions, brain or spinal cord disorder, cancer or tumor? | ☐ | ☐ | ☐ | ☐ |
| c. Any disease of the kidney, liver, lung, lymph glands, muscles, bones, stomach or intestines, AIDS, AIDS Related Complex or any immune deficiency disorder? | ☐ | ☐ | ☐ | ☐ |

| Question Number | Name of Person | 7. Give complete details including Names and Addresses of Doctors and Hospitals. |
|---|---|---|
| | | |
| | | |
| | | |

| 8. Do you have life insurance in force or applied for? Give Company, Amount, Plan, Issue Years, Ownership and if Waiver of Premium or Accidental Death Benefits are included. | |
|---|---|
| Proposed Insured    YES ☐    NO ☐ | Proposed Joint Insured    YES ☐    NO ☐ |
| | |
| | |
| | |

**9.  VARIABLE LIFE PLAN INFORMATION -Complete if Applicable.**

a. Dollar Cost Averaging Option ☐YES ☒NO
(Available on an Annual Mode Only)

b. Guarantee Period   *N/A*

b. Net Premium Allocation. Select up to 9 Subaccounts.
(0 or minimum of 10%. Must total 100%)
If using supplement, disregard this section.

| Suitability | YES | NO |
|---|---|---|
| c. Do you believe that this policy will meet your insurance need and financial objectives? | ✓ | |
| d. DO YOU UNDERSTAND THAT THE AMOUNT AND DURATION OF THE DEATH BENEFIT MAY VARY, DEPENDING ON THE INVESTMENT PERFORMANCE OF THE VARIABLE ACCOUNTS IN THE SEPARATE ACCOUNT? | ✓ | |
| e. DO YOU UNDERSTAND THAT THE POLICY VALUES MAY INCREASE OR DECREASE, DEPENDING ON THE INVESTMENT PERFORMANCE OF THE VARIABLE ACCOUNTS IN THE SEPARATE ACCOUNT? | ✓ | |
| f. Did you receive the separate account prospectus for the policy applied for? | ✓ | |

g. Date of Separate Account Prospectus: *5-1-00*

| FUND NAME | % ALLOCATED |
|---|---|
| | % |
| | % |
| | % |
| | % |
| | % |
| | % |
| | % |
| FIXED ACCOUNT | *100* % |

Form HL-14622                    APPLICATION CONTINUED                    Printed in U.S.A.

| Part C | | Proposed Insured | | Proposed Joint/Other Covered Insured | |
|---|---|---|---|---|---|
| **HAZARDOUS ACTIVITIES OF PROPOSED INSURED(S) - Complete for all Applications.** Please answer all questions "Yes" or "No." Explain "yes" answers in the space provided. | | | | | |
| **10.** | | YES | NO | YES | NO |
| a. Within the past 3 years, have you been convicted of, pleaded guilty or no contest to: (I). three or more moving violations and/or accidents? (II). driving under the influence of alcohol and/or drugs? If "yes", explain: | | ☐ ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ |
| b. Have you ever been convicted of a felony or misdemeanor other than a minor traffic violation? If "yes", explain: | | ☐ | ☐ | ☐ | ☐ |
| c. Are you a member, or do you intend to become a member, of the armed forces, including the Reserves? If "yes", explain: | | ☐ | ☐ | ☐ | ☐ |
| d. Except for vacation trips, do you intend to travel outside the U.S. or Canada within the next two years? If "yes", explain: | | ☐ | ☐ | ☐ | ☐ |
| e. Do you participate in aeronautics (hang-gliding, soaring, sky-diving, ballooning, etc.)? If "yes", explain: | | ☐ | ☐ | ☐ | ☐ |

| Jumps/Flights per year | Total # of jumps/Flights | Name of Club | Date Last Jump/Flight |
|---|---|---|---|
| | | | |

| f. Do you race, test or stunt drive automobiles, motorcycles, motor boats, or jet powered vehicles, or do you use or race snow mobiles, dirt bikes, dune buggies, etc.? If "yes", complete below: | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|

| Type of vehicle | Type of terrain/race/course | # of Races or Uses/year | Date of Last Race or Use |
|---|---|---|---|
| | | | |

| g. Do you participate in skin or scuba diving? If "yes", complete below: | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|

| Depth of Dives | # of Times per Year | Name of Club | Date of Last Dive |
|---|---|---|---|
| | | | |

| h. Do you participate in any other hazardous sports or activities (mountain climbing, competitive skiing, rodeos, etc.? If "yes", explain: | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|
| i. Have you ever engaged in or do you plan to engage in any aviation activity other than as a fare-paying passenger? If "yes", complete the remainder of this section. | ☐ | ☐ | ☐ | ☐ |

j. What types and kinds of planes do you fly or intend to fly?

| PERSON | FLIGHT STATUS | PILOT-MILITARY OR RESERVE | PILOT-CIVILIAN | CREW MEMBER |
|---|---|---|---|---|
| | Hours flown Past 12 Mos. | | | |
| | Hours flown 1-2 yrs. ago | | | |
| | Hours next 12 Months | | | |
| | Total Solo Hours | Total Hours Flown as a Pilot | | Date of Last Flight |

k. Type of Pilot's Certificate(s) or Rating(s)? (check as appropriate)
☐ Student    ☐ Private    ☐ Commercial    ☐ ATR    ☐ IFR
Year Issued: _____

l. If aviation avocation does not qualify for aviation coverage without additional premium, issue policy as follows:
☐ Aviation Coverage with Extra Premium    ☐ Aviation Exclusion Rider

REMARKS - IDENTIFY QUESTION, PROPOSED INSURED, AND ADDITIONAL DETAILS

Form HL-14622                          APPLICATION CONTINUED                          Printed in U.S.A.

**Part D**

**11.** AGREEMENT AND ACKNOWLEDGEMENT - Complete for all Applications.

Each of the undersigned declares that: the statements and answers contained in this application are complete and true to the best of each person's knowledge and belief; and each agrees that coverage can take effect only if the Proposed Insured(s) is/are alive and all answers material to the risk are still true and complete when the policy is delivered and paid for. I/We agree that the statements and answers contained in this application shall form the basis of any contract for life insurance that may be issued; and, a copy of this application shall be attached to and made part of the policy. I/We have received a copy of the Company Compliance Illustration for the life insurance applied for herein.

I/We agree that only an Officer of the Company may alter the terms of the application, the Conditional Receipt or the policy, or waive any of the Company's rights or requirements.

Signed at _Beverly Hills, CA_ this _1st_ day of _November_ , _2000_ .

_____
Signature of Proposed Insured
(Parent or Guardian if under 15 years of Age)

_____
Signature of Proposed Joint Insured / Other Covered Insured
(Parent or Guardian if under 15 years of Age)

$ _____
Amount Received with Application

X _____
Signature of Applicant/Owner if other than Proposed Insured(s)

_____
Signature of Licensed Agent

**12.** AUTHORIZATION TO OBTAIN, RELEASE, AND DISCLOSE INFORMATION - Complete for all Applications.

I authorize Hartford Life Insurance Company or Hartford Life and Annuity Insurance Company (Hartford) to complete a Personal History Interview and to obtain an Investigative Consumer Report on me or on my children. I authorize the release of any medical or non-medical information that relates to: (1) past or current health conditions including illnesses; sicknesses; diseases; disabilities; disorders; accidents; or injuries; (2) confinements in any hospital; medical facility; or medical clinic; (3) outpatient treatment in any hospital; hospital emergency room; medical facility; or clinic; (4) treatment for alcohol abuse; drug abuse; or mental health protected by Federal Law.

This information may be released by any person or organization that has records or knowledge of my health or of the health of my children, if they are applying for insurance. This includes any doctor; medical professional; health practitioner; therapist; counselor; hospital; clinic; insurer; reinsurer; consumer reporting firm; employer or the Medical Information Bureau (MIB). This information may be released for the purpose of determining eligibility for insurance under a new or an existing policy.

This information may be released to Hartford or to their legal representative. I understand that the MIB will release records of information only to Hartford.

Hartford may release the information in their file(s) to: their reinsurers; the MIB; any other insurance company to whom I or my children apply for life or health insurance; or other persons and/or organizations performing business or legal services in connection with this application or a claim. Except as specified, this information will not be given, sold or transferred to any person without first obtaining my consent. This consent must be written and state the use and the need for such information.

I understand that if I request details about any of the medical information gathered about me or my children which relates to this application; (a) the medical information; and, (b) the identity of the medical care institution or the medical person who provided the information; shall be released to me or to a licensed medical person of my choice.

Upon written request, I will receive details of the method I must use to exercise my right to access, correct and amend any information gathered about me or my children which relates to this application. I may revoke, upon written request, the right to use this consent form except to the extent that action has already been taken. A photocopy of this consent form is as valid as the original. When requested in writing, I will receive a copy of this form. This consent form will expire: two years from the date of the contract; or, one year from the date below, if no contract has yet been issued.

Dated _11-1-00_                    Signed X _____
                                   Proposed Insured (Parent or Guardian if under 15 years of Age)

Dated _____            Signed _____
                                   Proposed Joint Insured / Other Covered Insured
                                   (Parent or Guardian if under 15 years of Age)

Form HL-14622                    APPLICATION CONTINUED                    Printed in U.S.A.

REDACTED



EXHIBIT 2

BEFORE THE
AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the matter of the arbitration between<br><br>LIFE RECEIVABLES TRUST,<br><br>                  Claimant,<br><br>      - against -<br><br>GOSHAWK SYNDICATE 102 AT LLOYDS,<br><br>                Respondent. | AAA Arbitration No. ____ |

## STATEMENT OF CLAIM

Claimant Life Receivables Trust ("LRT"), by its attorneys Seward & Kissel LLP, respectfully submits this Statement of Claim against Respondent Goshawk Syndicate 102 at Lloyds (the "Underwriters").

### Nature of Proceeding

1.    LRT is the "Assured" under a certain contingency insurance policy issued by the Underwriters as an integral part of a "life receivables" transaction. LRT brings this proceeding to recover payment for its claims under the policy in question. LRT also seeks damages it has or will incur as a result of the Underwriters' failure to fulfill their contractual obligations under the policy to make timely payment of LRT's claims. As discussed below, the Underwriters' obligations to pay LRT's claims are unconditional and absolute.

### The Life Receivables Transactions

2.    A life receivables transaction is the purchase of an existing life insurance policy from a policy holder. Once acquired, the new owner maintains the policy against the life

originally insured. Because the new owner continues to pay the insurance premiums when due, the death benefit ultimately is paid to the new owner on the death of the insured.

3.    If purchased at a price that reflects a sufficient discount from the amount of the death benefit, and accounting for the need to maintain premium payments over a period of time, the purchase of life insurance policies represent a form of investment.

4.    For each life insurance policy acquired, a professional estimator projects the life expectancy ("LE") of the insured and the potential yield from the investment is predicted on that basis. By assembling a portfolio of policies, the volatility of the investment can be reduced.

5.    Because the prospective investment return from the purchase of a policy can only be estimated due to the uncertainty surrounding the mortality of the insured, contingency insurance is used to cover the actuarial risk in the calculation of the LE.

**The Contingency Insurance Programme**

6.    LRT is the owner and beneficiary of certain life insurance policies purchased through a series of life receivables transactions for which Life Settlement Corporation ("LSC") acts as servicer. LSC, as servicer, purchases the life insurance policies and then assigns the policies to LRT. As long as the premiums on the life insurance policies are paid when due, LRT will be paid the Net Death Benefit ("NDB") on the death of the insured.

7.    In order to mitigate against the actuarial risk in the calculation of the LE of each insured, LRT negotiated and purchased certain contingency insurance policies from the Underwriters (collectively the "Contingency Insurance Programme"). Each contingency policy covers the risk associated with different life insurance policies that comprise LRT's portfolio.

8.    Pursuant to each of the contingency policies, the Underwriters agreed to pay the NDB to LRT once the insured reached the LE plus two years (the "Deferred Period"). On

2

**Redacted**

payment of the NDB to LRT, the Underwriters are assigned the life insurance policies by LRT

and thereafter maintain the policies by paying the premiums. As the new owners of the life

insurance policies, the Underwriters ultimately receive the NDB from the life insurance

companies on the death of the insured.

9.      The Contingency Insurance Programme has the effect of guaranteeing an absolute

back-stop date on receipt of the NDB for each life insurance policy in LRT's portfolio. With the

contingency policies in place, LRT's minimum investment return is based on receipt of the NDB

of each policy in its portfolio no later than the Deferred Period, i.e., the LE of each insured plus

two years.

**LRT's Purchase of the Wang Policies for the Portfolio**

10.      MONY Life Insurance Company of America issued Policy Nos. B11629405 and

B12008496 insuring          Wang (the "Wang Policies"). Wang's daughter and

beneficiary,      Wang, sold the Wang Policies to LSC for inclusion in LRT's portfolio.

11.      Each Purchase Agreement and Absolute Assignment of Life Insurance Policy

entered into between LSC and Ms. Wang (the "Purchase Agreements") was executed on August

8, 2000. (Copies of the Purchase Agreements (without exhibits) are attached as Exhs. A and B.)

12.      The Purchase Agreements clearly state that "[t]he payment of the Purchase Price

to Seller [i.e., Ms. Wang] shall constitute the Closing of the transactions contemplated by this

Agreement." See Exh. A at 2; Exh. B at 2.

13.      On August 18, 2000, LSC entered into an Assignment of Purchase Agreement

with LRT for each of the Purchase Agreements (the "Assignment Agreements"). Under each

Assignment Agreement, LSC transferred to LRT "all of its rights, title and interest in and to that

certain Purchase Agreement dated 8/1/00 between the undersigned [i.e., LSC] and      Wang."

3

The rights in the Purchase Agreements transferred by LSC to LRT included the rights to purchase the Wang Policies. (Copies of the Assignment Agreements are attached as Exhs. C and D.)

14.    On September 29, 2000, LSC drew down on the warehouse debt facility provided by Babcock & Brown to fund LRT's purchase of the Wang Policies.

15.    LRT, through Settlement Funding LLC, paid the purchase price under the Purchase Agreements for the Wang Policies to Ms. Wang on October 2, 2000. With the payment of the purchase price on October 2, 2000, the transactions contemplated by the Purchase Agreements closed. (Copies of the checks issued to pay for each of the Wang Policies are attached as Exhs. E and F.)

**The Contingency Insurance for the Wang Policies**

16.    The Wang Policies initially were covered by interim Contingency Policy No. CR000252 issued by the Underwriters to LRT, as the Assured (the "Interim Policy"). (A copy of The Interim Policy is attached as Exh. G.) In relevant part, the Interim Policy covered "all policies set forth on the attached Bordereaux." The Wang Policies were listed on the "Interim Tranche Bordereaux" attached to the Interim Policy. See Exh. G.

17.    The Interim Policy was superceded by Contingency Policy No. CR010054 (the "Contingency Policy"). In relevant part, the Contingency Policy provides that "Qualified Life Insurance Policies totalling US10,762,975 of Net Death Benefit previously insured under Policy number: CR000252 [i.e., the Interim Policy] are covered hereunder with effect from inception." (A copy of the Contingency Policy is attached as Exh. H.)

18.    Each of the Wang Policies is listed in the "Closing Policy Files Bordereaux – 1st Advance" attached to the Contingency Policy. See Exh. H.

19.    The "Period" of the Contingency Policy is defined, in relevant part, as follows: "This Insurance shall cover Qualified Life Insurance Policies purchased by the Assured [LRT] on or after September 20, 2000 . . . " See Exh. H at 3.

20.    Each of the Wang Policies is a "Qualified Life Insurance Policy" as that term is defined under the Contingency Policy. See Exh. H at 21.

21.    In exchange for the insurance afforded by the Contingency Policy, LRT caused a premium to be paid to the Underwriters ("Contingency Insurance Premium"). The Contingency Insurance Premium was calculated based on the NDB of "each and all Qualified Life Insurance Policies acquired by the Assured and declared hereunder," including the Wang Policies. See Exh. H at 24.

22.    The Contingency Policy limits the NDB for any one Qualified Life Insurance Policy (as defined in the Contingency Policy) to US$5 million. See Exh. H at 3.

23.    The "Recourse" section of the Contingency Policy provides for the Underwriters' unconditional liability for the payment of claims. In relevant part, paragraph 2 of the Recourse section provides that the Underwriters' "obligation to pay the full and complete Net Death Benefit to the Assured . . . is absolute, unconditional and irrevocable." See Exh. H at 16-17. The only exception to the Underwriters' unconditional obligation is failure to pay the Contingency Insurance Premium when due.

24.    LSC has paid the Contingency Insurance Premium on behalf of LRT when due.

25.    Under the Claims Procedures in the Contingency Policy, LSC, as the Servicer and as agent for LRT, is required to (a) on or prior to the 60th day before the expiration of any Deferred Period, deliver drafts of a Claim Certification and Effective Assignment of the applicable Qualified Life Insurance Policy, and a complete Insurance Policy File (all as defined

5

in the Contingency Policy) to the Underwriters; and (b) after the expiration of any Deferred

Period, deliver a Claim Certification (as defined in the Contingency Policy) to the Underwriters

to substantiate the amount of loss claimed under the Contingency Policy.  See Exh. H at 6-7.

26.     Under the Claim Procedures in the Contingency Policy, the Underwriters are

required to pay an amount equal to the aggregate NDB payable under the applicable Qualified

Life Insurance Policy on or prior to the 15th Business Day after receipt of a Claim Certification

accompanied by an Effective Assignment.  See Exh. H at 8.

27.     The Contingency Policy provides that "all disputes and differences arising under

or in connection with this Insurance shall be referred to arbitration under the American

Arbitration Association Rules" (the "Arbitration Clause").  See Exh. H at 23.

28.     The Arbitration Clause provides that "the losing party in any arbitration

commenced under the section entitled **Claim Adjustment Period** above or otherwise relating to

the payment of a Claim shall bear the costs and expenses of the other party and all other

Interested Persons involved in such arbitration." (emphasis in original).  Id.

**Submission of the Claims on the Wang Policies**

29.     The Deferred Period for the Wang Policies expired on July 19, 2005.

30.     On or about May 11, 2005, in accordance with the Claims Procedures in the

Contingency Policy, LSC, through its counsel Lord Bissell & Brook LLP, forwarded a draft

Claim Certification and other documentation for the Wang Policies to the Administrator for the

Underwriters, Cavell Management Services Ltd. ("Cavell").

31.     By letter dated July 20, 2005, LSC, through its counsel, forwarded a Claim

Certification for each of the Wang Policies to Cavell as required by the Claim Procedures in the

Contingency Policy.  (A copy of the July 20, 2005 letter (without exhibits) is attached as Exh. I)

6

**The Underwriters' Denial of the Wang Claims**

32.    By letter dated July 22, 2005 to LSC's counsel, Cavell, acting on behalf of the Underwriters, denied the claims for the Wang Policies. Cavell contended incorrectly that: (a) the Wang Policies were not acquired within the coverage period and therefore did not qualify for coverage under the Contingency Policy, and (b) the bordereau attached to the Contingency Policy misrepresented the "policy acquisition date" for the Wang Policies as September 29, 2000. (A copy of the July 22, 2005 letter is attached as Exh. J.)

33.    In a subsequent letter to LSC's counsel, dated August 1, 2005, Cavell offered to return the Contingency Insurance Premium paid with respect to the Wang Policies, but stated that it would not pay any interest on the returned premium because of the alleged misrepresentation in the bordereau for the Contingency Policy. (A copy of the August 1, 2005 letter is attached as Exh. K.)

34.    By letter dated August 8, 2005, Seward & Kissel LLP, as counsel for LRT, informed Cavell that LRT strongly disagreed with Cavell's coverage position and would respond to Cavell's July 22, 2005 and August 1, 2005 letters in due course. In the same letter, LRT rejected Cavell's offer to pay back the premium for the Wang Policies. (A copy of the August 8, 2005 letter is attached as Exh. L.)

35.    By letter dated August 17, 2005, counsel for LRT informed Cavell that Cavell's purported denial of the claims was wrong for several reasons, including the following: (a) the Wang Policies were covered under the Interim Policy that preceded the Contingency Policy; (b) the Wang Policies were purchased after September 20, 2000 (i.e., within the Period of the Contingency Policy); (c) the bordereau for the Contingency Policy does not misrepresent the "policy acquisition date" for the Wang Policies; (d) the Underwriters knowingly accepted the

7

Wang Policies for coverage and knowingly accepted premiums for the Wang Policies, and (e) the Underwriters' payment obligations under the Contingency Policy are unconditional and absolute. (A copy of the August 17, 2005 letter (without exhibits) is attached as Exh. M.)

36.    Despite LRT's counsel's detailed explanation of the reasons why coverage exists for the Wang Policies under the Contingency Policy, the Underwriters have refused to honor their contractual obligations to pay the claims on the Wang Policies.

37.    By letter dated September 12, 2005, Barger & Wolen LLP, as counsel for the Underwriters, reiterated the Underwriters' refusal to pay the claims on the Wang Policies. (A copy of the September 12, 2005 letter is attached as Exh. N).

38.    In accordance with the Claim Procedures in the Contingency Policy, payment on the claims on the Wang Policies was due on August 11, 2005, the 15th Business Day after receipt by the Underwriters of a Claim Certification for each of the Wang Policies.

**Claim for Relief**

39.    LSC and LRT have complied with their obligations under the Contingency Policy.

40.    The Underwriters are obligated to pay LRT the NDB for the Wang Policies under the Contingency Policy.

41.    By refusing to pay the NDB to LRT for each of the Wang Policies, the Underwriters have breached their contractual obligations under the Contingency Policy.

42.    Because of the Underwriters' breach of their contractual obligations under the Contingency Policy, LRT has suffered damages in an amount to be demonstrated.

WHEREFORE, LRT requests entry of awards against the Underwriters as follows:

(a)    Awarding compensatory damages in favor of LRT against the Underwriters in the amount of $5,012,975.00, the NDB for the Wang Policies payable under the Contingency Policy;

8

(b)    Awarding LRT loss of income on the NDB for the Wang Policies as of August 11, 2005, the date on which payment of the NDB for the Wang Policies was due;

(c)    Awarding LRT compensatory damages in an amount equal to any premiums paid by LRT to maintain the Wang Policies since August 11, 2005, plus interest;

(d)    Awarding LRT its costs and expenses incurred in this arbitration, including, but not limited to, its attorneys fees and expenses, filing fees, case service fees, and arbitrators' compensation and expenses, pursuant to the Arbitration Clause of the Contingency Policy;

(e)    Awarding LRT punitive damages in an amount sufficient to deter the Underwriters from wrongfully disclaiming coverage in the future under the contingency policies issued as part of the life receivables transactions; and

(f)    Awarding LRT such other and further relief as the Panel deems just and proper.

New York, New York
September 14, 2005

SEWARD & KISSEL LLP

Dale C. Christensen, Jr.
John J. Galban
Rachel A. Gupta
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Attorneys for Claimant Life Receivables Trust